1  NICOLA T. HANNA
   United States Attorney
2  DAVID M. HARRIS
   Assistant United States Attorney
3  Chief, Civil Division
   JOANNE S. OSINOFF
4  Assistant United States Attorney
   Chief, General Civil Section
5  DANIEL A. BECK (Cal. Bar No. 204496)
   Assistant United States Attorney
6        Federal Building, Suite 7516
         300 North Los Angeles Street
7        Los Angeles, California 90012
         Telephone: (213) 894-2574
8        Facsimile: (213) 894-7819
         E-mail: daniel.beck@usdoj.gov
9
   Attorneys for the Federal Defendants
10
              UNITED STATES DISTRICT COURT
11
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
12
                  SOUTHERN DIVISION
13

14 | CITY OF COSTA MESA AND | No. 8:20-cv-00368-JLS-JDE
   | KATRINA FOLEY, |
15 | | **FEDERAL DEFENDANTS'**
   |                 Plaintiffs, | **OPPOSITION TO PLAINTIFFS'** *EX*
16 | | *PARTE* **APPLICATION FOR**
   |        vs. | **TEMPORARY RESTRAINING ORDER**
17 | | **AND ORDER TO SHOW CAUSE RE**
   | UNITED STATES OF AMERICA, | **ISSUANCE OF PRELIMINARY**
18 | THE DEPARTMENT OF HEALTH | **INJUNCTION**
   | AND HUMAN SERVICES, THE |
19 | UNITED STATES DEPARTMENT OF | **[Declarations of Dr. Kevin Yeskey and**
   | DEFENSE, THE UNITED STATES | **Dr. Michael Bell filed herewith]**
20 | AIR FORCE, THE CENTERS FOR |
   | DISEASE CONTROL AND | Hearing Date:    February 24, 2020
21 | PREVENTION, THE STATE OF | Hearing Time:    2:00 p.m.
   | CALIFORNIA, FAIRVIEW | Courtroom:       10A, in Ronald Reagan
22 | DEVELOPMENTAL CENTER |                  Federal Building and
   | (FAIRVIEW), THE CALIFORNIA |                  Courthouse
23 | GOVERNOR'S OFFICE OF |
   | EMERGENCY SERVICES, and THE | The Honorable Josephine L. Staton
24 | CALIFORNIA DEPARTMENT OF | United States District Judge
   | GENERAL SERVICES, |
25 | |
   |                 Defendants. |
26
27
28                                1

# **TABLE OF CONTENTS**

I. INTRODUCTION AND SUMMARY ................................................................ 1

II. THE PLAINTIFFS' *EX PARTE* FILINGS, THE JASON S. DEMPSEY DECLARATION, AND THE ACOSTA EMAIL ................................. 4

    1. Plaintiffs' Amended Application ...................................... 4

    2. The Jason S. Dempsey Declaration ................................. 5

    3. The February 20, 2020 Acosta Email and its Proposals ................... 6

III. THE FEDERAL GOVERNMENT'S QUARANTINE AUTHORITY ................. 7

IV. COVID-19 AND ITS INFECTION CONTROL PROCEDURES ........................ 8

V. THE CURRENT PROPOSAL TO USE THE FDC FACILITY TO HOUSE ASYMPTOMATIC PERSONS ................................................................ 8

VI. LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER ............. 10

VII. ARGUMENT .......................................................................................... 11

    A. Plaintiffs Cannot Demonstrate a Likelihood of Success on their Procedural Due Process Claim. ...................................................... 11

    B. Plaintiffs Cannot Demonstrate a Likelihood of Success on their Substantive Due Process Claim. ..................................................... 13

    C. Plaintiffs' Administrative Procedure Act Claim Is Defective ................... 15

        1. There Is No Jurisdiction For Plaintiffs' APA Claim Because Plaintiffs Have Not Identified A Reviewable Final Agency Action. ............................................................................ 15

        2. Plaintiffs Have Not Submitted Evidence Of Any Final Agency Action That Is "Arbitrary, Capricious, An Abuse of Discretion, Or Otherwise Not In Accordance With The Law." ........................ 18

    D. The Tenth Amendment "Anti-Commandeering" Principle Is Not Even Superficially Applicable .................................................. 20

    E. Plaintiffs Have Not Established Standing To Sue ...................................... 21

i

F.    Plaintiffs' Belated "Further Statement Re Nuisance Claim" ...................... 22

G.    For The Current Federal Quarantine, Issuing Unmerited Temporary
      Injunctive Relief Threatens To Cause Serious Harm .................................. 23

VIII.  CONCLUSION .......................................................................................... 24

ii

# TABLE OF AUTHORITIES

<u>**Cases**</u>

<u>Albright v. Oliver</u>,
   510 U.S. 266 (1994)...................................................................................13

<u>Alvarado v. Table Mountain Rancheria</u>,
   509 F.3d 1008 (9th Cir. 2007) ..............................................................16

<u>Am. Ship Bldg. Co. v. Nat'l Labor Relations Bd.</u>,
   380 U.S. 300 (1965)...................................................................................18

<u>Am. Trucking Ass'ns, Inc. v. City of Los Angeles</u>,
   559 F.3d 1046 (9th Cir. 2009) ..............................................................10

<u>Anderson v. United States</u>,
   612 F.2d 1112 (1979)................................................................................10

<u>Bragdon v. Abbot</u>,
   524 U.S. 624 (1998)...................................................................................15

<u>Breithaupt v. Abram</u>,
   352 U.S. 432 (1957)...................................................................................14

<u>Brewster v. Bd. of Educ. of the Lynwood Unified Sch. Dist.</u>,
   149 F.3d 971 (9th Cir. 1998) ................................................................11

<u>Brittain v. Hansen</u>,
   451 F.3d 982 (9th Cir. 2006) ...............................................13, 14, 15

<u>Califano v. Sanders</u>,
   430 U.S. 99 (1977)......................................................................................16

<u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>,
   401 U.S. 402 (1971)...................................................................................18

<u>City & Cty. of San Francisco v. Whitaker</u>,
   357 F. Supp. 3d 931 (N.D. Cal. 2018).............................................22

<u>City of Los Angeles v. Lyons</u>,
   461 U.S. 95 (1983)......................................................................................21

<u>City of Newark v. New Jersey,</u>
   262 U.S. 192 (1923)................................................................................12

<u>City of Sausalito v. O'Neill,</u>
   386 F.3d 1186 (9th Cir. 2004) .............................................................22

<u>Clapper v. Amnesty Int'l USA,</u>
   568 U.S. 398 (2013)......................................................................21, 22

<u>Collins v. City of Harker Heights, Tex.,</u>
   503 U.S. 115 (1992)................................................................................15

<u>Colo. River Indian Tribes v. Town of Parker,</u>
   776 F.2d 846 (9th Cir. 1985) .............................................................22

<u>Corales v. Bennett,</u>
   567 F.3d 554 (9th Cir. 2009) .............................................................14

<u>County of Sacramento v. Lewis,</u>
   523 U.S. 833 (1998)................................................................................14

<u>Dahl v. HEM Pharmaceuticals Corp.,</u>
   7 F.3d 1399 (9th Cir. 1993) ...............................................................10

<u>DeShaney v. Winnebago County Dept. of Social Services,</u>
   489 U.S. 189  (1989)..............................................................................15

<u>Dong v. Chertoff,</u>
   513 F. Supp. 2d 1158 (N.D. Cal. 2007) .........................................16

<u>Ecology Ctr., Inc. v. U.S Forest Service,</u>
   192 F.3d 922 (9th Cir. 1999) .............................................................18

<u>Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,</u>
   528 U.S. 167 (2000)................................................................................21

<u>FTC v. Standard Oil Co. of California,</u>
   449 U.S. 232 (1980)................................................................................17

<u>Gallo Cattle Co. v. U.S. Dep't of Agriculture,</u>
   159 F.3d 1194 (9th Cir. 1998) .................................................16, 17, 18

*Gomillion v. Lightfoot,*
   364 U.S. 339 (1960) ...................................................................................12

*Hunter v. City of Pittsburg,*
   207 U.S. 161 (1907) ...................................................................................12

*In re Zappos.com, Inc.,*
   888 F.3d 1020 (9th Cir. 2018), *cert. denied sub nom.* Zappos.com, Inc. v. Stevens, 139
   S. Ct. 1373 (2019) .....................................................................................21

*Kennedy v. City of Ridgefield,*
   439 F.3d 1055 (9th Cir. 2006) ..................................................................14

*Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.,*
   616 F.3d 963 (9th Cir. 2010) ....................................................................11

*Lujan v. Def. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................................21

*Mann v. Castiel,*
   681 F.3d 368 (D.C. Cir. 2012) ..................................................................23

*McNeil v. United States,*
   508 U.S. 106 (1993) ...................................................................................23

*Munaf v. Geren,*
   553 U.S. 674 (2008) ...................................................................................10

*Murphy Bros. v. Michetti Pipe Stringing,*
   526 U.S. 344 (1999) ...................................................................................23

*New York v. United States,*
   505 U.S. 144 (1992) ...................................................................................20

*Nunez v. City of Los Angeles,*
   147 F.3d 867 (9th Cir. 1998) ....................................................................14

*Opera Plaza Residential Parcel Homeowners Ass'n. v. Hoang,*
   376 F.3d 831 (9th Cir. 2004) ....................................................................16

*OSI, Inc. v. United States,*
   285 F.3d 947 (11th Cir. 2002) ..................................................................16

v

Palomar Med. Ctr. v. Sebelius,
   693 F.3d 1151 (9th Cir. 2012) ................................................................. 16

Printz v. United States,
   521 U.S. 898 (1997) ................................................................................. 20

Reno v. Condon,
   528 U.S. 141 (2000) ................................................................................. 20

School Board of Nassau County, Florida v. Arline,
   480 U.S. 273 (1987) ................................................................................. 15

Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,
   240 F.3d 832 (9th Cir. 2001) .................................................................. 10

Tamas v. Dep't of Soc. & Health Servs,
   630 F.3d 833 (9th Cir. 2010) .................................................................. 14

Thornton v. City of St. Helens,
   425 F.3d 1158 (9th Cir. 2005) ................................................................ 11

Town of Castle Rock, Colo. v. Gonzales,
   545 U.S. 748 (2005) ................................................................................. 12

Travelers Cas. & Sur. Co. of Am. v. Brenneke,
   551 F.3d 1132 (9th Cir. 2009) ................................................................ 23

Tucson Airport Authority v. General Dynamics Corp.,
   136 F.3d 641 (9th Cir. 1998) .................................................................. 16

U.S. v. Park Place Associates, Ltd.,
   563 F.3d 907 (9th Cir. 2009) .................................................................. 16

United States ex rel. Siegel v. Shinnick,
   219 F. Supp. 789 (E.D.N.Y. 1963) ......................................................... 18

United States v. Salerno,
   481 U.S. 739 (1987) ................................................................................. 14

Washington v. Glucksberg,
   521 U.S. 702 (1997) ................................................................................. 14

vi

<u>Westbay Steel, Inc. v. United States</u>,
   970 F.2d 648 (9th Cir. 1992) .................................................................23

<u>Western Radio Servs. Co. v. Glickman</u>,
   123 F.3d 1189 (9th Cir.1997) ...............................................................17

<u>Whitmore v. Arkansas</u>,
   495 U.S. 149 (1990).................................................................................21

<u>Wilkinson v. Austin</u>,
   545 U.S. 209 (2005) ................................................................................11

<u>Winter v. Natural Resources Defense Council, Inc.</u>,
   555 U.S. 7 (2008) ...................................................................................10

**Statutes**

5 U.S.C. § 701(a)(2) ......................................................................................16

5 U.S.C. § 704 ...............................................................................................17

5 U.S.C. § 706(2) .....................................................................................17, 18

28 U.S.C. § 2675(a) ......................................................................................23

42 U.S.C. § 243(a) .......................................................................................3, 8

42 U.S.C. § 264(a)-(d) .................................................................................3, 4

**Rules**

Fed. R. Civ. P. 3 ...........................................................................................23

**Regulations**

42 C.F.R. § 70.6 .............................................................................................3

42 C.F.R. § 71.2 .............................................................................................7

42 C.F.R. § 71.20 ...........................................................................................7

42 C.F.R. § 71.32(a).............................................................................3, 7, 17

42 C.F.R. § 71.33 ............................................................................................3

42 C.F.R. § 71.36 ................................................................................7

Control of Communicable Disease, 82 Fed. Reg. 6890 (Jan. 19, 2017) ...........................7

**<u>Other Authority</u>**

CDC, Coronavirus Disease 2019 (COVID-19) (Updated Feb. 22, 2020)

    https://www.cdc.gov/coronavirus/2019-ncov/summary.html....................................23

The Federal Defendants, by and through undersigned counsel, hereby oppose the Plaintiffs' *ex parte* Application for a Temporary Restraining Order (TRO) and respond to the Court's Order dated February 21, 2020. [Dkt. no. 9].

## I. INTRODUCTION AND SUMMARY

Federal and state public health authorities are employing time-tested, reasoned public health measures to respond to and mitigate the spread of a novel coronavirus, known as COVID-19, into the United States, between the States, and within the States, including through the use of quarantine and isolation. Time is of the essence in this response to the public health emergency presented by COVID-19: this public health response requires action in hours and days, not days and weeks. Any act that hinders the ability of federal and state public health authorities to implement these effective, time-tested measures endangers the public health—and, thus, the safety and well-being of the American people.

Plaintiffs' ill-informed and legally baseless application endangers the safety and well-being of the American people. Plaintiffs ask this Court to substitute unfounded speculation for the expertise of federal and state public-health authorities. Instead of providing public-health expertise (or any expertise), Plaintiffs ask this Court to rely on internet statements and speculation.

Public health experts at all levels of federal and state government need to spend their time and efforts addressing the COVID-19 outbreak and protecting the health and safety of our communities. The Federal Defendants respectfully request that this Court reject Plaintiffs' meritless application and lift the TRO before further harm is done. Plaintiffs' efforts have only increased the likelihood of the threats to public health that they seek to avoid.

On Friday evening, the City of Costa Mesa and its mayor Katrina Foley filed their *Ex Parte* Application for a Temporary Restraining Order [Dkt. no. 1], followed by an "Amended and Updated" *Ex Parte* Application [Dkt. no. 4]. Plaintiffs assert that

1

"Defendants intend to relocate at least 35-50 patients already diagnosed with the Coronavirus from a secure location on Travis Air Force Base, where they are isolated from population centers, to Costa Mesa, a densely populated city within a county of over 3 million." (Amended App. at p. 2). As their putative evidence that the alleged decision has already been made, Plaintiffs submit the Declaration of Jack Dempsey [Dkt. no. 4-4] and an email sent by a State of California employee on February 20, 2020 (the "Acosta Email") [Dkt. no. 4-5]. The Acosta Email states that it is a proposal. It begins "These guidelines are proposals at this time, and are for official use only not for release." Id. It further states a "Planning assumption that we would expect 30-50 individuals," followed by "Federal HHS would need to commit to providing the following …" Id. This is a planning document. Nonetheless, the Court issued a TRO shortly after the Plaintiffs' application. [Dkt. no. 9].

The Federal Defendants oppose the TRO, which should be immediately lifted because Plaintiffs' claims are (1) premature speculation and (2) lacking in any legal or factual basis that could warrant such an extraordinary disruption and intervention into the authority of expert federal agencies that are working, in close coordination with California's health authorities, to protect the health and safety of returned residents of California, their loved ones, and their communities.

Plaintiffs' reliance on the Due Process Clause, the Administrative Procedure Act (APA), and the Tenth Amendment are meritless. They identify no protected liberty or property interest; no denial of adequate procedural protection; no final agency action; no arbitrary and capricious action by the public health experts in their specialized field; and no commandeering of a state. If lawsuits based on speculation and unfounded internet fear—*not* science, facts, or accepted health practice—can delay a public health response, there will be irreparable harm to the public.

In connection with the federal quarantine of returned Americans, California authorities, including its health authorities, have recently suggested several possible

2

locations for housing California residents and citizens who have tested positive for COVID-19, received any necessary medical care at local hospital facilities that are outside of Travis Air Force Base, and now need an appropriate place to be housed until they twice test negative for COVID-19. California authorities suggested the vacant Fairview Developmental Center (FDC) in Costa Mesa as one possible site.

As explained in the concurrently filed declaration of Dr. Kevin Yeskey, the Principal Deputy Assistant Secretary for Preparedness and Response (ASPR), personnel from the U.S. Department of Health and Human Services (HHS) have conducted an initial on-site evaluation of the FDC facility. A further evaluation of the site, including preliminary planning activities for suitable services, is currently underway. Using such a site would be better for public health than the alternatives, which consist of using hospitals or home isolation. If the assessment establishes that the site meets or exceeds standards set by the Centers for Disease Control and Prevention (CDC), then HHS intends to work with the State of California to establish a safe, well-monitored and medically supported residential unit for the affected asymptomatic persons who have tested positive for COVID-19.

There is an urgent need to house these asymptomatic evacuees. COVID-19 is a serious matter, and public concern is high. By the same token, speculation should not be invoked to control the coordination and planning of federal and state agencies regarding the housing of those citizens who have been exposed or potentially have been infected with COVID-19. Discretion over how to manage federal quarantines is vested in the Secretary of HHS and the CDC Director. See 42 C.F.R. §§ 70.6, 71.32(a), 71.33; 42 U.S.C. § 264(a)-(d). And federal law encourages close coordination between federal and state authorities, which occurred here. See, e.g., 42 U.S.C. § 243(a).

As a city and an individual, Plaintiffs have not presented any legal claims that could entitle them to subordinate the decisions and planning activities of state and federal health experts to an indeterminate vetting process in district court. The drastic

remedy of preemptively issuing injunctive relief against the planning of specialized federal and state agencies—which are best equipped to handle public health emergencies of this type—is not justified by law. In fact, it is contrary to 42 U.S.C. § 264(a)-(d) and federal regulations at 42 C.F.R. parts 70 and 71, which vest such public-health decisions in the CDC Director, who is working with other federal and state authorities and experts. It raises the specter of the complex quarantine process being improperly controlled, delayed, and directed by piecemeal private litigation. Neither the Administrative Procedure Act nor Due Process permit that result. Accordingly, the Temporary Restraining Order should be lifted immediately.

## II.   THE PLAINTIFFS' *EX PARTE* FILINGS, THE JASON S. DEMPSEY DECLARATION, AND THE ACOSTA EMAIL

### 1.   Plaintiffs' Amended Application

Per the Plaintiffs' Amended Application, "[o]n February 21, 2020 at 3:30 p.m. counsel for the City provided notice to counsel for Defendants by e-mail … informing them Plaintiffs were filing this *ex parte* application and explaining the basis for the application." (Amended App. at 1).

Plaintiffs' Amended Application submits only one source of evidence regarding the alleged decision and plan to move Coronavirus patients from Travis Air Force Base to the Fairview Developmental Center ("FDC"): the Declaration of Jason S. Dempsey [Dkt. no. 4-4], along with its attached exhibit, the Acosta Email [Dkt. no 4-5].

Plaintiffs contend the Court has subject matter jurisdiction on the following bases: "Jurisdiction under 28 U.S.C. Section 1331 is proper as Plaintiffs' claims arise under the United States Constitution (including the Fifth, Tenth, and Fourteenth Amendments), 5 U.S.C. Section 701-06 (Administrative Procedure Act), and 42 U.S.C. Section 1983." (Amended App. at 2).

Although they received the Acosta Email on Thursday night, Plaintiffs thereafter gathered and submitted no additional evidence in their subsequent filings supporting

4

their contention that a decision had been made to transport patients to Costa Mesa, when it was made, or by whom. Instead of competent evidence, Plaintiffs relied on a variety of Internet webpages relating the ostensible dangers of COVID-19. [Dkt. nos. 1-5 to 1-17]. Even their cited articles do not support their claims. For example, Plaintiffs claim that "[o]ne federal official called the sudden jump in the number of cases in the U.S. caused by repatriating the individuals intended to be housed at Fairview as 'a tremendous public health threat.' " (Amended App. at p. 4 (citing Kazemi Decl. Ex. 15)). But the cited document just states that the official said "[t]his new virus represents a tremendous public health threat." Kazemi Decl. Ex. 15 (emphasis added). In other words, while COVID-19 is a serious public health issue, Plaintiffs misleadingly suggest that the threat the official referred to consists of sudden rises in the number of U.S. cases. Moreover, the federal official did not suggest that returning U.S. nationals or isolating those who test positive constitutes a serious public health threat.

### 2.   The Jason S. Dempsey Declaration

The Dempsey Declaration [Dkt. no. 4-4] identifies Mr. Dempsey as "the Emergency Services Manager for the City of Costa Mesa," and states that Costa Mesa has employed him in that capacity since August of 2018. (Dempsey Decl., ¶ 1).

According to Mr. Dempsey, he was contacted by Jim Acosta on the evening of February 20, 2020. The attached email identifies Mr. Acosta as the Acting Regional Administrator for the California Governor's Office of Emergency Services, Southern Region Operations. [Dkt. 4-5]. Mr. Dempsey's declaration avers that:

> Mr. Acosta said that there **would be a phone conference** with the California Office of Emergency Services, the Orange County Emergency Management Director, and a representative from Orange County Health Care Agency to discuss the fact that **preparations were being made to potentially utilize** Fairview Developmental Center (FDC), a state owned property located in the heart of the City. Specifically, they indicated that buildings **were being cleaned up** by Sunday, February 23, 2020 because they **might be placing 30 to 50 persons** who are infected with the 2019-nCoV virus at FDC.

(Dempsey Decl., ¶ 2). The key words here are that there "would be a phone conference…," that "preparations were being made to potentially utilize" buildings owned by the State of California, which "were being cleaned up," and "they might be placing 30 to 50 persons" there.

        3.    The February 20, 2020 Acosta Email and its Proposals

The Acosta Email identifies its recipients as Donna Boston and Jason Dempsey. Copied are three other employees of the California Governor's Office of Emergency Services. No federal agencies or personnel were copied on the Acosta Email.

The email's subject line is "Fairview parameters." The top of the email's body text makes clear: "These guidelines are <u>proposals</u> at this time, and are for official use only not for release." <u>Id.</u> (emphasis added).

Below that statement is the line, "Protocol for Symptomatic Persons." The first sentence then states "While at Travis Air Force Base, under a federal quarantine order, HHS medical staff will evaluate and provide medical care. If an individual presents with Novel Coronavirus symptoms the following protocol would be implemented." The following bulletpoints then identify steps that "would" happen pursuant to the proposed guidelines. Under the heading "Fairview Developmental Center Operational Logistics," it states a "Planning assumption that we would expect 30-50 individuals," followed by "Federal HHS would need to commit to providing the following …", listing procedures that the federal government, according to the proposal, would need to undertake. The proposed federal contributions would include:

        • Security and potential fencing
        • Onsite medical care including primary care, mental health, and supportive care
        • Wrap-around Services
        • Feeding
        • Cleaning and sanitation
        • Case management and logistics for departure.

<u>Id.</u> In sum, the Acosta Email sets forth one proposal regarding FDC for discussion.

### III.    THE FEDERAL GOVERNMENT'S QUARANTINE AUTHORITY

Congress has authorized the Surgeon General, with the approval of the Secretary of Health and Human Services, "to make and enforce such regulations as in his judgment are necessary to prevent the introduction, transmission, or spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 42 U.S.C. § 264(a). These regulations may "provide for the apprehension, detention, or conditional release of individuals . . . for the purpose of preventing the introduction, transmission, or spread of such communicable diseases as may be specified from time to time in Executive orders of the President upon the recommendation of the Secretary, in consultation with the Surgeon General." Id. § 264(b).

This regulatory authority has been delegated to the CDC. See 82 Fed. Reg. 6890, 6892 (Jan. 17, 2017). Under the CDC's quarantine regulations:

> Whenever the Director has reason to believe that any arriving person is infected with or has been exposed to any of the communicable diseases listed in an Executive Order, . . . he/she may isolate, quarantine, or place the person under surveillance . . . as he/she considers necessary to prevent the introduction, transmission or spread of the listed communicable diseases.

42 C.F.R. § 71.32(a). Quarantined individuals may be required to "provide . . . information concerning their . . . health status, known or possible exposure history, and travel history," id. § 71.20(b), and "undergo medical examination." Id. § 71.36. Violations of these regulations are punishable by up to a year in prison and/or a fine of up to $100,000 for individuals (or $200,000 for organizations) if a death does not result, and $250,000 (or $500,000) if one does. Id. § 71.2.

As applied under this authority, quarantine procedure separates and restricts the movement of people who have been exposed to contagious disease to see if they have become sick. Isolation procedure, on the other hand, separates sick people with a contagious disease from people who are not sick.

While Congress granted the CDC broad authority to promulgate and enforce federal quarantine regulations, it also expressly encouraged federal agencies to cooperate with state efforts to control the spread of infectious disease. For example, the "Secretary [of HHS] is authorized to accept from State and local authorities any assistance in the enforcement of quarantine regulations made pursuant to this chapter which such authorities may be able and willing to provide." 42 U.S.C. § 243(a). The Secretary may also "cooperate with and aid State and local authorities in the enforcement of their quarantine and other health regulations, and shall advise the several States on matters relating to the preservation and improvement of the public health." Id.

## IV.   COVID-19 AND ITS INFECTION CONTROL PROCEDURES

The concurrently filed declaration of Dr. Michael Bell provides background on the COVID-19 disease, and describes the proper procedures for infection control relating to the virus. As explained therein, reports of a respiratory disease caused by a novel coronavirus began to emerge out of Wuhan, Hubei Province, China, in January 2020. Infected patients commonly present with flu-like symptoms, which may range from mild to severe, although some infected patients may remain asymptomatic. The virus that causes COVID-19, now referred to as SARS-CoV-2, is thought to spread primarily through respiratory droplets produced when an infected person coughs or sneezes.

As paragraphs 18-20 of the Dr. Bell Declaration explain, individuals who have tested positive for COVID-19 but do not require hospital services (*i.e.,* asymptomatic) can generally be isolated in non-healthcare settings, including home isolation. Specific procedures are used to ensure that isolation is appropriate and effective.

## V.   THE CURRENT PROPOSAL TO USE THE FDC FACILITY TO HOUSE ASYMPTOMATIC PERSONS

The federal government has returned more than 1,100 U.S. nationals from Wuhan, Hubei Province and from the Diamond Princess, a cruise liner docked off the coast of Yokohama, Japan. These returned individuals were generally flown to one of five

domestic military bases for a mandatory 14-day quarantine. That period has ended for those repatriated from Wuhan, Hubei Province. From the Diamond Princess, approximately 171 Americans were evacuated to Travis Air Force Base in Fairfield, California. 67 of these individuals are California residents. See Yeskey Decl., ¶ 7. They are asymptomatic, meaning they have no symptoms of COVID-19. Id.

If evacuees at Travis Air Force Base become ill, they receive treatment at local hospitals. If they do not require further medical care from hospitals, but have tested positive for COVID-19, they must then be provided other forms of housing until they have two negative tests at least 24 hours apart for COVID-19. See Yeskey Decl., ¶¶ 7-10. Department of Defense policy does not permit returning them to Travis Air Base, which would pose a greater potential disruption to facility operations than the lesser resources and personnel needed for a group with no confirmed positives. Id. ¶ 16. Those who test positive must be transferred to other sites, identified by the State of California, for continued medical monitoring. Id.

The State of California recently suggested that the FDC facility potentially be used as such a location. Id. ¶ 11. The site has undergone an initial evaluation by HHS, and is currently being assessed further, along with preliminary planning activities. Id.

If a decision is made to use the FDC facility, the federal government will follow the proper procedures and provide the necessary services. Id. ¶ 12. These include detailed security, sanitation, food, medical care, case management, and logistics. Id.

There is an urgent need to house evacuees who test positive for COVID-19. Home isolation does not provide the same level of monitoring and care. And hospitalization is unnecessary for those who have tested positive for COVID-19 but are not experiencing COVID-19 symptoms. Such unnecessary hospitalization takes hospital beds from those patients who actually need them—particularly during the peak of influenza season when such beds are scarce. Id.

If the assessment of the Fairview site proves that it meets or exceeds CDC

9

guidance, HHS intends to work with the State of California to establish a residential unit that is safe, well monitored, and medically supported. Id.

Plaintiffs have submitted a declaration from Kimberly Hall Barlow [Dkt. no. 4-3], which purports to relate a conversation in which some California officials told her that the FDC facility was not suitable for an emergency shelter. Not only is the Barlow declaration hearsay, it is almost completely devoid of detail, and does not purport to address the specific quarantine-related usage for which the site is being assessed.

## VI.   LEGAL STANDARD FOR TEMPORARY RESTRAINING ORDER

The standard for issuing a temporary restraining order is "substantially identical" to that for issuing a preliminary injunction. Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001). A "preliminary injunction is an extraordinary and drastic remedy." Munaf v. Geren, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable injury in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that the proposed injunction is in the public interest. Id. at 20. These factors are mandatory. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits." Id.; see also Am. Trucking Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (citing Winter).

In addition, a motion for preliminary injunction that seeks mandatory relief "is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." Dahl v. HEM Pharmaceuticals Corp., 7 F.3d 1399, 1403 (9th Cir. 1993); see also Anderson v. United States, 612 F.2d 1112, 1114 (1979) ("[m]andatory preliminary relief, which goes well beyond simply maintaining the status quo pendente lite, is particularly disfavored, and should not be issued unless the facts

1    and law clearly favor the moving party").

2    **VII.   <u>ARGUMENT</u>**

3           The Federal Defendants' authority to manage and control federal quarantines in

4    coordination with state authorities may not be subordinated to private litigation in the

5    unilateral manner attempted by the City of Costa Mesa and Katrina Foley. The Amended

6    Application asserts three claims as the basis for their requested injunctive relief: (1)

7    violation of procedural and substantive due process; (2) the Administrative Procedure

8    Act; and (3) the Tenth Amendment's "anti-commandeering principle." (Amended App.

9    at pp. 8-10). None of these claims have merit, none presents a legally valid basis for

10   enjoining the Federal Defendants, and the Plaintiffs lack standing to assert the claims.

11          **A.     Plaintiffs Cannot Demonstrate a Likelihood of Success on their**

12          **Procedural Due Process Claim.**

13          A "procedural due process claim has two elements: deprivation of a

14   constitutionally protected liberty or property interest and denial of adequate procedural

15   protection." <u>Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.</u>, 616

16   F.3d 963, 970 (9th Cir. 2010) (citing <u>Brewster v. Bd. of Educ. of the Lynwood Unified</u>

17   <u>Sch. Dist.</u>, 149 F.3d 971, 982 (9th Cir. 1998)). Here, Plaintiffs cannot demonstrate that

18   any Defendant has deprived them of a liberty or property interest by proposing a plan to

19   house asymptomatic persons who tested positive for COVID-19 during the remainder of

20   their quarantine or isolation in a building that the State of California owns.

21          Protected interests are not created by the Due Process Clause, but by "existing

22   rules or understandings that stem from an independent source such as state law rules or

23   understandings that secure certain benefits and that support claims of entitlement to

24   those benefits." <u>Thornton v. City of St. Helens</u>, 425 F.3d 1158, 1164 (9th Cir. 2005). "A

25   liberty interest may arise from the Constitution itself, by reason of guarantees implicit in

26   the word 'liberty,' or it may arise from an expectation or interest created by state laws or

27   policies." <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005) (internal citations and

28                                          11

quotation marks omitted.). Procedural due process, however, only protects interests to which persons have "legitimate claim[s] of entitlement." <u>Town of Castle Rock, Colo. v. Gonzales</u>, 545 U.S. 748, 756 (2005).

The federal government has not deprived Plaintiffs of a constitutionally protected liberty or property interest by cooperating with the State of California to house patients in a state-owned building. Put another way, Plaintiffs do not have any *entitlement* to interfere with federal-state cooperation on federal quarantine issues. Plaintiffs argue vaguely that "If the Defendants are not enjoined from introducing people infected with a deadly disease into the community without taking adequate steps to prevent transmission of that disease, the federal government will have violated Plaintiff Foley, other individuals', and the City's substantive and procedural due process rights and their civil rights." (Amended App. at 8). That argument fails on its face, because it does not identify a liberty or property interest, nor any entitlement—Plaintiffs simply claim to disagree with the policy-driven decisions of expert federal and state public health authorities—the very decision makers that Congress entrusted to make such decisions.

Plaintiffs cite a single case for the proposition that a city might in principle have liberty or property interests protected from state action. That case held that individual citizens could challenge a state statute that redefined the boundaries of a municipality specifically so as to disenfranchise black citizens. <u>See</u> <u>Gomillion v. Lightfoot</u>, 364 U.S. 339 (1960). In other words, it did not hold that the municipality itself had any rights against the state. Indeed, it cited favorably the long-established precedent to the contrary. <u>Id.</u> at 342-43 (citing <u>Hunter v. City of Pittsburg</u>, 207 U.S. 161, 179-80 (1907)); <u>see also</u> <u>City of Newark v. New Jersey</u>, 262 U.S. 192, 196 (1923) ("Being but creatures of the State, municipal corporations have no standing to invoke the contract clause or the provisions of the Fourteenth Amendment of the Constitution in opposition to the will of their creator."). And regardless of whether Costa Mesa could have due process rights against state action in the abstract, Plaintiffs have not identified a specific entitlement

12

that the federal government has deprived them of.

Finally, even assuming that the public health policy interests of Costa Mesa constituted a "liberty" or "property" interest, Plaintiffs fail to present any evidence establishing that the federal and state Defendants are depriving them of such an interest. The declarations of Dr. Bell and Dr. Yeskey establish that the proposed plan does not pose a public health risk to the citizens of Costa Mesa, and that federal and state public health authorities are taking reasonable precautions, consistent with governing CDC procedures.[1]

Indeed, what Plaintiffs have asked this court to do—overrule established and expert state and federal protocols for patient monitoring and care—creates the very public health risk that they purportedly seek to avoid. See Yeskey Decl., ¶¶ 12-17.

### B. Plaintiffs Cannot Demonstrate a Likelihood of Success on their Substantive Due Process Claim.

Plaintiffs ask this Court to invent a new substantive due process right in favor of public health policy decisions they would prefer. But Plaintiffs have not plausibly alleged a violation of substantive due process rights.

Federal courts have "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this uncharted area are scarce and open ended." See Brittain v. Hansen, 451 F.3d 982, 990 (9th Cir. 2006) (quoting Albright v. Oliver, 510 U.S. 266, 271–72 (1994) (plurality opinion)). The Supreme Court has cautioned that we "must therefore exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of [federal judges]."

---

[1]    Plaintiffs rely heavily on an extremely short declaration, devoid of specifics and consisting of hearsay, in which the City Attorney claims she was told that some buildings on the site were unsuitable for an emergency shelter due to the need for renovations. The declaration does not in any respect address the site's suitability for quarantine housing purposes, for which the Defendants are assessing it.

13

Washington v. Glucksberg, 521 U.S. 702, 720, 772 (1997). Substantive due process "forbids the government from depriving a person of life, liberty, or property in such a way that 'shocks the conscience' or 'interferes with the rights implicit in the concept of ordered liberty.' " Corales v. Bennett, 567 F.3d 554, 568 (9th Cir. 2009); Nunez v. City of Los Angeles, 147 F.3d 867, 871 (9th Cir. 1998); see also United States v. Salerno, 481 U.S. 739, 746 (1987).

Plaintiffs invoke the first strand of substantive due process law (deprivations which "shock the conscience") when they argue that the government action was arbitrary. (Amended App. at p. 8). The Supreme Court has repeatedly recognized that "only the most egregious official conduct can be said to be arbitrary in a constitutional sense." Brittain v. Hansen, 451 F.3d 982, 991 (9th Cir. 2006) (citing Lewis, 523 U.S. at 845–49). Such conduct can be shown by "conduct intended to injure in some way unjustifiable by any government interest." Lewis, 523 U.S. at 849. Conduct that "shocks the conscience" may also be shown by "deliberate indifference to a known or so obvious as to imply knowledge of, danger." Kennedy v. City of Ridgefield, 439 F.3d 1055, 1064 (9th Cir. 2006); Tamas v. Dep't of Soc. & Health Servs,, 630 F.3d 833, 844 (9th Cir. 2010); see also Breithaupt v. Abram, 352 U.S. 432, 435 (1957) (explaining that conduct that "'shocked the conscience' and was so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency" would violate substantive due process).

Plaintiffs have alleged no conscience-shocking action here, much less shown a likelihood of success in proving it. On the contrary, even Plaintiffs' own submissions show that the federal and state health experts are trying to prevent additional harm and have proposed a plan to minimize risk to the public. Plaintiffs contend that, in their view, the public health policy advanced by the CDC and state emergency planning officials is flawed because it does not "take adequate steps to prevent transmission of the disease." (Amended App. at p. 8). But this runs afoul of the Court's repeated instruction that the Due Process Clause is not meant to substitute judicial policy-making for that of the other

14

branches. See Glucksberg, 521 U.S. at 772; Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128–29 (1992) ("Our refusal to characterize the city's alleged omission in this case as arbitrary in a constitutional sense rests on the presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces."); see also DeShaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 196 (1989) ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."); Bragdon v. Abbot, 524 U.S. 624, 650 (1998) (noting that "the views of public health authorities, such as the U.S. Public Health Service, CDC, and the National Institutes of Health, are of special weight and authority."); School Board of Nassau County, Florida v. Arline, 480 U.S. 273, 288 (1987) (recognizing that "courts normally should defer to the reasonable medical judgements of public health officials"). Plaintiffs have not shown, or even plausibly alleged, any action that "shocks the conscience."

Moreover, it is not enough to allege conscience-shocking action: "As a threshold matter, 'to establish a substantive due process claim a plaintiff must show a government deprivation of life, liberty, or property.' " Brittain, 451 F.3d at 991. As discussed above, Plaintiffs have not shown a deprivation of a constitutionally protected interest, and have no likelihood of success on the merits of their substantive due process claim.

## C. Plaintiffs' Administrative Procedure Act Claim Is Defective

### 1. There Is No Jurisdiction For Plaintiffs' APA Claim Because Plaintiffs Have Not Identified A Reviewable Final Agency Action.

The APA provides for a waiver of the federal government's sovereign immunity in specific circumstances. The APA itself, however, does not provide a district court with subject matter jurisdiction, which must instead be established on a separate statutory basis. The Supreme Court has long has held that the "APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency

15

1   action." Califano v. Sanders, 430 U.S. 99, 107 (1977); see also Palomar Med. Ctr. v.

2   Sebelius, 693 F.3d 1151, 1167 (9th Cir. 2012) ("the APA is not an independent grant of

3   subject-matter jurisdiction.... And pursuant to 42 U.S.C. §[ ] 405(g) ... our jurisdiction is

4   generally limited by the scope of the agency's 'final decision.'"); Tucson Airport

5   Authority v. General Dynamics Corp., 136 F.3d 641, 645 (9th Cir. 1998) (the APA does

6   not provide an independent basis for subject matter jurisdiction in the district courts);

7   Gallo Cattle Co. v. U.S. Dep't of Agriculture, 159 F.3d 1194, 1198 (9th Cir. 1998) ("It is

8   well settled that the APA does not independently confer jurisdiction on the district

9   courts."); Dong v. Chertoff, 513 F. Supp. 2d 1158, 1161 (N.D. Cal. 2007) (The APA

10  itself does not provide an independent basis for subject matter jurisdiction.); U.S. v. Park

11  Place Associates, Ltd., 563 F.3d 907, 923 (9th Cir. 2009) (A waiver of sovereign

12  immunity means the United States is amenable to suit in a court properly possessing

13  jurisdiction; it does not guarantee a forum.); Alvarado v. Table Mountain Rancheria, 509

14  F.3d 1008, 1016 (9th Cir. 2007) ("To confer subject matter jurisdiction in an action

15  against a sovereign, in addition to a waiver of sovereign immunity, there must be

16  statutory authority vesting a district court with subject matter jurisdiction.").

17        The petitioner has the burden to prove that subject matter jurisdiction exists

18  regarding an agency's decision. See OSI, Inc. v. U.S., 285 F.3d 947, 951 (11th Cir.

19  2002). Moreover, "a regulation promulgated by an administrative agency . . . cannot by

20  itself, in the absence of congressional authorization, confer subject matter jurisdiction to

21  federal courts." Opera Plaza Residential Parcel Homeowners Ass'n. v. Hoang, 376 F.3d

22  831, 837 (9th Cir. 2004).

23        The APA affirmatively exempts from judicial review any "agency action [that] is

24  committed to agency discretion by law." 5 U.S.C. § 701(a)(2). That standard is met here.

25  Unsurprisingly, Congress has committed to the discretion of the Secretary of Health and

26  Human Services the responsibility for determining whether and how to confine

27  individuals to prevent the spread of communicable disease.  The federal statute

28                                              16

authorizes the agency to make and enforce such regulations "as in [the Secretary's] judgment are necessary" to prevent the spread of communicable diseases, 42 U.S.C. § 264(a), and the implementing regulations vest the CDC Director with authority to "isolate, quarantine, or place" a potentially infected person under surveillance "as he/she considers necessary to prevent the introduction, transmission or spread of the listed communicable diseases, 42 C.F.R. § 71.32(a). These provisions vest responsibility for managing a potential public health emergency in the hands of the expert federal agencies.  They do no leave room for second-guessing by courts, whose rulings, however well-intentioned, could create the very public health crisis they seek to avert.

Furthermore, pursuant to 5 U.S.C. § 704, only "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court, are subject to judicial review." 5 U.S.C. § 704. No such statute applies here. Action by the Federal Defendants could thus only be reviewable under 5 U.S.C. § 706(2) if it constituted "final agency action for which there is no other adequate remedy in a court." See Gallo Cattle, at 1198. It is not enough that an agency just have taken some "action," however. The action complained of must *determine the parties' rights or obligations*, like an adjudication or rule-making, and the action must also not be committed to the agency's discretion by law.

> Agency action is 'final' if a minimum of two conditions are met: '[f]irst, the action must mark the consummation of the agency's decision making process ... it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.'

Gallo Cattle, supra, 159 F.3d at 1198-99 (quoting Western Radio Servs. Co. v. Glickman, 123 F.3d 1189, 1196 (9th Cir.1997) (internal quotes omitted)); see also FTC v. Standard Oil Co., 449 U.S. 232, 241 1980) (noting that the action must be a definitive statement of the agency's position with concrete legal consequences). As the Ninth Circuit explained when dismissing an APA claim, "The judicial officer's discretionary

17

decision not to allow Gallo to pay its assessments into escrow is not a 'final agency action' because it does not determine the rights or obligations of the parties, nor are there legal consequences flowing from it." Gallo Cattle, 159 F.3d at 1199; cf. Ecology Ctr., Inc. v. U.S Forest Svc., 192 F.3d 922, 925 (9th Cir. 1999) (monitoring does not constitute final agency action).

Plaintiffs do not identify a reviewable final agency action here. They do not identify a final agency decision, and they do not show that such action determines the rights or obligations of the parties. Accordingly, Plaintiffs' APA claim lacks subject matter jurisdiction.

> 2.    Plaintiffs Have Not Submitted Evidence Of Any Final Agency Action That Is "Arbitrary, Capricious, An Abuse of Discretion, Or Otherwise Not In Accordance With The Law."

Even if there were jurisdiction to review a specific final agency action under the APA here (and there is not), this Court can only set aside agency actions that it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard affords its "greatest deference" to an agency when it exercises its "special competence" in the subject-matter committed to it. Am. Ship Bldg. Co. v. Nat'l Labor Relations Bd., 380 U.S. 300, 316 (1965); cf. United States ex rel. Siegel v. Shinnick, 219 F. Supp. 789 (E.D.N.Y. 1963) ("the judgment required is that of a public health officer and not of a lawyer used to insist on positive evidence to support action; their task is to measure risk to the public . . . . They deal in a terrible context and the consequences of mistaken indulgence can be irretrievably tragic."). This "highly deferential" standard means that "the ultimate standard of review is a narrow one" and the court is "not empowered to substitute its own judgment for that of the agency." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

In their papers, the Plaintiffs claim that "[t]he plan violates the Administrative Procedure Act due to the federal Defendants' failure to consult with and incorporate

18

local government in the planning and implementation process, and risks imposing a serious burden on the City's emergency services." (Amended App. at p. 7). In fact Plaintiffs' own filings establish that the federal government is consulting and working with California, which was attempting to work with Costa Mesa. But in any event, there is no requirement that a federal agency "consult with and incorporate local government" any time the agency makes decisions; indeed, such a requirement would cripple the federal government. Similarly, the possibility that a federal agency's decision might theoretically impose a greater burden on municipal emergency services does not violate the agency's legal obligations.

Plaintiffs' only other explanation of the basis for their APA claim is as follows:

> The Defendants' conduct, introducing with virtually no warning a highly contagious and deadly disease into a populated area without first taking appropriate precautions to ensure the safety of the population and inform the public of efforts to reduce risk and proper precautions they themselves should take, violates the CDC's and HHS's internal regulations relating to quarantine procedures. The guidance the CDC is publishing on its own website regarding how to prevent the transmission of the disease strongly suggests it is violating its own procedures and therefore is violating the Administrative Procedures Act.

(Amended App. at p. 9). Plaintiffs cite no such regulations, however. Indeed, reflecting the prematurity of their filing, they do not cite what the plan is.

Plaintiffs' papers submitted CDC webpages as Exhibits 7 and 8 to the Kazemi Declaration. Plaintiffs speculate that CDC and HHS *might not* follow appropriate procedures to ensure the safety of Costa Mesa's population. The Bell Declaration and Yeskey Declaration, however, clearly set forth the proper procedures to follow for quarantine and infection control for COVID-19, and explain how the Federal Defendants will follow those procedures, in coordination with California state authorities. As explained in Dr. Bell's declaration, moreover, isolation and infection control for patients who do not need hospitalization services is different than infection control for patients

19

who require hospitalization. See Dr. Bell Decl., ¶¶ 18-20. Plaintiffs' efforts to imply that all patients must be hospitalized for proper isolation procedures are not correct.

In sum, Plaintiffs' speculation that the Federal Defendants might make a mistake or provide insufficient procedures *in their own specialized field* is not in any way a basis for finding that the Federal Defendants have made a final agency decision that is arbitrary, capricious, or contrary to law.

### D.   The Tenth Amendment "Anti-Commandeering" Principle Is Not Even Superficially Applicable

Plaintiffs argue that the Tenth Amendment's "Anti-Commandeering" principle is at stake. It is not. Plaintiffs are not the State of California. And the Federal Defendants have issued no commands to California; on the contrary, they have worked cooperatively with state officials to achieve the shared goal of relocating patients—all of whom are California residents—in the way that best protects the public health.

The hallmark of a commandeering claim is an assertion that the federal government has encroached on state prerogatives by commanding the state to "enact [certain] laws or regulations" or "require state officials to assist in the enforcement of federal statutes regulating private individuals." Reno v. Condon, 528 U.S. 141, 150 (2000). But the mere "accept[ance] from State and local authorities [of] any assistance in the enforcement of quarantine regulations . . . which such authorities may be able and willing to provide," 42 U.S.C. § 243(a), raises no such federalism concerns. This case thus bears no resemblance to the handful of cases cited in Plaintiffs' brief, where Congress "commandeered the state legislative process by requiring a state legislature to enact a particular kind of law," Condon, 528 U.S. at 149 (citing New York, 505 U.S. 144 (1992)), or where Congress "commanded 'state and local enforcement officers to conduct background checks on prospective handgun purchasers,'" Condon, 528 U.S. at 149 (citing Printz, 521 U.S. 898, 902 (1997)). And while Plaintiffs suggest that local ambulance services might be used to transport patients to the hospital should the need

20

arise—as would presumably be the case for any person who enters the city's area, and so might become ill or require emergency services there—Plaintiffs nowhere assert that the Federal Defendants issued any command in that regard.

The Federal Defendants have worked closely with their state counterparts to find a solution that best protects the public health, and have done no more than accept assistance that state officials have offered. Plaintiffs' attempt to assert a veto power over those efforts finds no support in the Tenth Amendment.

### E.     Plaintiffs Have Not Established Standing To Sue

As the Supreme Court has explained, an "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff must establish Article III standing to sue. Lujan v. Def. of Wildlife, 504 U.S. 555, 560 (1992). Standing requires that a litigant must demonstrate an (1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision. See In re Zappos.com, Inc., 888 F.3d 1020, 1024 (9th Cir. 2018), cert. denied sub nom. Zappos.com, Inc. v. Stevens, 139 S. Ct. 1373, (2019) (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000)). Importantly, where—as here—the relief sought is prospective relief only, it is well-established that a plaintiff must demonstrate a risk of future injury that is both "real" and "immediate" and neither "conjectural" nor "hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 102-03 (1983). Thus, a plaintiff seeking forward-looking relief must demonstrate the existence of a future "'threatened injury [that is] certainly impending.'" Clapper v. Amnesty Int'l USA, 568 U.S. 398, 401 (2013) (quoting Whitmore v. Arkansas, 495 U.S. 149, 158 (1990)).

The city and its mayor appear to maintain that they have brought suit to prevent harm to the residents of Costa Mesa. The Ninth Circuit has explained that, because municipalities' "power is derivative and not sovereign," they cannot claim the ability to sue as *parens patriae* on behalf of their citizens; municipalities are not treated like the

21

State of California in that regard. <u>See City of Sausalito v. O'Neill</u>, 386 F.3d 1186, 1197 (9th Cir. 2004) (quoting <u>Colo. River Indian Tribes v. Town of Parker,</u> 776 F.2d 846, 848 (9th Cir. 1985)); <u>City & Cty. of San Francisco v. Whitaker</u>, 357 F. Supp. 3d 931, 943 (N.D. Cal. 2018).  Accordingly, neither Costa Mesa nor its mayor Ms. Foley can assert standing based on purported injuries to city residents. Nor has the mayor identified any personal or independent injury that is certainly impending for her. A municipality may still "sue to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens," <u>City of Sausalito</u>, 386 F.3d at 1197, but the TRO papers do not identify any proprietary (or other) interest of the City itself at stake, as opposed to a general interest in the welfare of the residents. Only the State has the power to assert that interest.

Moreover, even if Plaintiffs could assert claims on behalf of city residents, they cannot demonstrate a "certainly impending" future injury. <u>See</u> <u>Clapper</u>, 568 U.S. at 401. The existence of a proposal involving a location within the boundaries of Costa Mesa (to house asymptomatic patients), does not establish that the city of Costa Mesa or its residents are likely to suffer any injury. Assuming that Defendants move forward with it, the Fairview proposal involves a multitude of security and health controls, as described in the declarations of Dr. Yeskey and Dr. Bell, and no one is likely to suffer any injury; much less is one "certainly impending." Plaintiffs have sued based on pure speculation that CDC will not properly implement its own protocols, that patients will not comply with isolation measures, and that further infection will necessarily result than cannot be contained. None of that is remotely likely, much less certain.

### F. Plaintiffs' Belated "Further Statement Re Nuisance Claim"

Plaintiffs belatedly filed a "further statement re nuisance claim" on the evening of February 22, 2020. [Dkt. no. 11]. No complaint has been filed. To the extent the Court wishes to entertain argument on this issue, the Federal Defendants respectfully request leave to file additional briefing. Furthermore, the Federal Defendants note that the United States is immune to suit for torts except pursuant to the limited waiver of

sovereign immunity provided by the Federal Tort Claims Act (FTCA). The FTCA does not permit any injunctive relief. See Westbay Steel, Inc. v. U.S., 970 F.2d 648, 651 (9th Cir. 1992) (noting that "the Act does not submit the United States to injunctive relief."). The FTCA also has strict jurisdictional prerequisites, including the filing of an administrative claim and exhaustion of administrative remedies, that have not been met here. See 28 U.S.C. § 2675(a); McNeil v. United States, 508 U.S. 106 (1993).

### G.   For The Current Federal Quarantine, Issuing Unmerited Temporary Injunctive Relief Threatens To Cause Serious Harm

A temporary restraining order is a serious legal remedy, the issuance of which often imparts a seeming legitimacy to the putative threat it enjoins. Here, there is no evidence in Plaintiffs' Application and Amended Application that warrants the drastic remedy of immediately issuing mandatory preliminary relief against multiple federal and State of California agencies, without so much as filing a complaint or obtaining and serving a summons—a threshold deficiency that normally deprives the Court of jurisdiction to enter any relief.[2] Fear of COVID-19 does not justify such unprecedented intrusion into federal quarantine decisions by the specialized agencies responsible for this area. Rumors and speculation proliferate and circulate rapidly, particularly online. Under such circumstances, it is especially important not to impart unwarranted legitimacy to fears and concerns that are not grounded in solid medical evidence.[3]

---

[2]    See, e.g., Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."); Travelers Cas. & Sur. Co. of Am. v. Brenneke, 551 F.3d 1132, 1135 (9th Cir. 2009) ("A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Fed. R. Civ. P. 4."); Mann v. Castiel, 681 F.3d 368, 371 (D.C. Cir. 2012) (proper service is "'a ritual that marks the court's assertion of jurisdiction over the lawsuit'" and "is fundamental to any procedural imposition on a named defendant"); Murphy Bros. v. Michetti Pipe Stringing, 526 U.S. 344, 350 (1999) ("[O]ne becomes a party officially, and is required to take action in that capacity, only upon service of a summons.").

[3]    https://www.cdc.gov/coronavirus/2019-ncov/summary.html ("For the general

# VIII.  **CONCLUSION**

Due to the commitment and hard work of our federal and state public health and emergency response professionals and other experts, the risk of COVID-19 to our communities remains low. These professionals and experts are working day and night to reduce that risk even further. But Plaintiffs' misguided lawsuit has only made their job that much harder and increased the potential risk to our communities. For the reasons set forth above, we respectfully request that this Court immediately lift the TRO and reject the Plaintiffs' application.


Dated:  February 23, 2020                NICOLA T. HANNA
                                         United States Attorney
                                         DAVID M. HARRIS
                                         Assistant United States Attorney Chief,
                                         Civil Division
                                         JOANNE S. OSINOFF
                                         Assistant United States Attorney
                                         Chief, General Civil Section

                                         */s/ Daniel A. Beck*
                                         _____
                                         DANIEL A. BECK
                                         Assistant United States Attorney

                                         Attorneys for the Federal Defendants

---

American public, who are unlikely to be exposed to this virus, the immediate health risk from COVID-19 is considered low at this time.").