1  Jennifer L. Keller, SBN 84412
2  jkeller@kelleranderle.com
   Nahal Kazemi, SBN 322026
3  nkazemi@kelleranderle.com
4  KELLER/ANDERLE LLP
   18300 Von Karman Avenue, Suite 930
5  Irvine, CA 92612
   T: (949) 476-8700
6  F: (949) 476-0900
7
8  Attorneys for Plaintiff,
   CITY OF COSTA MESA and KATRINA FOLEY
9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| CITY OF COSTA MESA, and KATRINA FOLEY, | Case No.  8:20-cv-00368-JLS-JDE |
| Plaintiff, | **REPLY IN SUPPORT OF *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION** |
| vs. | |
| UNITED STATES OF AMERICA, THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES AIR FORCE, THE CENTERS FOR DISEASE CONTROL AND PREVENTION, THE STATE OF CALIFORNIA, FAIRVIEW DEVELOPMENTAL CENTER (FAIRVIEW), THE CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES, and THE CALIFORNIA DEPARTMENT OF GENERAL SERVICES, | |
| Defendants. | |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   THE BALANCE OF HARDSHIPS DRAMATICALLY FAVORS PLAINTIFFS........... 1

      A.   President Trump's Promise to Alabama Confirms that Coronavirus Patients Pose a Public Health Risk, and Reveals the Federal Government's Plan as an Effort to Use this Crisis as a Political Weapon ...................................................................... 2

      B.   Plaintiffs' Further Declarations Underscore the Potential Harm and Explain that Plaintiffs Have Only Just Begun to Understand the Potential Detrimental Impact to Their Community............................................................................................. 4

      C.   Defendants' Suggestion that FDC is the Only Possible Site Because it is the Only Suitable State-Owned Property Makes No Sense .................................................... 5

      D.   The Federal and State Defendants' Conflicting Narratives Undermine Their Claimed Hardships............................................................................................... 7

      E.   Defendants' Narratives Conflict with the CDC's Most Recent Guidance about the Coronavirus and the Most Recent Scientific Evidence........................................... 8

III.  PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS ............................. 11

      A.   Plaintiffs Are Likely to Prevail on Their Nuisance Claims ................................... 11

      B.   Plaintiffs' Are Likely to Prevail on Their Due Process and Civil Rights Claims. 14

      C.   Plaintiffs Are Likely to Prevail on Their APA Claim........................................... 15

           1.   The Federal Defendants' Decision is Reviewable by This Court Under the APA ...................................................................................................... 15

           2.   Federal Defendants' Decision to Relocate Coronavirus-Positive patients to a Dilapidated Former Assisted Living Facility for Their Own Convenience and Expediency is Arbitrary and Capricious...................... 19

      D.   Plaintiffs Are Likely to Prevail on Their Tenth Amendment Claim .................... 20

IV.   THE STATE DEFENDANTS' FLAWED "SOVEREIGN IMMUNITY" ARGUMENTS DO NOT BAR PLAINTIFFS' CONSTITUTIONAL CLAIMS AGAINST THEM ....... 21

      A.   Plaintiffs' Coming Complaint Will Include the Relevant California State Officials ............................................................................................................................ 21

      B.   The Opposition Does Not Address Governor Newsom's and the California Legislature's Positions as to Whether Plaintiffs' Claims May Go Forward in this Court, Leaving Open the Possibility That They Will Consent ............................. 22

i

REPLY IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

C.    The State Defendants Ignore How the Fourteenth Amendment Prevails in a Direct Clash with The Eleventh Amendment ................................................. 23

V.    AT A MINIMUM, THE COURT SHOULD PROVIDE PLAINTIFFS TIME TO MARSHAL THE INFORMATION AND EVIDENCE THAT DEFENDANTS HAVE WORKED SO HARD TO KEEP FROM THEM............................................................. 24

VI.   CONCLUSION........................................................................................... 24

REPLY IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Cases**

*Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967) ...........................................15

*Alliance For The Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011)..............24

*Ambrosini v. Alisal Sanitary Dist.*, 154 Cal. App. 2d 720 (Cal. Ct. App. 1957).....12

*ANA Int'l, Inc. v. Way*, 393 F.3d 886 (9th Cir.2004)...............................................15

*ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059 (9th Cir. 2015) ........................................17

*Bennett v. Spear*, 520 U.S. 154 (1997) ...................................................................15

*Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994) ................................................. 18, 19

*Bright v. East Side Mosquito Abatement Dist.*, 168 Cal. App. 2d 7 (Cal. Ct. App. 1959)........................................................................................................................12

*Califano v. Sanders*, 430 U.S. 99 (1977) ................................................................15

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...................................................14

*City of Sausalito v. O'Neill*, 386 F.3d 1186 (9th Cir. 2004)....................................14

*Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009)............................................14

*Ex Parte Young*, 209 U.S. 123 (1908) .....................................................................21

*Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)...............................................................23

*Florida Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)....................................19

*Greater Westchester Homeowners Assn. v. City of Los Angeles*, 26 Cal. 3d 86, 101 (Cal. 1979)..................................................................................................................11

*Heckler v. Chaney*, 470 U.S. 821(1985) ..................................................................18

*Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000 (9th Cir.1998) ....................15

*Knick v. T'ship of Scott, Penn.*, 139 S.Ct. 2162 (2019)...........................................16

*McConnell v. PacifiCorp Inc.*, 2007 WL 2385096, at *5-6 (N.D. Cal. Aug. 17, 2007)........................................................................................................................11

iii

REPLY IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

*McNary v. Haitian Refugee Ctr. Inc.*, 498 U.S. 479 (1991) ....................................19

*Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765 (7th Cir. 2011) (Wood, J.)......13

*Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892 (7th Cir. 2014) (Wood, J.) ................................................................................................................12

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983)...........................................................................................................19

*Nat'l Ass'n of Regulatory Util. Comm'rs v. F.E.R.C.*, 475 F.3d 1277 (D.C. Cir. 2007) ...........................................................................................................20

*Newman v. Apfel*, 223 F.3d 937 (9th Cir. 2000) ..........................................17

*Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) .......16

*Paterno v. State of California*, 74 Cal. App. 4th 68, 104 (Cal. Ct. App. 1999) ......11

*Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984).....................21

*People v. Glenn-Colusa Irr. Dist.*, 127 Cal. App. 30 (Cal. Ct. App. 1932) ...........12

*Pinnacle Armor, Inc. v. United States*, 648 F.3d 708 (9th Cir. 2011) ....................17

*Printz v. United States*, 521 U.S. 898 (1997)..................................................20

*Roy v. Kentucky State Police*, 881 F. Supp. 290 (W.D. Ky. 1995) ........................20

*The Presbyterian Church (U.S.A) v. U.S.*, 870 F.2d 518 (9th Cir. 1989)...............13

*Traynor v. Turnage*, 485 U.S. 535 (1988) ..............................................15

*Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178 (D.C. Cir. 2006)...........................13

*Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261 (9th Cir. 1990)...........................16

*Venuto v. Owens-Corning Fiberglas Corp.* (22 Cal. App. 3d 116, 129)................11

*Veterans For Common Sense v. Shinseki*, 644 F.3d 845 (9th Cir. 2011) ...............13

*Webster v. Doe*, 486 U.S. 592 (1988) ......................................................18

*Williamson County Reg. Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985) ....................................................................................................16

iv

*Win Win Aviation, Inc. v. Richland County, South Carolina Sheriff's Dept.*, 2015
   WL 1197534 (N.D. Ill. Mar. 16, 2015) ................................................................13

**Statutes**

28 U.S.C. § 1331 ....................................................................................................19

42 U.S.C. § 264 ......................................................................................................18

5 U.S.C. § 702 .......................................................................................................12

5 U.S.C. § 706(2) ...................................................................................................19

REPLY IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

Plaintiffs submit the following Reply in Support of their Amended and Updated *Ex Parte* Application for TRO and Order to Show Cause Re Issuance of Preliminary Injunction (the "Application," Dkt. No. 4).[1]

## I.   INTRODUCTION

If there were any doubt that the federal government has no plan and is not acting in the best interests of the community, those doubts have been laid to rest by the Federal Government's most recent actions.  On February 23, 2020, President Trump spoke with Alabama Senator Richard Shelby and promised to protect the people of Alabama by not sending Coronavirus patients to that state even though the facility there is a former military base, a multi-jurisdictional training center for chemical, biological, radiological, and nuclear threats, and one of the most suitable in the country to handle the unique challenges of isolating and treating Coronavirus patients.  Yet Health and Human Services Secretary Alex Azar confirmed to Alabama Congressman Mike Rogers that no one exposed to Coronavirus would be sent to the Center for Domestic Preparedness in Anniston, Alabama.

Instead, it now seems like the entire national burden of isolating and caring for this entire cohort of people in the United States infected with the Coronavirus — and perhaps more, once Costa Mesa is established as the "go to" place for these folks — will fall on the community of Costa Mesa and its surrounding cities.  The Defendants have called this action interference with federal-state cooperation on federal quarantine issues.  (Dkt. 13 at 12.)  To the contrary, it has shined a light on the fact that the federal government is acting for arbitrary and capricious political reasons, and not based on the best scientific evidence or to protect the public.

## II.   THE BALANCE OF HARDSHIPS DRAMATICALLY FAVORS PLAINTIFFS

As this Court ruled in its order granting a temporary restraining order, the Plaintiffs have made a "strong showing of irreparable harm" (Dkt. 9 at 3), and "the

---

[1]   Plaintiffs adopt the same shorthand references as in their Application and in their Further Statement Re Nuisance Claim (the "Further Statement," Dkt. No. 11).

balance of equities tips heavily toward the Plaintiffs." (*Id.*)  Plaintiffs demonstrated that severe public health and safety risks were likely to ensue if the Defendants moved people infected with Coronavirus to an inadequate facility.

Around the world, countries are shutting down their borders, enforcing curfews, aborting major cultural events, and cancelling school to try to prevent the spread of this disease.  The risk to Costa Mesa in terms of threats to public health and safety and interference with daily life is severe.  The threat of Coronavirus could also bring commerce to a halt and keep people shut in their homes.  Business and tourism visits could drop off dramatically, events and conventions could be canceled, jobs may be lost, millions of dollars in tax revenues could disappear, and people might stay away from Costa Mesa and Orange County.

And Costa Mesa first responders and local hospitals will bear the worst of this crisis, as the CDC has itself has acknowledged that it expects more people from the Diamond Princess to test positive for the disease, become ill, and require treatment. (Dkt. 1-1, Ex. 15.)   In other words, contrary to the suggestions of the federal and state government in their oppositions, there is almost no chance the medically fragile individuals quarantined at Fairview will remain at Fairview and not expose the broader community; many will end up in local hospitals, exposing first responders and local medical staff, at the very least.

### A. President Trump's Promise to Alabama Confirms that Coronavirus Patients Pose a Public Health Risk, and Reveals the Federal Government's Plan as an Effort to Use this Crisis as a Political Weapon

President Trump put a finer point on the harm threatened against Costa Mesa Sunday when he promised to protect Alabama residents from this very same danger even though the facility in Alabama selected as a location to treat other Coronavirus patients is far more secure and suitable for this purpose.  The public statements of Governor Ivey, Senator Shelby, and Congressman Rogers thanking President Trump for cancelling the plans to use the Center for Domestic Preparedness and thereby

"keeping Alabamians safe," make clear that President Trump's promise presumed that moving individuals with Coronavirus to the State of Alabama posed a danger to that state's public health and safety. (Further Decl. of Nahal Kazemi, "Kazemi 2nd Decl.," Ex. A.)

Moreover, if it were truly necessary to send the Coronavirus patients to new locations now, then President Trump would not have withdrawn the Government's supposedly well thought out and scientifically based plan to locate the majority of those patients at a facility in Alabama uniquely qualified to handle this threat. And the people of Costa Mesa are now left to wonder if *everyone* infected with Coronavirus will be housed in a dilapidated former assisted living facility the State of California declared just three weeks ago to be unsuitable as an emergency shelter. Indeed, the State determined this facility could not be used even as an alternative to having people sleep on the street because it required two years and $25 million dollars in rehabilitation just to make it habitable. Are the people of Costa Mesa really supposed to believe this is the best location in the entire country to serve as the frontline for combatting and containing this potential epidemic?

In the absence of any meaningful communication from the federal government, Plaintiffs and the people of Costa Mesa and Orange County are left wondering why their community was chosen and why Alabama was spared. Why are secure federal facilities and specialized medical facilities inappropriate, but a rundown former home for people with developmental disabilities is perfectly situated to contain a dangerous and deadly disease? The concerns of the Plaintiffs and the people of Costa Mesa and Orange County are not founded on baseless rumors or fearmongering. Instead, the harm this virus could wreak on the community is palpable, and is exacerbated by the fact that the information they are receiving from the government is contradictory, incomplete, and constantly changing. Instead of getting reassurance that the federal government is working to

keep this region safe, Plaintiffs and those similarly situated feel abandoned by their government.  Worse than abandoned, they feel targeted.

### B. Plaintiffs' Further Declarations Underscore the Potential Harm and Explain that Plaintiffs Have Only Just Begun to Understand the Potential Detrimental Impact to Their Community

City employees have filed additional declarations with this reply in support of Plaintiffs' positions, highlighting the startling lack of coordination at the local level and how that lack of coordination is negatively affecting the City's ability to respond to any emergencies or public health threats arising from the use of Fairview to isolate Coronavirus patients.  For example, Acting Police Chief Bryan Glass identified key information the City's leadership would expect to receive in the event of a public health emergency that would allow it to better coordinate with other levels of government in responding to any threats.  (Glass Decl. at ¶ 5.)  He noted the failure to include City leadership in the planning process here would hamper the City's ability to serve as an effective partner.  (*Id.* at ¶ 6.)

Emergency Services Manager Jason Dempsey compared the bare bones and unconfirmed information he received from Cal OES to the robust and detailed action plan he would prepare for a relatively mundane event, like a football training camp that was expected to pose no threat to the community.  (Dempsey Decl. at ¶ 4.)  He gave detailed examples of information the City still did not have and which it needed to ensure community safety in the event Fairview was used to isolate Coronavirus patients.  (*Id.* at ¶ 7.)

And City Manager LoriAnn Farrell Harrison described in her declaration the normal methods and legal authorities relied on to coordinate among federal, state, county, and local officials, including activation of the National Incident Management System (NIMS), which is the standard protocol for coordinating a whole government response to an emergency.  (Farrell Harrison Decl. at ¶ 28.)  The NIMS system was not activated here, meaning critical information has not gotten to

those who need it and vital lines of communication have not been opened.  (*Id*. at ¶ 29).

Accordingly, and contrary to Defendants' claims of robust coordination (Dkt. 14 at 2-4), the intentional exclusion of the public safety officials and emergency managers with the best understanding of this community has ensured that planning for the use of Fairview has been inadequate and incomplete, increasing the risk to Costa Mesa and the surrounding area.

## C.   Defendants' Suggestion that FDC is the Only Possible Site Because it is the Only Suitable State-Owned Property Makes No Sense

Defendants expended a great deal of energy attacking the declaration of Costa Mesa City Attorney Kim Barlow.  They said it needed more details. (Dkt. 13 at 10.) They said it was hearsay (even though the statements relayed in it were those of the Defendant Department of General Services, making them admissible as those of a party opponent. (*Id.*).  And they said it didn't address the particular usage proposed. (*Id.*)  But what Defendants did not do was dispute its accuracy.  That is because the facts are plain: On February 5, 2020, representatives of the State Department of General Services, which has responsibility for the closure of the Fairview Developmental Center, informed officials from the City of Costa Mesa that the site was not suitable for use as an emergency homeless shelter.  And the reason given was the time (two years) and cost (approximately $25 million) necessary to make the facility fit for that purpose. (Dkt. 4-3).

If it was the case not three weeks ago that the Fairview Developmental Center was unfit as an alternative to people sleeping on the street, how are Plaintiffs to believe that the minor modifications Defendants claim were made over the weekend (Dkt. 14-3 at ¶5) were sufficient to make this facility better suited to now house, isolate, treat, and care for highly contagious individuals than a FEMA center tailor-made to this purpose?

5

REPLY IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION

Rather than confronting these facts, Defendants fall back on the position that that no other state-owned facilities are suitable. But Defendants give no reason why a facility must be state-owned to be used for this purpose. And there are certainly better suited federal facilities. There are also better suited medical facilities, such as all those designated to treat Ebola patients in 2014. As the Ocean View Unified School District argued in its amicus brief in this case:

> There are approved facilities that are well-positioned to receive, treat, and suppress the spread of the Coronavirus. In coordination with the CDC, California state officials approved and designated certain hospitals to address the Ebola virus. Those hospitals include Kaiser Oakland Medical Center, Kaiser South Medical Center in Sacramento, University of California San Francisco Medical Center, University of California Davis Medical Center in California. (https://www.infectioncontroltoday.com/viral/35-us-hospitals-are-designated-ebola-treatment-centers). Based on the designation of these facilities as Ebola virus treatment centers, these facilities are much more appropriate than Fairview, which is basically closed down. These facilities have appropriate treatment rooms to minimize or eliminate the spread of the Coronavirus. More importantly, medical personnel and staff in these facilities are rigorously trained in preventing the spread of the Ebola virus, which procedures are very similar those recommended by the CDC for treatment of the Coronavirus.
>
> Recently, 13 Americans infected with the Coronavirus aboard a cruise ship off the coast of Japan were transported to Omaha, Nebraska for treatment of the Coronavirus at University of Nebraska Medical Center (UNMC). (https://www.nebraskamed.com/biocontainment/coronavirus-qa-what-it-is-and-how-to-avoid-it). It is no

6

coincidence that UNMC is one of the 35 facilities designated to treat the Ebola virus."

Moreover, even if Defendants were correct that a dilapidated former assisted living facility could somehow be made suitable with a few minor tweaks over a weekend, then there is no reason another unused facility that is not in a densely crowded city, adjacent to residential neighborhoods, major freeways, schools, shopping centers, and a large airport, could not also be modified for this purpose.

At any rate, without any communication from Defendants, coupled with evidence that a more suitable location was vetoed by the President for political reasons, the Plaintiffs have ample reasons to conclude that the decision to place infected individuals in Costa Mesa was not made in good faith nor based on sound, scientific reasons.

### D. The Federal and State Defendants' Conflicting Narratives Undermine Their Claimed Hardships

Around the world, public health experts' best understanding of the Coronavirus is constantly changing and incomplete. Plaintiffs recognize the strain that these facts place on Defendants. But what Plaintiffs cannot understand, and what clearly undermines the Federal and State Defendants' claims that they are fully coordinating with one another and deploying their superior expertise, are all the contradictions in their respective filings.

The Federal Defendants claim that the infected individuals at issue are **asymptomatic**, need no treatment, and will place no burden on Costa Mesa, its emergency services, or its hospitals. (Dkt. 13-2 ¶7). The Federal Defendants insist the infected people are only in need of a place to stay while they complete a fourteen-day isolation period. (Dkt. 13-1 ¶10). In contrast, the State Defendants inform us that these individuals **have been diagnosed with the disease, hospitalized, treated, released**, and require *30 days'* isolation. (Dkt. 14-1 ¶10). The State Defendants add that these people are extremely medically fragile, in need of close care, and cannot

be exposed to the stress of travel.  (*Id.*; Dkt. 13 at p. 17).  The Federal and State Defendants cannot both be correct and the contradictions in their respective claims show there is no meaningful coordination at any level.

Further, while the State asserts it has fully coordinated with the County Health Agency and suggests the City is nothing more than an annoying interloper (Dkt. 14 at pp. 2-4), statements by the Orange County Health Agency expose this as yet another inaccurate statement.  Specifically, the Orange County Health Agency has expressed its concern over Defendants' hasty, ill-thought out, and poorly-communicated plan.  (Kazemi 2nd Decl., Ex. F).  And the State has only this weekend tried to coordinate with the County Health Agency (even though the Health Agency has a mandated role in enforcing quarantines and protecting public health – Dkt. 13 at p. 20).  In response, the County Executive asked the state and federal government to include Costa Mesa, neighboring cities, emergency managers, and local hospitals in the process because of the vital role each would play in minimizing the threat of this disease spreading throughout the community.  (Kazemi 2nd Decl., Ex. G).

### E.   Defendants' Narratives Conflict with the CDC's Most Recent Guidance about the Coronavirus and the Most Recent Scientific Evidence

Defendants claim there is no alleged harm to Plaintiffs because there is no threat of transmission and no threat of burden on the community's public health and emergency resources.  But this is flatly contradicted by information the CDC provided during its own teleconference on Friday.  The CDC admitted on this call that it expects more people from the Diamond Princess to not only contract the virus, but to become ill and require care. (Dkt. 1-1, Ex. 15).  And if all those people are relocated to Costa Mesa, just where are they supposed to receive medical care? According to the State's regional director for the Office of Emergency Services, in local hospitals. (Dkt. 4-5).  In their Opposition, the Federal Defendants attacked the Plaintiffs for relying on this communication as it supposedly only reflected initial

plans, (Dkt. 13 at p. 2), yet Defendants have refused to provide Plaintiffs with any information other than these "initial plans." Plaintiffs are therefore entitled to assume that Defendants mean what they say when they state that people who become ill from the disease will be transported to local hospitals.[2]

Defendants also ignore the burden that hosting federal health workers, support staff, and security personnel in the community will impose. If protocols for preventing transmission of the disease are still changing, there is a substantial likelihood of transmission of the disease to those charged with caring for the infected. Yet Defendants have provided no information on how they will prevent this potential vector of transmission. Will they be providing housing for the caregivers, medical personnel, and support staff at Fairview? Are they, too, to be isolated ore quarantined? If so, will there be sufficient space at Fairview, now that it seems that it is the only place in the entire country where the federal government intends to isolate Coronavirus patients? And if the health care, security, and support personnel are not going to be housed at Fairview, where will they stay and what precautions will be taken to prevent transmission off campus? To the extent the federal government can be said to have a plan, it has not shared that plan with the Plaintiffs or other stakeholders at risk of harm.

Further, the most recent scientific evidence shows the incubation of this disease may be as long as 24 days or longer. (Dkt. 1-1, Ex. 5). Scientific evidence also shows the virus may remain active for as long as nine days on inanimate surfaces, contradicting Defendants' claim that only close contact with infected individuals creates a risk. (Kazemi 2nd Decl., Ex. B). Individuals who have

---

[2]    Defendants also argued that leaving the infected people in Solano County would put an unfair burden on that community's public health resources. (Dkt. 14-1 ¶23). But this contention is at odds with their assertion that caring for these individuals poses **no** burden to the community where they are hosted. Nor can defendants explain why moving them to a more densely populated and more residential area without coordinating with the local government in that region is not an unfair burden.

repeatedly tested negative for the disease have transmitted it to others. (Kazemi 2nd Decl., Ex. C). And cases in Italy, Iran, and Hong Kong suggest the disease can be passed without direct contact with an infected individual. (Dkt. 1-1, Ex. 9).

Plaintiffs acknowledge that a novel and highly contagious disease is difficult to understand and even more difficult to combat. Mistakes are going to be made, such as the laboratory mistake in San Diego that allowed an individual who was still contagious to be released from the hospital. (Kazemi 2nd Decl., Ex. D). Or the mistakes made by the Japanese government in not moving more quickly or effectively to quarantine the Diamond Princess. (Kazemi 2nd Decl., Ex. E). Or our own Federal Government's decision to repatriate individuals who had the disease, over the CDC's objections. (Dkt. 1-1, Ex. 12).[3] But Defendants should recognize that whatever mistakes are made in handling patients at the Fairview Developmental Center will be borne by Costa Mesa, Orange County, and all of Southern California, at the very least. Insisting on such a makeshift facility in such a densely populated area for this quarantine will surely increase exponentially the harms arising from those mistakes.

Additionally, it is worth noting that if Fairview is the only site in the entire United States deemed acceptable for housing Coronavirus patients, it will remain that way. No other community will step up to help shoulder this burden. They will instead appeal to the President to protect them from the harm the federal government sees fit to impose on Costa Mesa. If Fairview becomes the one place with staff trained and protocols in place to contain Coronavirus, the impetus will be to send all Coronavirus infected individuals here. As the CDC now believes it can no longer prevent but can only slow the community-based transmission of the disease,

---

[3]   Defendants dismissed Plaintiffs' concerns as nothing more than internet-based rumormongering. They did not, however, contradict the assertion that the federal government overruled the CDC's own determination that it was too much of a public health risk to repatriate the infected individuals rather than leave them in hospitals abroad for treatment. (Dkt. 1-1, Ex. 12).

Defendants have themselves admitted they expect this disease will spread in the communities where it is located.  As of now, the most likely place for community-based transmission will be the only community where the federal government intends to introduce significant numbers of people with the disease – Costa Mesa.

## III.   PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS

### A.   Plaintiffs Are Likely to Prevail on Their Nuisance Claims

Defendants' arguments that Plaintiffs may not assert nuisance claims against them are meritless.  Plaintiffs have strong claims against both sets of Defendants which compel immediate injunctive relief.

First, the State Defendants' contention that Section 3482 of the California Civil Code ("Section 3482") shields them from Plaintiffs' nuisance claims oversimplifies California law and ignores the factual record showing that Defendants have no plan, and that their reckless choice of an unsuitable quarantine site needlessly exposes Plaintiffs to risks of tremendous harm.[4]

The California Supreme Court and numerous other courts interpreting California law have long recognized that, "'although [under Section 3482] an activity authorized by statute cannot be a nuisance, the Manner in which the activity is performed may constitute a nuisance.'"  *Greater Westchester Homeowners Assn. v. City of Los Angeles*, 26 Cal. 3d 86, 101 (Cal. 1979) (quoting *Venuto v. Owens-Corning Fiberglas Corp.* (22 Cal. App. 3d 116, 129)).  For example, where a public improvement "is erected *improperly*, it cannot be fairly stated that the legislature contemplated the doing of the very act causing damage."  *Paterno v. State of California*, 74 Cal. App. 4th 68, 104 (Cal. Ct. App. 1999) (emphasis in original and internal quotation marks omitted); *see also, e.g.*, *McConnell v. PacifiCorp Inc.*, 2007 WL 2385096, at *5-6 (N.D. Cal. Aug. 17, 2007) (Section 3482 did not bar plaintiffs' nuisance claims where pleadings "allege[d] that the manner in which defendant

---

[4]     Section 3482 provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance."

operated the dams has created a nuisance," notwithstanding fact that project was pursuant to a FERC-issued license); *Bright v. East Side Mosquito Abatement Dist.*, 168 Cal. App. 2d 7, 10-12 (Cal. Ct. App. 1959) (statute authorizing district to abate mosquitoes did not permit abatement in such a manner as to create a nuisance through the creation of a thick blanket of chemical fog which made it impossible for motorists to see or to proceed safely down a highway); *Ambrosini v. Alisal Sanitary Dist.*, 154 Cal. App. 2d 720, 725-27 (Cal. Ct. App. 1957) (statutory authorization to construct a sewer outfall did not preclude nuisance liability for constructing a defective outfall); *People v. Glenn-Colusa Irr. Dist.*, 127 Cal. App. 30, 36 (Cal. Ct. App. 1932) (district's statutory right to divert water from river did not give it the right to do so without protecting fish, and its failure to do so was a public nuisance).

This commonsense rule is in accord with federal common law, which similarly provides that a party may sue a federal agency under the federal common law for creating a public nuisance caused by an agency's selection of a course of action to implement a policy. *Michigan v. U.S. Army Corps of Engineers*, 758 F.3d 892, 901 (7th Cir. 2014) (Wood, J.) ("*Mich. v. U.S. Army Corps II*").

Here, Defendants have, without coordinating with county or local officials, let alone each other, decided to move forward with a quarantine in a manner that has a high likelihood of introducing precisely the types of public health concerns that nuisance laws are meant to abate.

Second, the Federal Defendants' argument that the doctrine of sovereign immunity bars Plaintiffs' federal common law nuisance claims has no legal support. Specifically, Section 702 of the Administrative Procedure Act provides a statutory basis for a federal common law claim for nuisance. Section 702 provides:

> <u>An action in a court of the United States seeking relief other than money damages</u> and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702 (emphasis added).  "This waiver of immunity found in § 702 is "generally applicable" and is not limited only to claims reviewable through the APA." *Win Win Aviation, Inc. v. Richland County, South Carolina Sheriff's Dept.*, 2015 WL 1197534, at *2 (N.D. Ill. Mar. 16, 2015); *see also Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) (Wood, J.) ("*Mich. v. U.S. Army Corps I*") ("[T]he waiver in § 702 is not limited to claims brought pursuant to the review provisions contained in the APA itself."); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("[T]he APA's waiver of sovereign immunity applies to any suit whether under the APA or not." (quotation marks omitted)); *The Presbyterian Church (U.S.A) v. U.S.*, 870 F.2d 518 (9th Cir. 1989) (§702's waiver of sovereign immunity applies more broadly than to actions under the APA itself); *Veterans For Common Sense v. Shinseki*, 644 F.3d 845, 865 (9th Cir. 2011) (same).

"The waiver covers actions that seek specific relief other than money damages," such as claims for injunctive relief. *Mich. v. U.S. Army Corps I*, 667 F.3d at 2011.  And in *Mich. v. U.S. Army Corps I*, the Seventh Circuit held that a federal common law claim for nuisance may be maintained against the federal government under Section 702.  *See id.* at 774-76.  Accordingly, the Federal Defendants' observation that the Federal Tort Claims Act does not permit injunctive relief is simply irrelevant because the FTCA is not the basis for Plaintiffs' federal common law nuisance claim.  *See id.* at 776 (noting that, "[b]y its terms, the FTCA does not apply to *any* federal common-law tort claim, no matter what relief is sought," explaining that "state tort law—not federal law—is the source of substantive liability under the FTCA," and reasoning that "if the FTCA could never apply to the type of claim advanced, then there is no reason to think that it implicitly forbids a particular type of relief for a claim outside its scope").[5]

---

[5]     The Federal Defendants urge that they need more time to respond to Plaintiffs' federal common law nuisance claims, but as of the filing of this reply, they have yet to file a more detailed rebuttal to these claims.

## B. Plaintiffs Are Likely to Prevail on Their Due Process and Civil Rights Claims

The Court already identified the considerable liberty interests at stake here, including the rights of Plaintiffs and others similarly situation to live in their homes, go to school, travel, conduct business, engage in commerce, and participate in public life. (Dkt. 9 at 3.)  Defendants' claims that these interests are not at stake rests on the unsupportable position that housing Coronavirus patients at an ill-equipped facility poses no threat to those interests.  For the reasons stated above, Defendants conduct directly and obviously threatens Plaintiffs' liberty interests.[6]

Moreover, the decisions made by Defendants in narrowing down the list of all places in the United States that could possibly serve this function to just this one facility in Costa Mesa was clearly arbitrary.  *See Corales v. Bennett*, 567 F.3d 554, 568 (9th Cir. 2009).  It was selected over far more suitable facilities and is now the only site under consideration after Senator Shelby asked the President to remove a far more suitable location as a political favor.  Fairview has no unique medical equipment.  It was not designed for patient isolation.  It is not attached to a facility specializing in infectious diseases.  It is not remote from potential vectors of transmission.  And it is not even particularly habitable.  Choosing this site over others for political reasons and at the possible expense of public safety is precisely the sort of arbitrary decision that due process protections exist to prevent.

---

[6]   Federal Defendants' cursory standing arguments fail for the same reason.  As with their deficient due process arguments, they assume that Plaintiffs' interests will not be invaded by Defendants' conduct.  This is simply untrue.  Defendants' conduct constitutes a "real" and "immediate" threat to those interests, including to the City's "proprietary interests," which are "congruent" with those of its citizens.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004).

C.    **Plaintiffs Are Likely to Prevail on Their APA Claim**

1.    <u>**The Federal Defendants' Decision is Reviewable by This Court Under the APA**</u>

The Federal Defendants advance numerous arguments claiming that this Court cannot review their administrative decision to place Coronoa virus-positive patients in an unsecure, unfit facility. Federal Defendants' argument neglects the weight of the case law. In general, there is a "strong presumption that Congress intends judicial review of administrative action." *Helgeson v. Bureau of Indian Affairs*, 153 F.3d 1000, 1003 (9th Cir.1998) (quoting *Traynor v. Turnage*, 485 U.S. 535, 542 (1988)); *see also Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–41 (1967) ("[T]he Administrative Procedure Act ... embodies the basic presumption of judicial review . . . . [O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 (1977); *ANA Int'l, Inc. v. Way*, 393 F.3d 886, 890 (9th Cir.2004) ("The default rule is that agency actions are reviewable ... even if no statute specifically authorizes judicial review").

The Federal Defendants erroneously argue the Court cannot review their placement decision because it is not a "final decision." A decision is "final" under the APA when two conditions are satisfied: "First, the action must mark the 'consummation' of the agency's decision-making process, it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotations and internal citations omitted). Here, Federal Defendants' decision to relocate the Corona virus-positive patients to the unsecure Fairview facility — as Federal Defendants told the City Council on Thursday night and President's Trump's decision on Sunday to exclude the only alternative — confirms the agency's decision-making process is complete.

Moreover, legal consequences will flow from Federal Defendants' decision. The City currently leases recreation facilities from the Department of General Services at Fairview  allowing its residents to use a portion of the Fairview facility. (Farrell Harrison Decl. at ¶ 33.)   Upon placing and quarantining the patients at Fairview, however, the quarantine procedures will eliminate the City's right to use Fairview facilities for its residents.

"[T]he general rule is that administrative orders are not final and reviewable 'unless and until they impose an obligation, deny a right, or fix *some* legal relationship as a consummation of the administrative process.  The legal relationship need not alter the legal regime to which the involved federal agency is subject." *Oregon Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 987 (9th Cir. 2006) (emphasis in original; internal quotations, alterations, and citations omitted). Likewise, a decision can satisfy the second *Bennett* element "if it has a 'direct and immediate . . . effect on the day-to-day business' of the subject party." *Id.* (*quoting Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990)); *see also Williamson County Reg. Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 193 (1985) ("the finality requirement is concerned with whether the initial decision-maker has arrived at a definitive position on the issue that inflicts an actual, concrete injury...."), *overruled on other grounds*, *Knick v. T'ship of Scott, Penn.*, 139 S.Ct. 2162 (2019).  Accordingly, because the Federal Defendants' decision creates legal consequences for the City's lease (and inflicts an actual injury in the process), the Federal Defendants' decision is final.

Federal Defendants rely on *Gallo Cattle Co. v. U.S. Department of Agriculture* to contend that if an agency exercises its discretion, that act is not a "final decision." (Fed. Defs.' Opp'n at 17-18.)   But their reliance on *Gallo* is misplaced.  There, the plaintiff was a milk producer required under federal law to pay assessments to the National Dairy Promotion and Research Board; the plaintiff challenged the constitutionality of these assessments in an ongoing administrative

proceeding and sought permission to escrow current and future assessments pending resolution of the administrative proceeding. The administrative officer denied the request to escrow the payments. The Ninth Circuit held the officer's decision was "not a 'final agency action' because it does not determine the rights or obligations of the parties, nor are there legal consequences flowing from it." The obligation to pay assessments arose under the applicable federal law, *not* from the officer's denial of interim relief: "The judicial officer's denial of interim relief imposes no obligation on Gallo at all. Further, there are no legal consequences arising from the decision denying interim relief, nor does the decision fix the rights of the parties." *Gallo*, 159 F.3d at 1199. Here, however, Federal Defendants' decision to commandeer Fairview *will* cause legal consequences for the City by depriving it of a facility it is contractually entitled to use.

The Federal Defendants next argue the Court should refrain from intervening in their arbitrary decision because the APA does not allow review of an agency decision if the applicable statute vests discretion with the agency, and — according to Federal Defendants — 42 U.S.C. § 264(a) does just that. (Fed. Defs.' Opp'n at 16-17.) But the Ninth Circuit has addressed and rejected the argument Federal Defendants advance here.

**"[T]he mere fact that a statute contains discretionary language does not make agency action unreviewable."** *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 718–19 (9th Cir. 2011) (emphasis added; internal citation and quotation omitted). *See also ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1071 (9th Cir. 2015) (holding that where a statute vested discretion with the State Department, "that does not deprive [the court] of the right to review [an agency's] actions for an abuse of its discretion or to determine if its actions were otherwise arbitrary and capricious"); *Newman v. Apfel*, 223 F.3d 937, 943 (9th Cir. 2000) ("The fact that an agency has broad discretion in choosing whether to act does not establish that the agency may justify its choice on specious grounds. To concede otherwise would be to disregard

entirely the value of political accountability, which itself is the very premise of administrative discretion in all its forms."); *Beno v. Shalala*, 30 F.3d 1057 at 1066, 1068 (9th Cir. 1994) (decision of the Secretary of Health & Human Services to grant a waiver to California to permit greater experimentation with administration of welfare benefits was reviewable even though the statute permits the Secretary to authorize waivers only "to the extent and for the period the Secretary finds necessary," and which "in the judgment of the Secretary [are] likely to assist in promoting[statutory] objectives").  Rather, the judicial review is precluded only in "'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply,' *Webster v. Doe*, 486 U.S. 592, 599 (1988), thereby leaving the court with 'no meaningful standard against which to judge the agency's exercise of discretion.' *Heckler v. Chaney*, 470 U.S. 821, 830 (1985); *see* 5 U.S.C. § 701(a)(2)." *Pinnacle Armor*, 648 F.3d at 719.

Here, the Federal Defendants rely on 42 U.S.C. § 264, which provides ample standards for the Court to judge the agency's exercise of its discretion.  Under § 264, and the correlated C.F.R. provisions, the Surgeon General is permitted to promulgate regulations "necessary to prevent the introduction, transmission, or spread of communicable diseases[.]"  The Federal Defendants' decision can therefore be examined in this context, which the Federal Defendants admit applies.

Applying the standard in § 264 reveals the Federal Defendants' decision does not further their statutory obligation to make decisions in a manner that will prevent the transmission of Corona Virus.  The Federal Defendants' decisions defy common sense.  It is impossible to fathom how a rundown building just deemed unfit to be an emergency homeless shelter, located in a densely populated area, can be the best place in the entire country to isolate individuals with Coronavirus.  The crumbling and obsolete infrastructure of Fairview and its incompatibility with the CDC's own guidelines for isolation would make it a truly illogical choice, even if it were not

located in one of the most densely populated parts of one of the most densely populated counties in the country.

Finally, Federal Defendants claim that there is no independent jurisdiction under the APA. But, where a plaintiff alleges federal constitutional violations as a result of an agency's decision, federal question jurisdiction already exists under 28 U.S.C. § 1331. *See, e.g.*, *McNary v. Haitian Refugee Ctr. Inc.*, 498 U.S. 479, 498 (1991) (holding that a statutory preclusion provision did not deprive courts of constitutional challenges to agency conduct).

> **2.   <u>Federal Defendants' Decision to Relocate Coronavirus-Positive patients to a Dilapidated Former Assisted Living Facility for Their Own Convenience and Expediency is Arbitrary and Capricious</u>**

The APA requires that where, as here, an agency acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the reviewing court shall "hold unlawful and set aside [the] agency action, findings, and conclusions." 5 U.S.C. § 706(2). "[W]hile formal findings are not required, the record must be sufficient to support the agency action, show that the agency has considered the relevant factors, and enable the court to review the agency's decision." *Beno v. Shalala*, 30 F.3d 1057, 1074 (9th Cir. 1994) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744, (1985)). An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

It is difficult to imagine a decision-making process more arbitrary and capricious than the one seen here. The federal government has taken out of consideration a facility on a secure installation, with the infrastructure, equipment,

and trained personnel to handle isolation of highly infectious individuals because a political ally of the President asked him to do so.  There is no question that Congress did not intend for the executive branch to treat this decision-making process as a way to reward political allies, at the expense of public health.  Eliminating a well-suited facility in favor of a very poorly suited one for reasons having nothing to do with good public policy or sound science is the paradigmatic arbitrary act.

The Federal Defendants' argument that there is no final decision which Plaintiffs can challenge is also inconsistent with the State's position that there is literally nowhere else to send these individuals.  Now that the Federal Defendants can no longer look to Alabama as an alternative, the decision to infected people at Fairview appears to be a fait accompli.  And refusing to publicly acknowledge that does not make it less true.

### D.      Plaintiffs Are Likely to Prevail on Their Tenth Amendment Claim

Plaintiffs also have a viable Tenth Amendment claim, which likewise supports injunctive relief.  And the Federal Defendants' contention that anti-commandeering principles do not apply here because Plaintiffs are not "State of California officers" misunderstands the law.  These principles are not limited to state officials.  To the contrary, they apply with equal force to local officials.  *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, <u>or those of their political subdivisions</u>, to administer or enforce a federal regulatory program.") (emphasis added); *Roy v. Kentucky State Police*, 881 F. Supp. 290, 292 n.4 (W.D. Ky. 1995); *see also Nat'l Ass'n of Regulatory Util. Comm'rs v. F.E.R.C.*, 475 F.3d 1277, 1283 (D.C. Cir. 2007) ("*In Printz* the Court found that New York 's anti-commandeering principle precluded a provision of the Brady Handgun Violence Prevention Act requiring <u>local law enforcement officers</u> to help conduct background checks on individuals seeking to purchase a firearm") (emphasis added).

## IV. THE STATE DEFENDANTS' FLAWED "SOVEREIGN IMMUNITY" ARGUMENTS DO NOT BAR PLAINTIFFS' CONSTITUTIONAL CLAIMS AGAINST THEM

### A. Plaintiffs' Coming Complaint Will Include the Relevant California State Officials

State and federal officials announced their plan under the cover of darkness at the eleventh hour. Clearly, time did not permit Plaintiffs to list in Friday's emergency filing the names of the involved California officials who are included as defendants in the coming complaint. But rest assured, they are named and must answer for their ongoing violations of Plaintiff Foley and other individuals' civil rights and their substantive and procedural due process rights.

Based on the Supreme Court's holding in the seminal *Ex Parte Young* case, naming the relevant state officials as defendants to Plaintiffs' coming claims eliminates any potential Eleventh Amendment concerns. *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908) (permitting federal suits against state officials to obtain prospective relief against violations of the Fourteenth Amendment.) The State Defendants cite *Ex Parte Young* but contend that case does not apply. *See* State Opp. at 18. Not so. *Ex Parte Young* clearly applies because Plaintiffs' claims are "for prospective injunctive relief against state officers in their official capacities for their alleged violations of federal law." *Id*.

In addition, the State Opposition's argument about *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984), is as misinformed as it is misleading. That case held that *Ex Parte Young* did not permit suits in federal courts against state officers alleging violations of *state* law. But it reaffirmed that *Ex Parte Young* permits suits in federal court against state officials alleging violations of federal law. *Id*. *Pennhurst* also reiterated the well-established federal principle that "a suit challenging the constitutionality of a state official's action is not one against the State." 465 U.S. at 102. Here, Plaintiffs' claims against state officials are not based on state law. They challenge the federal constitutionality of the actions of the to-be-named California officials, who will need to answer for their violations of federal

law, including the Fourteenth Amendment (as well as Section 1983 and potentially other federal statutes).

The State Defendants' other flawed arguments contend they are but pawns in this Fairview debacle because "it is the federal government's responsibility to provide security and safety precautions for housing of quarantined patients at the Fairview facility." *See* State Opp. at 19. Nonsense. *First*, that argument presents a highly factual issue for which the State Defendants' opposition provides insufficient evidence. *Second*, that argument is belied by the undisputed fact that Fairview is not federal property. *Third*, the relevant state officials cannot abandon their duties and responsibilities to the people of Costa Mesa and California because "the Feds made us do it." *Id.* Nor can the State Defendants reconcile their claim of purported "sovereign immunity" with their simultaneous – and unsupported – contention that the involved California officials are somehow powerless against the Federal government.

**B.    The Opposition Does Not Address Governor Newsom's and the California Legislature's Positions as to Whether Plaintiffs' Claims May Go Forward in this Court, Leaving Open the Possibility That They Will Consent**

The State Defendants concede that Plaintiffs' claims against them can proceed with the consent of the State of California. *See* State Opp. at 17. But their Opposition makes no mention of Governor Newsom's or the California Legislature's position on the matter.[7] Until the Court has heard from those branches of government, any consent and/or waiver arguments remain open, and any and all claims directly against the State Defendants should move forward.

---

[7]    Notably, Governor Newsom made clear last May that Fairview required "a site evaluation" and presented "constraints" in meeting housing and homelessness needs. *See, e.g.,* https://www.latimes.com/socal/daily-pilot/news/story/2020-02-23/federal-agencies-respond-to-costa-mesas-temporary-restraining-order-calling-it-disruptive-interference.

### C.   The State Defendants Ignore How the Fourteenth Amendment Prevails in a Direct Clash with The Eleventh Amendment

Section 1 of the Fourteenth Amendment states:  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The State Defendants' opposition glaringly ignores the Supreme Court's decision in *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976), regarding the interplay between the Eleventh and Fourteenth Amendments.  *Fitzpatrick* made clear that the Fourteenth Amendment trumps the Eleventh when the two are directly in conflict. *Id.*  The decision in *Fitzpatrick* was based upon the rationale that the Fourteenth Amendment, adopted well after the Eleventh Amendment and the ratification of the Constitution, operated to alter the pre-existing balance between state and federal power achieved by the Constitution and the Eleventh Amendment. *Id.*  By ratifying the Fourteenth Amendment, the states surrendered a portion of the sovereignty that had been preserved to them by the original Constitution, including their right to sovereign immunity when in conflict with the Fourteenth Amendment. "The substantive provisions [of the Fourteenth Amendment] are, by express terms, directed at the States.  Impressed upon them by those provisions are duties with respect to their treatment of private individuals."  *Fitzpatrick*, 427 U.S. at 454.

Plaintiffs' action seeks to prevent the State of California and its officers from further violating California citizens' procedural and substantive due process rights under the Fourteenth Amendment.  The State Defendants are subjecting the residents of Costa Mesa (and the rest of California) to significant risk of disease and even death.  In this action, the Fourteenth Amendment is directly in conflict with the Eleventh Amendment.  In such situations, the Fourteenth Amendment prevails (*Fitzpatrick*, 427 U.S. at 454), and Plaintiffs can bring claims directly against the State Defendants without any bar from the Eleventh Amendment.

**V.    AT A MINIMUM, THE COURT SHOULD PROVIDE PLAINTIFFS TIME TO MARSHAL THE INFORMATION AND EVIDENCE THAT DEFENDANTS HAVE WORKED SO HARD TO KEEP FROM THEM**

In the event the Court finds the Plaintiffs have not shown a substantial likelihood of success on the merits, the Court should still enjoin the transfer of people exposed or infected with Coronavirus to Costa Mesa.  Under the sliding scale variant of the standard for granting a temporary restraining order, the Court should grant the order when the balance of hardships tilts sharply in Plaintiffs' favor (as it does here), so long as there are serious questions going to the merits of the case.  *Alliance For The Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011).

Here, Defendants have shrouded from the public their decision-making process, their plans to minimize risk to the community, and whether they intend to follow the latest scientific evidence or rely on outdated protocols.  Their claims of unique and unmatched expertise ring hollow given their own about-face on the use of a far more appropriate facility on grounds unrelated to good science.  Their own briefing suggests confusion among them as to who will be served at this facility, what their needs are, how long they will be there, and whether they are likely to depend on local health care resources.

Plaintiffs respectfully request that if the Court does not continue the temporary restraining order or issue a preliminary injunction, it orders, at a minimum, evidentiary hearings on the safety and suitability of Fairview.  Finally, should the Court deny Plaintiffs' requested relief and declines to order any such hearings, Plaintiffs respectfully ask that the Court issue a stay until next Monday to allow Plaintiffs to file an appeal and emergency motion with the Ninth Circuit.

**VI.    CONCLUSION**

Plaintiffs' Application asked this Court to temporarily restrain Defendants from transporting persons infected with or exposed to the Coronavirus to any place within Costa Mesa, California until an adequate site survey has been conducted, the designated site has been determined suitable for this purpose, all necessary

safeguards and precautions have been put in place, and the public and local government have been informed of all efforts to mitigate risk of transmission of the disease.  These requests made sense at the time of Plaintiffs' original application.

But as Plaintiffs have acquired more information about Defendants' reckless and arbitrary decision-making, as well as their total lack of meaningful coordination, Plaintiffs now believe evidentiary hearings are warranted and essential for determining whether Defendants should move forward at all in Costa Mesa. Accordingly, Plaintiffs also respectfully request further evidentiary hearings to address the significant questions about the safety and suitability of Fairview for housing Coronavirus patients.

Dated:  February 24, 2020                    KELLER/ANDERLE LLP

By:   /s/ Jennifer L. Keller

Jennifer L. Keller
Attorneys for Plaintiffs,
City of Costa Mesa and Katrina Foley

REPLY IN SUPPORT OF EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER AND
ORDER TO SHOW CAUSE RE ISSUANCE OF PRELIMINARY INJUNCTION