LEON J. PAGE, COUNTY COUNSEL
MARIANNE VAN RIPER, Sr. Assistant (CA SBN 136688)
marianne.vanriper@coco.ocgov.com
LAURA D. KNAPP, Supervising. Deputy (CA SBN 162800)
laura.knapp@coco.ocgov.com
333 West Santa Ana Boulevard, Suite 407
Santa Ana, California 92701
Telephone: (714) 834-6020
Facsimile: (714) 834-2359

Attorneys for Amicus Curiae, County of Orange,

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION – SANTA ANA

| | |
|---|---|
| CITY OF COSTA MESA, and KATRINA FOLEY,<br><br>        Plaintiff,<br><br>   vs.<br><br>UNITED STATES OF AMERICA, THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES AIR FORCE, THE CENTERS FOR DISEASE CONTROL AND PREVENTION, THE STATE OF CALIFORNIA, FAIRVIEW DEVELOPMENTAL CENTER (FAIRVIEW), THE CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES, and THE CALIFORNIA DEPARTMENT OF GENERAL SERVICES,<br><br>        Defendants. | Case No. 8:20-cv-00368-JLS-JDE<br><br>**COUNTY OF ORANGE'S AMICUS CURIAE BRIEF IN SUPPORT OF CITY OF COSTA MESA'S REQUEST FOR A CONTINUED TEMPORARY RESTRAINING ORDER**<br><br>**Judge: The Honorable Josephine L. Staton**<br><br>DATE: MARCH 2, 2020<br>TIME:  2:00 P.M.<br>COURTROOM: 10A |

**TO THE HONORABLE JOSEPHINE L. STATON, ALL PARTIES HEREIN AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

The County of Orange respectfully submits the following amicus curiae brief in

support of the City of Costa Mesa's Motion for a Temporary Restraining Order ("TRO").

## 1.   **INTRODUCTION**

The Board of Supervisors of the County of Orange ("County") takes the health and safety of its citizens very seriously.  The Board takes great care in appointing a Public Health Officer and trusts that she and other Health Care Agency ("HCA") personnel will be adequately prepared to address infectious disease outbreaks threatening County residents. After all, in a public health care crisis, the County's public health personnel are the first responders and first line of defense.  However, with the limited information coming from the State and Federal government, the efforts of the County Public Health officials to protect the health and safety of County residents have been materially impaired.

Only through an exchange of information can County health officials adequately prepare for the coronavirus ("COVID-19") pandemic that is now threatening our nation and the residents of Orange County.  The County appreciates the District Court's thoughtful order requiring the parties meet and confer over the proposed utilization of the Fairview Developmental Center ("FDC").  However, during the meet and confer process, representatives of the involved Federal agencies revealed that they currently have no Operational Plan or Security Plan for the FDC—and that there would be no sharing of any such plans unless and until this litigation ends.  An Operational Plan is what would normally be provided by the Federal government and would be the roadmap that provides the detailed information, including procedures and protocols, and the assignment of respective roles and responsibilities, that the County's health care officials, as well as local law enforcement, fire departments, and hospitals would need in order to properly manage this public health crisis.[1]

As stated in the previously filed declaration of HCA's Director, Richard Sanchez, "[i]n past public health situations, the California Department of Public Health has been

---

[1] Federal government officials also admit that they have not yet made contact with any local Orange County hospitals, even though such facilities would be utilized if COVID-19 patients transferred to the FDC subsequently become symptomatic and require hospitalization.

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

much more communicative, collaborative, and timely in providing guidance and information to the Orange County Health Care Agency." Doc 24, Sanchez Decl., ¶11. The State and Federal government's seemingly abrupt decision to move COVID-19 positive patients to the FDC was thrust upon County public health officials with very little advance notice, guidance or information to ensure the safety of the residents of the County. The magnitude of this public health risk cannot be understated, particularly when the COVID-19 virus is known to be highly contagious and the FDC, which is in the middle of a densely-populated, urban County, was never intended to house infected persons. Moreover, the utilization of the FDC to house asymptomatic COVID-19 patients would appear to be inconsistent with the Center of Disease Control's ("CDC") own guidance calling for home isolation.

Hence, the County encourages the Court **to keep the existing Temporary Restraining Order in place** until (1) Operational and Security Plans are provided and all impacted stakeholders, including local public health officials, have the opportunity to review, provide vital input and prepare for the demands which will be placed upon the County's health care system and public health professionals; and, (2) that all parties agree to adhere to clearly-defined CDC protocols.

## 2. <u>THE COUNTY'S VITAL INTEREST IN PROTECTING ITS HEALTH AND WELL-BEING OF ITS CITIZENS AND ECONOMY</u>

Orange County has a population of 3.2 million, making it the *third* most populous county in California, and the *sixth* most populous in the United States. In fact, Orange County has more residents than 21 States.[2] It is the second most densely populated county in California, behind San Francisco County. Orange County consists of 8% of the total of the California population but possesses only 0.5% of its land area. Orange County possesses more density in population than Los Angeles County by almost double (4,033 vs. 2,527 persons per square mile).

---

[2] With a population of 3.2 million, Orange County has almost as many residents as the entire state of Utah (3.205 million).

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

1    Orange County is a *premiere* tourist destination, with attractions like Disneyland,

2  Knott's Berry Farm, and several popular beaches given it possesses more than 40 miles (64

3  km) of coastline.  Orange County is not only populated by its residents but also its

4  workforce and tourist visitors.  The plan to use FDC to house COVID-19 positive patients

5  in a highly densely populated County with a vibrant tourist industry would be devastating.

6  It could severely damage the County's tourism industry and local economy, and most

7  importantly local health and welfare.

8    Governed by its Board of Supervisors, the County government is responsible for

9  ensuring that County residents are safe and protected from infectious disease in the

10  community.  The County also has an interest in protecting and promoting its vibrant and

11  flourishing tourism industry.  To that end, on Wednesday, February 26, 2020, the County

12  declared both a local emergency and a local health emergency to prepare for COVID-19.

13  (Copies of the Proclamation of a Local Emergency and the Declaration of Local Health

14  Emergency are attached hereto as Exhibits A and B, respectively).  The declaration of both

15  a local emergency and local health emergency assists the County of Orange to better

16  leverage resources in order to prepare to for staffing needs and greater agency coordination

17  all while allowing for future reimbursement for County activities by state and federal

18  governments for COVID-19 related County expenses.

19    Orange County Ordinance Sec. 3-1-6(b) provides that, in the event of a proclamation

20  of local emergency, the Director of Emergency Services empowered to, *inter alia*: (1) make

21  and issue rules and regulations on matters reasonably related to the protection of life and

22  property; (2) obtain vital supplies and equipment found lacking and needed for the

23  protection of life and property; (3) require emergency services of any County officer or

24  employee.

25    A County Health Officer has great duties and responsibilities in the event of an

26  infectious disease threat or outbreak.  California Health and Safety Code section 101040

27  provides that the local County Health Officer may take any preventive measure necessary to

28  protect and preserve the public health from any public health hazard during any state or

local emergency.  In addition, California Health and Safety Code section 120175 provides that the local Health Officer knowing or having reason to believe that any infectious disease exists within the territory under his or her jurisdiction, "shall take measures as may be necessary to prevent the spread of the disease or occurrence of additional cases."

Health and Safety Code Section 120175.5 provides that during an outbreak or threat of outbreak that threatens the public's health, a local health officer shall, *inter alia*: (1) Promptly notify and update governmental entities within the local health officer's jurisdiction about communicable diseases; (2) Make any relevant information available to governmental entities, including, but not limited to, the locations of concentrations of cases, the number of residents affected, and the measures that the governmental entities should take to assist with outbreak response efforts.  In addition, the local health officer may issue orders to other governmental entities within the local health officer's jurisdiction to take any action the local health officer deems necessary to control the spread of the communicable disease.  Finally, Health and Safety Code section 120200 provides that "Each health officer, whenever required by the department, shall establish and maintain places of quarantine or isolation."

3.  **THE TRO SHOULD REMAIN IN EFFECT**

    a.  **Both the County and the City of Costa Mesa Still Lack Crucial Information Necessary to Adequately Protect the Public, Including an Operational and Security Plan for the FDC**

As indicated in the previously filed declaration of Richard Sanchez, Orange County HCA staff were requested by California Department of Public Health staff to assess infection control risk at FDC.  Doc. 24, Sanchez Decl., ¶ 6.  This raises serious questions as to the veracity of the state and federal assessment of the suitability of FDC for housing COVID-19 positive patients, and in turn, the safety of the County's residents. Information flow from the California Department of Public Health to the Orange County Health Care Agency has been consistently poor to the point that relevant information regarding COVID-19 has been willfully withheld and only discovered through media stories or direct calls

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

1    from members of the media.  *Id*. at ¶ 9.  The meet and confer process ordered by this Court
2    did not adequately address or alleviate the County's serious concerns.  The County is still in
3    need for much improved communication.

4          This is highlighted by the fact, during the Court ordered meet and confer meeting that
5    took place on the afternoon of February 27, 2020, with officials and attorneys from the
6    County, the City of Costa Mesa, the State and Federal government, the Federal government
7    admitted it had no Operational Plan or Security Plan for housing COVID-19 positive
8    persons at FDC.  When Vice Chair of the County's Board of Supervisors, Andrew Do,
9    specifically asked when the Operational Plan could be expected, a representative from the
10   Federal government replied that an Operational Plan would be provided after the conclusion
11   of this litigation, if the Federal government ultimately decides to move forward with the
12   FDC housing of COVID-19 positive persons.[3]  The U.S. Attorney representative stated that
13   when the TRO was filed, the litigation created obstacles as information is allegedly
14   "weaponized."  This recalcitrance is directly contrary to the intent of this Court's Order for
15   information exchange.  In addition, during the meet and confer process, Federal government
16   representatives repeatedly referred to "applicable standards" without ever citing any source
17   in response to crucial questions about courses of treatment, illustrating their disregard for
18   both the local public health interest and the Court's demand for more information.

19         Prior to and during the meet and confer meeting, the County's Health Officer, Dr.
20   Nichole Quick, presented a number of questions in her previously-filed declaration, the
21   answers to which she deemed important in order to adequately prepare for COVID-19 in the
22   County and for the health and safety of Orange County residents.  During the meet and
23   confer, Dr. Quick specifically noted that most of her questions would normally be
24   encompassed in an Operational Plan.  Such a plan provides details so the County, as a local
25   jurisdiction, can be prepared for what will be required of them.

26         In addition, there is a necessity to follow previously established communications flow

27
28   _____
     [3] When asked what additional approvals were required before moving forward with
     FDC, the U.S. Attorney represented that a written response would be provided.

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

1   protocols such as the activation of a "Joint Information System" to ensure impacted
2   jurisdictions are a part of any operational planning and information dissemination.  HCA
3   has been receiving multiple calls each day from local health care facilities regarding
4   possible suspect cases of COVID-19.  Timely COVID-19 guidance from the State and/or
5   Federal government is required so that accurate information can be relayed to schools,
6   colleges, and universities, and workplaces. *Id*. at ¶ 4.  This has not been occurring.

    **b.**    **CDC Protocols Must Be Clearly Defined and Followed by All Local, State and Federal Health Officials**

9       The published CDC Guidelines directly conflict with the proposed plan to isolate and
10  concentrate COVID-19 infected persons at the FDC.  The CDC guidelines provide <u>for home</u>
11  <u>isolation</u> for persons testing positive for COVID-19 patients, but who do not require
12  hospitalization.  In fact, the guidelines expressly provide that if someone is positive for
13  COVID-19, but does not require hospitalization, home isolation is <u>recommended</u>.  The
14  suitability assessment for residential placement requires there to be a separate bedroom,
15  bathroom, caregivers, access to food and other necessities.  The County believes that this is
16  the protocol being used throughout the nation—for many COVID-19 positive patients who
17  do not require hospitalization.  These guidelines, are collectively attached as Exhibit C and
18  can be found at:

19      (1)    https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-home-
20      care.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoron
21      avirus%2F2019-ncov%2Fguidance-home-care.html ; and

22      (2)    <u>https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-prevent-</u>
23      <u>spread.html</u>

24      However, during the meet and confer, the CDC guidance regarding home isolation
25  was mentioned and the question was asked by Dr. Quick, the County's Health Officer, as to
26  why the California COVID-19 positive persons are being treated differently (meaning, not
27  being placed in home isolation) than other COVID-19 positive persons elsewhere in the
28  country.  **There was no answer given.**  It was also pointed out that the COVID-19 persons

1    to be placed at FDC would not be isolated from *each other*.  This is particularly alarming
2    since the congregate isolation situation did not fare well for the crew on the Diamond
3    Princess cruise ship and clustering asymptomatic COVID-19 patients together raises the
4    specter of repeated re-infections of patients no longer testing positive.

5        c.    **According to the Federal Government, the FDC Is Currently the <u>Only</u>**
6              **<u>Non-Military/Non-Hospital Location Designated in the Entire Country to</u>**
7              **Potentially House COVID-19 Positive Patients**

8            As we learned during the meet and confer process, there is only one non-military
9    location in the entire country which is being utilized for congregate isolation of COVID-19
10   positive persons not requiring hospitalization.  That location is at Texas Center for
11   Infectious Disease in San Antonio, Texas.  Therefore, if FDC is designated as planned, it
12   will be the only non-medical/non-military facility in the entire country to house COVID-19
13   positive patients.

14           Federal officials also confirmed that presently there are five military bases being used
15   to quarantine COVID-19 patients.  They repeatedly indicated that these five sites were
16   erected *within days*.  This shows the Federal government's cavalier attitude and lack of
17   appreciation for the significant difference between quarantining people in isolated locations
18   using government personnel and placing quarantined patients in the middle of one of the
19   most-densely populated locations in the country while using civilian personnel.

20           During the meet and confer process, local officials were also informed that the State
21   of California has thousands of properties in its inventory.  And if the federal government
22   truly plans on only ever sending "8 or 9" asymptomatic COVID-19 patients to the FDC, the
23   balance of equities strongly favors following CDC protocols and allowing these persons to
24   instead isolate at home.

25       d.    **The Fact That the Federal Officials Left Wide Open the Possibility FDC**
26             **May Be Used To House COVID-19 Patients From Other States Should**
27             **Weigh Heavily In This Court's Decision.**

28           During the meet and confer, the Federal representatives indicated that currently there

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

are 8 or 9 persons from the Diamond Princess cruise ship that they are contemplating moving to the FDC but would not commit to capping the number.  This leaves open the possibility of housing COVID-19 infected persons from other states at FDC.  This heightened use, in particular, demands a more formal and defined approach, which an Operational Plan and Safety Plan would ensure.

## 4.    **CONCLUSION**

The District Court has recognized that local authorities do not enjoy a veto over national health care policy.  At the same time, the County of Orange should not be subjected to Defendants' arbitrary and capricious – and seemingly entirely irrational – selection of the FDC, a facility that is wholly unsuited for the concentration of COVID-19 patients.  Even after hours of discussion, we simply do not understand the rationale of the State and Federal government in selecting this facility.  We believe that Defendants can do much better than this.

The lack of transparency, candor and open communication between the State and Federal government with the County and its local counterparts is alarming in light of the significant threat to public health and safety posed by the COVID-19 virus.  Until an Operational Plan and Security Plan for the FDC is developed, and until Defendants agree to abide by CDC-guidance recommending home isolation of asymptomatic COVID-19 patients, the County respectfully requests that the TRO remain in place.

DATED:  February 28, 2020

Respectfully submitted,

LEON J. PAGE, COUNTY COUNSEL
MARIANNE VAN RIPER, SENIOR ASSISTANT
LAURA D. KNAPP, SUPERVISING DEPUTY


By: _____/s/_____
       LEON J. PAGE, COUNTY COUNSEL

Attorneys for Amicus Curiae, COUNTY OF ORANGE

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

COUNTY OF ORANGE
STATE OF CALIFORNIA
PROCLAMATION OF A LOCAL EMERGENCY

REQUEST FOR GOVERNOR TO DECLARE A STATE OF EMERGENCY

WHEREAS, in accordance with Government Code Section 8630, a local emergency may be proclaimed by the Board of Supervisors of the County of Orange or by an official so designated by ordinance adopted by the Board of Supervisors; and

WHEREAS, Section 3-1-6(a) of the Codified Ordinances of the County of Orange provides that the Director of Emergency Services shall request the Board of Supervisors to proclaim a local emergency when the Board of Supervisors is in session and the Chair of the Emergency Management Council to so proclaim when the Board of Supervisors is not in session; and

WHEREAS, the Board of Supervisors is not currently in session, and the Director of Emergency Services has requested that the Chair of the Emergency Management Council proclaim a local emergency; and

WHEREAS, a novel coronavirus, COVID-19, which causes infectious disease resulting in symptoms of fever, coughing and shortness of breath with outcomes ranging from mild to severe illness and in some cases death, has arisen in China and spread to numerous other countries including the United States; and

WHEREAS, the Centers for Disease Control and Prevention has determined the virus to be a very serious public health threat, yet the method and efficacy of transmission of the virus is not yet fully understood and no vaccine currently exists; and

WHEREAS, Orange County has a population of over 3 million residents, is a major tourist destination, has a high volume airport within its jurisdiction and is a significant

**Exhibit A - Page 10**

destination for business travel all resulting in high volumes of foreign and domestic travelers

traveling into and out of the County, which has the potential to result in significant spreading of

the disease; and

WHEREAS, the Health Officer of the County of Orange has determined that the County

is preparing for an imminent and proximate threat to public health from the virus; and

WHEREAS, communities within the geographic boundaries of Orange County have and

will continue to prepare and, as necessary, take significant response actions to any developing

contagion and to any other risks that may arise from introduction and possible spread of the

virus;

WHEREAS, the above described events are creating a condition of extreme peril to the

safety of persons and property within the territorial limits of the County of Orange which

conditions are or are likely to be beyond the control of the services, personnel, equipment and

facilities of the County of Orange, and require the combined forces of other political

subdivisions to combat;

IT IS HEREBY PROCLAIMED that a local emergency exists within the geographic area

of Orange County;

IT IS FURTHER PROCLAIMED AND ORDERED that as of this date all County

departments and agencies take those actions, measures and steps deemed necessary to assure the

safety and welfare of Orange County residents and property, including requesting mutual aid to

the extent such aid is necessary and utilizing EOC Cal Cards and any other available funding

stream to acquire resources determined by the DES or an authorized emergency purchaser as

necessary to respond to this declared emergency.

**Exhibit A - Page 11**

ACCORDINGLY, THE CHAIR OF THE BOARD OF SUPERVISORS ACTING AS THE CHAIR OF THE EMERGENCY MANAGEMENT COUNCIL HEREBY REQUESTS that the Governor declare a State of Emergency and make all relevant funds available to the County of Orange and all eligible community members and businesses, including but not limited to, California Disaster Assistance Act funds and State Private Nonprofit Organizations Assistance Program funds, and that the Governor request that the President of the United States make a Presidential Declaration of Emergency in and for the County of Orange and make all relevant funds available to the County of Orange and all eligible community members and businesses, including, but not limited to, aid provided by the Small Business Administration.

Date: 2|26|20          Signed: _____

Michelle Steel,
Chairwoman of the Board of Supervisors Acting as
the Chair of the Emergency Management Council
County of Orange

**Exhibit A - Page 12**

## DECLARATION OF A LOCAL HEALTH EMERGENCY

WHEREAS, Health and Safety Code section 101080 authorizes a local health officer to declare a local health emergency in the health officer's jurisdiction, or any part thereof, whenever the health officer reasonably determines that there is an imminent and proximate threat of the introduction of any contagious, infectious, or communicable disease, chemical agent, non-communicable biologic agent, toxin, or radioactive agent;

WHEREAS, the Centers for Disease Control and Prevention announced on February 25, 2020 that community spread of COVID-19 is likely to occur in the United States;

WHEREAS, based on the Centers for Disease Control and Prevention statements, there is an ongoing risk and likelihood of COVID-19 positive patients being identified in Orange County;

WHEREAS, based on the foregoing, there is an imminent and proximate threat of the introduction of COVID-19 in the County of Orange and a threat to the public health of the County residents;

THEREFORE, the County Health Officer hereby declares a health emergency.

Nichole Quick, MD, MPH
Health Officer

2/26/2020
Date

 Centers for Disease
Control and Prevention

# Coronavirus Disease 2019 (COVID-19)

 **On February 11, 2020 the World Health Organization announced an official name for the disease that is causing the current outbreak of coronavirus disease, COVID-19. CDC will be updating our website and other CDC materials to reflect the updated name.**

# Interim Guidance for Implementing Home Care of People Not Requiring Hospitalization for 2019 Novel Coronavirus (2019–nCoV)

**Updated February 12, 2020**

Printer friendly version ■ [PDF]

This interim guidance is for staff at local and state health departments, infection prevention and control professionals, and healthcare personnel who are coordinating the home care and isolation[1] of people with confirmed or suspected 2019-nCoV infection, including persons under investigation (see Criteria to Guide Evaluation of Persons Under Investigation (PUI) for 2019-nCoV). This includes patients evaluated in an outpatient setting who do not require hospitalization (i.e., patients who are medically stable and can receive care at home) or patients who are discharged home following a hospitalization with confirmed 2019-nCoV infection.

 **Preventing 2019-nCoV from Spreading in Homes and Communities:** Interim guidance that may help prevent 2019-nCoV from spreading among people in homes and in communities.

In general, people should adhere to appropriate transmission-based isolation precautions until the risk of secondary transmission is thought to be low. Current information on 2019-nCoV is limited, thus home precautions should be conservative based on general recommendations for other coronaviruses, like Middle Eastern Respiratory Syndrome (MERS), and may last up to 14 days.
This document does not apply to patients in healthcare settings. For interim healthcare infection prevention and control recommendations, see Interim Infection Prevention and Control Recommendations for Patients with Known or Persons Under Investigation for 2019 Novel Coronavirus (2019-NCoV) in a Healthcare Setting. CDC will update this interim guidance as needed and as more information becomes available.

## Assess the Suitability of the Residential Setting for Home Care

In consultation with state or local health department staff, a healthcare professional should assess whether the residential setting is appropriate for home care. Considerations for care at home include whether:

- The patient is stable enough to receive care at home.
- Appropriate caregivers are available at home.
- There is a separate bedroom where the patient can recover without sharing immediate space with others.
- Resources for access to food and other necessities are available.
- The patient and other household members have access to appropriate, recommended personal protective equipment (at a minimum, gloves and facemask) and are capable of adhering to precautions recommended as part of home care or isolation (e.g., respiratory hygiene and cough etiquette, hand hygiene);
- There are household members who may be at increased risk of complications from 2019-nCoV infection (.e.g., people >65 years old, young children, pregnant women, people who are immunocompromised or who have chronic heart, lung, or kidney conditions).

**Exhibit C - Page 14**

1/2

# Provide Guidance for Precautions to Implement during Home Care

A healthcare professional should

- Provide CDC's Interim Guidance for Preventing 2019 Novel Coronavirus (2019-nCoV) from Spreading to Others in Homes and Communities to the patient, caregiver, and household members; and
- Contact their state or local health department to discuss criteria for discontinuing any such measures.

## Footnotes

[1]Isolation is defined as the separation or restriction of activities of an ill person with a contagious disease from those who are well.

## Additional Resources

- Interim Healthcare Infection Prevention and Control Recommendations for Persons Under Investigation for 2019 Novel Coronavirus
- Interim Guidance for Preventing 2019 Novel Coronavirus (2019-nCoV) from Spreading to Others in Homes and Communities
- Interim Guidance for Healthcare Professionals

Page last reviewed: February 12, 2020

**Exhibit C - Page 15**

 Centers for Disease
Control and Prevention

## Coronavirus Disease 2019 (COVID-19)

# Interim Guidance for Preventing the Spread of Coronavirus Disease 2019 (COVID-19) in Homes and Residential Communities

Update: February 14, 2020

**(This guidance provides clarification regarding evaluation for home isolation and a new section with information regarding preventative steps for** household members, intimate partners, and caregivers **in a nonhealthcare setting of a person with symptomatic, laboratory-confirmed COVID-19.)**

This interim guidance is based on what is currently known about the epidemiology of COVID-19 and the transmission of other viral respiratory diseases. CDC will update this interim guidance as needed and as additional information becomes available.

Coronaviruses are a large family of viruses, some causing illness in people and others that circulate among animals, including camels, cats, and bats. Rarely, animal coronaviruses can infect people exposed to infected animals, and then spread among people, as has been seen with MERS-CoV and SARS-CoV, and likely now with SARS-CoV-2, the virus that causes COVID-19. This interim guidance may help prevent this virus from spreading among people in their homes and in other residential communities.

This interim guidance is intended for:

- People with confirmed or suspected COVID-19, including persons under investigation, who do not need to be hospitalized and who can receive care at home (see Interim Guidance for Implementing Home Care of People Not Requiring Hospitalization for Coronavirus Disease 2019 (COVID-19));
- People with confirmed COVID-19, who were hospitalized and then determined to be medically stable to go home (see Interim Guidance for Implementing Home Care of People Not Requiring Hospitalization for Coronavirus Disease 2019 (COVID-19));
- Household members, intimate partners, and caregivers in a nonhealthcare setting of a person with symptomatic, laboratory-confirmed COVID-19.

## Prevention steps for

**People with confirmed or suspected COVID-19 (including persons under investigation) who do not need to be hospitalized**

*and*

**People with confirmed COVID-19 who were hospitalized and determined to be medically stable to go home**

Your healthcare provider and public health staff will evaluate whether you can be cared for at home. If it is determined that you do not need to be hospitalized and can be isolated at home, you will be monitored by staff from your local or state health department. You should follow the prevention steps below until a healthcare provider or local or state health department says you can return to your normal activities.

**Stay home except to get medical care**

You should restrict activities outside your home, except for getting medical care. Do not go to work, school, or public areas. Avoid using public transportation, ride-sharing, or taxis.

Separate yourself from other people and animals in your home

**Exhibit C - Page 16**

separate yourself from other people and animals in your home

People: As much as possible, you should stay in a specific room and away from other people in your home. Also, you should use a separate bathroom, if available.

Animals: You should restrict contact with pets and other animals while you are sick with COVID-19, just like you would around other people. Although there have not been reports of pets or other animals becoming sick with COVID-19, it is still recommended that people sick with COVID-19 limit contact with animals until more information is known about the virus. When possible, have another member of your household care for your animals while you are sick. If you are sick with COVID-19, avoid contact with your pet, including petting, snuggling, being kissed or licked, and sharing food. If you must care for your pet or be around animals while you are sick, wash your hands before and after you interact with pets and wear a facemask. See COVID-19 and Animals for more information.

**Call ahead before visiting your doctor**

If you have a medical appointment, call the healthcare provider and tell them that you have or may have COVID-19. This will help the healthcare provider's office take steps to keep other people from getting infected or exposed.

**Wear a facemask**

You should wear a facemask when you are around other people (e.g., sharing a room or vehicle) or pets and before you enter a healthcare provider's office. If you are not able to wear a facemask (for example, because it causes trouble breathing), then people who live with you should not stay in the same room with you, or they should wear a facemask if they enter your room.

**Cover your coughs and sneezes**

Cover your mouth and nose with a tissue when you cough or sneeze. Throw used tissues in a lined trash can; immediately wash your hands with soap and water for at least 20 seconds or clean your hands with an alcohol-based hand sanitizer that contains 60 to 95% alcohol, covering all surfaces of your hands and rubbing them together until they feel dry. Soap and water should be used preferentially if hands are visibly dirty.

**Clean your hands often**

Wash your hands often with soap and water for at least 20 seconds or clean your hands with an alcohol-based hand sanitizer that contains 60 to 95% alcohol, covering all surfaces of your hands and rubbing them together until they feel dry. Soap and water should be used preferentially if hands are visibly dirty. Avoid touching your eyes, nose, and mouth with unwashed hands.

**Avoid sharing personal household items**

You should not share dishes, drinking glasses, cups, eating utensils, towels, or bedding with other people or pets in your home. After using these items, they should be washed thoroughly with soap and water.

**Clean all "high-touch" surfaces everyday**

High touch surfaces include counters, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, tablets, and bedside tables. Also, clean any surfaces that may have blood, stool, or body fluids on them. Use a household cleaning spray or wipe, according to the label instructions. Labels contain instructions for safe and effective use of the cleaning product including precautions you should take when applying the product, such as wearing gloves and making sure you have good ventilation during use of the product.

**Monitor your symptoms**

Seek prompt medical attention if your illness is worsening (e.g., difficulty breathing). **Before** seeking care, call your healthcare provider and tell them that you have, or are being evaluated for, COVID-19. Put on a facemask before you enter the facility. These steps will help the healthcare provider's office to keep other people in the office or waiting room from getting infected or exposed. Ask your healthcare provider to call the local or state health department. Persons who are placed under active monitoring or facilitated self-monitoring should follow instructions provided by their local health department or occupational health professionals, as appropriate.

**Exhibit C - Page 17**

If you have a medical emergency and need to call 911, notify the dispatch personnel that you have, or are being evaluated for COVID-19. If possible, put on a facemask before emergency medical services arrive.

**Discontinuing home isolation**

Patients with confirmed COVID-19 should remain under home isolation precautions until the risk of secondary transmission to others is thought to be low. The decision to discontinue home isolation precautions should be made on a case-by-case basis, in consultation with healthcare providers and state and local health departments.

# Recommended precautions for household members, intimate partners, and caregivers in a nonhealthcare setting[1] of

**A patient with symptomatic laboratory-confirmed COVID-19**

*or*

**A patient under investigation**

Household members, intimate partners, and caregivers in a nonhealthcare setting may have close contact[2] with a person with symptomatic, laboratory-confirmed COVID-19 or a person under investigation. Close contacts should monitor their health; they should call their healthcare provider right away if they develop symptoms suggestive of COVID-19 (e.g., fever, cough, shortness of breath) (see Interim US Guidance for Risk Assessment and Public Health Management of Persons with Potential Coronavirus Disease 2019 (COVID-19) Exposure in Travel-associated or Community Settings.)

Close contacts should also follow these recommendations:

- Make sure that you understand and can help the patient follow their healthcare provider's instructions for medication(s) and care. You should help the patient with basic needs in the home and provide support for getting groceries, prescriptions, and other personal needs.
- Monitor the patient's symptoms. If the patient is getting sicker, call his or her healthcare provider and tell them that the patient has laboratory-confirmed COVID-19. This will help the healthcare provider's office take steps to keep other people in the office or waiting room from getting infected. Ask the healthcare provider to call the local or state health department for additional guidance. If the patient has a medical emergency and you need to call 911, notify the dispatch personnel that the patient has, or is being evaluated for COVID-19.
- Household members should stay in another room or be separated from the patient as much as possible. Household members should use a separate bedroom and bathroom, if available.
- Prohibit visitors who do not have an essential need to be in the home.
- Household members should care for any pets in the home. Do not handle pets or other animals while sick.  For more information, see COVID-19 and Animals.
- Make sure that shared spaces in the home have good air flow, such as by an air conditioner or an opened window, weather permitting.
- Perform hand hygiene frequently. Wash your hands often with soap and water for at least 20 seconds or use an alcohol-based hand sanitizer that contains 60 to 95% alcohol, covering all surfaces of your hands and rubbing them together until they feel dry. Soap and water should be used preferentially if hands are visibly dirty.
- Avoid touching your eyes, nose, and mouth with unwashed hands.
- You and the patient should wear a facemask if you are in the same room.
- Wear a disposable facemask and gloves when you touch or have contact with the patient's blood, stool, or body fluids, such as saliva, sputum, nasal mucus, vomit, urine.
  - Throw out disposable facemasks and gloves after using them. Do not reuse.
  - When removing personal protective equipment, first remove and dispose of gloves. Then, immediately clean your hands with soap and water or alcohol-based hand sanitizer. Next, remove and dispose of facemask, and immediately clean your hands again with soap and water or alcohol-based hand sanitizer.
- Avoid sharing household items with the patient. You should not share dishes, drinking glasses, cups, eating utensils, towels, bedding, or other items. After the patient uses these items, you should wash them thoroughly (see below "Wash

3/4

**Exhibit C - Page 18**

towels, bedding, or other items. After the patient uses these items, you should wash them thoroughly (see below "Wash laundry thoroughly").

- Clean all "high-touch" surfaces, such as counters, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, tablets, and bedside tables, every day. Also, clean any surfaces that may have blood, stool, or body fluids on them.
  - Use a household cleaning spray or wipe, according to the label instructions. Labels contain instructions for safe and effective use of the cleaning product including precautions you should take when applying the product, such as wearing gloves and making sure you have good ventilation during use of the product.
- Wash laundry thoroughly.
  - Immediately remove and wash clothes or bedding that have blood, stool, or body fluids on them.
  - Wear disposable gloves while handling soiled items and keep soiled items away from your body. Clean your hands (with soap and water or an alcohol-based hand sanitizer) immediately after removing your gloves.
  - Read and follow directions on labels of laundry or clothing items and detergent. In general, using a normal laundry detergent according to washing machine instructions and dry thoroughly using the warmest temperatures recommended on the clothing label.
- Place all used disposable gloves, facemasks, and other contaminated items in a lined container before disposing of them with other household waste. Clean your hands (with soap and water or an alcohol-based hand sanitizer) immediately after handling these items. Soap and water should be used preferentially if hands are visibly dirty.
- Discuss any additional questions with your state or local health department or healthcare provider.

## Footnotes

[1]Home healthcare personnel should refer to Interim Infection Prevention and Control Recommendations for Patients with Known or Patients Under Investigation for Coronavirus Disease 2019 (COVID-19) in a Healthcare Setting.

[2]Close contact is defined as—

a) being within approximately 6 feet (2 meters) of a COVID-19 case for a prolonged period of time; close contact can occur while caring for, living with, visiting, or sharing a health care waiting area or room with a COVID-19 case

– or –

b) having direct contact with infectious secretions of a COVID-19 case (e.g., being coughed on).

Page last reviewed: February 18, 2020

**Exhibit C - Page 19**

4/4

# CERTIFICATE OF SERVICE

I declare that I am a citizen of the United States employed in the County of Orange, over 18 years old and that my business address is 333 W. Santa Ana Blvd., Suite 407, Santa Ana, California 92701, and my email address is vanessa.leiva@coco.ocgov.com.  I am not a party to the within action.

I certify that I caused the foregoing **COUNTY OF ORANGE'S AMICUS CURIAE BRIEF IN SUPPORT OF CITY OF COSTA MESA'S REQUEST FOR A CONTINUED TEMPORARY RESTRAINING ORDER** to be served on February 28, 2020, upon all counsel of record listed below by electronic filing utilizing the U.S.D.C.'s CM/ECF:

**Daniel A Beck, Esq.**
AUSA - Office of US Attorney
300 North Los Angeles Street Suite 7516
Los Angeles, CA 90012
Ph: 213-894-2574; Fax: 213-894-7819
daniel.beck@usdoj.gov
Representing Defendants:
**The Centers for Disease Control and Prevention**
**The Department of Health and Human Services**
**The United States Air Force**
**The United States Department of Defense**
**United States of America**

**Matthew John Fletcher, Esq.**
Connor Fletcher and Hendencamp LLP
2211 Michelson Drive Suite 1100
Irvine, CA 92612
Ph: 949-622-2600; Fax: 949-622-2626
mfletcher@businesslit.com
Representing Movant: **Ocean View School District**

**Alison Sara Flowers, Esq.**
Tiffany Joy Israel, Esq.
Aleshire and Wynder LLP
3880 Lemon Street Suite 520
Riverside, CA 92501
Ph: 951-241-7338; Fax: 951-300-0984
aflowers@awattorneys.com; tisrael@awattorneys.com
Representing Amicus: **City of Newport Beach**
CITY ATTORNEY'S OFFICE
Aaron Harp, Esq. aharp@newportbeachca.gov
100 Civic Center Dr.;Newport Beach, CA 92660; Ph: 949-644-3131;

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

**Nahal Kazemi, Esq.**
**Jennifer L Keller, Esq.**
Keller Anderle LLP
18300 Von Karman Avenue Suite 930
Irvine, CA 92612
Ph: 949-476-8700; Fax: 949-476-0900
nkazemi@kelleranderle.com
jkeller@kelleranderle.com
Representing Plaintiffs:
**City of Costa Mesa and Katrina Foley**

**Darin L Wessel,**
California Department of Justice
Office of the Attorney General
600 W. Broadway, Suite 1800
San Diego, CA 92101
Ph: 619-738-9125; Fax: 619-645-2581
darin.wessel@doj.ca.gov
Representing Defendants:
**The California Department of General Services**
**The California Governors Office of Emergency Services**
**The Department of Health and Human Services**
**The State of California**

Juan C Basombrio, Esq.
Siena M Caruso, Esq.
Dorsey and Whitney LLP
600 Anton Boulevard Suite 2000
Costa Mesa, CA 92626-7655
Ph: 714-800-1400; 714-800-1499 (fax)
basombrio.juan@dorsey.com; caruso.siena@dorsey.com
Representing Amicus:
**Orange County Business Council (Amicus)**
2 Park Plaza
Suite 100
Irvine, CA 92614
Ph: 949-476-2242; 949-476-9240 (fax)

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

CERTIFICATE OF SERVICE

Philip D Kohn, Esq.
Rutan and Tucker LLP
611 Anton Boulevard Suite 1400
Costa Mesa, CA 92626-1931
Ph: 714-641-5100; 714-546-9035 (fax)
pkohn@rutan.com
Representing Amicus:
City of Laguna Beach (Amicus)

I declare that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.  Executed in Santa Ana, California this 28th day of February, 2020.

/s/
Vanessa Leiva

OFFICE OF THE COUNTY COUNSEL
COUNTY OF ORANGE

CERTIFICATE OF SERVICE