Jennifer L. Keller, SBN 84412
jkeller@kelleranderle.com
Nahal Kazemi, SBN 322026
nkazemi@kelleranderle.com
KELLER/ANDERLE LLP
18300 Von Karman Ave., Suite 930
Irvine, CA 92612
T: (949) 476-8700 | F: (949) 476-0900

Kimberly Hall Barlow, SBN 149902
kimberly.barlow@costamesaca.gov
77 Fair Drive
Costa Mesa, CA 92626
T: (714) 754-5000

*Attorneys for Plaintiffs, City of Costa
Mesa and Katrina Foley*

Nicola T. Hanna, United States Attorney
David M. Harris, Assistant United States
Attorney Chief, Civil Division
Joanne S. Osinoff, Assistant United States
Attorney Chief, General Civil Section
Daniel A. Beck, Cal. SBN 204496
daniel.beck@usdoj.gov
Assistant United States Attorney
Federal Building, Suite 7516
300 North Los Angeles Street
Los Angeles, CA 90012
T: (213) 894-2574 | F: (213) 894-7819

*Attorneys for Federal Defendants*

Xavier Becerra, Attorney General of
the State of California
Jennifer M. Kim, SBN 178364
Supervising Deputy Attorney General
Jennifer.Kim@doj.ca.gov
Darin L. Wessel, SBN 176220
Deputy Attorney General
Darin.Wessel@doj.ca.gov
Michael E. Byerts, SBN 218946
Deputy Attorney General
Michael.Byerts@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
T: (213) 269-6266 | F: (213) 897-2805

*Attorneys for State Defendants*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| CITY OF COSTA MESA and KATRINA FOLEY, | **Case No.  8:20-cv-00368-JLS-JDE** |
| Plaintiffs, | |
| vs. | **JOINT STATUS REPORT** |
| UNITED STATES OF AMERICA, THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES AIR FORCE, THE CENTERS FOR DISEASE CONTROL AND PREVENTION, THE STATE OF CALIFORNIA, FDC (FAIRVIEW), THE CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SERVICES, and THE CALIFORNIA
DEPARTMENT OF GENERAL
SERVICES,

        Defendants.

Pursuant to the Court's Order (Dkt. 29), Plaintiffs City of Costa Mesa and Katrina Foley ("Plaintiffs") and Defendants United States of America, The Department of Health And Human Services, The United States Department of Defense, The United States Air Force, The Centers for Disease Control and Prevention, The State of California, FDC (Fairview), The California Governor's Office of Emergency Services, and The California Department of General Services ("Defendants"), hereby submit this Joint Status Report.

At the invitation of the Court, Third-party County of Orange (the "County") also participated in the court-ordered meeting the Parties held on Thursday, February 27, 2020.

The joint portions of this Report reflect those areas where the Parties agree. Separate sections within this Report reflect the positions of the Parties where they diverge.  For ease of reference, any exhibits submitted in support of this Report by the Plaintiffs are designated with numbers.  Exhibits submitted by the State and Federal Defendants are designated with letters.

## I.   <u>THE MEETING AND PARTICIPANTS</u>

At the Court's direction, on Tuesday, February 25, 2020, the City and County posed to the Defendants questions (*see* Exhibit 1) relating to the three topics the Court directed the Participants to discuss, namely: "(1) the basis on which the determination was made that the Fairview Development Center ("FDC") in Costa Mesa, California is an appropriate facility to house asymptomatic individuals who have tested positive for COVID-19, (2) the specific measures that have been and will be taken by the state and federal governments to ensure the health, safety and welfare of the surrounding community, and (3) the anticipated number of individuals who will be housed at FDC, both initially and over time." (Dkt. 29).  Defendants were directed to "use best efforts to obtain answers to all such questions by the time the parties meet."  (*Id.*).

The County hosted the Court-directed meeting in its conference center in Santa Ana at 1:30 p.m. on Thursday, February 27, 2020.  At the meeting, the Parties and the County (altogether, the "Participants") met to try to open lines of communication and ensure the City and the County received more specific information on the subjects the Court directed the parties to discuss. Representatives for their Participants and their counsel all participated, with representatives for Defendants participating by teleconference.

Participating for the Plaintiffs were:

- Mayor Katrina Foley, Plaintiff
- Andrea Marr, PE, City Council Member
- Lori Ann Farrell Harrison, City Manager
- Bryan Glass, Chief of Police
- Dan Stefano, Fire Chief
- Jason Dempsey, Emergency Services Manager
- Connor Lock, Mayor's Chief of Staff
- Steve Gordin, Ph.D., the City's consultant on structural and seismic engineering

Counsel for the Plaintiffs were:

- Nahal Kazemi of Keller/Anderle, LLP
- Shaun Hoting of Keller/Anderle, LLP
- MC Sungaila of Haynes and Boone, LLP
- Kimberly Hall Barlow, City Attorney

Participating for the County were:

- OC Board of Supervisors Chairwoman Michelle Steel (and staff)
- OC Board of Supervisors Vice Chair Andrew Do (and staff)
- Frank Kim, County Executive Officer
- Richard Sanchez, Director, OC Health Care Agency
- Dr Nichole Quick, County Health Officer, Orange County

JOINT STATUS REPORT

- David Souleles, Deputy Agency Director, Public Health Services, OC Health Care Agency
- Dr Matthew Zahn, Medical Director, Communicable Disease Control
- Tammi McConnell, Emergency Medical Services Director, Medical/Health Operational Area Coordinator
- Jessica Good, Health Care Agency Public Information Officer
- Molly Nichelson, MPPM, Public Information Manager

Counsel for the County were:

- Leon Page, County Counsel
- Marianne Van Riper, Senior Assistant County Counsel
- Laura Knapp, Supervising Deputy County Counsel
- Massoud Shamel, Senior Deputy County Counsel

Participating for the Federal Defendants via Teleconference were:

- Dr. Matthew Westercamp, BNS, MS, PhD., Epidemiologist in the International Infection Control Program, Division of Healthcare Quality Promotion (DHQP), CDC
- Jonathan N. Greene, Deputy Assistant Secretary Director, Office of Emergency Management and Medical Operations, U.S. Department of Health and Human Services, Assistant Secretary for Preparedness and Response (ASPR).
- Captain Scott Lee, Federal Health Coordinating Official, HHS Office of the Assistant Secretary for Preparedness and Response (ASPR).

With the consent of all parties, Mr. Will O'Neil, the mayor of Newport Beach, which filed an amicus brief in support of the Plaintiffs and shares a long border with Costa Mesa, as well as a school district, participated in the meeting. Representatives from Congressman Harley Rouda's office (whose district encompasses FDC) were also present. A representative of California Assemblywoman Cottie Petrie-Norris also attended.

3

JOINT STATUS REPORT

## II.   JOINT STATEMENT OF THE MEETING OUTCOMES

The County circulated an agenda for the meeting based on the questions posed by the Plaintiffs and County.  (See Exhibit 2).  The questions were organized into those relating to medical and public health concerns; public safety questions; the suitability and selection of Fairview Developmental Center; and burden sharing. The State Defendants provided written responses to those of Plaintiffs' questions that the State Defendants determined were within their remit to answer at the beginning of the meeting.  (See Exhibit A).

Counsel for the Federal Defendants were present in person with representatives from the CDC and Office of the Assistant Secretary for Preparedness and Response (ASPR) at the Department of Health and Human Services participating by phone.  Counsel for the State Defendants were present in person with representatives from the Governor's Emergency Operations, Governor's Office of Emergency Services, California Health and Human Services Agency, and the Department of General Services participating by phone.

At the beginning of the meeting, representatives for the City and County gave brief opening remarks, followed by brief opening remarks by representatives of the Federal and State Defendants.  The Federal Participants who were calling in from the East Coast asked to limit the time for questions to 90 minutes to two hours.

Dr. Nichole Quick posed the questions for the Plaintiffs and the County relating to medical and public health issues.  These questions largely tracked Dr. Quick's declaration, filed with the Court on February 24, 2020.  (Dkt. 25).  The representatives from the CDC and the Office of the Assistant Secretary for Preparedness and Response (ASPR) at the Department of Health and Human Services, provided those responses on behalf of the Federal Defendants.  The representatives for the State of California provided supplemental oral responses to the State Defendants' written responses.

The City's Fire Chief (Dan Stefano), Police Chief (Bryan Glass), Emergency Services Manager (Jason Dempsey), and City Manager (Lori Ann Farrell Harrison) posed questions to the Federal Defendants regarding public safety concerns. The State Defendants deferred to the Federal Defendants on this issue as the use of FDC as an isolation site would be a federal operation.

Council Member Andrea Marr, PE, Dr. Steve Gordin, and City Manager Lori Ann Farrell Harrison posed questions about the safety and suitability of the facilities at FDC for use for the intended purpose. Mayor Foley posed questions about the criteria for selecting FDC as opposed to other sites as well as why isolation could not continue on military bases. The representative from the California Department of General Services, and the Federal Defendants' representatives responded to these questions.

Ms. Farrell Harrison posed questions about burden sharing to the Federal Defendants.

The Federal Defendants who were appearing from the East Coast indicated that they were unable to address the remaining questions at this point, as the meeting had gone over two hours. Counsel for the Federal Defendants offered to provide written responses to those specific remaining questions that were not addressed during the meeting. Plaintiffs asked when those responses in writing would be provided. Federal Defendants responded that it would depend on how many questions remained at the end of the meeting, but they would endeavor to provide them promptly.

After discussing the list of questions submitted by the City and County from Exhibit 2, the Participants discussed follow up questions and questions addressing recent events since the Plaintiffs and County submitted their questions on Tuesday. This process also led to several questions that the State and Federal Defendants offered to endeavor to respond to in writing. The meeting concluded at approximately 4:35 p.m.

### III.   PLAINTIFFS' STATEMENT OF THE MEETING OUTCOMES

The Participants met to discuss the Defendants' plans to move purportedly nine COVID-19 positive individuals over 400 miles to a site the State declared just three weeks ago was unfit to use as an emergency homeless shelter, so that they could be in a residential facility where they could have their temperatures taken several times a day.[1]

During this meeting, Defendants could not explain why FDC was chosen, what criteria were used in selecting the facility (other than the fact that there are approximately ten rooms with doors that can close and access to a bathroom), why more remote facilities were not considered, and why it was perfectly safe to place these infected individuals in a facility surrounded by residential homes, but keeping them in isolation on a 6383 acre military base posed a threat to military readiness. Instead, Defendants repeatedly stated they could not explain the criteria, but that they would follow standard CDC protocols without describing those protocols, and when pressed for basic information, such as the points of contact for the lead agencies, they instead read their mission statements from their department websites.

Defendants also refused to provide basic information, like the incident command structure, operational plan, comprehensive and collaborative pre-planning information, the security plan, and when a decision on whether to use the FDC would be made.  The Defendants blamed the Plaintiffs for preventing them from sharing information by initiating litigation, even though, as this Court noted, the Plaintiff's request and the Court's Temporary Restraining Order, did not require the halting of any planning or any sharing of communication.  Defendants also refused to state how many people would be housed at the facility, whether the number would increase, or whether they intended to use the facility after the initial cohort of eight

---

[1]   Plaintiffs suggested having a court reporter present to provide a complete and accurate record of the conversation that all parties and the Court could rely on, or in the alternative, making a recording of the conversation.  The Defendants rejected this suggestion and the meeting proceeded with no transcript or recording made.

or possibly nine patients from the Diamond Princess are no longer COVID-19 positive.

Defendants could also not explain why, the day after this Court extended its Temporary Restraining Order, the California Office of Emergency Services abruptly stopped sharing its daily report on the COVID-19 situation with County and Local emergency managers. The daily report (called a Situation Cell) is a critical resource for designated emergency managers to share vital information regarding COVID-19 developments quickly and effectively. Withdrawing this information from County and Local emergency managers was certainly not in the spirit of the Court's Order to re-open lines of communication among the Participants and renders the City and County blind to critical developments in this fast-changing crisis.[2]

Before the meeting, the County and City submitted four categories of questions requesting basic information local government officials need to protect public health and safety and cooperate with state and local officials.

Plaintiffs repeatedly pressed Defendants for specific plans, procedures, protocols, and timelines. Defendants responded by citing the five previous sites where they had worked with "state and local authorities" without difficulty. In this case, there has been no effort to include the local authorities in the pre-planning process. Only at the end of the meeting, in response to questions posed by Mayor Foley, did Defendants acknowledge these five previous sites were all military bases and were set up for entirely different protocols as none of these bases will allow COVID-19 exposed individuals to remain on-site once they have tested positive.[3]

---

[2] As of the time Plaintiffs finalized this Status Report for filing, the City's Emergency Manager was still not receiving the Situation Cell, despite the State Defendants' assurances of full cooperation and transparency at the Thursday meeting.

[3] The need to coordinate with "state and local" authorities when the federal government transfers potentially infectious people by federal government aircraft to a military base is negligible. Apparently, the Defendants assumed the same would be true in setting up an operation in the middle of a densely populated city.

7

JOINT STATUS REPORT

After revealing this information, Defendants were asked if there were *any* civilian sites *anywhere* in the country, where they were considering housing COVID-19 positive patients other than FDC. They responded there was one: the Texas Center for Infectious Diseases. As the Court already knows, the only other civilian facility under consideration, the FEMA Domestic Preparedness Center in Alabama was removed from consideration by President Trump on Sunday, February 23, 2020, for reasons the Defendants have yet to articulate. The differences between sites specifically designed to monitor and handle infectious diseases, such as the sites in Alabama and Texas, and FDC are too numerous to name. The contrast between them certainly supports Plaintiffs' view that the selection of FDC was arbitrary and capricious.

The State Defendants were pressed specifically on whether any more remote sites were considered, including the Sonoma County Developmental Center (which is already closed and not surrounded by residential neighborhoods). They replied that facility was unsuitable, despite being far more isolated than FDC and having no current staff on-site in need of protection. The reason the State gave was that the boiler had been turned off, making it "impossible" to use that site. The State Defendants could not explain why the boiler being shut off by itself (which can ordinarily be remedied within a few days) created this purported, but unsupported "impossibility."

The Defendants provided no information at the meeting to suggest this selection and planning process was anything other than arbitrary and capricious.

A.    Plaintiffs' Unanswered Medical and Public Health Concerns:

The County's questions regarding medical and public health concerns were met largely with references to an as-yet not shared operational plan. Dr. Quick herself noted that most of the responses to the questions she posed would normally be included in an operational plan. When County Supervisor, Andrew Do, asked when the County and Local officials could expect to receive the operational plan, he

was told by the Federal Defendants that they would not share the operational plan while the litigation was ongoing.  This is clearly contrary to the spirit of the Court's Order (Dkt. 29), directing the Parties to re-establish open lines of communication.

County officials expressed concern that they could not properly plan to support this proposed operation or minimize its impacts on public health in the absence of an operational plan and sufficient time to review it, pose questions, and prepare for its implementation.  Defendants' refusal to disclose to the County or Local officials the operational plan *until after litigation is resolved* will leave the County Health Agency with insufficient time to review and prepare in a manner that will protect public health.

Representatives from both the State and Federal Defendants stated they had not been in contact with local hospitals or local EMS providers about capacity to transport, care for, and treat COVID-19 patients, despite repeatedly stating they would rely on local health care resources to treat patients whose symptoms became severe or other individuals who were accidentally exposed to the virus.  The State and Federal Defendants had no answers to the City's questions about when there will be more testing kits available, as there are apparently only 200 COVID-19 test kits available for the entire state of California.  As people undergoing isolation and quarantine need to be tested multiple times, the Plaintiffs are concerned the number of tests currently available is dangerously insufficient.

In response to questions about the proposed "congregate" isolation of COVID-19 positive individuals at FDC, Representatives from the Federal Defendants stated that individuals who had tested positive for COVID-19 did not present health risks to each other and did not need to be isolated from one another.[4] County Health Officer, Dr. Nichole Quick, noted that nothing in the CDC protocols

---

[4]    Plaintiffs note that one of the changes in the sheltering criteria presented by the Federal Defendants was from requiring *individual* rooms with doors that close and a *dedicated* bathroom for each room, to rooms with doors that close and *access* to a bathroom.

for COVID-19 positive individuals calls for or contemplates congregate isolation, like that proposed for FDC. The CDC's own recommendations are for either home isolation and monitoring when appropriate, or hospitalization. (See Ex. 3). This deviation from the CDC's own recommendations creates far more questions than answers and further supports Plaintiffs challenge of Defendants' course of action unsupported by their own medical and scientific guidelines.

      B.   <u>Plaintiffs' Unanswered Public Safety Concerns:</u>

Most of the City and County's questions about public safety were met with a conclusory, scripted reassurance that CDC protocols would be followed, without any elaboration on what those protocols were or whether they needed to be tailored to this particular site and set of circumstances.

County and Local officials still do not have clarity as to what level of Personal Protective Equipment (PPE) should be utilized by first responders as opposed to local medical providers. CDC representatives suggested first responders needed to take no more precautions than they would with the cold or flu. This response was inconsistent with what the County and Local public safety officials have seen in other locations responding to the COVID-19 virus.

The City and County representatives asked about where the medical, support, and security staff brought in to care for the patients would be housed. The Federal Government responded they would not be housed at FDC, but did not have any further information as to where they would stay. When asked whether these individuals presented a transmission vector to the community, given they would be in contact with infected individuals daily and then going into the community, the Federal Government dismissed this concern and claimed there was no risk.

The Federal Defendants avoided all questions related to the physical security of the site and related procedures, by asserting that information was considered "Law Enforcement Sensitive," yet there has been no information relayed to City or County Law Enforcement agencies regarding the plans. Of specific concern is information

related to access control of FDC, gate guards, roving patrols, and whether or not armed personnel other than law enforcement will be present on site. Information related to the use of force policy is also important to know for local agencies due to FDC's location and proximity to the public.

The FDC is frequently used by children in the surrounding neighborhoods as a pathway to local schools and a place to play soccer or ride skateboards. In addition to children who frequent the area, there is a community of developmentally disabled individuals in a housing development on the site. These people may not be able to fully understand the changed circumstances at FDC and may not be able to understand or obey orders from security protecting the site. For these reasons, it is critically important that City and County Law Enforcement understand the use of force policy and have an opportunity to share information with the Federal agencies and contractors that would provide security at this site.

C.   Plaintiffs' Unanswered Facility-Related Concerns:

The State Defendants provided a conclusory assurance that all systems at FDC were fully operational, but had no specific information or documentation to support this claim. The State Defendants could not explain the discrepancies between FDC's new clean bill of health and its past assessments, including its 2016 closure report that stated the HVAC system at FDC was beyond its useful life span *and failing*. (Ex. 1-B, 2016 State Report on the Closure of FDC attached to the City's Questions at p. 84). The State and Federal Defendants were also unaware of the water line break on February 11, 2020, at FDC, in the buildings Defendants stated they intend to use to house the patients. Given the significant structural deficiencies at FDC, Fire Chief Dan Stefano asked if a secondary structure had been identified on site to house individuals should the primary structure become uninhabitable for any reason. The Defendants had not identified any secondary structures for this purpose.

The State's written answers to Plaintiffs' questions contradicted their 2016 report regarding the seismic deficiencies at FDC. The 2016 report stated that the

last assessment of the buildings for seismic deficiency was conducted in 1994 (and was only a partial assessment).  (*Id.* at p. 77).  That assessment found that the buildings evaluated were in significant need of retrofit and repair.  The State Defendants' written responses (Ex. B) state, however, that buildings D, E, and F were retrofitted between 2000 and 2002 and do not present structural or seismic concerns.[5]  The State Defendants did not have any documentation to support this position and could not explain why FDC's own 2016 closure report did not reflect major work the State claims, without documentation, was done sixteen years earlier.

The State Defendants' information about the mechanical and structural concerns at FDC was vague.  Plaintiffs note that the State's own Department of General Services determined this location would not be a suitable emergency shelter without two years and $25 million in renovations, which raises significant concern about the suitability of the site.  Despite these concerns, the State Defendants could not provide any information on the condition of the buildings they intended to use, many of which are wood-framed buildings from the 1960s that have not been adequately maintained during the course of the draw-down of use of FDC.  The State Defendants had no information on whether there was an investigation of the extent of fungal attack on the building they intended to use.  They could not provide any information on the expected duration of the use of the site.

Given the significant problems at FDC, Plaintiffs do not understand why Defendants are proposing its use as a congregate isolation facility, especially given that this use diverges from the CDC's own guidelines for caring for those who do not require hospitalization.  (See Ex. 3).

The State Defendants also could not answer questions about why they had not provided contractually-required notice to the unionized state employees who work at FDC about changes to their work conditions and any health and safety precautions

---

[5]    The State did not provide any information that would correlate Buildings D, E, and F, with buildings 11-16, those that have been suggested as a potential shelter for the COVID-19 patients.

those employees should take to protect themselves, their families, and the community from transmission of COVID-19.

The State Defendants could not explain what made FDC particularly suited for use as a CDC isolation site.  They referred to the CDC sheltering criteria, but could not elaborate on the criteria they purportedly used to make their decision beyond the need for rooms with doors that closed and access to bathrooms.  Even by these criteria, FDC seems particularly ill-suited.  During his walk-through of the property with the Department of General Services on February 22, 2020, Fire Chief Dan Stefano observed in the buildings designated for use (Buildings 11-16) that there was a lack of secure enclosures, closets and small offices were being identified as potential rooms for people to occupy, and the bathrooms in that facility were open and communal.

Nor could the State Defendants answer questions posed by Mayor O'Neil about how many other state-owned or leased properties (there are over 36,000) could also meet this generic sheltering "criteria," or why other properties with "rooms with doors that closed and access to bathrooms" were deemed less suitable than FDC. They also could not explain whether remoteness from population centers was a factor considered when preparing the list of potential isolation sites.

The State Defendants could not answer Mayor Foley's questions why the alternative sites they identified, including the former Juvenile Camp in Los Angeles and the Sonoma County Developmental Center were not more appropriate than FDC, given their remoteness from population centers and the fact that there were no staff currently working on site at those locations who would need to be protected from exposure.

D.   The City and County's Unanswered Cost-Sharing Concerns:

The Defendants repeatedly asserted that if any need for medical services for the COVID-19 positive individuals arises, the Defendants must rely on local support, including local first responders and local hospitals to provide that support.  The

Federal Defendants stated that first responders would not need to take any other precautions than they would in dealing with cold or flu patients, so the Federal Government would not be providing local first responders with any PPE. The City's public safety officials noted the discrepancy between this and the CDC's droplet protocol, calling for specific PPE, including respirators, face shields, gowns, and gloves. The Defendants provided no explanation for why Orange County's first responders would not require the PPE required under the CDC's droplet protocol. (See Ex. 4). Further, no clear answer was provided regarding the issues associated with the decontamination of exposed equipment and procedures for various materials other than to research on the CDC's website.

The County and Local governments described specific, and potentially significant costs they could incur as a result of providing this support, including expenditure of PPE, decontamination of personnel and equipment, and lost staff time due to illness. The Defendants confirmed they were not prepared to commit any resources to sharing this burden.

## IV.   **FEDERAL DEFENDANTS' STATEMENT OF THE MEETING OUTCOMES**

On balance, the Court-ordered meeting was informative and productive. It illustrated how coordination between the varied Federal, State, County, and local City officers would have proceeded if the Plaintiffs had not prematurely initiated a disruptive litigation campaign, damaging these communications.[6]

At 3:53 p.m. on February 25, 2020, the Plaintiffs e-mailed to the defendants 114 questions on ten pages of pleading paper. Orange County also asked five additional questions by email. Over the next day and a half, the Federal Defendants

---

[6]   Plaintiffs' counsel initially requested that the meeting be transcribed by a court reporter, or that it be recorded. Defendants' counsel opposed, arguing that the attempt to turn the meeting into a contested trial, deposition, or cross-examination, and would defeat the entire point of attempting to open up communications. All parties therefore agreed that the meeting would not be recorded.

worked tirelessly to obtain answers to as many of these questions as possible. At the meeting, the Federal Defendants' representatives ended up answering the vast majority of the questions.

Attending for the Federal Defendants were three prominent officers from the Centers for Disease Control and Prevention and the Office of the Assistant Secretary for Preparedness and Response ("ASPR") of the U.S. Department of Health and Human Services. Since these experts are all located on the East Coast, and are working intensively on the COVID-19 health crisis, they were not able to travel in person for the meeting, and had allotted up to two hours of time for it.

First was Dr. Matthew Westercamp, BNS, MS, PhD. Dr. Westercamp is an Epidemiologist in the International Infection Control Program, Division of Healthcare Quality Promotion (DHQP), Centers for Disease Control and Prevention (CDC).

Second was Jonathan N. Greene, Deputy Assistant Secretary Director, Office of Emergency Management and Medical Operations, U.S. Department of Health and Human Services, Assistant Secretary for Preparedness and Response (ASPR).

Third was Captain Scott Lee, Federal Health Coordinating Official, HHS Office of the Assistant Secretary for Preparedness and Response (ASPR).

Although many questions were answered by multiple officers, generally Dr. Westercamp answered most of the questions focused upon the more scientific aspects of infection control, while Mr. Greene addressed the more operational aspects of the proposed use of FDC to house Diamond Princess evacuees who are California residents, if the decision to use the facility was made.

The questioning began with a process in which local public health and safety sat by a table in the middle of the room, next to the conference phone, with the other meeting participants—approximately sixty persons—all sitting at a distance from the phone in the large rectangle of tables surrounding the center.

Sitting by this middle table, Dr. Nicole Quick began with questions that largely tracked those set forth in her declaration. [Dkt. no. 25]. The questions and answers by Dr. Quick to Dr. Westercamp and Mr. Greene were efficient, and the answers were detailed and informative, since they centered on science, health, and operational issues, discussed between health professionals. Dr. Westercamp explained the details of COVID-19 and its infection control. Dr. Westercamp explained how he had inspected a portion of FDC from an infection control perspective, leading to his assessment that a small number of units would be suitable for housing California residents from the Diamond Princesss who were positive for COVID-19 but did not require hospital medical services.

Other local officers followed. Questions by Fire Chief Dan Stefano, Acting Police Chief Bryan Glass, and Emergency Services Manager Jason Dempsey were largely directed to Mr. Greene, from ASPR, who covered the operational and security aspects of the proposed site and its planned use.

Steve Gordin asked questions about seismic safety, which Federal and State representatives addressed. The State of California representatives noted that there had been a very recent inspection. Similarly, State of California representatives addressed inspections of the building's water and power systems.

Elected officials and attorneys occasionally interjected additional questions during the course of these proceedings, sometime argumentatively or demonstratively. Overall, such questions were significantly less substantive than those posed by the health and safety professionals.

After proceeding for more than two hours, at approximately 3:49 p.m. PST the Federal Defendant representatives from the East Coast had to drop off the phone call, since they did not have more time allotted, as they had indicated at the start. At that point the Federal Defendant representatives had addressed questions up to the bottom of page 8 of the Plaintiffs' 114 questions, leaving 19 questions that were not yet addressed and which the California Defendants did not answer, instead deferring

to the Federal Defendants.[7] The Federal Defendants' counsel explained that they would therefore endeavor to quickly provide written answers to these few remaining questions.

Several follow-up questions were asked by elected officials and attorneys. The Federal Defendants agreed to provide written answers to these additional questions as well, relative to the planned operation of the site.

In sum, while there were predictable periodic efforts to 'weaponize' the proceedings in various legal and political respects, they were mitigated. The meeting gave a glimpse of the type of communications between government agencies and officials that would have occurred, had there not been an immediate resort to litigation.

## V.  STATE DEFENDANTS' STATEMENT OF THE MEETING OUTCOMES

The federal government has determined (as it informed the State today, February 28, 2020) that it now does not need to use the Fairview Developmental Center site to maintain a federal quarantine of passengers from the Diamond Princess cruise ship.  This development reflects the imminent end of the quarantine period for those passengers, as well as the unexpectedly small number of passengers who have tested positive for COVID-19.  Based on initial estimates from the CDC, it was expected that as many as 50% of the passengers could test positive within the quarantine period; in fact, actual results have been much, much lower.

This development also reflects the reality that state and federal public health officials must act swiftly and decisively to confront a rapidly evolving public health crisis.  The Court's Temporary Restraining Order deprived public health officials of a secure quarantine facility at a time when such a facility was badly needed, and has occupied key hospital resources in other counties at a time when those resources

---

[7]   Specifically, questions nos. IV 17-24, 25, 27-35, and nos. V 1-2, as set forth on pages 8-10 of Plaintiffs' questions.

were needed for other patients.  This litigation has also consumed myriad other state and federal resources, including the attention of key public health officials, at a time when the State is working to marshal every available resource to protect the public.

Because the situation has evolved, and because State public health officials have found new ways to confront that evolving situation, this case is now moot.

During the February 27, 2020 meeting, the City and amici asked a series of new questions, in addition to the written questions submitted by the Court's deadline, that the State Defendants agreed to look into further.  Although this case is now moot, the State—which always endeavors to work with its local partners—now uses its best efforts to answer those questions, as follows:

1.     Does the State have any documentation showing the Risk Category 2 assessment in 2019 for the buildings at FDC proposed for CDC use?

STATE'S RESPONSE:  See documentation attached as Exhibit B.

2.     Does the State have any documentation showing that Fairview was tested for water, power, etc. and found to be fully operational?

STATE'S RESPONSE:  In  February 2020, DGS  provided cleaning and minor maintenance and repair services to buildings D, E, and F (aka Residence Halls 11 through 16), which are the only buildings being considered by the federal government.   As part of those services, DGS tested the water, sewer, and power systems within each building to confirm the systems are functional.   The tests revealed no water system or pipe leaks in buildings D, E, or F.  The State Defendants are not aware of a recent water line break at Fairview affecting buildings D, E or F. DGS found each building to be fully operational.  No formal documentation of the testing was created.

3.     What CDC criteria was used to vet the buildings proposed for use at FDC?

STATE'S RESPONSE:  The CDC sheltering criteria are attached as Exhibit C.

4.     The City learned that the Governor's Office had an information-sharing call with Orange County members of Congress.  Will these calls be expanded to include local officials?

STATE'S RESPONSE:   The Governor's office has had two legislative briefing calls, at which general coronavirus updates were shared.  There were no discussions about Fairview, or plans to house COVID-19 patients at Fairview, because of this pending litigation.  The Governor's office invited both the state Congressional delegation and state legislative officials to participate in the calls.  If those legislative officials wanted to invite or share information with local officials, including city and county governments, there was nothing preventing them from doing so.

5.     Cal-OES sends out daily briefings called the Situation Cell.  The local officials stopped receiving the updates as of Tuesday.  Will they start receiving these daily reports again?

STATE'S RESPONSE:  This is a unique event and required adjustments to the type of reporting Cal OES generates and disseminates. Cal OES is developing a new reporting model and cadence for wider dissemination for this event, which would include local government.

6.     The City identified that there is a soccer field on a portion of the grounds at the FDC that has been used in the past by nearby residents.  The City asked for details about the safety of the roads used to access the field and actual use of the field and what measures would be taken to ensure safety of those who might use the access road and soccer field.

STATE'S RESPONSE:   The operational details of the proposed FDC isolation site are to be handled by the CDC, and that includes perimeter fencing and security.  The proposed soccer field is not within the currently proposed perimeter. Buildings D, E, and F are the only structures being proposed for use as the isolation buildings.  These structures are located on the far south end of the campus, with the

remaining large campus serving as a buffer.  The soccer field is located outside the campus of buildings and is on the far north end.  Further, the State Defendants attach as Exhibit D the current map of Fairview.  The attached map shows the relative position of the Buildings D, E, and F, and the soccer fields in question.  It is the State's understanding and expectation that CDC medical personnel would make the determination of whether the access road to the soccer field and soccer field could be safely used while the proposed isolation site is in use, or whether access would need to be restricted.

7.      The City and amici participants expressed their general and specific concerns about the proposal to use Fairview as an isolation site and the potential impact of on the City financially and otherwise.

STATE'S RESPONSE:    The State Defendants initiated a search for alternative state-owned isolation sites within California because the CDC had indicated its plan to transport COVID-19 positive, asymptomatic, California residents from Travis Air Force Base to Alabama.  California health officials were concerned that such a transfer would be medically disruptive, given that the patients are elderly, and suffer from other health problems.  California health officials further determined that keeping these asymptomatic California residents in hospitals, as compared to moving them for isolation to FDC, would strain the local health systems, taking up hospital beds with patients who did not need to be hospitalized, and introduce unnecessary public health risks.  The State Defendants further decided that establishing a centralized isolation site, like the FDC proposed site, better promoted public health where residential isolation would be impracticable. Placement at a centralized isolation site, that has been serving as a skilled nursing facility, also allowed for centralized monitoring by CDC officials and medical care providers in a medically controlled environment as compared to other recognized methods for isolation. FDC is the only state-owned site identified to date that is

vacant, ready for immediate use, and, we believe, consistent with the CDC sheltering criteria.

## VI.    <u>CONCLUSION</u>

The Plaintiffs believe a continuation of the Court's order is required and an evidentiary hearing should be held to allow for examination of the decision-making process in selecting FDC as a potential COVID-19 isolation site.

Dated: February 28, 2020          KELLER/ANDERLE LLP
                                    Jennifer L. Keller
                                    Nahal Kazemi


                          By:   */s/*    *Jennifer L. Keller*
                                    Jennifer L. Keller
                                    *Attorneys for Plaintiffs City of Costa Mesa*
                                    *and Katrina Foley*


Dated:  February 28, 2020          NICOLA T. HANNA
                                    United States Attorney
                                    DAVID M. HARRIS
                                    Assistant United States Attorney Chief,
                                    Civil Division
                                    JOANNE S. OSINOFF
                                    Assistant United States Attorney
                                    Chief, General Civil Section

                                    */s/ Daniel A. Beck*

                                    DANIEL A. BECK
                                    Assistant United States Attorney

                                    *Attorneys for the Federal Defendants*

JOINT STATUS REPORT

Dated:  February 28, 2020

Respectfully submitted,

XAVIER BECERRA
Attorney General of California

/s Darin L. Wessel

DARIN L. WESSEL
MICHAEL E. BYERTS
Deputy Attorneys General
*Attorneys for the State of California;
the California Governor's Office of
Emergency Services; and the
California Department of General
Services*