# Exhibit 1

**From:** Courtney L. McKinney
**Sent:** Tuesday, February 25, 2020 3:50 PM
**To:** daniel.beck@usdoj.gov; richard.childress@usdoj.gov; caseview.ecf@usdoj.gov; USACAC.Civil@usdoj.gov; darin.wessel@doj.ca.gov; Marianne.vanriper@coco.ocgov.com
**Cc:** Jennifer L. Keller; Nahal Kazemi; Shaun Hoting; Kimberly Hall Barlow; Tarquin Preziosi
**Subject:** City of Costa Mesa, et al. vs. USA, et al.
**Attachments:** 2020-02-25 City of Costa Mesa's Questions re Defendants' Proposal to Transfer Covid-19 Patients to the FDC.pdf

Counsel,

Please see the attached document, Plaintiffs' Questions Regarding Defendants' Proposal to Transfer COVID-19 Patients to the FDC.

Due to the urgent circumstances, we are serving this document by email please let us know if you would like hard copy service as well.

Best,
**Courtney L. McKinney**
Paralegal



18300 Von Karman Ave., Suite 930   |   Irvine, California 92612-1057
949.476.8700   |   Fax 949.476.0900
cmckinney@kelleranderle.com   |   www.kelleranderle.com   |

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at info@kelleranderle.com or by telephone at 949.476.8700 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

Jennifer L. Keller, SBN 84412
jkeller@kelleranderle.com
Nahal Kazemi, SBN 322026
nkazemi@kelleranderle.com
18300 Von Karman Avenue, Suite 930
Irvine, CA 92612
T: (949) 476-8700
F: (949) 476-0900

Attorneys for Plaintiffs,
CITY OF COSTA MESA and KATRINA FOLEY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| CITY OF COSTA MESA and KATRINA FOLEY, <br><br> Plaintiffs, <br><br> vs. <br><br> UNITED STATES OF AMERICA, THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES AIR FORCE, THE CENTERS FOR DISEASE CONTROL AND PREVENTION, THE STATE OF CALIFORNIA, FDC (FAIRVIEW), THE CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES, and THE CALIFORNIA DEPARTMENT OF GENERAL SERVICES, <br><br> Defendants. | **Case No.  8:20-cv-368** <br><br> **PLAINTIFFS' QUESTIONS REGARDING DEFENDANTS' PROPOSAL TO TRANSFER COVID-19 PATIENTS TO THE FDC** |

Pursuant to the Court's Order (Dkt. 29), Plaintiffs City of Costa Mesa and Katrina Foley hereby serve upon all Defendants the following questions relating to Defendants' proposal to transfer COVID-19 patients to the Fairview Developmental Center.

## I.    Medical/Public Health Questions

1. What are the details and characteristics of COVID-19 patients? We have no information regarding the health status, total number, timeline of prior tests, timing of transport, and method of transport to Fairview Developmental Center (FDC).

2. Is the transport of patients from their current locations to FDC consistent with Centers for Disease Control and Prevention guidance on transport of COVID-19 positive patients?

   a. What are the current plans for transporting patients from their current locations to FDC?

3. Will COVID-19 patients who become symptomatic be cared for at FDC or transported to local hospitals?

   a. What is the current plan for transporting patients from FDC to local hospitals if the patients become symptomatic or otherwise need to be transported?

   b. What are the current criteria for determining whether a COVID-19 patient is symptomatic?

4. In the event COVID-19 positive patients are transported to local hospitals, who will be monitoring exposed health care workers, other staff, and transportation providers?

5. In the event COVID-19 positive patients are transported to local hospitals, how will exposed health care workers other staff, and transportation providers be monitored?

6.  Who will pay for transport and medical care, and will the 911 system be used for transport?

7.  How will COVID-19 patients be cleared?  Will it be two consecutive negative specimens separated by 24 hours, and which laboratory and which tests will be used?

8.  How can COVID-19 testing be conducted at Fairview in a safe manner given that there are no Airborne Infection Isolation Rooms (AIIR) at Fairview?

9.  Will patients be transported to a hospital for COVID-19 testing in an AIIR?

10. How will specimens be processed and sent for testing?

11. Is there onsite capacity to care for patients' other medical conditions and for blood draw, oropharyngeal and nasopharyngeal swabbing, and chest X-ray?

   a.  If there is no onsite capacity for blood draw, oropharyngeal and nasopharyngeal swabbing, or chest X-rays, how will these tests be conducted?  Where will they be conducted?

   b.  Will there be an ability to take care of other simple medical conditions such as a urinary tract infection, skin infection, hypertension, diabetes, etc.?

12. After clearing how will COVID-19 patients travel to their county of residence?

13. What are the cleaning and disinfection plans/protocols for FDC to assure no further transmission?

14. What are the planned provisions for isolating patients?

15. Are those provisions for isolating patients consistent with Centers for Disease Control and Prevention guidance, such as use of individual living quarters?

16. What are the plans for enforcing isolation orders to prevent possible community exposure of COVID-19?

   a.  What are the plans in the event that isolation is inadvertently breached?

17. Who is assessing infection control risk at FDC?

PLAINTIFFS' QUESTIONS REGARDING DEFENDANTS' PROPOSAL TO TRANSFER COVID-19 PATIENTS TO THE FDC

18. What is the workforce infection control plan and living arrangements to prevent possible community exposure as well as who will provide active monitoring for the workforce?

19. What is the infection control training for workforce on the property including medical, custodial, food service, and maintenance staff, among others?

20. What are the infection control plans for other individual residing or working at the FDC?

21. Will FDC only be used to house asymptomatic patients, or will it also house patients who are symptomatic, but deemed not to require hospitalization?

22. As Dr. Bell testified in his declaration, "whether and to what extent individuals without obvious symptoms are able to transmit infection to others is currently undetermined." As it may be possible for asymptomatic individuals to transmit the disease via viral shedding, why are the federal and state governments' isolation protocols for asymptomatic and symptomatic patients different?

23. Have the state and federal governments developed a protocol for identifying the underlying and chronic medical conditions the patients may suffer from to ensure that their medical needs can be met while isolated at FDC?

24. Have the state and federal governments developed a protocol for communicating with local hospitals/medical centers to prepare them to meet the potential needs of the patients?

## II.  **Public Safety Questions**

1. Who are the lead agencies and what are their roles?

2. Who are the incident commanders from the federal and state agencies?

3. Will Costa Mesa and Orange County be part of the Unified Command?

4. Who will be the Federal point of contact (POC) for local government requests for information?

5.      Who will be the State point of contact for local government requests for information?

6.      Who will be the Federal POC for resources and mutual aid?

7.      Who will be the State POC for resources and mutual aid?

8.      Who will be the Federal POC for media and public inquiries?

9.      Who will be the State POC for media and public inquiries?

10.     What will be the information sharing process between lead federal and State agencies and Costa Mesa and the County?

11.     How often will the City and County be updated regarding: FDC site, patients/clients, staff, problems, local support requests or potential requests, breaches of security, etc.?

12.     Who will handle any attempt by a patient to leave FDC before they are medically cleared?

13.     What is the plan in case someone does successfully leave FDC despite being positive for the virus?

14.     Will Costa Mesa Police Department be expected to respond to any calls for service at FDC during the operation?

15.     How will people be excluded from FDC?

16.     Will there be physical barriers such as walls, fencing, etc.?

17.     If there will be physical barriers to prevent access to the site, where will they be located?

18.     If there will be physical barriers to prevent access to the site, what will the barriers be?

19.     Will patients be kept a certain distance away from any physical barriers around the site?

20.     Will the site perimeter be guarded?

21.     Will any part of the site remain accessible to the public?

22. How will individuals currently living on the site (see Map attached as Exhibit A) be protected?

23. Will security be static or roving?

24. Will security be armed?

25. Will security be authorized to use deadly force?

26. What are the protocols for entering FDC during an emergency?

27. What are the common communications systems and protocols to be used at FDC?

28. Does the federal government know with a high level of certainty how COVID-19 is transmitted?

29. How far can COVID-19 travel? Is it airborne?

30. What is the level of personal protective equipment necessary for complete protection from COVID-19?

31. How long can the virus remain on various surfaces, such as porous and non-porous?

32. What is the decontamination procedure for porous and non-porous equipment?

33. What is the decontamination procedure for personnel?

34. What is the screening process for contaminated emergency response personnel?

35. Who will pay the financial obligation associated with the reconstitution of equipment and supplies, and screening of City personnel involved in a response?

36. If emergency responders are infected with COVID-19, what is the protocol?

37. Will air operations be conducted at FDC or nearby?

38. How much warning will Costa Mesa be provided prior to the arrival of air ambulance or other helicopters?

PLAINTIFFS' QUESTIONS REGARDING DEFENDANTS' PROPOSAL TO TRANSFER COVID-19 PATIENTS TO THE FDC

### III. Questions Regarding the Integrity of Fairview

#### A. Mechanical/HVAC

1. According to the State's own findings in its 2016 report on FDC (see state report attached as Exhibit B), the current ventilation system for FDC is beyond its useful life and failing.  If FDC is used to isolate anyone who may in fact be capable of spreading the infection, does the government intend to make any changes to the existing ventilation system such that it meets the CDC guidelines for isolation?

2. What are the plans to make the current mechanical system capable of creating negative ventilation?

3. Is the current mechanical system capable of creating at least six air changes per hour, per the CDC guidelines?

4. What are the plans to add HEPA filtration on building exhaust systems?

5. How long will it take to install filters and retrofit to create negative ventilation?

6. If additional rooftop equipment is added, are the buildings structurally sound to support that weight?

#### B. Seismic/Structural

The State's 2016 report (Exhibit B) by CHHS and DGS Referred to Seismic Safety Deficits at FDC.  According to Part 6 of Exhibit B, in 1994, DGS evaluated the structural status of the buildings at FDC by from nearly perfect (Risk Level I) to unsafe even in the absence of an earthquake (Risk Level VII).

Out of 53 "major" FDC buildings, 28 were evaluated (94% of total square footage):

- 3 (11%) were designated as Risk Level VI,
- 4 (14%) at Risk Level V

6

- 13 (46%) at Risk Level IV
- 8 (29%) at Risk Level III

25 "major" buildings (6% of total square footage) were not assigned a risk level. "Smaller one-story structures" were excluded from evaluation "due to funding limitations."

According to the Section of Exhibit B entitled "Special Repairs and Other Major Projects," as of 2016, no structural retrofit work has been conducted on the FDC buildings.

7. Which 28 buildings exactly were assigned the aforementioned Risk Levels?

8. Which of those 28 buildings are currently being considered for occupancy?

9. Which document was used for risk level assignment? How does this document relate to current standards (for example, ASCE 41-13)?

10. Which 25 buildings were not assigned a risk level? Are these buildings to be avoided or should they be evaluated?

11. What is the actual structural configuration of these buildings (wood framing, concrete masonry, steel frames, etc.)?

12. What was the reason for the risk classification, particularly, at the higher risk levels?

13. What is the actual condition of the "smaller one-story structures" (can be structurally deficient and hazardous, and/or should be cordoned)?

14. What is the risk rating of the buildings according to current building standards (for example, ASCE 41-13)?

15. Which (if any) FDC buildings can be approved for safe occupancy according to current standards?

## IV.   Fairview Operations and Site Certification Questions

1. If the Court's order is dissolved on March 2, what time and date will FDC actively begin housing COVID-19 patients?

2.	For how long will FDC be used for this purpose?

3.	What is the maximum number of patients to be housed simultaneously at FDC due to COVID-19 exposure?

4.	Given Defense counsel's statements at Monday's hearing that they have identified "10 units" at FDC that meet CDC requirements, what is the Defendants' plan if they need to house more patients than can be accommodated in those 10 individual rooms?

5.	Which buildings will be used to house patients?

6.	Which buildings (if any) will be used to house support staff?

7.	Will you need to put trailers on the property?

8.	Will the site be expanded?

9.	Will additional buildings at FDC, besides the "pod" identified as useable be used in the future?

10.	What other sites are being considered for FDC overflow?

11.	Have other sites in more remote areas been explored?

12.	During the hearing, counsel for defendants mentioned that the FDC was "certified" by CDC on Monday, February 24.  Under what guidelines/authority was such certification granted?

13.	Please provide us with a copy of the actual certification and any documentation (applications, declarations, etc.) supporting the certification

14.	Have the water/sewer/power systems been tested?

15.	What analysis has been done to determine the sufficiency of the water/sewer/power systems for the intended use?

16.	What are the conditions of the water/sewer/power systems?

17.	Who will be doing the repair work in the event any of these systems fail?

18.	Where will the patients in the facility be relocated to during a failure?

19.	Will you rely on FDC's existing maintenance staff to support FDC's systems?

20. If you will rely on FDC's existing maintenance staff to continue working on-site, when will you inform them of the change in their working conditions?

21. If you will rely on FDC's existing maintenance staff to continue working on-site, when will you provide them training to protect them from exposure?

22. If you will rely on FDC's existing maintenance staff to continue working on-site, what steps are you taking to prevent them from accidentally introducing the virus into the community?

23. If you will rely on FDC's existing maintenance staff to continue working on-site, what personal protective equipment will you provide them?

24. Are there any contracts in place for service and repairs, if so who and are they available 24 hours a day to respond to an isolation zone?

25. How will contract repair workers be protected and screened for contamination?

26. What are the air monitoring capabilities?

27. How will the rooms be retrofitted to provide wi-fi, TV, exercise facilities, etc. to reduce the risk of patients trying to leave the site?

28. Will access to any of the adjacent housing (on or off the facility) be affected?

29. There is an on-site community of individuals with developmental disabilities (see Exhibit A). Will access to their housing be affected by the isolation plan?

30. How will on-site security personnel be trained to deal with these individuals with developmental disabilities, who may not be able to fully understand or comply with orders?

31. How will the on-site security deal with individuals, including children, who are used to accessing the site for recreation and other purposes?

32. Will non-governmentally owned vehicles be used to transport materials into or out of FDC? Will rented vehicles be used? If so, how will these vehicles

be assessed for decontamination needs before being used by members of the general public?

33. Will all waste be treated as biohazard, including but not limited to unfinished food, scrap paper, etc.?  How will the waste be transported from FDC and to where?

34. Has a biohazard site been identified with adequate safeguards and capacity to handle the waste, including everything from bodily fluids to unfinished meals to contaminated fixtures?

35. Will any roads not on the FDC campus need to be closed or restricted during the use of the facility as an isolation center?

## V. **Burden Sharing**

1. What plan is in place to address costs incurred by Costa Mesa due to:

   a. Clean up of any areas off FDC site that become contaminated or potentially contaminated due to FDC COVID-19 patients or materials.

   b. Comprehensive personal protective equipment procurement, sustainment, decontamination, and replacement. The City should have the best available protection for its Police and Fire personnel as well as other City staff (maintenance) working in the adjacent properties.

   c. Decontamination of ambulances and other public safety apparatus used to move FDC patients with worsening health to local hospitals.

   d. Public information campaign and messaging to address public safety, health and awareness regarding the FDC in Costa Mesa.

2. What happens if a worker infects someone in the local community?

   a. Who will pay for the costs of all secondary infections?

   b. Who will respond to secondary infections in the community?

Dated: February 25, 2020          KELLER/ANDERLE LLP

By:   */s/ Jennifer L. Keller*
          Jennifer L. Keller
Attorneys for Plaintiffs,
CITY OF COSTA MESA and
KATRINA FOLEY

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE

I am over the age of 18 and not a party to the within action.  My business address is 18300 Von Karman Avenue, Suite 930, Irvine, California 92612-1057.

On February 25, 2020 I served the foregoing document described as:

**PLAINTIFFS' QUESTIONS REGARDING DEFENDANTS' PROPOSAL TO TRANSFER COVID-19 PATIENTS TO THE FDC**

on the interested parties and counsel identified on the attached service list by the following means of service:

BY E-MAIL:  The document was sent electronically to each of the individuals at the email addresses indicated on the attached service list.  The transmission was made with no error reported.

Executed February 25, 2020.

*/s/ Courtney McKinney*
Courtney McKinney

## SERVICE LIST

**United States Department of Justice**

Daniel Beck, AUSA
    daniel.beck@usdoj.gov
Richard Childress
    richard.childress@usdoj.gov

CC:   caseview.ecf@usdoj.gov
      usacac.civil@usdoj.gov

*Counsel for Defendants*, The Centers for Disease Control and Prevention, The Department of Health and Human Services, The United States Air Force, The United States Department of Defense, United States of America.

**State of California, Department of Justice**
Darin L Wessel
darin.wessel@doj.ca.gov

*Counsel for Defendants,* The State Of California, FDC (Fairview), The California Governor's Office Of Emergency Services, And The California Department Of General Services

**County of Orange**
Marianne Van Riper
    marianne.vanriper@coco.ocgov.com

*Counsel for the County of Orange*

| | |
|---|---|
| **From:** | Nahal Kazemi |
| **Sent:** | Tuesday, February 25, 2020 4:20 PM |
| **To:** | Courtney L. McKinney; daniel.beck@usdoj.gov; richard.childress@usdoj.gov; caseview.ecf@usdoj.gov; USACAC.Civil@usdoj.gov; darin.wessel@doj.ca.gov; Marianne.vanriper@coco.ocgov.com |
| **Cc:** | Jennifer L. Keller; Shaun Hoting; Kimberly Hall Barlow; Tarquin Preziosi |
| **Subject:** | RE: City of Costa Mesa, et al. vs. USA, et al. |
| **Attachments:** | Attachment B - FDC_ClosurePlan_20160401.pdf; Attachment A - FDCHousing.pdf |

Counsel,

Please see Attachments A and B to the City's Questions.

Thank you.

**Nahal Kazemi**
Senior Counsel

18300 Von Karman Ave., Suite 930   |   Irvine, California 92612-1057
949.476.8700   |   Fax 949.476.0900
nkazemi@kelleranderle.com   |   www.kelleranderle.com   |   

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at info@kelleranderle.com or by telephone at 949.476.8700 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

---

**From:** Courtney L. McKinney <cmckinney@kelleranderle.com>
**Sent:** Tuesday, February 25, 2020 3:50 PM
**To:** daniel.beck@usdoj.gov; richard.childress@usdoj.gov; caseview.ecf@usdoj.gov; USACAC.Civil@usdoj.gov; darin.wessel@doj.ca.gov; Marianne.vanriper@coco.ocgov.com
**Cc:** Jennifer L. Keller <jkeller@kelleranderle.com>; Nahal Kazemi <nkazemi@kelleranderle.com>; Shaun Hoting <shoting@kelleranderle.com>; Kimberly Hall Barlow <khb@jones-mayer.com>; Tarquin Preziosi <tp@jones-mayer.com>
**Subject:** City of Costa Mesa, et al. vs. USA, et al.

Counsel,

Please see the attached document, Plaintiffs' Questions Regarding Defendants' Proposal to Transfer COVID-19 Patients to the FDC.

Due to the urgent circumstances, we are serving this document by email please let us know if you would like hard copy service as well.

Best,
**Courtney L. McKinney**
Paralegal



18300 Von Karman Ave., Suite 930   |   Irvine, California 92612-1057
949.476.8700   |   Fax 949.476.0900
cmckinney@kelleranderle.com   |   www.kelleranderle.com   |

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply e-mail at info@kelleranderle.com or by telephone at 949.476.8700 and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.



# Housing near Fairview Development Center (FDC)

<span style="color:magenta">■</span> Habor Village Apartments (State apartments on long term lease)

<span style="color:yellow">■</span> Cornerstone (prviate condominium project)

<span style="color:blue">■</span> Mark Ln (State-housing for disabled persons not on FDC parcel)

<span style="color:green">■</span> Christopher Ln (State-housing for disabled persons on FDC parcel)



0    285    570    1,140 Feet



Data Source: ESRI Aerial Basemap,
City of Costa Mesa: street, address,
and parcel files.

**California Health and Human Services Agency**

**Department of Developmental Services**



**Plan for the Closure of**

# FAIRVIEW DEVELOPMENTAL CENTER

## AND

# PORTERVILLE DEVELOPMENTAL CENTER GENERAL TREATMENT AREA



**April 1, 2016**

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** ............................................................... 1


**PART 1:  INTRODUCTION** ........................................................ 4

    **Background**
    **Plan Approach**
    **Plan Development Process**


**PART 2:  ENSURING SERVICES DURING AND AFTER TRANSITION** ..................... 13

    **Individualized Planning Process and Transition Planning**
    **Monitoring for Appropriate Services**
    **Quality Management System**
    **Advocacy Services**
    **Community Resource Development**
    **Safety Net Services**
    **Access to Health and Medical Services**
    **Fiscal Impact of Closure**


**PART 3:  STAKEHOLDER INPUT AND IMPACT STATEMENTS** .............................. 34

    **Summary of Public Comments**
    **Consumer Input**
    **County and City Input**
    **Response to Comments and Suggestions Received**
    **Impact of Closure**
    **Impact on Residents and their Families**
    **Impact on Employees**
    **Impact on the Communities Surrounding FDC and PDC**
    **Statutorily Required Statements of Impact on Regional Center Services**


**PART 4:  RESIDENT INFORMATION** .......................................................... 50

    **The Residents of Fairview Developmental Center**
    **The Residents of the Porterville Developmental Center**
      **General Treatment Area**

# TABLE OF CONTENTS (continued)

**PART 5:  EMPLOYEE INFORMATION** ........................................................... **56**

    **Employee Input to the Planning Process**
    **Opportunities for Developmental Center Employees**
    **Employee Career Center**
    **Employee Access to Information**
    **Staff Support Advisory Group**
    **Foster Grandparents and Senior Companions**
    **Employee Information for Fairview Developmental Center**
    **Employee Information for the Porterville Development Center**
        **General Treatment Area**


**PART 6:  FACILITY INFORMATION** .............................................................. **76**

    **Facility Information for Fairview Developmental Center**
    **Facility Information for the Porterville Developmental Center**
        **General Treatment Area**
    **Facility Information for Both Developmental Centers**
    **Disposition of Developmental Center Property Process**


**PART 7:  ATTACHMENTS** ........................................................................... **87**

**PART 8:  GLOSSARY OF ACRONYMS** ...................................................... **102**

Department of Developmental Services
Michael Wilkening, Acting Director
1600 Ninth Street, Room 240, MS 2-13
Sacramento, CA 95814
TDD (916) 654-2954 (For the Hearing Impaired)
(916) 654-1897
http://www.dds.ca.gov/DevCtrs/

## EXECUTIVE SUMMARY

This "Plan for the Closure of Fairview Developmental Center and the Porterville Developmental Center General Treatment Area" (FDC/PDC GTA Closure Plan or the plan) was prepared pursuant to Welfare and Institutions (W&I) Code section 4474.1 and is being submitted to the Legislature for approval. It provides important data and information concerning each developmental center's (DC) residents, the employees, the families and other stakeholders, and the facility land, buildings and leases. It identifies pertinent information on related initiatives and requirements that will have a bearing on services and resource development directly involved in the closure process. It presents the principles, priorities and commitments of the Department of Developmental Services (the Department or DDS) throughout the closure process and beyond. The plan formalizes the comments received from stakeholders throughout the plan preparation phase, including input received in meetings and hearings, and through written comments from organizations and individuals. The plan captures a point-in-time perspective that will change and evolve with greater dialog and experience so that the best possible outcomes can be achieved for the individuals served, their families and the DC employees.

The FDC/PDC GTA Closure Plan reflects the same approach as the Sonoma Developmental Center (SDC) Closure Plan, but is adjusted for the unique characteristics and circumstances of FDC and the PDC GTA, and is updated for more recent developments and stakeholder input.

The overriding priority for this plan is to meet the individual needs of each resident while he or she continues to live at the DC, through every aspect of transition into a community, as appropriate, and ongoing thereafter. An individualized process is essential for proper planning and assessment of needs, and will include key persons in the resident's life. Efforts will focus on identifying or developing services and supports to meet the specific needs of each resident, and ensuring the quality of those services through monitoring and oversight functions. Residents will not move from the DC until appropriate services and supports identified in their Individual Program Plan (IPP) are available in the community. The transition planning process will be used to ensure services and supports are appropriately coordinated and in place when the individual moves into his or her new home.

Consistent with statutory requirements, the plan identifies the essential policies and strategies that will be utilized to:

- Achieve a safe and successful transition of individuals with developmental disabilities from the DC to appropriate community-based living arrangements, as determined through the individualized planning process;

- Support employees with future employment options by generating or identifying job opportunities, providing assistance, counseling and information, and working closely with the affected bargaining units (BU); and

1

- Work with the Department of General Services (DGS) to assess the DC property and determine its disposition.

The input received from stakeholders is the first essential phase of the closure planning process.  The Department values the input received so far from the DC residents, families, employees and all other stakeholders.  If this plan is approved, stakeholder input will continue to be critical as the closure process evolves.

The closure of each DC will impact all who live or work at the DC as well as their families, friends, and the local community.  The well-being of the residents and employees of the DC will remain the top priority for the Department throughout the closure process.  Acknowledging that change is difficult, the Department is committed to developing positive options for both the residents and employees, and supporting them in meaningful ways.

Below is a summary of the important components of this plan:

- **Health Clinic Services.**  The Department will offer key specialized health clinic services and supports at each DC throughout the closure process, and until fundamental services are established and operational in the community.  These services include, but are not limited to, medical, dental, adaptive engineering, physical therapy, orthotics, mental health, and behavioral services.

- **Behavioral Services.**  In line with the "Task Force on the Future of the Developmental Centers" (DC Task Force) recommendations and state and federal shifts in how services are provided to people with developmental disabilities, the Department is working with regional centers (RC) and the California Department of Social Services (CDSS) to develop services in the community for individuals with challenging behaviors, including, but not limited to: Enhanced Behavioral Supports Homes (EBSHs), Community Crisis Homes (CCHs), and Delayed Egress/Secured Perimeter (DE/SP) homes.

- **Crisis Services at Fairview Developmental Center.**  The Southern STAR (Stabilization, Training, Assistance and Reintegration) home at FDC will continue to operate during the closure process.  FDC residents, as well as individuals currently living in the community, will have access to crisis stabilization services as needed and as specified in law.  DDS will evaluate the ongoing need for crisis services as part of the closure process.

- **Community Oversight.**  Ongoing oversight and monitoring must occur to ensure that the quality of care and services continues to meet the needs of persons served after transition, and will be accomplished by implementing a Quality Management System (QMS) and a Quality Management Advisory Group (QMAG).  Data will be made available and accessible to families and decision makers for this purpose.

- **Community State Staff Program.**  The statewide expansion of the Community State Staff Program (CSSP) allows employees to follow the individuals they work

with at the DC into community settings to provide continuity of care. RCs and the Department are supportive of this program and are actively encouraging the use of the CSSP through outreach and educational information.

- **Employee Recruitment and Retention**.  DDS is working with the California Department of Human Resources (CalHR) on methods to fill vacant positions and incentivize employees to stay at each DC through the end of closure. Potential options will include discussions and/or negotiations with the affected BUs, as appropriate.

- **Safety Net Services.**  DDS is addressing the issue of how to assure the availability of residential services to persons with significant developmental needs.  Consistent with the Lanterman Developmental Disabilities Services Act (Lanterman Act) and the goal of serving individuals in the least restrictive environment appropriate for their needs, DDS' priority is to build community residential capacity.  As appropriate, strategies will be identified for addressing extraordinary needs or gaps in service under W&I Code section 4474.2, which grants DDS the authority for using DC or other Department staff to operate, or assist in the operation of community facilities.  The issue of a safety net for living arrangements will be further discussed and analyzed through the work of California Health and Human Services Agency's (CHHS) Department of Developmental Services (DDS) Task Force beginning April 2016.

- **Property Disposition.**  The State will follow the surplus property process for FDC and PDC.  Once DDS no longer has a use for the property, DGS then takes the lead in determining the future use of the property and arranging for its sale, transfer or disposition.

## PART 1:
## INTRODUCTION

The Department is undertaking another important step toward changing how developmental disability services in California are delivered to individuals with significant service needs.  In the 2015 May Revision to the Governor's Budget, the Administration announced its intent to initiate closure planning for the three remaining DCs.  On October 1, 2015, the Department submitted the SDC Closure Plan for legislative approval pursuant to W&I Code section 4474.11.  Based on decertification actions at SDC and the settlement agreement that was negotiated with the Centers for Medicare and Medicaid Services (CMS), closure of SDC was the Department's first priority.

This FDC/PDC GTA Closure Plan is being submitted for legislative approval pursuant to W&I Code section 4474.1 (Attachment 1).  If this plan and the SDC Closure Plan are approved, the Department will proceed with closing the three remaining non-secure DCs and transitioning resources and services to the community.  Only the PDC Secure Treatment Program (STP) and the Canyon Springs Community Facility (CF) will remain DDS-operated facilities.

### BACKGROUND

Since its inception in the 1960s, the California community system for serving individuals with developmental disabilities has grown and matured.  Under the provisions of the Lanterman Act, 21 private, non-profit RCs assess individuals and determine their eligibility and need for services.  Today, RCs develop, manage and coordinate services and resources for more than 290,000 individuals in the community.

Since the passage of the Lanterman Act in 1969, the role of the State-operated DCs has been changing.  DCs are no longer the only alternative available to families of children with developmental disabilities who are unable to be cared for at home.  Because of the importance given to community integration and serving individuals in the least restrictive environment appropriate for the person, as determined through the person-centered planning process, the populations in large, State-operated facilities have drastically declined.  Additionally, the trailer bill to the Budget Act of 2012 (Assembly Bill [AB] 1472, Chapter 25, Statutes of 2012) imposed a moratorium on new admissions to DCs.  As of January 1, 2016, DDS was providing direct care and treatment to 1,039 residents[1] in the DCs and CF, as follows:

---

1  This plan covers all residents who were at each DC as of May 1, 2015, the first day of the month that the intent to close the state's remaining DCs was announced.  The January 1, 2016, population is reflected here to provide more recent population information.

| Facility | Residents |
|----------|-----------|
| FDC | 248 |
| FDC Crisis | 4 |
| PDC STP | 192 |
| PDC GTA | 171 |
| SDC | 370 |
| SDC Crisis | 5 |
| Canyon Springs CF | 49 |
| **TOTAL:** | **1,039** |

The current trend away from large, congregate institutions has resulted in DCs that are expensive to operate and maintain.  The DCs are aging and now have extensive needs for infrastructure improvements and repairs.  As the DC system changes, it becomes more difficult to attract and maintain qualified and stable staffing, which challenges the continuity of resident care.  With the pending decertification actions at FDC and the PDC GTA and the potential loss of federal funding, DDS is moving forward with closing the DCs and investing in community services.  DDS will continue to operate only a limited number of facilities that serve individuals who are court-ordered from the criminal justice system or require specialized treatment while transitioning to the community.

**PLAN APPROACH**

W&I Code section 4474.1 specifies the process to follow and the information to include in a proposal to close a DC.  This combined FDC/PDC GTA Closure Plan specifically addresses those requirements for each of the DCs, and captures important information that will help prepare readers to actively participate as the plan is considered by the Legislature, and as closure progresses.

The plan provides important data and information concerning the DC residents, the employees, the families and other stakeholders, as well as the facility land, buildings and leases.  It identifies pertinent information on related initiatives and requirements that will affect services and resource development related to the closure process.  It presents the principles, priorities, and commitments of the Department.  It also identifies the essential policies and strategies that will be utilized to:

- Achieve a safe and successful transition of individuals with developmental disabilities from the DC to appropriate living arrangements, as determined through the individualized planning process;

- Support employees with future employment options by generating or identifying job opportunities, providing assistance, counseling and information, and working closely with the affected BUs; and

- Work with DGS to assess the DC property and determine its disposition.

Additionally, the FDC/PDC GTA Closure Plan formalizes the comments received from stakeholders throughout the plan preparation process, including those received in meetings and hearings, and through written comments from organizations and

individuals.  It also incorporates the experience gained from prior DC closures.  This plan captures a point-in-time perspective that will change and evolve with greater dialog and experience during the closure process so that the best possible outcomes can be achieved for the individuals served, their families and the DC employees.

This plan is the first step in a closure process that has multiple, overlapping phases including stakeholder engagement, the development and approval of a closure plan, resource development, individualized transition planning through the IPP process, and review and modification of the closure plan through the annual budget process.  This plan is a guiding document that is not intended to detail where each individual will move, services needed, or the specific transition activities required.  Those decisions will be made by each individual's Interdisciplinary (ID) Team, using a person-centered approach and documented through the IPP process.

The following are important principles and parameters that will affect ongoing planning and implementation efforts as the closures of FDC and the PDC GTA progress:

- Meeting the needs of each DC resident, now, during transition and ongoing through quality services, and ensuring their health and safety;

- Enabling the active and meaningful participation of the individuals with developmental disabilities, their families and representatives, advocates, RCs, the local communities, and other interested parties throughout the closure process;

- Compliance with federal and State laws, and applicable court decisions and settlements;

- Compliance with any applicable settlement agreement that is entered into by the State and CMS.  The State and CMS are currently in the process of negotiating separate settlement agreements for FDC and the PDC GTA to address compliance issues and achieve appropriate community or other placements for residents of the affected units so that federal funding will continue.  Final settlement agreements are expected to be in place in April 2016;

- Implementing and maintaining compliance with the new federal regulations for Home and Community-Based Services.  The regulations set new standards for home and community-based settings, emphasizing integration, individual privacy, and choice.  The regulations became effective in March 2014 and provide up to a five-year implementation process ending March 17, 2019.  Many unknowns remain on how the regulations will affect the delivery of developmental services in California.  More information on the HCBS regulations is available on the DDS website at http://www.dds.ca.gov/HCBS/;

- Incorporating the recommendations and guidance from the DC Task Force and subsequent DDS Task Force, as appropriate, to further improve the service system.  Background and detail about the work of these task forces is available on the CHHS website at http://www.chhs.ca.gov/pages/DCsTaskForce.aspx;

- Effectively using State funds and maximizing federal funds for the short- and long-term costs associated with the delivery of services and the closure of the DCs; and

- Implementing this plan as approved by the Legislature, including any future modifications.

Also important to the development of this closure plan is the experience and perspectives gained from prior DC closures.  As described in the SDC Closure Plan[2], incorporation of "lessons learned" has been a vital part of each closure effort DDS has undertaken and will continue to inform efforts to transition individuals from the remaining DCs into the community and to develop appropriate community resources.  Described throughout this closure plan are recommendations shared by stakeholders involved with prior DC closures as well as the broader stakeholder community, which include:

- Ongoing communication and collaboration at the local level.  Each DC is a different community with very different needs, populations served, employees and geographies.  Therefore, forums for local stakeholders to weigh in with what is working and what is not working has proven to be a key element of a successful closure.  With the closure of Lanterman DC, DDS began a standard approach of working closely with three advisory groups for advice and recommendations on resident transitions, quality management, and staff support throughout the closure process.  The Department will continue to utilize this approach and consider if additional forums are needed.

- Ongoing oversight and monitoring to ensure that the quality of care and services continues to meet the needs of persons served after transition.  Data should be made available and accessible to families and decision makers for this purpose.

- More proactive focus on the development of day programs appropriate for the individuals served at the DCs.

- Better focus on the more challenging individual situations, with greater support provided to the families early in the closure process, to achieve a transition that satisfies the family.

- Increased coordination between physicians, psychologists, behaviorists, etc., and equivalent community professionals that will be assuming care for an individual. Increased collaboration with DC staff throughout the closure process; and, once an individual has moved to a community living option, implementing various monitoring activities and quality management functions to ensure that services are appropriate and complete for the individual, or whether adjustments to the IPP are needed.

---

2 Available online at http://www.dds.ca.gov/SonomaNews/docs/closurePlan10_01_15.pdf.

- More training between the DCs and the service providers throughout the closure process.  This proactive cross-training helps during the development of the resources, as well as during the consumer's transition.

The proposed SDC Closure Plan was submitted to the Legislature on October 1, 2015, for consideration and approval, and provides significant detail about the approach, processes and activities that will be undertaken by the Department and the RCs to achieve a successful closure, one person at a time.  This FDC/PDC GTA Closure Plan takes the same approach, and is reflective of the Department's existing authority, responsibilities, and commitments under the Lanterman Act, the best practices and experiences gained from prior closure efforts, the concerns and input communicated by stakeholders, and the various initiatives and program improvements that will support the closure and successful outcomes.  It is intended to address the statutory requirements for a closure plan, reflect essential information about FDC and the PDC GTA, and highlight important aspects of the closures.  This plan is not intended to be an exhaustive source of information.  Where greater background or detail is provided by another source, it will be referenced.  Additionally, all reports and other significant documents related to DC closures are available on the DDS website at http://www.dds.ca.gov/DevCtrs/.

Beginning with the closure of Agnews DC, all closure plans focus on the principles of the Lanterman Act for delivering developmental services in California.  The fundamental goal is to empower individuals to make choices and receive the services and supports they need to lead more independent and productive lives in the least restrictive environment appropriate for their needs.  Closures are accomplished by developing community capacity to meet the specific needs of the DC residents and to enable them to live near their families in integrated settings.  Essential to the process is the ID Team conducting a thorough and well-coordinated person-centered planning process, including transition planning, and a concentrated community resource development effort so that all of the needs of each resident can be met in the community, which may include: residential, day, work, health, dental, behavioral, specialty equipment, psychiatric and other services.  Once a person transitions to his or her new living arrangement, monitoring and quality assurance measures are utilized to evaluate the quality of the services provided, whether the services meet the individual's needs, or whether they should be modified, for the individual to be successful in his or her new home.

The overriding priority for this plan is to meet the individual needs of each resident while he or she continues to live at the DC, through every aspect of transition into another living arrangement, and ongoing thereafter.  An individualized process is essential for proper planning and the assessment of needs, and will include key persons in the resident's life.  Residents will not move from the DC until appropriate services and supports identified in their IPP are available in the community.  The transition planning process will be utilized to coordinate the timely delivery of services so that they coincide with the individual's move.

The Department is also committed to assisting DC employees during the closure process.  The Department will concentrate on methods to retain employees within the

developmental disabilities services system.  In 2014, W&I Code section 4474.2 was amended to allow State employees to work in the community with residents who are transitioning from any DC.  The statewide expansion of the CSSP allows any DC resident moving to the community, including those not under a closure plan, to benefit from the continuity of care and the experience of DC employees.  The employees will also be supported in a number of important ways aimed at generating and identifying future job opportunities.  The Department will communicate job information and assist employees with job-search preparation and endeavors.  Throughout the closure process, the Department will work closely with the affected BUs to provide the appropriate assistance to employees.

A chart summarizing the Major Implementation Steps and Timelines involved in the closure process is provided in Part 1, Exhibit 1 on Page 11.

## PLAN DEVELOPMENT PROCESS

On May 14, 2015, the Department announced its intention to initiate the closure planning process for the three remaining DCs; SDC, FDC and the PDC GTA.  After meeting and discussing the closure with stakeholders and receiving extensive input, the SDC Closure Plan was submitted for Legislative approval on October 1, 2015.  Consistent with the original announcement, the Department subsequently moved forward with planning for the closure of FDC and the PDC GTA.  The letter notifying interested parties of the Department's intent to submit a closure plan for FDC and the PDC GTA to the Legislature by April 1, 2016, is provided in Attachment 2.

Even though the Department is presenting a combined closure plan for FDC and the PDC GTA, the closure processes for each DC will be independent of the other.  Beginning with the planning phase, the Department conducted separate stakeholder processes for each location so that local interests were properly represented and communications were clearly understood.  The Department made it a priority to meet in-person with as many stakeholders as possible to hear their concerns, perspectives and issues, and used this input to inform the development of this closure plan.  Meetings were held with residents, families, employees, unions, advocates, RCs, providers, local government officials, State legislative representatives, and other organizations from December 2015 through March 2016.

On January 30, 2016 a formal public hearing was held at PDC to gather input for this plan.  A second public hearing specific to FDC was held on February 6, 2016, at FDC.  The input received from the hearings and various meetings is summarized in Part 3.  Copies of written correspondence and comments received are provided in Attachment 3 (a separately bound compilation of stakeholder comments).

A detailed list of all stakeholders contacted during the plan preparation process is provided as Attachment 4.  Additionally, Attachment 5 provides the calendar of the activities and meetings that took place.

The general sentiments communicated to the Department during public hearings and in written comments, predominantly by families, employees and community partners, are that 1) the DCs should not close entirely, but instead services should be rebuilt and

reimagined; 2) the State should continue to provide services that will benefit the DC residents as well as other underserved populations; and 3) DC assets and employees should be retained in the service system.  Advocates and RCs support closure and emphasize the need for individualized program planning, expansion of community resources, appropriate funding, and the inclusion of individuals in everyday community-based settings.  There was general support for retaining DC assets and employees to benefit the community system of services; and, concern that there would be gaps in the service system that the State needs to address.

The input received from stakeholders is the first essential phase of the planning process.  Stakeholder input will continue to be critical as closure activities progress and evolve.  Efforts and objectives require meaningful communication and coordination as progress is made, and the Department will rely heavily on continuing stakeholder involvement to inform processes, monitor changes and make recommendations for the most effective use of available resources.  DDS is strongly committed to ensuring the provision of quality care for individuals while they reside at the DC and as they transition to community-based services.  As identified later in this plan, DDS intends to establish various advisory groups for critical input and guidance.

FDC and the PDC GTA are scheduled to close by the end of December 2021.  There are many challenges associated with this goal, as well as opportunities for review and adjustment of this plan as we move forward.  Important to the ongoing planning process is the identification of resources that currently exist in the community and those that still need to be developed, that meet the needs of the persons residing at the DCs.  The safety of the individuals in transition is paramount, and the necessary services and supports will be in place before a resident moves to an appropriate community setting.

## MAJOR IMPLEMENTATION STEPS AND TIMELINE

| ACTIVITY* | DATES |
|---|---|
| The 2015 May Revision is released, announcing the intent to close SDC, FDC and the PDC GTA. | May 14, 2015 |
| Coordinate various aspects of the plan with CHHS, DHCS, CDPH and CDSS, including, but not limited to, housing development, licensing, managed care and federal funding. | Ongoing |
| Separate stakeholder planning processes were conducted for FDC and the PDC GTA to receive input and recommendations on which to base the closure plan, including meetings with:<br>• DC residents<br>• Family members of DC residents<br>• Employees and BU representatives<br>• Local officials/legislators<br>• County officials<br>• RCs<br>• SCDD<br>• DRC<br>• Other stakeholder groups | December 2015 – March 2016 |
| DDS emergency regulations for implementation of the EBSHs became effective.  CDSS regulations are pending. | February 5, 2016 |
| Implement a process to inform and update stakeholders and appropriate entities regarding closure activities, including development of a webpage. | Webpage Complete – Communication Ongoing |
| Submission of the FDC/PDC GTA Closure Plan to the Legislature. | April 1, 2016 |
| Legislative review and approval of the Closure Plan. | TBD |
| Work with RCs regarding CPP development and community capacity in RC catchment areas. | April 2016 – closure |
| Work with DHCS, managed care health plans and RCs to ensure availability and coordination of health services, including Memoranda of Understanding between the health plans and RCs to define respective roles and responsibilities. | July 1, 2016 – closure |

| ACTIVITY* | DATES |
|---|---|
| Establish and convene Advisory Groups for:<br>• Resident Transition<br>• Quality Management<br>• Staff Support | July 1, 2016 – closure |
| Focus on individualized transition planning as part of the IPP development. | July 1, 2016 – closure |
| Develop and implement IHTPs, Specialized Behavior Plans and Safety Plans for residents, as appropriate. | July 1, 2016 – closure |
| Assist DC employees by providing information, training opportunities, job fairs, and employment announcements. | July 1, 2016 – closure |
| Coordinate the deployment of DC employees to the CSSP/community services.  Work with RCs and providers to determine numbers and types of state staff who may be interested and for what functions. | July 1, 2016 – closure |
| Transition residents from FDC and the PDC GTA. | Continuous through closure |
| Establish a Business Management Team at each DC to develop a plan for the administrative and physical plant activities of closure. | 2016 |
| Promulgate regulations for implementation of the CCHs. | 2017 |
| Maintain current health clinic services and supports at each DC to provide transition services and ongoing care, as determined appropriate. | 2016 – closure, TBD |
| Closure of FDC and the PDC GTA. | By December 2021 |
| Post-closure activities at each DC. | Initial months following closure |
| Warm shutdown of areas at each DC not still in use. | Upon closure and while DDS is responsible for the property |

\*  For assistance with acronyms used in the "Activity" column, please see Part 8:
   Glossary of Acronyms on Page 103

# PART 2:
## ENSURING SERVICES DURING AND AFTER TRANSITION

Two essential components must come together for individuals to successfully move from a DC in to the community.  First, an ID Team must conduct a thoughtful and well-coordinated person-centered planning process with a special focus on transition planning.  The ID Team carefully identifies the individual's needs, interests and preferences and the services and supports that will meet those needs, and formalizes the planning process in the IPP.  Potential service providers are considered, and once selected, the ID Team arranges for the services and supports to coincide with the move.  A process is followed whereby the individual can visit and experience those service providers before the move in to the community actually takes place.

Second, community capacity must be developed and available to meet the full range of those services and supports needs when the individual transitions, including residential, day, work, health, dental, behavioral, specialty equipment, psychiatric and other services.  The RCs involved with the closures identify each individual's needs utilizing comprehensive assessments and the person-centered planning process, analyze the existing community capacity to meet those specialized needs, and develop new services and options through their Community Placement Plan (CPP) when unmet needs are identified.

The following sections provide additional detail on the processes and activities involved in these essential aspects of closure.

## INDIVIDUALIZED PLANNING PROCESS AND TRANSITION PLANNING

### Individualized Planning Process

The closure process is designed to ensure a safe transition for each resident.  In developing each person's IPP, as mandated in the Lanterman Act, the ID Team will meet to identify each person's goals and objectives, and the services and supports that will be provided based upon the resident's assessed needs, preferences and choices. The ID Team meetings typically include the following participants:  1) the resident; 2) the legally authorized representative, family and/or advocate; 3) identified staff from the DC and the Regional Resource Development Project (Regional Project); 4) one or more RC representatives, including the RC service coordinator; and 5) others invited by the resident or his or her authorized representative.  DC team members include staff that provides direct services to the resident, including physicians, nursing staff, psychology staff and ancillary staff, as indicated based on their involvement with the individual.

Prior to the development of a transition plan, DC residents have a comprehensive assessment completed by their RC that identifies the person's choices, preferences and the types of community-based services and supports needed to ensure a successful transition to a community setting.  This comprehensive assessment will inform the

process and be updated on an annual basis until the person has transitioned to the community.

The staff at the DC will assist the residents in preparing for their maximum participation in the ID Team process by having discussions with them on the closure proposal, providing education regarding their choices, and increasing their opportunities to explore and visit community options.

**Transition Planning**

The IPP and related transition activities are all part of a coordinated planning and implementation process that is flexible and ongoing to meet each person's unique needs during and after transition.  ID Team members exchange information; perform and participate in assessments; document findings, recommendations and outcomes; and carefully coordinate the transition from the DC to the community.  The DC staff and involved RCs are working together to ensure the men and women who live at the DC and their families become actively engaged in evaluating community options.

Through the ID Team process, the DC and RCs will work with individuals, families and, where appropriate, other participants, to review transition options based on each individual's assessed needs, preferences and choices, including such options as Supported Living Services (SLS) and the Self-Determination Program.  The DC will increase the opportunities for more individuals to participate in community tours and view potential living options.  The DC will also coordinate "meet and greet" introductions to potential providers so that the person, their family and providers can see if a specific option identified through exploration activities has the potential for success.

Once a person has had a successful "meet and greet" and it is determined that a specific living option should be pursued, visits to the prospective home (and if appropriate, potential work/day program settings) and planned meetings between proposed vendors will be scheduled.  Additionally, the individual will have the opportunity to spend time in the home, meet other individuals who already reside in the home, and meet the staff.  If problems arise or it appears that community providers are not able to meet the individual's needs, the process is delayed or stopped until identified problems can be resolved.

As part of the transition planning process, the ID Team will begin preparing an Individualized Health Transition Plan (IHTP), as well as Specialized Behavior and Safety Plans for the person, when applicable.

- **Individualized Health Transition Plan.**  A comprehensive IHTP will be developed by the ID Team and incorporated into the IPP for each resident transitioning from the DC.  The IHTP will include the person's health history and current health status provided by the person's medical staff.  The person, involved family members, conservator, authorized representative and/or advocate may participate in the development of the IHTP.  The IHTP will provide specific information on how the individual's health needs will be met and the health transition services that will be provided, such as occupational therapy,

respiratory therapy and other specialized health procedures.  The IHTP will assist the ID Team in assuring all of the necessary health supports are in place prior to the move from the DC.

- **Specialized Behavior and Safety Plans.**  Where indicated by the IPP, the ID Team will develop a comprehensive Specialized Behavior Plan that will be incorporated into the IPP.  Also as indicated, it will develop and incorporate a Safety Plan that includes components related to safety for consumers who have significant behavioral support needs, who currently have rights restrictions, or who may need the use of highly restrictive methods such as psychoactive medications.  The Specialized Behavior Plan and the Safety Plan will assist new service providers in understanding the needs of the individual and adequately providing the needed behavioral supports in new settings.

## <u>Familiarization (Cross-Training) Activities</u>

The IPP will include specific activities to familiarize new community staff with the details of the comprehensive assessment and the IPP, including the Specialized Behavior Plan, along with any informal or personalized knowledge from the DC staff who know the individual best.  Activities may include meetings with the ID Team and providers (including residential, day services, vocational, health care, behavioral health and any other provider identified in the transition plan) to exchange information specific to that individual's transition plan.

Cross-training of community providers by DC staff is accomplished through in-person visits of DC staff or the provider (at the provider's location or at the DC), simulated training situations, or actual observation of daily activities and programming across support settings.

## <u>Transition Review Meeting</u>

When all members of the ID Team are satisfied that the arrangements agreed upon have been implemented, will meet the person's needs, and the person is prepared to move, the ID Team holds a Transition Review Meeting (TRM).  At the TRM, the ID Team reviews and finalizes the consumer's IPP, including the transition plan, the IHTP, the Specialized Behavior Plan and the Safety Plan, as applicable.  The TRM is held at the conclusion of the transition process and is where the ID Team sets a placement date.  TRMs must occur no less than 15 days prior to the planned move.

## MONITORING FOR APPROPRIATE SERVICES

It is the goal of everyone involved that the development and implementation of the individual planning process provides for the safe and successful transition of DC residents to the community.  The process is flexible, multi-faceted and includes close monitoring.

The Department currently operates three Regional Projects, including one at FDC (the South Coast Regional Project) and one at PDC (the Porterville Regional Project).

The Regional Projects assist in the planning and transition of DC residents to the community, assess individuals experiencing difficulty in their community homes, and address specific support needs.  These Regional Projects serve all three DCs as well as Canyon Springs CF.

Consistent with the previous closures, staff from the Regional Projects will remain involved with persons moving from each DC into the community and will provide a core quality assurance function.  After a person has moved to his or her new community-based home, Regional Project/state personnel, in coordination with the RC, completes a number of face-to-face visits with the individual.  These visits have been increased for additional monitoring to occur during the transitioning process.

In addition, the RC is directly involved in the actual transition of the individual to his or her new home.  Anyone moving from the DC to the community will receive enhanced RC case management for at least two years.  For example, for anyone residing in out-of-home placement, the RC will complete a face-to-face visit at least quarterly. Individuals who move to an Adult Residential Facility for Persons with Special Health Care Needs (ARFPSHN) or an EBSH will receive enhanced clinical staffing in the home and oversight by the RC and the Department that is statutorily required for those models of care.  Additional visits, supports, and training are provided to the individual and/or the service provider on an as-needed basis.

Provisions are in place for the protection of the individual's health and safety through the Department, the RC, the CDSS, and the DHCS.  Close monitoring enables early identification of any issues and timely intervention.  As needed, additional resources will be arranged to support the individual in their new home.  Following is a summary of established monitoring activities:

- State personnel provides follow-up 5 days, 30 days, 90 days, 6 months, and 12 months after the move.  Additional visits, or assistance with follow-up activities or guidance, occur as necessary to assure a smooth transition.

- State personnel, in coordination with the RC, provides additional visits, supports, and onsite training to the individual and/or the service provider as needed to address the individual's service needs.

- The RC conducts face-to-face visits every 30 days for the first 90 days after the move and as determined by the IPP thereafter.

- During the two years following transition, individuals receive enhanced RC case management.

- Each individual has an IHTP that identifies his or her primary care physician, dentist, and all other specialty health care providers.

- Medically fragile consumers transitioning from the DC to CDSS-licensed ARFPSHNs will be visited by a registered nurse at least monthly, or more frequently as appropriate.  At least four of these visits are unannounced.  In

addition, these individuals will be seen by a physician at least every 60 days or more frequently if specified in the Individual Health Care Plan (IHCP)[3].

- Following the initial placement period, RC personnel visit all individuals, including former DC residents, residing in Community Care Facilities (CCF) and Intermediate Care Facilities (ICF) four times annually; and conduct at least two unannounced visits.

- CDSS conducts annual unannounced visits to CCFs.

- DHCS conducts annual unannounced licensing and recertification visits of health care facilities.

- Consistent with the State's commitment to the federal government, DDS and DHCS conduct joint on-site reviews, at least biennially, of each RC and selected providers.  Visits include consumer record reviews; interviews with RC service coordinators, quality assurance and clinical staff and service providers; consumer interviews; and physical plant reviews, to assess health and safety, satisfaction and adequacy of service provision.

- DDS conducts daily reviews of Special Incident Reports to provide oversight of consumer health and safety, and to identify potential trends in incidents.

The Department will also develop and implement a detailed quality management plan that will be maintained during the closure process.  It will include a quality oversight and internal monitoring system with tools and data, and a stakeholder advisory group, as described in the QMS section, below.  The QMS will be used by both internal and external reviewers to monitor transitions.

## <u>The Resident Transition Advisory Group</u>

Monitoring transitions from a DC in to the community is critical to ensuring the appropriateness and adequacy of services.  Various practices have been utilized during previous closures that helped to achieve successful transitions.  As a result of this prior experience, the Department will establish a Resident Transition Advisory Group (RTAG) for each DC.  The RTAG will include representation from the individuals who reside at the DC, parents and family members, the involved RCs and DDS.  This advisory group will evaluate the current transition planning process in place for residents and make recommendations to the Department for improvements.  Previous transition practices that have worked well will be shared with the RTAG to assist in the evaluation.

In line with employee and family input, the Department recognizes the importance of having staff familiar with each person's needs throughout the closure process.  It is also

---

3  The IHCP is a document required by statute to be in place prior to admission to an ARFPSHN.  The IHCP supplements the IHTP that is prepared by the ID Team and is incorporated into the IPP as part of transition planning.

essential that each resident's ID Team involve the participation of knowledgeable staff. As was experienced during previous closures, early departure of knowledgeable employees required the Department to find alternatives to stabilize care and services during the final months of closure.  The Department is committed to providing diligent monitoring and management of staffing levels to ensure the needs of the residents are met at every stage, and will utilize the Staff Support Advisory Group to support the goal of adequate staffing throughout the closure process, as described further in Part 5.

**Contingencies for Meeting Consumer Needs**

Once placement has occurred, the Department will continue to support individuals so that they are successful in their community placement.  As part of the transition planning process, the ID Team will identify any known or anticipated issues or challenges the individual could experience in their new setting, and where indicated, develop a contingency plan of provisions that might be needed to support the individual in the community.

Throughout the placement process, several monitoring and follow up activities are conducted by the RC and the Regional Project, as described above.  This ongoing effort allows for identification of any issues and provides a plan for timely intervention.  As needed, the RC or DC will provide additional resources to support the individual in their new home.  DC staff may render necessary services in order to complement the community resource.  If post-placement monitoring and support efforts are not successful, an additional assessment process under W&I Code section 4418.7 may be initiated, including consideration of alternative resources through the statewide specialized resource service.  Additionally, the Regional Project may arrange for other services to assist an individual's adjustment in the community.

While the DC is open, and when an individual's legal status permits, prior residents of the DC may be placed on provisional placement for a period of up to one year.  The length of the provisional placement may be less in those cases where the court's authorization of placement at the DC expires before that date or when the facility closes. Such a placement affords a right of return to the DC at any time during the provisional placement period when an adequate standard of care cannot be maintained in the particular placement.

For individuals who face the greatest challenges for a successful placement in the community, DDS will work with the RCs to address extraordinary needs or gaps in service under W&I Code section 4474.2, which grants DDS authority for using DC or other department staff to operate, or assist in the operation of community facilities. Unless contracted through the CSSP, such services will be temporary in nature, while community services are developed or other measures are identified to address extraordinary service needs.

**QUALITY MANAGEMENT SYSTEM**

Use of a thorough and transparent QMS ensures safe and successful transitions from the DC.  Over the past 15 years, California has moved steadily toward a more integrated, value-based quality management and improvement system that produces desired consumer outcomes.  The statewide QMS is based upon the CMS Quality Framework.  At the core of the model is the consumer and family.  Quality management starts with establishing clear expectations for performance (design), collecting and analyzing data to determine if the expectations are met (discovery), and finally, taking steps to correct deficiencies or improve processes and services (remediation and quality improvement).

RCs have a strong foundation in quality management activities based upon existing requirements in statute and regulation.  For example, RCs have active quality assurance departments whose staffs work to recruit, train, and monitor providers to continuously improve service quality.  Case managers meet with consumers in out-of-home living options at least quarterly; in licensed homes two of these visits are unannounced.  Each RC regularly reviews Special Incident Report information and implements actions to decrease risks to health and safety while honoring consumer choice, community integration and independence.  Regular in-service trainings are provided to RC staff.  RCs train their staff and providers in specialty areas, such as positive behavioral supports.  They develop, implement, and monitor Corrective Action Plans for service providers, when needed.  Each RC has a 24-hour response system wherein a duty officer can be reached after hours.

In addition to the current statewide QMS and RC quality management processes, the Department, in conjunction with the RCs, will use a QMS at each DC to monitor individuals' quality outcomes and satisfaction, and identify areas that may need improvement.  The QMS strategy for the closure will be enhanced by building upon the existing DDS and RC quality assurance systems and incorporating the Department's obligations under the CMS agreement.  The focus of this strategy will be on assuring that quality services and supports are available prior to, during, and after transition.  Specifically, the DC QMS will include the development, implementation, and monitoring of service provider performance expectations, individual outcomes, and systemic outcomes and process measures including:

- The development and monitoring of the IHTP for every DC resident;

- Enhanced monitoring by RC clinicians (when identified in the IPP);

- An additional year of RC case management at a 1:45 caseload ratio;

- Establishment of a QMAG specific to each DC;

- An annual family and consumer satisfaction survey through the National Core Indicator (NCI) project for all individuals transitioning from the DC and their families.  The NCI survey addresses key areas of concern including employment, rights, service planning, community inclusion, choice, and health and safety.

19

There is a face-to-face/in-person interview for individuals receiving services and a mail-in survey for families or conservators.  NCI surveys are anonymous;

- On-site visits and interviews will be conducted.  Once fully implemented, the DC QMS will enable RC staff, clinicians, and other professionals, Regional Project staff, and other involved parties that visit the home to assess individuals and service providers based on the established service provider expectations and individual outcomes;

- RC staff will review IPPs for content and quality to ensure that person-centered planning objectives, health and safety issues and the services and supports identified through the transition process are being met;

- Semi-Annual Risk Management Reporting will be provided by the DDS risk management contractor that will include:

  - Reportable Incidents – The number and rate of reportable incidents among people moving from the DC will be captured and reported using Special Incident Reports.  As required by Title 17, section 54327 of the California Code of Regulations (CCR), vendors and long-term health care facilities report occurrences of suspected abuse, suspected neglect, injury requiring medical attention, unplanned hospitalization and missing persons, if they occur while a consumer is receiving services funded by a RC.  In addition, any occurrence of consumer mortality or a consumer being a victim of a crime must be reported, whether or not it occurred while the consumer was receiving services funded by a RC;

  - Changes in residential settings – Data on residential settings from the Client Master File (CMF) and Purchase of Services (POS) data will be used to identify changes in residence type.  Instability in residence may indicate potential care issues or may indicate changes in service needs; and

  - Changes in skills of daily living, challenging behaviors and personal outcomes – Elements tracked through the Client Development Evaluation Report (CDER) will be monitored for potential deterioration or improvement of the consumer over time.  The CDER is completed at the time of transition and at least annually once a person has moved to the community.

The Department will continue monitoring the health, safety and well-being of persons transitioning from the DC to the community.  Expectations and a clear process will be in place for post-placement monitoring and required documentation.  State employees, RC staff and providers will share the responsibility in assuring identified outcomes are met while providing and accessing resources to make community living successful.

**The Quality Management Advisory Group**

Essential to the DC QMS is the establishment of a QMAG.  Representation on the QMAG will include individuals, parents and family members of current and former DC residents, RCs, the SCDD, and DRC.  The Department anticipates establishing a QMAG for each DC in late summer, after approval of the closure plan by the Legislature.

The QMAGs will provide guidance to the Department and RCs in the refinement of the DC QMS.  On an ongoing basis, the QMAGs will inform the Department and RCs on findings from their review of the data collected on the quality of services being provided to former DC residents.  Subject to the conclusion of negotiations and final settlement agreements with CMS for FDC and the PDC GTA, an Independent Monitor may also inform the DC QMS and participate in the QMAG for each DC.

## ADVOCACY SERVICES

The Department currently has an interagency agreement with the SCDD for clients' rights and volunteer advocacy services for DC and CF residents.  Under the Volunteer Advocacy Services (VAS) program, SCDD provides advocacy resources and assistance to DC residents who have no legally appointed representative to help them make choices and decisions.  In addition, at the request of legally appointed representatives, Volunteer Advocates will assist those representatives in advocacy efforts.  Residents access these services through their own requests as well as through referral by the DC based upon their need for assistance and/or representation and the lack of other available resources.  Services range from facilitation of resident involvement in social and recreational activities, to attendance with the resident at program planning and other meetings impacting services and supports for the resident.  When a resident receiving services moves from the DC to the community, the Volunteer Advocate continues to monitor the move and support the individual for 12 months after the move, and identifies advocacy assistance services for the individual from community resources.

W&I Code section 4433(b)(1) requires the Department to contract for clients' rights advocacy services for all individuals with developmental disabilities.  Under the interagency agreement with the Department referenced above, the SCDD currently provides clients' rights advocacy services for individuals living in a DC or CF.  Additionally, the Department currently contracts with the DRC Office of Clients' Rights Advocacy (OCRA) for clients' rights advocacy for all consumers in the community.  When a person moves out of the DC, the OCRA Clients' Rights Advocate (CRA) assumes the responsibility for the clients' rights advocacy services of the individual within the RC catchment area of their residence.

Additionally, W&I Code section 4418.25 facilitates coordination between the DC and community CRAs by requiring RCs to provide copies of each DC resident's comprehensive assessment or update no less than 30 calendar days prior to each resident's IPP meeting, including the time, date, and location of the IPP meeting to the OCRA CRA for the RC.  The OCRA CRA may participate in the meeting unless the consumer objects on his or her own behalf.  This allows the OCRA CRAs to become

familiar with DC residents prior to their move from the DC and to work collaboratively with the SCDD CRAs at the DC to provide advocacy services as appropriate to each resident.

## COMMUNITY RESOURCE DEVELOPMENT

The FDC/PDC GTA Closure Plan reflects the Administration's commitment to establishing permanent, integrated community housing for individuals with developmental disabilities.

## The Community Placement Plan Process

Each fiscal year DDS receives CPP funds for developing resources in the community as an alternative to institutional care, including the development of new and innovative service models.  The primary purpose for the funding is to reduce reliance on DCs, certain mental health facilities that are ineligible for federal funding, and out-of-state placements.  The CPP is used to fund the development and start-up of residential facilities, day programs and other ancillary services and supports, as well as costs to transition (or deflect) an individual from institutional care into the community.  The funds also support the comprehensive assessments of DC residents from which RCs plan for future service needs.

The Governor's Budget for 2016-17 proposes total CPP funding of $146.6 million for DDS, of which $54.3 million is additional funding specifically for the closure of FDC ($29.7 million) and the PDC GTA ($24.6 million).  The $146.6 million also includes $67.8 million in base CPP funding, referred to as regular CPP, budgeted annually for statewide community resource development; and another $24.5 million specific to the closure of SDC.

The RCs involved with the closure of a DC will identify each of their resident's needs utilizing comprehensive assessments and the person-centered planning process.  The RCs then analyze the particular needs of their DC consumers compared to the services that already exist in their catchment areas, the resources they have under development, and the needs of their other consumers.  In April of each year, the RCs propose the development of new projects and resources using budget year CPP funds to meet the broad array of future service needs, including specialized residential and non-residential services.  Non-residential services include, but are not limited to, day programs, clinical services, transportation, employment services and crisis services.  Two or more RCs may also partner and propose Regional Projects for statewide use, usually addressing specialized services for individuals facing particularly complex challenges.  For the DC residents, community options will reflect living options where individual support needs can best be met and, if desired, as close as possible to the community where the individual's family resides.  The characteristics of the people who reside at the DC and of the communities in which their families live are, therefore, important to determining the array of needed community-based services and supports.  The plan to develop new services will be refined over time as more is known about each individual's needs and preferences.

After working closely with each RC and thoroughly considering each proposal for the development of resources, the unique circumstances of the RC, and the statewide priorities within available funding, DDS allocates the CPP funds to the RCs for the approved projects.  Approved projects support individuals transitioning from DCs, as well as those transitioning from certain mental health facilities and out-of-state placements.  Additionally, projects support individuals who would otherwise enter more restrictive living options.

One of the priorities identified for the closure of FDC and the PDC GTA is the development of day programs to properly support an individual at the time he or she transitions to the community.  The Department has received various stakeholder comments, particularly for the closure of SDC, regarding the availability and timeliness of appropriate day services, including the need for successful day program visits prior to the actual move.  Greater focus on day programs will occur during the review and approval process for each RC's CPP projects.  Once the planned residential service location and the estimated timeline for the home coming online are known, the funding and development of new day programs can be appropriately sequenced.  In addition, the Department will work with the DCs so that each ID Team, where appropriate for the individual, places greater emphasis on day program visits and orientation as part of the transition plan.

### Development of Residential Homes

A significant portion of CPP funding goes toward the development and start-up of new residential homes.  When a CPP project to develop housing is approved, DDS then works with the RC to properly manage the project and account for the funds over the life of the project.  Quarterly reporting by the RC allows DDS to monitor progress and the expenditure of CPP funds for their allotted purpose.  As the project evolves, DDS considers any RC requests for funding changes or changes to the project scope and/or schedule.  Additionally, RCs involved with a DC closure participate in monthly calls with the Department to review resource development progress and issues.

Housing projects often require two or more years to complete.  Key phases of these projects include:  the selection and acquisition of property suited for renovation or development; design and permitting for the work to be done; renovation or construction of the home to meet building code, accessibility and safety requirements; selecting and contracting with a service provider; staffing and equipping the home, and providing necessary staff training; obtaining a license as a residential or health facility, or in the case of ARFPSHNs, for example, obtaining program certification; and then phased occupancy of the home to ensure the quality of individualized care and transition services.  Unforeseen obstacles are inherent in each of these phases and can significantly change the estimated completion date for, or even the viability of a project.

The Department is working closely with CDSS and the RCs to ensure a coordinated process for licensing community homes developed to support a DC closure.  DDS and CDSS have entered into an interagency agreement for this purpose, and CDSS has hired professional staff, funded by DDS with hours dedicated to timely processing applications and licensing the new homes.  DDS also has retained the services of a

Retired Annuitant who will troubleshoot important licensing issues with CDSS Community Care Licensing and the State Fire Marshal, among other responsibilities.

RCs will acquire most of the residential capacity in the community using the "buy it once" model that was first authorized for the closure of Agnews DC.  This model separates the ownership of the home from the service delivery, so that a provider can be changed without having to move the residents.  The home is owned by a non-profit housing corporation.  The rate that is paid to the service provider includes the payment for leasing the home until the mortgage is paid in full.  At that time the provider's rate is reduced, so that the housing cost is paid for only once during the useful life of the home.  Additionally, the use of the home is restricted in perpetuity for the benefit of individuals who are eligible for RC services.  This model will result in an inventory of stable and permanent community housing for individuals with developmental disabilities.

## Specialty Homes and Programs for Developmental Center Residents

In addition to consideration of existing and successful community living options, such as Adult Family Homes and Family Teaching Homes, ICFs, and Adult Residential Facilities, a specific focus will include the development of homes and services adapted to meet the unique and specialized medical, physical, and behavioral needs of the DC residents.  Following is a description of the specialty homes and programs that will be available:

**Adult Residential Facility for Persons with Special Health Care Needs.**  Since the opening of the first ARFPSHN home in 2007, this residential model has shown remarkable success in meeting the needs of some of the most medically fragile consumers.  There are now 38 ARFPSHNs in operation statewide.  With the statutory changes in AB 1472 (Chapter 25, Statutes of 2012), this model of residential care is now available for a person currently residing in a DC who has an IPP that specifies special health care and intensive support needs that indicate the appropriateness of placement in an ARFPSHN.

The ARFPSHN model of care includes:  1) specific staffing requirements relative to 24/7 licensed nursing (Registered Nurse, Licensed Vocational Nurse, Psychiatric Technician); 2) DDS program certification; and 3) mandatory safety features (fire sprinkler system and an alternative back-up power source). ARFPSHNs fill a critical gap in the existing State residential licensing categories.  To live in an ARFPSHN, the consumer's health conditions must be predictable and stable at the time of admission, as determined by the IHCP team and stated in writing by a physician.  In addition to 24/7 nursing supervision, the law requires:

- Development of an IHCP that lists the intensive health care and service supports for each consumer that is updated at least every six months;

- Examination by the consumer's primary care physician at least once every 60 days;

- At least monthly face-to-face visits with the consumer by a RC nurse;

- DDS approval of the program plan and on-site visits to the homes at least every six months; and

- CDSS licensure of the homes, which includes criminal background clearance, Administrator orientation, annual facility monitoring visits and complaint resolution.

For DC residents requiring licensed nursing care, the ARFPSHN model will provide one option for these residents to move to a home-like, community-based setting.  However, not everyone who lives in a Nursing Facility (NF) residence will need an ARFPSHN home.  There are specific eligibility criteria that must be met to live in an ARFPSHN home and alternative residential models are available that address ongoing medical needs such as:  Specialized Residential Facilities (licensed by CDSS) and ICFs (licensed by the CDPH) to provide 24-hour-per-day services.  There are three types of ICFs, which all provide services to Californians with developmental disabilities:  ICF/DD-H (Habilitative), ICF/DD-N (Nursing) and ICF/DD-CN (Continuous Nursing).  More information on ICF program types is available online at: http://www.dds.ca.gov/LivingArrang/ICF.cfm.

**Enhanced Behavioral Supports Homes.**  An EBSH is a CCF certified by DDS and licensed by CDSS as an adult residential facility or a group home that provides 24-hour nonmedical care to individuals with developmental disabilities who require enhanced behavior supports, staff, and supervision in a homelike setting.  EBSHs have a maximum capacity of four consumers.  EBSHs provide intensive behavioral services and supports to adults and children with developmental disabilities and challenging behaviors that cannot be managed in a community setting without the availability of enhanced behavioral services and supports, and who are at risk of institutionalization or out-of-state placement, or are transitioning to the community from a DC, other state-operated residential facility, institution for mental disease, or out-of-state placement.  EBSHs are staffed 24/7 with professional staff and undergo a certification process by the Department, similar to the ARFPSHN certification process.

The Department is encouraged by the possibilities this model offers to address behavioral services statewide.  Currently, 20 EBSHs are in development throughout California, and more are expected to begin development in 2016-17.  However, EBSHs will not begin operation pending development of the homes and the promulgation of emergency regulations by both DDS and CDSS.  The DDS component of the regulations became effective in early February 2016.  The companion CDSS regulations have begun the public review and comment phase.

**Community Crisis Homes.**  A CCH is a facility certified by DDS and licensed by CDSS as an adult residential facility, providing 24-hour nonmedical care to individuals with developmental disabilities in need of crisis intervention services who would otherwise be at risk of admission to the acute crisis unit at FDC or SDC, out-of-state placement, a General Acute Care Hospital (GACH), an acute psychiatric hospital or an institution for mental disease.  CCHs will meet all statutory requirements for use of behavior interventions including seclusion and restraint.  A CCH is authorized to have a have maximum capacity of eight consumers.  However, in response to feedback gathered

through the 2014 DC Task Force Implementation Workgroups, the Department is developing six, four-bed CCHs.

CCHs differ from the acute crisis units at FDC and SDC in that they are located in communities throughout the State and do not require a commitment under W&I Code section 6500.  CCHs require enhanced staffing and supervision and enhanced staff qualifications.  A significant benefit of CCHs is that the homes can accommodate immediate admission for individuals in acute crisis, whereas admission to the acute crisis units at FDC and SDC require a judicial process.

Currently, four CCHs are approved for development in Northern California and two more in Southern California.  The CCH regulations are currently being drafted and are expected to be effective before the CCHs are ready to open in approximately mid-2017.

**Delayed Egress and Delayed Egress/Secured Perimeter Homes.**  Health and Safety Code sections 1267.75 and 1531.15 authorize residential facilities utilizing delayed egress devices to also utilize secured perimeters.  DE/SP homes were developed as residential options affording a degree of security not previously available in the community.  These homes are designed for individuals who are difficult to serve in the community who, due to difficult-to-manage behaviors or a lack of hazard awareness and impulse control, would pose a risk of harm to themselves or others.  DE/SP homes do not qualify for federal funding.

Though often referenced together, it is important to note that a Delayed Egress (DE) home does not necessarily have a secured perimeter.  DE and DE/SP models offer two different levels of security to meet significant needs in the community.  Delayed egress provides the first level of security, while the addition of a secured perimeter provides an increased level of security to protect the safety of the residents and others.  "Delayed Egress" means the use of a device or devices in a residential facility that precludes use of exits by the consumer for a predetermined period of time, not to exceed 30 seconds. "Secured Perimeter" refers to secured perimeter fences around a facility utilizing delayed egress devices that meets prescribed requirements, such as the requirement that the need for the service be part of an individual's IPP, that the home meet fire and building codes, that the home provide proper training to staff regarding use and operation, and that the secured perimeter not substitute for adequate staff.  A residential facility or group home utilizing delayed egress devices and having six or fewer residents may install and utilize secured perimeters.

Currently, 22 DE homes are in development and six have been completed.  Ten DE/SP homes are in progress and four have been completed.  Both of these residential models offer the opportunity to be sited on acreage, adjacent to open space areas, or offer outdoor space to residents, which was identified as an interest of stakeholders.

**Supported Living Services.**  Supported Living Services (SLS) consists of a broad range of services for adults with developmental disabilities who, through the IPP process, choose to live in homes they own or lease themselves in the community. Many adults who have lived in DCs have chosen SLS because it fits their personal needs.

SLS is designed to further develop individuals' relationships, inclusion in the community, and work toward their short and long-range personal goals.  Because there may be life-long concerns, SLS is offered for as long and as often as needed, with the flexibility required to meet a person's changing needs over time, and without regard solely to the level of disability.

Typically, an SLS agency works with the individual to establish and maintain a safe, stable, and independent life in his or her own home.  The guiding principles of SLS are found in the Lanterman Act at W&I Code section 4689(a).  DDS regulations for SLS are found in Title 17, Division 2, Chapter 3, Subchapter 19 (section 58600 et seq.) of the CCR.

**Self-Determination Program.**  In October 2013, Governor Edmund G. Brown Jr. signed into law the Self-Determination Program (Senate Bill [SB] 468, Chapter 683, Statutes of 2013) which will provide consumers and their families with more freedom, control, and responsibility in choosing services and supports to help them meet objectives in their IPP.  As authorized in W&I Code section 4685.8(c)(6), "'Self-determination' means a voluntary delivery system consisting of a defined and comprehensive mix of services and supports, selected and directed by a participant through person-centered planning, in order to meet the objectives in his or her IPP. Self-determination services and supports are designed to assist the participant to achieve personally defined outcomes in community settings that promote inclusion. …"

Implementation of the Self-Determination Program is contingent upon approval of federal funding and budget neutrality.  The Department, in consultation with stakeholders, drafted a 1915(c) Home and Community-Based Services Waiver application for the Self-Determination Program that was submitted to CMS on December 31, 2014.  In August 2015, at the request of CMS, new language was added to the Self-Determination Program Waiver application describing how homes and settings where participants will reside and receive services meet the requirements of the federal home and community-based settings rules that became effective in March 2014. The required 30-day public comment period for the revised application concluded on September 7, 2015.  The Waiver application was formally resubmitted to CMS on September 29, 2015.  In response to this submission, in a letter dated December 11, 2015, CMS requested information and clarification regarding the contents of the Waiver application.  This type of request is a standard part of the CMS review process.  DDS, in conjunction with the DHCS, is working with CMS to provide the requested information; however, there is no specified timeline for federal approval.

Upon approval, the Self-Determination Program will be implemented for up to 2,500 participants during the first three years.  The initial 2,500 enrollees will be selected at random from a pool of interested parties who have participated in a pre-enrollment informational meeting.

DDS has committed to providing outreach and training regarding the Self-Determination Program for DC residents and families, to increase awareness of this option for coordinating services after residents move into the community.

## SAFETY NET SERVICES

The need for a "safety net" was articulated during the deliberations of the DC Task Force in 2013.  The DC Task Force members identified the appropriate role of the State to be that of providing the placement of last resort, so that there will always be a safety net of essential services if/when service providers are unwilling, unable or unavailable in the community to provide the appropriate level of residential care, particularly for individuals with significantly challenging behaviors.  The need has also been raised as a concern by many residents and family members affected by the closures.  Assuring appropriate services for every person in our system is the ultimate goal for the Department and the RCs.

To address the recommendations of the DC Task Force, DDS is developing new models of care in the community to fill service gaps for persons with significantly challenging behaviors; specifically, EBSHs, CCHs and DE or DE/SP homes.  As these homes come on line, DDS will evaluate the need to modify these services and/or develop additional models of care to better serve this population in the community.

As recommended by the DC Task Force, after the planned closures of SDC, FDC, and the PDC GTA, the Department will continue to operate the PDC STP and the Canyon Springs CF in Cathedral City.  The STP serves individuals who are committed for placement through the criminal justice system.  The Canyon Springs CF, commonly referred to as a transition facility, primary serves individuals from the STP who are ready for increased community access and integration into the community.

DDS is working with stakeholders and especially RCs to fully understand the circumstances and the challenges to identifying appropriate, stable placement options for individuals with significant challenges.  The issue of safety-net services will be the focus of the next DDS Task Force meeting to be held in April 2016.

Consistent with the Lanterman Act and the goal of serving individuals in the least restrictive environment appropriate for their needs, DDS' priority is to build community residential capacity for all persons with significant developmental service needs.  As appropriate, strategies will be identified for addressing extraordinary needs or gaps in services under W&I Code section 4474.2, which grants DDS authority for using DC or other Department staff to operate, or assist in the operation of community facilities.

The issue of a safety net is complicated and may involve multiple strategies.  All services must be carefully designed to satisfy the Lanterman Act requirement that individuals be served in the least restrictive environment appropriate for their needs.  Any solution must be well thought out, supportable, and fiscally prudent.

## ACCESS TO HEALTH AND MEDICAL SERVICES

A comprehensive system of health care for individuals who are moving from a DC into the community must be identified.  DDS and the involved RCs will work to establish health care system components as well as develop methods to support a seamless transition and ensure individuals have access to appropriate medical and other ancillary services.

Service and support needs for each consumer are provided through an extensive transition planning and resource identification phase before a resident moves into the community. Within this process, a comprehensive health assessment is performed and an IHTP is developed. Each person's medical and health support needs are identified as well as the providers to address those needs. All information is documented in the IPP. As needs change, the IPP is updated. The IPP is accomplished through an ID Team process that necessarily includes medical staff familiar with the individual.

## Health Clinic Services from the Developmental Center

The DCs provide the full range of medical, dental, and behavioral services required by residents. As part of the closure plan, DDS is proposing to offer health clinic services at each DC as a way to bridge any gaps that may exist in community medical and professional services and to ensure a smooth transition. The intent is to provide continuity of medical care and services, including specialty services, and address stakeholder concerns. During the closure process, it is expected that DC clinics will provide medical, dental, adaptive/rehabilitative engineering, physical therapy, orthotics and mental health and behavioral services to current and former DC residents, while allowing additional time for these services to be obtained or established in the community. As closure progresses, data will be collected to assess the usage, accessibility and sustainability of each health clinic service, the availability of services in the community, and will be used to consider how the full range of service needs should be met after closure.

In accordance with W&I Code section 4474.1(g)(12), the following narrative describes where services will be obtained that, upon closure, will no longer be provided by the DC:

> Each RC involved in the closure of FDC and/or the PDC GTA is responsible for coordinating services received by each individual, depending on their living arrangement and needs. These services may include residential, day, work, health care, behavioral, specialty equipment, psychiatric, or other services. To meet the needs of each individual who transitions from a DC, the involved RCs will continue to leverage existing relationships with community-based professionals, health plans and service providers, and will develop new services through their CPPs where unmet needs are identified. Services to be obtained will be individualized, based on the IPP process.

## Community-Based Health Services

The Department is working with the involved RCs to ensure continuity of services through community-based providers when the DCs close. RCs have established productive partnerships with local managed care health plans (health plans) that provide medical resources for individuals currently in the community. Efforts will focus on developing a comprehensive array of qualified specialty providers through the health plans, and establishing enhanced case management and coordination for timely access to quality services. Additional resource development will focus on dental and dental sedation services, behavioral support services, and adaptive equipment services. A focus on behavioral support services began with resources that were approved for 2015-16. As part of the Governor's Budget for 2016-17, the Department has proposed

29

two Dental Consultant positions to specifically coordinate and oversee the statewide development of, and access to dental services for DC residents transitioning to the community.

As of January 1, 2016, all of FDC's residents were Medi-Cal eligible, with 75% dually covered by Medicare, and 2% having Medi-Cal supplemental insurance coverage.  Also as of January 1, 2016, all but one of the PDC GTA residents were Medi-Cal eligible, 69% were dually covered by Medicare and 1% have additional private insurance coverage.  Medi-Cal and Medicare coverage will allow DC residents to access existing community-based health services.

Each DC and the RCs will work together to review the comprehensive, individualized medical and support plans in place for residents.  DDS will work with DHCS, the health plans, and RCs to assess and ensure the availability of needed health, dental and behavioral services in surrounding communities.  If gaps are identified in services, DDS will work with the RCs and the health care communities to develop services and ensure:

- Access to the full array of required services by qualified providers, including, but not limited to, primary health and specialty medical care, optometry and ophthalmology, pharmacy, support services such as occupational and physical therapies, and the provision of medical equipment and supplies;

- Comprehensive case management for each consumer, which includes coordination and oversight of their individualized health services to assure the provision of all services identified as medically necessary by their primary care physician; and

- Coordination among the RC, the health plan, and other health service providers to ensure efficient access to quality services.

**FISCAL IMPACT OF CLOSURE**

The proposed DDS 2016-17 budget for DCs is $526 million ($307.5 million General Fund [GF]) and contains funding to provide care and treatment for 847 residents (Governor's Budget total average in-center population for 2016-17) and the operation and maintenance of three DCs and one State-operated CF.  The overall budget is developed based on DC population, unique client characteristics, number and type of medical units, facility square footage, and property acreage.

The DDS budget also provides funding for RC operations, purchase of services for consumers living in the community, and statutorily required CPP to increase community capacity for the placement and transition of DC residents, as well as services for the deflection of consumers from entering a DC.  Additionally, with three overlapping DC closures with staggered closure dates (SDC, FDC, and PDC GTA), DDS has proposed funding in the Governor's Budget for Headquarters for closure coordination and oversight.

The decision on where a resident will relocate will be made on an individual basis through the IPP development process.  The Department, working with the RCs, is currently anticipating the transition of approximately 60 FDC and 42 PDC residents (from both the STP and GTA) into community living arrangements in 2016-17.  Generally, the cost of transitioning residents into community settings is covered by CPP funding.  Detailed below are the costs proposed in the Governor's Budget for 2016-17 associated with the transition of residents into the community and other closure activities.

## Developmental Center Costs

**Staffing Adjustments.**  The 2016-17 proposed budget includes positions and funding to maintain minimum levels of both level of care and non-level of care positions during the closure for the benefit of the residents.  The positions are necessary to ensure the health and safety of residents still residing in the DCs, meet licensing requirements, perform resident transition activities, and maintain essential infrastructure.  The net staffing adjustments proposed in the Governor's Budget for 2016-17 reflect the population decline while maintaining essential levels of staffing at the DCs and the specialized services required for resident transitions as follows:

- FDC:  44.5 positions, $3.2 million in total funds

- PDC GTA:  1 position, $56,000 in total funds

**Workers' Compensation Costs.**  The 2016-17 proposed budget includes an annual appropriation of $15 million ($8.4 million GF) to settle open Workers' Compensation claims for both open and closed DCs.  The total estimated settlement costs for all open claims is $75 million in total funds, which includes $19.5 million for FDC and $7.5 million for the PDC GTA.

**Staff Recruitment and Retention.**  As the Department moves forward with the closure of FDC and the PDC GTA, it recognizes the importance of recruiting and retaining qualified staff to provide continuity of habilitation and treatment services, and ensure the health and safety of residents.  DDS is working with CalHR to explore recruitment and retention incentives for employees to stay at each DC through the end of closure.  Potential options may require legislation, additional funding, and/or negotiations with the affected BUs.

**Future Closure Costs.**  The Department will identify other FDC and PDC GTA closure costs as part of future budget processes.  Based on the Lanterman DC closure experience, the following items are anticipated to have cost impacts for FDC and the PDC GTA:

- Increasing specialized support staffing levels to ensure the health and safety of residents during all phases of closure, to prepare the facility for warm-shut down, and to perform other closure activities related to the transfer of clinical records, historical archiving, equipment disposition, etc.

31

- Resident relocation costs and staff overtime associated with workload to oversee resident transfers to new living arrangements.

- Staff leave balance cash-outs and unemployment insurance costs.  The Department will be required to "cash out" accrued vacation, annual leave, personal leave, holiday credit, certified time off, and excess time for employees separating from state service due to retirement or layoff.  It is anticipated that incremental employee layoffs will occur throughout the closure process.  The need for layoff will depend on the resident population and the identification of excess positions by classification.

- Provision of peer informational sessions for employees.

- The establishment of Career Centers at FDC and the PDC GTA to assist interested employees in preparing for and securing alternative employment.

- Operation of health clinics at FDC and the PDC GTA to provide services to residents as they transition into the community.

For both FDC and the PDC GTA, the Department is responsible for maintaining all facilities and land until the final disposition of the property occurs.  The period, often referred to as "warm shut-down," is the time it takes after the last resident is transitioned until the Department is no longer responsible for the property.  There are costs associated with warm shut-down, including but not limited to maintaining physical plant facilities and providing security.

As part of the closure process, the Department will work with DGS to complete necessary assessments and assist DGS as it determines options for the future disposition of the property, which may have associated costs.  There are no assumptions at this time associated with the ultimate disposition of the FDC and PDC GTA property.

## DDS Headquarters Costs

The proposed Governor's Budget for 2016-17 includes a request for $2.1 million ($1.8 million GF), for new and redirected vacant headquarters positions for staffing and contract services needed to support the continued efforts for multiple overlapping DC closures.  This workload includes overseeing the development and licensing of community facilities and consumer programs, supporting layoff activities, resolving Workers' Compensation claims, reconciling payroll and benefits, ensuring accuracy of financial records and resident trust accounts, supporting information technology activities, conducting equal employment opportunity investigations, and collaborating and communicating closure plans and progress with stakeholders.

## Regional Center/Community Costs

The Department is responsible for ensuring the availability of necessary services and supports for FDC and the PDC GTA residents transitioning into the community.  The RC

costs will be funded from CPP resources, as reflected semi-annually in DDS Estimates released in January and May as part of the Governor's Budget and May Revision.  The initial RC costs associated with developing community resources for the proposed closure of FDC and PDC GTA were detailed in the General  for 2016-17 and are summarized in the following table.  These funds are in addition to $67.8 million ($44.1 million GF) in regular CPP budgeted for statewide community resource development.

| Community Placement Plan 2016-17 (in thousands) | | | |
|---|---|---|---|
| | FDC | PDC GTA | Total |
| Operations | $ 1,200 | $    600 | $  1,800 |
| Purchase of Services | 28,500 | 24,000 | 52,500 |
| Total | $29,700 | $24,600 | $54,300 |

**Flexibility for Funding Distribution**

DDS distributes the resources within the DC budget for FDC and the PDC GTA, and between the DC budget and the RC budget for community-based services, as resident needs and community capacity are more fully assessed.  Such redistributions will be part of the budget process and reflected in the DDS fiscal estimates.  As was necessary in the closure of Lanterman DC and Agnews DC, flexibility will be required to move funding between items of appropriation within the Department's budget during the closure process.

**Long-Term Impact of Developmental Center Closures**

With the planned closure of SDC at the end of 2018, and FDC and the PDC GTA by the end of 2021, DDS recognizes there will be a long-term impact to the DDS organization and programs.  These future changes will be reflected in the proposed budget(s) for the fiscal year in which they are applicable.

## PART 3:
## STAKEHOLDER INPUT AND IMPACT STATEMENTS

### SUMMARY OF PUBLIC COMMENTS

As specified in W&I Code section 4474.1, the Department welcomed public comments regarding the closures of FDC and the PDC GTA for consideration and to inform this closure plan.  The Department held and participated in many meetings to obtain verbal and written input from a variety of stakeholders.  (Refer to Attachment 4 for the list of stakeholders contacted and Attachment 5 for a list of meetings held.)  On January 30, 2016, a public hearing for the PDC GTA was held from 10:00 a.m. until 5:00 p.m. at PDC.  Verbal testimony was received from 24 speakers who attended the PDC hearing in person, or who called in.  An additional 18 written comments specific to the closure of the PDC GTA were received by the Department through March 1, 2016.  The public hearing regarding the closure of FDC was held on February 6, 2016, at FDC, also from 10:00 a.m. until 5:00 p.m.  Fifty-two individuals testified at the FDC hearing or via the conference call line provided for the hearing, and approximately 69 individuals or organizations submitted written comments specific to the closure of FDC.  Three additional written comments were received that addressed the closures of both FDC and the PDC GTA.  Some individuals provided their input more than once using different methods of correspondence.  Of the 87 written comments received, 38 were from family members, 8 were from DC staff or volunteers, 14 were from members of the surrounding communities, 8 were from consumers, 18 were from other interested parties and 1 did not indicate any affiliation.

The majority of public comments submitted noted significant concerns and/or opposition to closure, recognition of the expert care and treatment the residents receive at the DCs, and fear that their current care and treatment cannot be replicated in the community.  Many stakeholders for both FDC and the PDC GTA expressed a desire to keep their DC open, or at least a smaller portion open, and asserted the DC's role as a vital part of the community.  Several individuals shared that the Governor and legislators who do not have individuals with significant disabilities in their families should not be making decisions to close the DCs.  Many individuals shared that no one, especially policymakers in Sacramento, know the needs of their family members better than they do, except maybe for the DC staff.  Participants mentioned their discouragement with the low number of elected officials in attendance, thanked the ones who did attend, and encouraged policymakers to visit the DCs before making decisions to close them.

Overwhelming support and appreciation of DC staff were consistent themes.  For many, a DC was the only option after numerous community placements failed.  Families expressed gratitude for the DC staff who respect, love, support, and care for residents like their own family members.  Commenters shared that after working with individuals for years, or even decades, DC staff are able to expertly manage the complex medical and/or behavioral needs of the men and women who live in the DCs.  Appreciation for the DC Foster Grandparents and Senior Companions was also expressed by many individuals.  Families communicated that the DC is their loved ones' home and often times the only home they have ever known, or truly thrived in.  The length of time individuals have resided at a DC and the importance of stability and predictability in the

lives of individuals living in the DCs were highlighted; as were the difficulties many individuals experience with change, and concerns about confusion, trauma, regression and loss of established peer groups resulting from moving away from the DC.  It was also noted that unit consolidations are an added stress factor for individuals in transition.

Families strongly felt that the DCs have advantages that cannot be duplicated in a community home including educational opportunities, social and recreational activities (such as shopping, adaptive bowling, dances, movies, paid employment, outings in the community, walking and enjoying open space), safe and accessible grounds, higher staffing ratios, higher number of licensed staff available, and easy access to specialized medical and dental care 24 hours a day, 7 days a week.  It was also noted that senior citizens can live in congregate settings, such as assisted living or memory care facilities, without the same philosophical objections to congregate care encountered by the DCs.

Family members and friends identified strongly with their role as advocates for their loved ones and their obligation to act as a voice on behalf of individuals who cannot speak for themselves.  Some elderly family members worried about who would be the voice for their loved ones once they are gone.  Testimony and written comments often referenced the DCs as the "least restrictive environment/choice" for residents.  Families appreciate that residents can independently and safely walk to – and participate in – leisure activities, religious services and work, or any other activity of their choosing. The fact that all of their loved ones' needs are well-supported in their respective DC community is of great value to the families of residents.  Many families would like to see DC services continue long enough to allow all remaining DC residents to live out the remainder of their lives in the familiar, supportive DC environment they already know as home.

Several remarks reflected an appreciation for life-saving care and treatment provided at the DCs including specialized medical (podiatry, respiratory care and neurology were mentioned multiple times) and dental services (including sedation dentistry), as well as biomechanical engineering/adaptive technology services and other specialized services not perceived as readily available in the community.  Families greatly value the DC staff and physicians for their expertise in working with individuals with significant developmental and physical disabilities.  Concerns were shared regarding community physicians trying to change medications or treatment plans without comprehensive knowledge of what has worked and what has not worked for individuals in the past, as well as concerns about who monitors medication administration in the community. Apprehensions about 24/7 availability of appropriate nursing staff, the number of "awake staff" to properly care for family members overnight, and underpaid community staff that do not have appropriate levels of training or experience with people like their loved ones were expressed by many.  There were also fears that staff in the community would not stay around long enough to ensure meaningful relationships and continuity of care for their relatives.

Most people making comments agreed that if the State is going to proceed with closure, individualized transition planning and oversight, including stakeholder oversight, will be key.  There was consensus that there is no "one-size-fits-all" approach to care for people with intellectual and developmental disabilities, and that there is a wide range of

abilities and needs within the DC population that have to be addressed on an individual basis.  Some individuals felt that not everyone can safely be transitioned, and others felt that transitions should not have a prescribed time limit and should take as long as necessary to get people accustomed to their new homes and services.  It was very important to some commenters that individuals transitioning from the DCs not wind up isolated in their community home without meaningful activities or interactions with others.  Attention to diet and exercise and access to balanced meals and nutritious food were also identified as key considerations.  There was interest in data and metrics on the experiences of people who have moved from the DCs and increased transparency regarding their outcomes.  Many people expressed support for the CSSP, urged the Department to incentivize CSSP participation for providers and would like to see employees who have established relationships with individuals follow them to their new homes for as much time as is necessary to facilitate transitions.

Several comments pointed out the need to increase funding for the community services system and to pay staff in the community more than just minimum wage.  In addition to the need to strengthen funding for community services, some individuals commented on the need to develop community capacity and improve the quality of medical and dental providers in the community.  Families want homes to be developed near them, as well as near quality medical and dental facilities.  Families suggested distributing maps of proposed development so they could see where homes are going to be.  Family members want to know if they can visit homes at any time, or if they have to make an appointment first.  They would also like to know how they can determine if a home is licensed or not before considering it as an option.  Several families shared their experiences with, or concerns about, the instability of private vendors citing financially mismanaged homes, understaffed homes, and/or homes suddenly closing and leaving residents nowhere to go.  Others were concerned that too much money is being used to develop homes for people moving from the DCs and providers are getting paid too much per month to provide services.  Still others thought the State's resources would be better spent by consolidating services at one of the remaining DCs, rather than being spread throughout the State to create and maintain expensive, specialized homes.

Advocates for and against closure agreed that the State needs to better define what safety net services are going to look like and are hopeful that DC property can be used for those services, in addition to the expansion of community-based safety net services.  Comments noted that DE homes are not enough to guarantee the safety of many individuals residing at the DCs, especially those with elopement issues, lack of safety awareness, impulse control issues, or other significant behaviors.  There was strong support for the idea that the State should support DCs or other residential services as options for people who cannot survive in the community.  Families would like to know how combative behavior is managed in a community home and warn that law enforcement responses, or bouncing people from home to home or to psychiatric wards are not appropriate methods.  They would also like to know what options are available if someone is not happy with their placement and how long clinic services will be provided at the DC.

Support for closure was the minority opinion shared at both public hearings and in the written comments.  Some family members of former DC residents shared their transition experiences, and advised current DC families to be very involved and learn as much as

they can about service options available in the community.  Other individuals chose to view the DC closures as an opportunity to enhance the communities around the DCs by updating the facilities and expanding services provided on the DC campuses to help other populations in need including, but not limited to:  providing affordable/low-income housing, housing for veterans and/or the local homeless population, mental health services, addiction recovery services and housing, job training, youth programs, athletic activities, theater arts programs, service animal training, culinary arts programs, hospital services for the community at large, food bank and urban agriculture applications, educational services (including expanding or creating partnerships with local community colleges), and providing much needed space and facilities for local non-profit organizations.  There was strong support for keeping DC property as public lands and considerable opposition to private development of the DC campuses.

Though there were considerable commonalities among the issues and concerns raised by commenters from both DCs, there were also some items unique to each facility.  For FDC, comments highlighted the need to continue key FDC services such as wound care and skilled nursing services, as well as the need for considerations related to the specialized needs of the aging/senior population served at FDC.  Some community representatives suggested a desire to form a community group to manage the changes coming with the closure of FDC, and families from other DCs that participated in the FDC hearing articulated empathy for the difficult choices FDC families are facing.  Costa Mesa residents shared concerns about the city's general plan recommendations for potential future uses of the FDC property, and there was general opposition to private development.  FDC families would like to see expansions of Harbor Village and/or Shannon's Mountain, or the creation of additional mixed-use, integrated communities using sections of the FDC property.

Comments specific to the closure of the PDC GTA included concerns that the local economy cannot afford to lose the staff (and residents) of the GTA and that programs similar to what is currently offered at PDC, such as the transitional treatment program, are needed in the community.  PDC GTA families are more spread out, and many live out of state which has hampered the exchange of information about the closures.  Some family members expressed a belief that the State values the lives of the forensic population at PDC more than the lives of individuals in the GTA, and in particular, that the State is receiving more money for individuals in the STP which makes it to the State's benefit to keep the STP open.  Questions were asked about how individuals in the STP, who have made poor choices, can displace individuals who did not make those same types of choices, but have no voice or choice in the matter.  PDC GTA stakeholders also suggested that: some EBSHs be developed on the grounds of PDC; the State consider keeping a portion of the GTA open to continue to serve individuals with significant service needs; the State find a way to continue the unique employment opportunities and contracts available at PDC; and, the State explore establishing acute crisis services at PDC.

**CONSUMER INPUT**

A PowerPoint presentation was used to help educate consumers at FDC and in the PDC GTA about the DC closures and to solicit input about what is most important to them regarding the closures.  The PowerPoint was shared and discussed with

interested DC residents at town-hall style meetings and through other existing advocacy meetings at the DCs.  During the PowerPoint presentation, Department staff reiterated that each resident and their team would be involved in making choices about their futures and encouraged everyone to ask questions, talk with their social workers and remember that the DC staff is there to support them through this change and any anxiety or nervousness they may be experiencing.

A similar PowerPoint, modified for consumers who are already in the community, was posted on the DDS webpage and distributed to the primary RCs and the statewide Consumer Advisory Committee (CAC), allowing input on the closure from a diverse group of consumers living in the community.  The PowerPoints were designed to be easy-to-read and enhance the ability for people with developmental disabilities to provide input on the plan[4].

Many consumers at both FDC and the PDC GTA expressed a desire to move into the community, to have more choices and find a group home that they like with roommates of their choosing.  At both DCs, several residents indicated that they would like to live closer to their parents.  Making sure that family can continue to visit, email, call, send photos and otherwise interact with family members once they move to the community was very important to a lot of the men and women who live in the DCs.

Numerous residents of both DCs disclosed that they have lived at their DC for a long time and they did not know if there were good services in the community that could help them like they have been helped at the DC.  Many FDC residents and residents of the PDC GTA acknowledged that they have been working towards independence and shared that they want the chance to visit homes so they are not going to strange places. Several residents of both DCs also voiced concerns that their DC is closing immediately and that they won't have enough time to make informed decisions.  Some residents had very specific requests, such as finding a home in Harbor Village and choosing their own roommates, while others expressed a desire to live in the San Diego area in a group home or in an apartment with SLS.  A few individuals at each DC shared that they would like their current staff persons to follow them into the community and work in their new home.

Almost all of the residents who communicated with the Department to inform the closure plan shared that they think DC staff do a great job, they appreciate and like the DC staff members that work with them, and like that the staff help them make good choices.  At more than one consumer meeting, the residents asked for a round of applause for the DC staff members and thanked them for doing a good job.  Several consumers asked what was going to happen to the DC staff and worried about where the staff members they know are going to go and what they are going to do for a job in the future.

Many residents also expressed some anxiety or fear of the unknown and worries about receiving lower-quality care in the community.  Residents referenced conversations where parents and other family members shared their reservations about losing the quality care experienced at the DC, and some residents shared the future that their

---

4 The Consumer Outreach PowerPoint is available online via: http://www.dds.ca.gov/DevCtrs/

family members would like for them, such as staying at the DC, or moving back into the family home, or very nearby the family home.  A number of residents at both FDC and PDC expressed that they want "good," supportive staff in their new homes and that safety in the homes was a concern, so they had questions about who is going to make sure that everything that is supposed to be in a home is there, such as food, dishes, doctors and enough staff.  Other residents acknowledged the need to work on their behaviors to be successful in the community and wanted to know what happens to people who don't want to move before the DC closes, or where other people within their residences were going to move to and if they would be able to see them again.

Residents from both FDC and the PDC GTA communicated that they enjoy access to outdoor space/parks, leisure activities (including camping, fishing and the holiday celebrations at the DCs), really like "good food," want to "live a healthy life," like having quality day activities, want to be able to go shopping and to other places in the community such as restaurants and movies, are interested in getting pets, want to know what is going to happen to the animals at the DC, and want to make sure they have "good staff" to provide important medical care (several individuals referenced diabetes management as a key health concern) in their new home.  Many residents also shared that school, music/music class and being able to attend church are important to them, as well as keeping relationships with their Foster Grandparents or Senior Companions. Also very important to many DC residents are paid work opportunities, specifically their current jobs, both on and off campus, such as at Carl's Jr., Costco and Best Buy.

In addition to the shared comments and concerns from the residents of both DCs detailed above, the residents in the PDC GTA had some questions and concerns that were very specific to their facility or their previous community experiences.  Specifically, the PDC GTA residents had questions about why the STP was going to stay open when their program was going to close, what will happen once the STP is full, what options are going to be available if they don't succeed in their community placements and if there are still 5150's in the community because they had not had good experiences with those in the past.  The PDC GTA residents were also interested in finding group homes with people who have similar disabilities to their own, including comparable psychiatric diagnoses and homes specifically for individuals who are deaf, and having roommates in similar age groups.  Still others expressed that they wanted to find a home that could help them with their anger issues and coping skills, and more than a couple of residents asked about when they would have to move, if they would have to wait to move when everyone was ready, or if people would leave when their homes were ready.

Similar to the questions posed to the residents of FDC and the PDC GTA, consumers living in the community and members of the statewide CAC were asked to think about what might be important to them if they were moving out of a DC, what people living at the DCs should do to get ready to move, and what self-advocates can do to help people living at FDC and in the PDC GTA to move.

Most consumers living in the community shared that safety, freedom and having the right supports should be very important to anyone moving out of a DC.  They encouraged the men and women living in the DCs to explore their options, "dream big," and try new things.  There was a lot of thought given to ensuring people have choices and the ability to identify and develop their own gifts, especially in relation to work.

Volunteerism and job shadowing were two specific examples of opportunities consumers felt might be helpful to the residents of the DCs to help them identify employment opportunities.  It was also suggested that the Department should work with the Department of Rehabilitation (DOR) to explore how people moving from a DC could participate in, and benefit from, the Workforce Innovation and Opportunity Act (WIOA).

They acknowledged that moving out of a DC will be "life-changing," that freedom might be scary and that people should have lots of good supports in place to help them with their choices, including the support of family and friends and possibly local advocacy groups.  Finding a safe, clean home and being close to family and friends were consistent items noted by consumers, as well as the need for good staff that will learn what each person needs to be successful and develop meaningful relationships with the people they work with.  Some consumers felt that not everyone moving out of a DC will need a group home and suggested that opportunities for consumers to live in their own apartments be offered and considered, if appropriate.  Consumers also suggested that consumers be provided with opportunities to develop friendships with their new neighbors and recommended that a list of fun and inexpensive things to do be prepared for consumers to check out once they move into the community.

Several consumers shared the importance of having medical insurance and a good emergency response system, as well as the need for individuals with autism to receive care from trained professionals who recognize the diversity of all individuals with autism.  Consumers thought it was important to work with individuals moving from the DCs to make sure they know why they take certain medications and the importance of always taking medications as ordered by their physicians.  They noted many people have the need for behavioral health services and that paying attention to self-esteem and confidence in new settings is important to staying healthy.  It was also recommended that if there is not 24-hour staff, a designated person be nearby who can quickly respond if help is needed.

In terms of preparing individuals for their move from a DC, consumers suggested referring people to support groups, making sure their new homes are tailored to each individual's needs, and possibly making videos to help people see homes and learn more about life in the community.

## COUNTY AND CITY INPUT

As part of the stakeholder process, the Department met with city and county representatives for both FDC and PDC to gather their input on areas of interest and potential future uses of DC property.  Representatives from both regions expressed appreciation for their respective facility's contribution to the community and concerns about ensuring current DC residents get the care they need in the community.

Representatives from the City of Costa Mesa and Orange County discussed their support for the City of Costa Mesa's multi-use General Plan Update, positive development of the FDC site, and gave consideration to the ongoing need for services for individuals with developmental disabilities and the behavioral health communities impacted by the closure of FDC.  Orange County proposes establishing a Health Resource Center/Federally Qualified Health Center to serve underserved populations

and the development of "supportive housing," a combination of affordable housing and services to help people live more stable, productive lives.  A clinic could address the complex and specialized needs of former FDC residents in the community, as well as provide employment options for FDC employees.  "Supportive Housing" could be coupled with job training, life skills development, substance abuse programs and case management services for populations in need of assistance.  A letter from the Orange County Health Care Agency that provides more detail on these potential options is included in the separately bound Attachment 3, starting on page 22.

Representatives from the City of Porterville and Tulare County value the local employment opportunities provided by PDC, the quality services that have been delivered at the facility, and prefer that future uses of the PDC GTA property be complementary to the continued operation of the STP.  Concepts discussed include: identifying higher-education uses for the property through either the University of California system, California State University system, and/or Porterville College; transitioning the GTA to academy or training facilities for State public safety agencies, such as the California Department of Forestry and Fire Protection, CDCR, or the California Highway Patrol; or the potential development and use of PDC property as a sports facility for local residents.  A letter from the City of Porterville that details their recommendations can be found on page 139 in the separately bound Attachment 3.

## RESPONSE TO COMMENTS AND SUGGESTIONS RECEIVED

Many stakeholders, especially family members of the men and women who live at FDC or the PDC GTA, offered a variety of ideas, options and suggestions based on the essential services they see their loved one receiving at the DC and their past experiences in the community.  The following section includes some of the significant themes and ideas expressed by stakeholders through the comment process and responses from the Department.

1) **FDC and/or the PDC GTA should remain open, or at least a smaller portion; consolidate the remaining DC population at one of the facilities to ensure housing for all of the remaining residents' lifetimes; given local housing crises (affordability and existing inventory), build homes on-site at the DCs so people don't have to leave their homes; build new, updated housing for residents at one or more of the DCs.**

   As announced in the 2015 May Revision, the State has decided to close its remaining non-secure DCs due in large part to the declining population, the decertification of ICF units at the remaining DCs, the changes in how federal and state governments deliver services to people with developmental disabilities, and the challenges of operating and maintaining aging facilities.

   Federal rules have made clear that clustered housing and services will not qualify for federal funding.  Relocating individuals to different areas of a DC, or building a series of small homes for all of the residents does not bring the DCs into compliance with federal rules as DC residents would not be integrated with people who do not have disabilities.  The State is emphasizing community

integration for any housing and services that are developed to meet the needs of the DC residents.

Additionally, the DCs have significant infrastructure problems.  Upgrading facilities would cost, at a minimum, hundreds of millions of dollars to develop homes or services that would likely not be eligible for federal reimbursement.

2) **Don't just use the DCs for people with developmental disabilities; use them to house veterans, homeless people, individuals recovering from substance abuse, seniors, people with dementia or Alzheimer's, the mentally ill and other populations in need.**

DDS is responsible for, and has the expertise in serving people with developmental disabilities.  Our system is not designed to serve the other populations stakeholders have identified as in need.  The Administration is open to alternative uses of DC property moving forward, although these uses must be evaluated in the context of aging infrastructures and appropriateness.

3) **Expand Harbor Village and Shannon's Mountain; use DC land to provide housing, including specialized service model homes on-site (such as EBSHs with delayed egress or ARFPSHNs); and provide other specialized services (medical, dental, behavioral, specialized equipment) on-site for people with developmental disabilities in perpetuity.**

Consistent with the DC Task Force recommendations and stakeholder input, the Department is proposing to offer health clinic services to meet the specialized service needs for people in transition during the closure process.  (See Part 2 of this plan.)  Periodic review of clinic services will be established to allow the Department to assess the need for, and the continued viability of, services on-site.

Considerations for developing services on-site include aging infrastructure, licensure and code issues, and adherence to CMS regulations and funding requirements.  The Department will continue to explore options and partnerships to ensure continuity of services for DC residents, as well as those in need in the community.  Emphasis will be placed on developing integrated community services.

4) **Expand FDC's Crisis Center to serve more individuals or establish a crisis center at PDC.**

The Department will continue to provide crisis services via the Northern (SDC) and Southern (FDC) STAR programs.  The STAR programs meet a current need of the system.  The Department will review and assess the continued appropriateness, viability, and need for crisis services at the DCs as community resources are developed and new models of care come online.

5) **Comprehensive transition planning is necessary, should be flexible, should reflect that FDC or the PDC GTA has been home to individuals for decades**

**and should include medical, dental, behavioral, mental health, therapeutic and recreational needs, community outings, special events, maintaining established social connections and acclimation to new environments or processes.**

Transition planning is flexible to reflect any necessary changes and address an individual's needs, including that for many residents of FDC and the PDC GTA, this is the only home they have ever known.  Thoughtful and careful transitions are the goal of all parties involved, and individuals will not be moved until all services and supports needed are in place and operational.  The extensive transition process and monitoring outlined in this plan are designed to address the above-mentioned concerns through the IPP process and with the ID Team. (See Part 2 of this plan for a detailed description of the transition planning process.)

6)   **Families want loved ones placed in homes close to them.**

Families are encouraged to talk with their RC service coordinators and ID Teams to make sure desires about home location, potential roommates and any other consumer and/or family concerns and requests are known and addressed through the transition planning process.

7)   **Appropriate funding is required to develop and maintain services and supports necessary for community placement.**

During development of this closure plan, the Legislature passed, and the Governor signed, Special Session legislation that includes significant funding for developmental disabilities services in the community (ABX2 1, Chapter 3, Statutes of 2016).  More specifically, the legislation appropriates a total of $287 million of State GF moneys on July 1, 2016, which is in addition to the Governor's proposed budget for 2016-17.  A significant portion of the new funding will be matched by federal Medicaid funds.

The services and supports people receive under the Lanterman Act as identified in their IPP are an entitlement.  Each year the Department estimates the cost of providing developmental services system-wide which forms the basis for the proposed budget.  The Department will continue to make annual budget proposals reflective of the services needed.  DDS proposals related to safe and successful transitions will be informed by RC requests through the CPP process and ongoing assessments of needs through the required annual comprehensive assessment updates.

8)   **There needs to be enhanced monitoring and data collection of the community experiences encountered by people moving from the DCs.**

The existing quality management processes of the Department and RCs address many of the concerns raised by stakeholders.  Oversight in the community is robust and includes multiple safeguards from multiple entities to ensure consumer safety.  The QMS section of this plan (Part 2) provides a summary of

the outcome and process measures currently used, minimum time frames and requirements for visits, as well as all of the different entities that are involved in oversight after transition.  The establishment of a QMAG at each facility, will help guide this oversight.  Layered on top of these protections are the safeguards and quality controls that providers have in place.  To improve transparency, the Department is in the process of reviewing how best to make data and information collected in the community available to family members and other interested parties.

9) **The State should continue to operate the GTA, instead of keeping the STP open.**

An appropriate role for DDS is to provide public safety through the continuing operation of the STP.  As specified in law, an individual with developmental disabilities who has allegedly committed a serious crime and is determined by a court to be unable to stand trial due to a competency issue, may be ordered to the PDC STP for competency training and other treatment and habilitation.  A court makes the determination that placement of the individual in the STP is the most appropriate option.  By court order, and in the interest of the individual and the public, DDS must serve the individual in a safe and secure environment. Funding for the STP is provided entirely by the State GF.

Conversations will continue between the Department, family members, residents, employees and other stakeholders of both FDC and the PDC GTA. The Department appreciates education efforts undertaken by the Fairview Family and Friends (FFF) parent group in partnership with the Southern California RCs and DDS, and will continue to help with those FFF efforts.  In the absence of an organized family organization at PDC, the Department recognizes the need for enhanced communication and information sharing with PDC families.  The Department has established an email distribution list to share requested information with families and is conducting additional family meetings and information sessions.

**IMPACT OF CLOSURE**

The closure of FDC and PDC GTA will impact all who live or work at the DCs as well as their families, friends, and the local community.  The well-being of the residents and employees will remain the top priorities for the Department throughout the closure process.  While change will be difficult, the Department is committed to developing positive options for both the residents and employees, and supporting them in meaningful ways.  Integral to this process is continuing to work closely with stakeholders to anticipate and address issues timely, and in a way that mitigates any adverse impact.

There is not a single viewpoint as to how the closures will impact DC residents and their families, employees, the community and the RC system.  For many DC residents, their families and DC employees, closure imposes unwanted changes in their lives.  For others, closure brings opportunities for improving people's lives, increasing community resources and options promoting community integration, and/or maximizing utilization of the DC properties for the greater public good.  To ensure everyone's views are

represented, all written correspondence received regarding the closures are provided in Attachment 3.

## IMPACT ON RESIDENTS AND THEIR FAMILIES

Each resident will participate in planning for his or her own personal future and will transition to an alternative living option that meets personal preferences, interests, and needs.  Regardless of location, all will receive the services and supports identified in their IPP.

The impact of closure on residents of FDC and the PDC GTA and their families will vary significantly, given the individualized approach to planning for services required by the Lanterman Act.  Under the Lanterman Act, a person-centered planning process is used to consider the person's assessed needs, the least restrictive settings and options for providing services and supports, and the consumer's and family's preferences and choices, including preferences for where and with whom the consumer will live.

As is true for all persons with developmental disabilities served through the RC system in California, residents moving out of FDC and the PDC GTA into the community will receive the full range of necessary services consistent with the consumer's IPP, including person-centered planning, access to specialized services, service coordination and case management, and quality of service monitoring from employees of the local RC.  New service models, in particular the new residential facility licensure category for individuals with significant behaviors (EBSH), will provide greater opportunities for some residents to live in the community.

## IMPACT ON EMPLOYEES

For employees, the impact of the closure of FDC and the PDC GTA will be mitigated as much as possible through a multi-faceted program designed to help staff obtain alternate job opportunities.  This program is discussed in detail in Part 5 of the plan and includes a variety of services and outreach activities to be conducted and coordinated through Career Centers at both DCs.

The Department will encourage and assist DC employees to voluntarily transfer to vacancies within the Department.  The CSSP has been expanded statewide and now is available to all DC employees.  This program will create job opportunities in the local community where employees can apply their experience and skills, and continue providing services to former DC residents.  In addition, the Department will provide information, training and encouragement for DC employees to consider movement into the private sector to become service providers for persons with developmental disabilities living in the community.

## IMPACT ON THE COMMUNITIES SURROUNDING FDC AND PDC

FDC is located in the City of Costa Mesa, California. Costa Mesa has a population of about 110,000 and is located about three miles from the Pacific Coast in Orange County. The area around FDC is economically diverse and is home to a variety of retail and industry operations, as well as recreation and education sites.  There has been

considerable interest in developing mixed-use housing on FDC property to meet a variety of local needs, including affordable housing.  While many of the residents moving to the community may not live in the Costa Mesa area, resources will be developed to serve those who stay in the area.  Almost 1,000 employees currently work at FDC and approximately 73% of those employees live in Orange County.  The Department's efforts to assist employees with identifying future job opportunities are aimed at minimizing the economic impact of job losses to FDC's local community.

The City of Porterville is located 165 miles north of Los Angeles and 171 miles east of the Pacific Coast with a population of approximately 55,000 citizens.  PDC is one of the largest employers in the city and the GTA employs about 450 people, all of whom live in Tulare County.  Other than PDC, the city's economy is centered on various industries, including agri-business, light industry, and commercial enterprise.  The Department is committed to augmenting the community service system for persons with developmental disabilities, in and around Porterville, for residents who choose to stay in the area.  The STP will remain open so some employment opportunities will remain at the facility, but it is unclear as to what specific economic effects the closure will have at this time. Stakeholders have noted that the economic impact to the local community could be significant.

Part 5 provides more information on the employee composition of FDC and the PDC GTA.

## STATUTORILY REQUIRED STATEMENTS OF IMPACT ON REGIONAL CENTER SERVICES

The statute governing closure requires the plan to address the impact on RC services. Below are statements from the Association of Regional Center Agencies and the RCs that serve the majority of the men and women who live at FDC and in the PDC GTA:

### Association of Regional Center Agencies

"The Association of Regional Center Agencies (ARCA) and its member regional centers support the proposed closure of the General Treatment Area at Porterville Developmental Center and Fairview Developmental Center. ARCA is prepared to work with the Department and others to develop necessary resources to ensure that the planning and closure activities result in positive outcomes for every affected consumer. The successes of the recent Agnews and Lanterman Developmental Center closures are an example of how well-planned and collaborative efforts can achieve such outcomes. These proposed closures, in combination with the proposed closure of Sonoma Developmental Center, highlight California's commitment to serving all individuals with developmental disabilities in community settings.

Regional centers were established to develop local community-based service systems as an alternative to costly state-operated institutions. Prior to the establishment of regional centers, 2,000 to 3,000 California families annually sought admission for an individual to one of the state's developmental centers. Prior to the passage of the Lanterman Act, developmental center care was the only alternative available to families in need of support regardless of the level of need or type of support desired. The

regional center system was established in response to families who were eager to keep their loved ones with developmental disabilities in community settings. Thus, from their inception, a primary regional-center function has been to deflect individuals from placement in state developmental centers by creating community-based alternatives, and to transition those living in state developmental centers into the community.

The regional-center system has, obviously, been very successful, as evidenced by the steady decline in the number of individuals living in institutions and the closure of four large state developmental centers since the mid-1990s. In 1968, there were 13,355 individuals living in state developmental centers and a legislative committee at that time reported "…that thousands of children are on waiting lists for State hospitals…" Today the developmental centers serve less than 1,100 individuals, despite the state's general population increase from 19.4 million in 1968 to more than 39 million in 2016. Thus, since the establishment of the first regional centers, the number of individuals in California residing in developmental centers has been reduced from one in 1,453 of the general population to one in 38,146 today. However, the costs of placing and maintaining individuals with medical and/or behavioral characteristics in the community are not insignificant, although much less than serving these same individuals in state developmental centers.

Section 4418.1(a) of the Wel. & Insti. Code states that 'The Legislature recognizes that it has a special obligation to ensure the well-being of persons with developmental disabilities who are moved from state hospitals to the community.' ARCA believes that the Department, all regional centers, family members, and the provider community share this same obligation. With this vital obligation in mind, ARCA and its member regional centers look forward to working with the Department in its planning to close the General Treatment Area at Porterville Developmental Center and Fairview Developmental Center."

**Kern, Valley Mountain & Central Valley Regional Centers
Joint Impact Statement**

"Central Valley Regional Center (CVRC), Kern Regional Center (KRC) and Valley Mountain Regional Center (VMRC) support the State of California in their decision to close the developmental centers. CVRC and KRC have a history of active participation in the Porterville Regional Project (PRP) Steering Committee and have participated in hundreds of successful community placements over the course of the past two decades. VMRC, which has a much smaller number of clients at Porterville Developmental Center (PDC) has successfully placed dozens into the community. The regional centers intend to work closely with PRP in designing and coordinating the most comprehensive placement course.

CVRC and KRC currently serve the largest number of residents in the General Treatment Area (GTA) of PDC and intend to work jointly in the development of those supports, services and living environments to serve these individuals. CVRC and VMRC are currently developing a joint project intended to serve several of the current GTA residents.

47

The charge of adequately serving the remaining 68 CVRC clients, 32 KRC clients, and 7 VMRC clients in the GTA will challenge our existing community resources.  An intelligent, creative and thoughtful process will be necessary to meet the needs of a diverse client population. A significant portion of our remaining clients have resided in a State Developmental Center (SDC) for a number of decades and, as such, have a repertoire of unique institutional behaviors that must be addressed during the planning, transition and placement processes. CVRC, KRC and VMRC are mindful of the importance of engaging with our client's family members, extended family and other significant relationships. We are committed in insuring their active involvement as well as supporting the family in the transition of their loved ones into the community. It is our desire to engender the same trust and confidence these significant family members have held for the SDC.

The regional centers will require sufficient state financial support to assure the development of a community infrastructure to address the complex profile of the remaining clients.  The regional centers of the Central Valley currently exist within an already strained community support system and in preparation of PDC closure, DDS, along with the regional centers, must work with the impacted community entities to prepare for the influx of individuals with developmental disabilities who have significant service needs including law enforcement, hospitals, medical services, psychiatric and legal support systems.

The Central Valley remains a largely rural environment with major medical centers located only in the largest metropolitan areas, thus challenging the regional centers with ongoing transportation issues, as well as a critical mass of qualified practitioners willing to serve those with special health care needs. It will be incumbent upon the regional centers to identify and secure the necessary clinical services and providers to address medical, dental, behavioral and the necessary durable medical equipment to allow our clients to pursue the least restrictive daily living and working environments. With continued support from the State, including DDS, consideration should be given for a joint clinical services project to meet the unique challenges of our complex clientele.

CVRC, KRC, and VMRC have a successful history of working with state employees in the development of community facilities and will require the assistance of the Department to engage with existing developmental center staff in transitioning our clients to the community, participating in the ongoing stabilization as well as consideration for the development of a cache of state employees interested in serving our mutual clients in community settings. The complex profiles of our remaining SDC clients will require enhanced funding in order to acquire and maintain a compensation package for the maintenance of long term, qualified and well educated staff.  CVRC, KRC and VMRC stand willing to engage with PDC staff to cultivate interest in prospective service providers.

Central Valley, Kern and Valley Mountain are committed to work together in supporting the state and DDS in developing the most comprehensive plans in successfully transitioning our clients into valley communities."

**Eastern Los Angeles, Harbor, North Los Angeles County, Orange County, South Central Los Angeles, San Diego, San Gabriel/Pomona and Tri-Counties Regional Centers**
**Joint Impact Statement**

"The statute governing closure requires the plan to address the impact on regional center services.  Below are statements from the Association of Regional Center Agencies and the Southern California regional centers that serve most of the Fairview residents:

The SCCRCD is in agreement with the Department of Developmental Services' (DDS's) decision to close Fairview Developmental Center (FDC).  We recognize the decision to close FDC is extremely complex and will forever change the lives of the consumers who will be impacted by the closure.  However, we believe that with careful person-centered planning and tailoring resources to the unique needs of each consumer, viable community living arrangements can be secured for each of them.

To affect the successful closure of FDC, DDS needs to work proactively with the SCCRCD.  Specifically, DDS needs to: 1) support and enhance each regional center's resource development and case management efforts associated with the closure; 2) support and fund the collaborative resource development and community placement activities among the Southern California regional centers via the Southern California Integrated Health and Living Project;  3) support and fund permanent and affordable housing; 4) facilitate timely licensing for Community Care Licensed residential and day services; and 5) develop adequate and sustainable rate structures for the specialized medical and behavioral services required to safely serve FDC residents in the community.

The SCCRCD recognizes that the aforementioned support plan will require more details than covered in this letter.  As such, we look forward to working with DDS to develop the comprehensive plan necessary to ensure individuals moving from FDC into the community can and will receive the appropriate residential, day and health services consistent with their individual needs.

The SCCRCD looks forward to working with DDS, FDC residents and their families, as well as FDC staff to affect a smooth transition of each individual into the community.

Sincerely,
George Stevens
Chair, SCCRCD"

# PART 4:
# RESIDENT INFORMATION

The highest priority of the Department in developing this plan is to ensure the continued health and safety of the DC residents during and following their successful transition to appropriate living arrangements identified through the individual planning process.  The plan is informed by significant data and information about the men and women who reside at the DCs and important input received from meetings with residents, family members, employees and local interests; the public hearings; and extensive correspondence received via email, by mail or through the online submission form made available on the DDS website.

The following sections separately identify the overall demographics of the populations residing at FDC and the PDC GTA.

## THE RESIDENTS OF FAIRVIEW DEVELOPMENTAL CENTER

### Demographics

**Level-of-Care and Services Provided at FDC:**  FDC currently provides services to residents under three levels-of-care.  The facility is licensed as a GACH with distinct licenses for an ICF and NF.  As of January 1, 2016, 248 people were in continuing residence in the facility with 102 individuals (approximately 41%) living on one of six NF residences and the remaining 146 (approximately 59%) residing on one of the facility's nine ICF residences.  The census on each of the NF or ICF units ranges from 1 to 25 residents.  The third level-of-care is provided by the Acute Care unit where residents receive medical and nursing care when they experience an acute health care condition.

**RC Communities:**  FDC is a resource to the Southern California area with over three-quarters of the individuals living at FDC (87%) being served by seven Southern California area RCs.  Eight other RCs serve the remaining 13% of individuals, with each of those having ten or fewer persons in residence.  The population by RC is summarized on the following page:

| Regional Center | NF | ICF | Total | % |
|---|---|---|---|---|
| Orange County (RCOC) | 41 | 36 | 77 | 31% |
| San Diego (SDRC) | 18 | 31 | 49 | 20% |
| Harbor (HRC) | 16 | 9 | 25 | 10% |
| South Central Los Angeles (SCLARC) | 11 | 14 | 25 | 10% |
| North Los Angeles County (NLACRC) | 5 | 13 | 18 | 7% |
| San Gabriel/Pomona (SG/PRC) | 3 | 10 | 13 | 5% |
| East Los Angeles (ELARC) | 2 | 9 | 11 | 4% |
| Inland (IRC) | 1 | 7 | 8 | 3% |
| Tri-Counties (TCRC) | 1 | 5 | 6 | 2% |
| Westside (WRC) | 2 | 3 | 5 | 2% |
| Frank D Lanterman (FDLRC) | 0 | 4 | 4 | 2% |
| Alta California (ACRC) | 1 | 2 | 3 | 1% |
| San Andreas (SARC) | 1 | 1 | 2 | 1% |
| Golden Gate (GGRC) | 0 | 1 | 1 | 1% |
| East Bay (RCEB) | 0 | 1 | 1 | 1% |
| **Total** | **102** | **146** | **248** | **100%** |

**Length of Residence:**  The majority of residents have lived at FDC for many years with 42% having resided there for more than 30 years.  The length of stay for the remaining residents has 21% living at FDC for 21 to 30 years, another 23% for 11 to 20 years, 8% for 6 to10 years, and 6% for 5 or fewer years.

**Age:**  FDC's population is older, with more than 79% of the residents age 40 and older.  People aged 65 years or older make up 15% of the population, with the oldest being 98 years of age.  There are three individuals under 22 years of age.

**Family Involvement:**  About 66% of the resident population at FDC as of January 1, 2016, has identified family connections and involvement.  An additional 77 (31%) are conserved, three individuals (1%) access advocacy services, with the remaining number having no formally identified representative.  All individuals are identified as needing assistance in making life and care decisions.

**Gender and Ethnicity:**  The resident population at FDC is 63% male and 37% female.  Seventy-four percent (74%) of the population is identified as White, 15% identified as Hispanic/Latino, with 6% identified as Black/African American, and the remaining 5% identified as Asian, Pacific Islander, Filipino or Other.

**Developmental Disability**:  The Lanterman Act defines developmental disability in W&I Code section 4512(a) as a:

"… [d]isability that originates before an individual attains 18 years of age; continues, or can be expected to continue, indefinitely; and constitutes a substantial disability for that individual…[T]his term shall include intellectual

disability, cerebral palsy, epilepsy, and autism.  This term shall also include disabling conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an intellectual disability, but shall not include other handicapping conditions that are solely physical in nature."

Fifty percent (50%) of the residents at FDC have profound intellectual disability, 19% have severe intellectual disability, 15% have a moderate intellectual disability, and 16% are persons assessed with mild, or other levels of intellectual disability.  Residents may also have mental health issues, with 36% identified as having a significant impact.  A majority of consumers have additional disabilities including 48% of the population with epilepsy, 21% have autism, and 28% have cerebral palsy.  In addition, 59% of the residents have challenges with ambulation, 56% have vision difficulties, and 23% have a hearing impairment.

## Primary Service Needs

Residents at FDC require a variety of services and supports.  The following defines five broad areas of service and identifies the number of consumers for whom that service is their primary need:

**Significant Health Care Services:**  This area includes the need for intermittent pressure breathing, inhalation assistive devices, tracheotomy care, or treatment for recurrent pneumonias or apnea.  Significant nursing intervention and monitoring are required to effectively treat these individuals.  Ninety-eight (98) of FDC's residents (40%) have significant health care needs as their primary service need.

**Extensive Personal Care:**  This need refers to people who do not ambulate, require total assistance and care, and/or receive enteral (tube) feeding.  Thirteen (13) residents of FDC (5%) require extensive personal care as their primary service need.

**Significant Behavioral Support:**  This need addresses individuals who have challenging behaviors that may require intervention for the safety of themselves or others.  Sixty-eight (68) residents (27%) have been identified as requiring significant behavioral support as their primary service need.

**Protection and Safety:**  This area refers to those individuals who need a highly structured setting because of a lack of safety awareness, a pattern of self-abuse or other behavior requiring constant supervision and ongoing intervention to prevent self-injury.  Fifty-three (53) of the residents (21%) require highly structured services as their primary service need.

**Low Structured Setting:**  This service need addresses those consumers who do not require significant behavioral support or intervention but do require careful supervision.  Sixteen (16) individuals residing at FDC (7%) were identified as needing this level of service.

**THE RESIDENTS OF THE PORTERVILLE DEVELOPMENTAL CENTER GENERAL TREATMENT AREA**

## Demographics

**Level-of-Care and Services Provided at PDC:**  PDC currently provides services to residents under three levels-of-care.  The facility is licensed as a GACH with distinct licenses for an ICF and NF.  As of January 1, 2016, 171 people were in continuing residence in the GTA with 49 individuals (approximately 29%) living on one of four NF residences and the remaining 122 (approximately 71%) residing on one of the facility's seven ICF residences.  The census on each of the NF or ICF units ranges from 1 to 20 residents.  The third level-of-care is provided by the Acute Care unit where residents receive medical and nursing care when they experience an acute health care condition.

There are additional ICF residences at PDC that provide specialized services in the STP.  This program area serves individuals involved with the criminal justice system who have been found incompetent to stand trial and are admitted to receive competency training and treatment.  The STP is enclosed by a secured perimeter and separated from the GTA.  The STP is not included as part of this closure plan.

**RC Communities:**  PDC is a resource to the Central California area with just over half of the individuals living at the PDC GTA (68%) being served by three central area RCs.  A number of other RCs (15) serve the remaining 32% of individuals, each having ten or fewer persons in residence in the GTA.  The population by RC is:

| Regional Center | NF | ICF | Total | % |
|---|---|---|---|---|
| Central Valley (CVRC) | 18 | 54 | 72 | 42% |
| Kern (KRC) | 11 | 21 | 32 | 19% |
| Tri-Counties (TCRC) | 7 | 5 | 12 | 7% |
| Alta California (ACRC) | 3 | 6 | 9 | 5% |
| Golden Gate (GGRC) | 1 | 7 | 8 | 4% |
| Valley Mountain (VMRC) | 1 | 7 | 8 | 4% |
| North Los Angeles County (NLACRC) | 5 | 1 | 6 | 4% |
| South Central Los Angeles (SCLARC) | 1 | 3 | 4 | 2% |
| Far Northern (FNRC) | 0 | 3 | 3 | 2% |
| Frank D Lanterman (FDLRC) | 0 | 3 | 3 | 2% |
| East Bay (RCEB) | 0 | 3 | 3 | 2% |
| Westside (WRC) | 0 | 2 | 2 | 1% |
| San Gabriel/Pomona (SG/PRC) | 0 | 2 | 2 | 1% |
| San Diego (SDRC) | 0 | 2 | 2 | 1% |
| North Bay (NBRC) | 1 | 1 | 2 | 1% |
| Inland (IRC) | 0 | 1 | 1 | 1% |
| San Andreas (SARC) | 1 | 0 | 1 | 1% |
| Orange County (RCOC) | 0 | 1 | 1 | 1% |
| **Grand Total** | **49** | **122** | **171** | **100%** |

**Length of Residence:**  The majority of GTA residents have lived at PDC for many years with 39% having resided there for more than 30 years.  The breakdown on the length of stay for the remaining residents shows 18% have made PDC their home for 21 to 30 years, another 18% for 11 to 20 years, 21% for 6 to10 years, and 4% for 5 or fewer years.

**Age:**  The PDC GTA population is older, with more than 75% of the residents age 40 and older.  People aged 65 years or older make up 18% of the population, with the oldest being 86 years of age.  There is no one under 22 years of age in the GTA.

**Family Involvement:**  About 50% of the resident population at the PDC GTA as of January 1, 2016, has identified family connections and involvement.  An additional 63 (37%) are conserved, four individuals (2%) access advocacy services, with the remaining number having no formally identified representative.  All individuals are identified as needing assistance in making life and care decisions.

**Gender and Ethnicity:**  The resident population at the PDC GTA is 75% male and 25% female.  Seventy-four percent (74%) of the population is identified as White, 15% identified as Hispanic/Latino, with 8% identified as Black/African American, and the remaining 3% identified as Asian, Pacific Islander, Filipino or Other.

**Developmental Disability:**  The Lanterman Act defines developmental disability in W&I Code section 4512(a) as a:

> "… [d]isability that originates before an individual attains 18 years of age; continues, or can be expected to continue, indefinitely; and constitutes a substantial disability for that individual…[T]his term shall include intellectual disability, cerebral palsy, epilepsy, and autism.  This term shall also include disabling conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an intellectual disability, but shall not include other handicapping conditions that are solely physical in nature."

Fifty-five percent (55%) of the consumers who reside at the PDC GTA have profound intellectual disability, 9% have severe intellectual disability, 12% have a moderate intellectual disability, and 24% are persons assessed with mild, or other levels of intellectual disability.  Some residents also have mental health issues, with 45% identified as having a significant impact.  A majority of consumers have additional disabilities including 51% of the population with epilepsy, 9% have autism, and 26% have cerebral palsy.  In addition, 47% of the residents have challenges with ambulation, 61% have vision difficulties, and 16% have a hearing impairment.

## Primary Service Needs

Residents at the PDC GTA require a variety of services and supports.  The following information defines five broad areas of service and identifies the number of consumers for whom that service is their primary need:

**Significant Health Care Services:**  This area includes the need for intermittent pressure breathing, inhalation assistive devices, tracheotomy care, or treatment for

recurrent pneumonias or apnea.  Significant nursing intervention and monitoring are required to effectively treat these individuals.  Thirty-six (36) of the residents in the GTA (21%) have significant health care needs as their primary service need.

**Extensive Personal Care:**  This need refers to people who do not ambulate, require total assistance and care, and/or receive enteral (tube) feeding.  Thirty-five (35) residents of the PDC GTA (20%) require extensive personal care as their primary service need.

**Significant Behavioral Support:**  This need addresses individuals who have challenging behaviors that may require intervention for the safety of themselves or others.  Eighty-seven (87) residents (51%) have been identified as requiring significant behavioral support as their primary service need.

**Protection and Safety:**  This are refers to those individuals who need a highly structured setting because of a lack of safety awareness, a pattern of self-abuse or other behavior requiring constant supervision and ongoing intervention to prevent self-injury.  Thirteen (13) of the residents (8%) require highly structured services as their primary service need.

**Low Structured Setting:**  This service need addresses those consumers who do not require significant behavioral support or intervention but do require careful supervision.  No one residing at the PDC GTA was identified in this category.

## PART 5:
## EMPLOYEE INFORMATION

The DC workforce is a dedicated group of employees that consistently demonstrate specialized abilities, caring and an investment in the best outcomes possible for the people they serve.  Families and friends of DC residents overwhelmingly recognized the skills, expertise and devotion of staff in their comments and acknowledged deep appreciation for the excellent care their loved ones have experienced at the DCs.  The selflessness and dedication of FDC and the PDC GTA employees validates the Department's appreciation of the work DC staff do every day.

The Department is committed to the implementation of employee supports that will promote workforce stability and provide opportunities for employees to determine their future.  To this end, the Department will:

- Provide employees with current and accurate information to assist them in understanding their choices and rights before making decisions that could impact their futures;

- Encourage them to seek new opportunities to serve individuals with developmental disabilities within the community service system;

- Support them by offering assistance to further their personal goals; and

- Provide opportunities to enhance their job skills.

Employee retention during the closure and transition process is necessary to assure continuity of services and to protect our most valuable resource, the expertise and commitment of a dedicated workforce.  Employees have suggested, and the Department is working with CalHR to explore, the possibility of retention bonuses, state service credit opportunities, and the ability to guarantee positions or specialized training for employees who stay through the end of closure.  These types of employee benefits potentially require legislative authorization and funding, and are subject to collective bargaining.

## EMPLOYEE INPUT TO THE PLANNING PROCESS

## Union Input

The Department conducted employee forums to provide opportunities for staff to ask questions and give input for consideration in the planning process.  In addition, notification of the proposed closure and a request to meet with the Department to gather input for the development of the closure plan was sent to the union representatives of the: California Association of Psychiatric Technicians (CAPT); American Federation of State, County, and Municipal Employees (AFSCME); Service Employees International Union (SEIU); Union of American Physicians and Dentists (UAPD); California Statewide Law Enforcement Association (CSLEA); Association of California State Supervisors

(ACSS); International Union of Operating Engineers (IUOE); and the Professional Engineers of California Government (PECG).

Representatives of AFSCME, CSLEA, ACSS and CAPT participated in a January 27, 2016, meeting where the Department shared information on the closure of FDC and the PDC GTA, discussed the needs of the employees to be considered in the planning process and accepted input for the closure plan.  At this meeting the unions urged the Department to:

- Subsidize provider participation in the CSSP to ensure positions are available for DC employees who want to participate in the program;

- Explore service credits for DC employees to stay and retention bonuses for employees that stay until the very end.  Ideally, bonuses would be "PERS-able" and 1:1 service credit matches should be considered, including service credits for employees participating in the CSSP;

- Provide incentive packages to encourage retirements;

- Explore the suspension of the one-time 240-day extension rule as it prevented more senior staff staying through the closure of Lanterman DC;

- Identify ways to bargain flexibility into the layoff process to address the specific staffing needs of a DC in closure;

- Make a case manager available, one-on-one, to all employees impacted by layoff to educate them on processes and facilitate timely submission of paperwork;

- Not use contract registries and ensure mandated overtime is not overused;

- Reclassify all of the employees at PDC to "safety" class;

- Explore legislation to allow transfers between safety and non-safety positions and allow floating of relief staff between the STP and GTA at PDC;

- Reach out to all other State departments regarding job vacancies, facilitate job fairs specific to other departments, provide a list of similar classifications to employees to help them identify other employment opportunities and provide Department vacancy information, by facility, on a quarterly basis to the unions;

- Consider the possibility of establishing a Federally Qualified Health Clinic on DC sites;

- Consider the possibility of a non-profit organization running the DCs;

- Give employees at a minimum a 5% bonus to create parity with California Department of Corrections and Rehabilitation (CDCR) salaries; and

- Create an internal website with comprehensive information pertaining to layoff, including seniority scores, similar to what CDCR developed.

## DC Employee Input

Suggestions raised by employees through stakeholder meetings and comment submissions were thoughtful and varied.  Many employees aired concerns about residents losing familiar staff and felt that staff retention is key to ensuring correct supports for consumers as they transition to the community.  It was suggested that employees provide multiple cross-training opportunities to service providers throughout the closure process, with a focus on hands-on training, as imperative to successful transitions - especially for individuals with significant challenging behaviors.

The need for communication and transparency with employees throughout the closure process was expressed and there was interest in having additional employee meetings and forums to share concerns as closure progresses.  Several employees shared that they need a specific closure date, not just "by 2021" to effectively plan for their futures.

The CSSP was discussed at length.  Employees urged the Department to identify additional funding for CSSP to encourage participation and maintain continuity for staff and clients in the community.  Employees were interested in knowing what classifications were hired in the community in the past and if Southern California DC employees could work in Northern California homes and programs.  It was suggested that the Department utilize the CSSP to provide expert mobile crisis teams of DC employees, or to run small, state crisis homes.  Employees proposed that the Department look at ways to broaden the use of the CSSP to include non-level-of-care employees and promote the number of open CSSP positions more effectively than positions were promoted for the Lanterman DC closure.

Employees also expressed interest in becoming community service providers and asked that the Department find ways to remove barriers, such as Conflict of Interest policies, that deter employees from becoming vendorized with a RC.  Several staff members shared their interest in learning how to start programs to meet the significant need for appropriate day services in the community, as well as vocational and educational programs.  Employees also noted a significant need for additional community-based services, not just home and day programs, but art, education, recreation and other activities.

Recruitment and retention were also common items raised throughout input from employees.  Employees are interested in incentives to stay through closure, especially cash incentives (to start immediately) or raises.  The need for "out of class" pay to recognize the jobs people are doing in addition to their current responsibilities was raised and employees were interested in identifying incentives to keep future retirees through closure.  Many employees suggested "golden handshakes" (retirement incentives) be offered.  Specific suggestions included offering two years of additional service credit if employees stay through closure, or offering medical benefits as part of any "golden handshake." Some employees also viewed "golden handshakes" as a way to allow younger workers the opportunity to stay employed.  Employees also asked the

Department to determine if they can negotiate with other State departments to give employees the option to participate in Social Security to avoid severe Social Security Insurance cuts experienced by former DC employees who had already transferred to other State positions.

Additional suggestions and comments raised by employees through stakeholder meetings include:

- Job fairs with local providers, resume classes, interview techniques, career counseling and other supports would be very helpful.  Training for non-client care positions would also be appreciated, as well as information on equivalent classifications and/or roles and responsibilities in community-based positions and training specific to positions in the community.

- Maintain freedom of the campus for clients, explore some residential opportunities on-grounds for very extreme cases.  Other employees mentioned they would like to see the property used for community groups, educational needs, be transferred to a university, or otherwise be repurposed to benefit people with developmental disabilities.

- Facilitate client transitions to managed care to ensure any special medical or psychiatric needs are able to be addressed as soon as an individual moves and that people are not subject to lengthy health plan enrollment delays.

- Several employees would like to know what State-operated facilities the future of our system might have.

- Create an outpatient service center where people in the community can benefit from the dental, lab, x-ray, biomechanical/customized engineering and other specialized expertise of DC employees on an ongoing basis.

- Extend post-placement follow-up services from DC staff to 18 months instead of 12.

- Improve communication about state testing opportunities, create local exam opportunities and look at increasing the frequency of testing opportunities.

- Apply accreditation and certification requirements for recreational therapists at the DC to equivalent positions in the community.

Comments and suggestions that were made specifically for FDC include:

- There was interest expressed in learning more about a state program to assist employees in layoff with their mortgage costs.

- A way for employees to keep their housing in Harbor Village should be identified so they're not losing their job and their home.  A suggestion was made to

establish a one-year grace period for employees living at Harbor Village to maintain their 20% rent savings.

- A way to maintain or transition the Sensory Integration Clinic services provided at FDC should be identified so the resource is not lost.

- A secure treatment program should be opened at FDC, similar to what's offered at PDC.

- A small community with wrap-around services should be created to utilize the expertise of DC staff and provide services to those with the greatest need.

- A desire to have the Department work with other State departments to broaden employment opportunities for teachers and Rehabilitation engineering staff was expressed.  It was suggested that the Department look for ways to create more opportunities for Adult Education Teachers and Teaching Assistants and their specialized skill sets, possibly by creating an avenue for teachers to augment or modify their credentials so it can be utilized in the State prison system.  The lack of opportunities to gain supervisory experience was also an issue for employees in these classifications during the Lanterman DC closure.

- Buildings at FDC should be retained to establish educational and vocational programs at FDC for people in the community, using State staff.

- When the Career Center is established at FDC, ensure the center is in a location that is easily accessible and supportive to employee morale, not in a basement or hard to find area.

Comments and suggestions that were made specifically for PDC include:

- An acute crisis clinic should be established at PDC similar to the Northern and Southern STAR clinics.

- One or more GTA units should be kept open to establish a transitional treatment program at PDC.

- The Department of State Hospitals (DSH) should assume responsibility for the STP at PDC.

- Ways should be identified to keep PDC's unique work program and existing contracts in place to maintain employment opportunities for individuals with developmental disabilities.

The Department acknowledges and appreciates the commitment, dedication and expertise of DC employees as we work together to realize the best possible future for the residents and employees of FDC and the PDC GTA.

**OPPORTUNITIES FOR DEVELOPMENTAL CENTER EMPLOYEES**

On behalf of DC employees and in accordance with W&I Code section 4474.1(d), contact is being made with the local counties, RCs, and other State departments using similar occupational classifications for development of a program to place staff of the DCs, as positions become vacant, in similar positions operated by or through contracts. Contact has already been made with the DSH, the Department of Veterans Affairs, the Department of Motor Vehicles, the Employment Development Department (EDD), CDCR, DGS, CDSS, CDPH, DHCS, CalHR, and DOF.  Additionally, DDS contacted all 21 RCs to establish a partnership for the hiring of DC employees through the CSSP.

The Department has reached out to the EDD offices in Orange and Tulare Counties and discussed the closure plan.  EDD staff work in partnership with County one-stop centers and the County Workforce Development Board to deliver comprehensive rapid response services to employers and employees as specified in the WIOA.  Career Center services being offered include:  orientation, education and training information, job search assistance, interview skills workshops, resume preparation, unemployment benefits, the California Training Benefits program, and additional links to community-based organizations that provide laid-off employees with additional services, as available and appropriate.  Orange County's Rapid Response Business Services will take the lead in the coordination of the activities and services to be provided based on the specific needs of FDC.

Community Services Employment Training is the WIOA one-stop operator for Tulare County and they will take the lead in the coordination of the activities and services to be provided based on the specific needs created by the closure of the PDC GTA.  The Rapid Response Business Program Coordinator for Tulare County has been notified and will be available to assist the employees of PDC.  There are two Comprehensive one-stops located in Tulare County; one in Visalia and one in Porterville.  Their Site Coordinators have been notified and are also available to assist PDC's employees.

If this plan is approved, the Department and other State and local employers will share information on an ongoing basis through the employee placement program that is in development.  Such exchange will include:  the classifications and numbers of employees; the anticipated staffing needs of the employers and the ability of DC staff to meet their recruitment needs; advertised job openings for which DC employees can apply; information on local recruitment events and training programs; and opportunities for employers to participate in DC-sponsored job fairs.

In addition to efforts made on behalf of DC employees as a group, there will be a number of individualized services offered, with the Department's first priority being to assist employees in identifying alternatives that build upon their expertise and strengthen the developmental disabilities services system.  The DC employees will be apprised of all available options for their continued involvement in serving the current residents in their future settings.  This continued involvement can take several forms under CSSP, as described below.

Employees at the DCs have learned and developed a wide range of special skills that make them effective in providing services and supports to persons with developmental

disabilities.  In California, most employees have to complete a training program and/or pass a licensing examination administered by the State.  In addition, these professionals have developed a repertoire of expertise beyond their formal education that is invaluable in working with persons with developmental disabilities.  Because a great number of DC employees have committed many years to providing services and supports to this special population, it is hoped that many of them will be interested in continuing their service to individuals with developmental disabilities in the years ahead. Staff expertise surveys were conducted to assist in identifying unique skills, abilities, and specialized training that staff members have accumulated over their careers.  Input from the State employee survey will help to distinguish services that could be provided in other settings.  The Department will continue to work with employees throughout the closure process to identify the resources and assistance they need.

## Community State Staff Program

In June 2014, the Department received authorization (SB 856, Chapter 30, Statutes of 2014, section 845.1) to expand the CSSP statewide to support any consumer who has transitioned out of any DC, or to deflect admission to a DC.  State employees work through contracts established between DDS and either a RC or service provider. Contract employees maintain their salaries and benefits and the vendor/contractor reimburses the State for the cost.

While the expansion of the program no longer is restricted to a particular DC closure, the CSSP remains a critical support for consumer transitions and continuity of staff.  To establish the change, appropriate collective BUs were notified.  The Department and CalHR bargained new agreements with CAPT and SEIU to participate in the program. The new agreements cover the employee selection process, the provision of ongoing supervision, and employee rights and representation.

Experience with previous closures has led to the development and refinement of various options and improvements in services and supports, particularly in the area of crisis management.  The Department anticipates developing a stronger partnership with RCs and providers utilizing State staff's knowledge and expertise in the area of acute nursing services, home management, crisis intervention, and behavioral support.  In August 2015, DDS sent a memo to the Executive Directors of all 21 RCs encouraging them to seek information about the new statewide CSSP (Attachment 6).  Thus far, five of the seven RCs with the highest percentage of consumers at FDC have expressed an interest in the CSSP and met with a CSSP Coordinator.  For the PDC GTA, four RCs have shown an interest in the CSSP and have met with a CSSP Coordinator.  The DDS CSSP Coordinators will continue to schedule one-on-one meetings with interested RC teams to discuss the RC staffing needs and the expertise that the Department can provide through CSSP.  In addition, there are ongoing informational sessions for FDC employees to increase their awareness of the CSSP.  As of February 10, 2016, 232 FDC employees have attended informational sessions.  The Department will be scheduling informational sessions for PDC employees to increase their awareness of the program.

The CSSP can maintain familiar staff for transitioning DC residents, and enhance individuals' services by bringing the depth of experience a DC employee has into the

community service system.  In addition, the CSSP offers consultative and administrative services in the areas of mobile crisis intervention and deflection services.  The Department provides extensive staff training and orientation to prepare employees for community-based services.  Through this program, the specialized knowledge, skills and abilities of the State staff are shared with co-workers thereby enhancing service continuity.

As part of the marketing strategy for the CSSP, the Department developed a Staff Expertise Survey to identify the experiences and unique skills of State staff.  The survey was conducted in December 2015 for all DC/CF employees to query the specialized services offered at each DC/CF.  In addition, CSSP marketing materials, such as brochures, FAQs and a PowerPoint presentation, have been updated and are available on the DDS website at http://www.dds.ca.gov/DevCtrs/DCInitiatives_Community.cfm. Education and outreach materials on the CSSP will continue to be refined for clarity and to address common questions and concerns for both employees and potential contractors.  The Department continues to assess the feasibility of potential incentives or process enhancements that could assist in improving participation in the program and will work to schedule additional trainings on the CSSP for interested parties.

## Opportunities at Other DCs

Job opportunities at other DCs will be much more limited as time passes.  Some opportunities will become available at the PDC STP and at Canyon Springs CF in the future, and DC employees have the opportunity to apply for these positions, as desired. Also, transfer rights may be negotiated through the collective bargaining process related to closure discussions.  When appropriate, the Department will implement a Department Restrictions of Appointments (DROA) process during closure, which would provide hiring priority for DC employees for advertised departmental vacancies.  Internal Department transfers provide two important benefits:  employees remain in the development disabilities service system; and there is some flexibility to manage transfer dates so that critical staff remains at the DC during closure.

## Opportunities at Other State Departments

It is expected that a number of DC employees, especially those in non-nursing positions, will find opportunities for future employment by exploring positions in other State departments.  Employees who wish to pursue these options will be assisted in the following ways:

- **Surplus Status.**  Following legislative approval of this plan and CalHR approval of the Staff Reduction plan, DC employees with permanent status become eligible for "surplus status," which will afford them many of the same benefits as the State Restriction of Appointments (SROA) program described below.  With "surplus status" a DC employee has hiring priority when applying for advertised vacancies in any classification for which the employee is eligible for lateral transfer.

- **State Restriction of Appointments.** Once the Department has submitted and received approval from CalHR on a formal Staff Reduction plan related to the closure of a DC, employees will be eligible to participate in the SROA process. Any State department that receives applications for an advertised vacancy from SROA candidates who are either in that job classification or eligible for consideration as a lateral transfer, is required to consider SROA candidates before promotional candidates or another candidate who does not have SROA status. A non-SROA candidate may only be hired over someone with SROA status in rare circumstances where specialized knowledge to perform the job is required and approval is granted by CalHR. Employees are guaranteed a minimum of 120 days of SROA status prior to layoff, but it may be longer with CalHR approval. DDS will be engaged in discussion with CalHR for possible flexibility in the layoff process to ensure the safety of the consumers is considered as the number one priority.

## Private Sector Opportunities

In line with suggestions from DC employees, opportunities will be provided for interested employees to learn about transferring to the community service system as non-state community service providers. In partnership with local RCs, the Department will sponsor meetings that provide DC employees with information regarding service needs, resources and the process for becoming a RC vendor. Additionally, opportunities to become a RC employee will be shared.

## EMPLOYEE CAREER CENTER

A Career Center will be established at each DC to provide personal support for each employee, assist them as needed in identifying their future interests, and equip them with knowledge to successfully achieve their goals. The Career Center will be accessible to staff on all shifts and provide activities that will include:

- RC presentations on various opportunities for serving individuals with developmental disabilities in community settings, and related requirements;

- Individual and group career counseling and planning sessions;

- Special speakers on topics of interest;

- Training to support the development of new job skills and certifications identified as necessary in the community such as Certified Nursing Assistant and Direct Support Professional training programs;

- Workshops on topics such as interviewing techniques and resume writing;

- Computer access for job searches and online application submission, including instructions on how to save application information to facilitate applying for many different positions without having to re-enter application information every time;

- Up-to-date lists of job opportunities within the State, counties, cities, and RC systems and the local areas;

- Informational sessions on finding and taking exams with other State agencies and navigating the State job market utilizing the DROA process, the SROA process, and transfer and reemployment eligibility;

- The State layoff process and procedures;

- Coordination of job fairs for prospective employers of DC employees;

- Retirement and benefit workshops in collaboration with California Public Employees' Retirement System (CalPERS); and

- Personnel-related Question and Answer sessions.

**EMPLOYEE ACCESS TO INFORMATION**

It is recognized that accurate and timely communication throughout the closure process is essential.  Communications within all levels of the DC organization will take place to ensure that all employees are kept informed about progress on the closure and about available job opportunities.  Throughout the closure process, the Department and the management team at each DC review potential additional avenues for effective communication.  In addition to the information that is available to employees through the Career Center, other key methods of communications with DC employees will occur, including:

**Employee Newsletter:**  Employee newsletters or bulletins will be utilized at both DCs throughout the closure process to keep employees informed of current information.  Although different at each DC, they typically include updates on the closure, recognition of staff, employee events and community happenings, announcements and other related items of interest.  The frequency of the newsletter is monthly, but can be increased, as appropriate, to ensure timeliness of important information.  Additionally, the newsletter may be supplemented by hardcopy mailers, and time sensitive information may be distributed by special email alerts.

**Employee Meetings:**  A consistent schedule of general employee meetings, at varied times to meet the needs of all shifts, will be established.  These general employee meetings provide staff with regular access to DC management for information sharing and support.  Closure information will also be shared and discussed at the Governing Body/Executive Team meetings.  Information is then shared with the DC staff by their managers and supervisors, through meeting minutes, and/or through brown bag lunch events for employees.  Additionally, regular meetings are held with employee organization representatives where questions are posed and answered, concerns are brought forward, and information is shared.

**Management Rounds:**  The DC management team members conduct residence and department rounds on all shifts, which allow employees to share any comments or

concerns, and ask questions related to the progress of the closure.  Answers to questions that are of broad interest will be made available to all employees.

**Websites:**  Each DC will provide closure information for its employees on the DC intranet for access at any time.  A dedicated webpage addressing the DC closures has been established on the DDS website at http://www.dds.ca.gov/DevCtrs/, where, by clicking on the photo of the DC you would like more information about, you are directed to a "Closure News and Updates" page specific to each DC.  There will be a direct link to the appropriate dedicated webpage on each DC's intranet to ensure easy access for employees.

**Marquee:**  Both FDC and PDC will utilize marquee signage at the entrance of each DC to post announcements.

## STAFF SUPPORT ADVISORY GROUP

The Department recognizes the importance of retaining experienced staff at the facility throughout the closure process.  To support the Department's goal of ensuring adequate staffing and to assist DC employees in developing personal plans for their futures, the Department will convene a Staff Support Advisory Group (SSAG).  This advisory group will include representatives of DC employee groups and management, DDS, and related BUs.  The advisory group will help ensure continuity of staffing, that activities discussed in this section meet the needs of employees, and assist in identifying morale-boosting activities that encourage camaraderie among the staff as the closure process proceeds.

## FOSTER GRANDPARENTS AND SENIOR COMPANIONS

Important services are provided to residents of each DC through Senior Corps, a Federal grant program administered by the Corporation for National and Community Service that pairs volunteer Foster Grandparents and Senior Companions with persons in need of comforting, companionship and mentoring.  As of December 1, 2015, 184 residents at FDC were receiving services from 38 Foster Grandparents and 54 Senior Companions.  At PDC, 128 residents were receiving services from 23 Foster Grandparents and 41 Senior Companions.

The Foster Grandparents and Senior Companions are low-income senior citizens who are recruited from the community and paid a small stipend.  Combined with extensive training and supervision, they bring their knowledge, skills and experience to the role, serving an average of four hours per day at FDC and an average of five hours per day at PDC.  The Foster Grandparents and Senior Companions help in the classroom, take residents on outings, and participate in special events such as birthdays and holidays.

Although they are not state employees, the Foster Grandparents and Senior Companions are an integral part of the DC community.  They will be kept informed of the DC closure status and future opportunities that may exist for them to continue to serve DC consumers when they transition to the community.  Establishing a RC sponsor to administer the Foster Grandparent and Senior Companion Program in the community will also be explored as part of the DC closure process.

## EMPLOYEE INFORMATION FOR FAIRVIEW DEVELOPMENTAL CENTER

### Employee Characteristics

A summary of FDC employee characteristics is provided in the following table and selected information is described in the narrative.

| Fairview Employee Characteristics | | | |
|---|---|---|---|
| **TOTAL** | | **01/08/16** | |
| | | **# OF STAFF** | **% OF STAFF** |
| | | **983** | **100%** |
| **Gender** | Male | 410 | 42% |
| | Female | 573 | 58% |
| **Ethnicity** | American Indian | 2 | 1% |
| | Asian | 172 | 17% |
| | Black/African American | 78 | 8% |
| | Filipino | 197 | 20% |
| | Hispanic | 262 | 26% |
| | White | 250 | 25% |
| | Pacific Islander | 6 | 1% |
| | Other | 16 | 2% |
| **Age** | Under 43 | 208 | 21% |
| | 43 – 50 | 266 | 27% |
| | 50+ | 509 | 52% |
| ***Work Status** | # OF TOTAL STAFF @ FDC | 983 | |
| | Permanent Full-Time | 927 | 94% |
| | Permanent Part-Time | 35 | 3% |
| | Permanent Intermittent | 5 | 1% |
| | Temporary/Limited-Term | 10 | 1% |
| | Retired Annuitant | 6 | 1% |
| **Classification** | Direct Care Nursing | 451 | 46% |
| | Level-of-Care Professional | 61 | 6% |
| | Non-Level-of-Care/Administrative Support | 471 | 48% |
| **Years of Service** | 10 Years or Less | 267 | 27% |
| | 11 - 20 Years | 478 | 49% |
| | 20 Years or More | 238 | 24% |
| **Residency (list all counties where employees live)** | Kern | 1 | 0% |
| | Los Angeles | 134 | 14% |
| | Orange | 722 | 73% |
| | Riverside | 62 | 6% |
| | Sacramento | 1 | 0% |
| | San Diego | 6 | 1% |
| | San Bernardino | 55 | 6% |
| | Tulare | 1 | 0% |
| | Ventura | 1 | 0% |

**Time Base and Years of Service.**  As of January 2016, there were 983 employees at FDC.  Of these employees, 94% are full-time, 4% are part-time, and the remaining 2% are intermittent, temporary, or limited-term employees.

Twenty-seven percent (27%) have worked at FDC for ten years or less.  Forty-nine percent of the staff has been employed at the facility between 11 and 20 years.  The remaining 24% have worked at FDC for 20 years or more.

**Demographics**.  Fifty-eight percent of the workforce is made up of women.  Fifty-two percent of the total workforce is 50 years of age or older, 27% of employees are between 43 and 50 years of age, and 21% of employees are under 43 years of age.

Employees at FDC are from diverse ethnic backgrounds.  The number of employees who identify themselves as Hispanic represents 27% of the workforce.  The next most predominant group, representing 25% of the workforce is Caucasian.  Following in descending order, 20% of the employees are Filipino, 17% are Asian, 8% are Black/African American and the remaining 3% are American Indian, Pacific Islanders and Other.

**Classifications**.  A wide range of employees and classifications provide services to people residing at FDC, as reflected in the table on the following page.

The classifications fall into one of the following three categories:

> **Direct Care Nursing:**  The direct care nursing staff makes up 46% of the workforce and includes those employees who are assigned to shifts and fulfill required staffing minimums for providing direct care services to the men and women residing at FDC.  These employees are primarily registered nurses, psychiatric technicians, psychiatric technician assistants, and trainees or students.

> **Level-of-Care Professional:**  The level-of-care professionals make up 6% of the total workforce and include physicians, rehabilitation therapists, social workers, teachers, physical and occupational therapists, respiratory therapists, vocational trainers, and others who also provide a direct and specialized service for the consumers at FDC but are not in classifications included in the direct care nursing minimum staffing ratios.

> **Non-Level-of-Care and Administrative Support:**  The remaining 48% of the workforce includes those who are in non-level-of-care nursing positions but provide other direct services to consumers and also administrative support.  This category includes dietary employees such as cooks and food service workers, plant operations staff, clerical support, personnel and fiscal services employees, health and safety office staff, quality assurance reviewers, and all facility supervisors and managers.

## FDC Employee Classifications and BUs

| Classification | BU | # of EE's | Classification | BU | # of EE's | Classification | BU | # of EE's |
|---|---|---|---|---|---|---|---|---|
| A COORD NUR SVS | S17 | 5 | FOOD SVS TECH II | R15 | 10 | PROP CONT I | R04 | 1 |
| A DIR OF DIETETICS | S19 | 2 | GROUNDSKEEPER | R12 | 4 | PROTESTNT CHAPLAIN | R19 | 1 |
| A TECHNLGY SP | R20 | 4 | H GEN SVS ADM II | S01 | 1 | PSY TECH INSTRUCT | R18 | 1 |
| ACCOUNTING TECH | R04 | 3 | HEALTH REC TECH I | R04 | 2 | PSYCH TECH A | R18 | 107 |
| ACCT I/SP | R01 | 2 | HLTH REC T II SP | R04 | 3 | PSYCH/HF-CLINCIAL | R19 | 9 |
| ADMINISTRTV AST II | C01 | 1 | HLTH SVS SP | R17 | 14 | PSYCH/HF-EXPERIMEN | R19 | 0 |
| AS INFO SYS AN/SP | R01 | 1 | HOSPITAL WORKER | R15 | 5 | PSYCHIATRIC TECH | R18 | 215 |
| ASO GOVRL PROG ANL | R01 | 3 | IND PROG COORDNTR | R19 | 14 | PUB HEALTH NURSE I | R17 | 2 |
| ASO PERSONNEL ANLT | R01 | 1 | INFO SYS TC | R01 | 1 | RAD TECH | R20 | 2 |
| AST HOSPITAL ADMR | M01 | 1 | INVESTIGATOR | R07 | 5 | REGIS DIETITIAN | R19 | 3 |
| AUTO EQUIP OPER I | R12 | 7 | LAB REL ANLYST | E97 | 1 | REGISTERED NURSE | R17 | 75 |
| AUTOMOBILE MECHANC | R12 | 2 | LAUNDRY SUPVR II | S15 | 1 | REHAB TH ST F/ART | R19 | 1 |
| AUTOMTV POOL MGR I | S12 | 1 | LAUNDRY WORKER | R15 | 2 | REHAB TH ST F/MUSI | R19 | 8 |
| BARBERSHOP MANAGER | R15 | 1 | LEAD GROUNDSKEEPER | R12 | 1 | REHAB TH ST F/REC | R19 | 9 |
| BEAUTY SHOP MANAGR | R15 | 1 | LICENSED VOC NURSE | R20 | 14 | RESP CR PRACTNER | R20 | 8 |
| BLDG MAINT WORKER | R12 | 4 | LOCKSMITH I | R12 | 1 | RESP CR SUP | S20 | 1 |
| C.E.A. | M01 | 2 | MAT & STORES SP | R12 | 3 | SCHL BUS DRIVER | R20 | 1 |
| CARPENTER I | R12 | 3 | MD DIR/ST HOSP | M16 | 1 | SEAMER | R15 | 2 |
| CATHOLIC CHAPLAIN | R19 | 1 | MG SVS TECH | R01 | 2 | SEASONAL CLERK | R04 | 1 |
| CH OF PLANT OPR I | S12 | 1 | NURSE INST | R17 | 3 | SECRETARY | R04 | 1 |
| CH OF PLNT OPR III | S12 | 1 | NURSE PRACTITIONER | R17 | 3 | SER ASST FOOD | R15 | 1 |
| CLIN SOC WORK | R19 | 9 | NURSING COORDINATR | E48 | 1 | SER ASST HOSPITAL | R15 | 1 |
| CLINCL LAB TECHGST | R20 | 1 | NURSING COORDINATR | S17 | 1 | SHEET METAL WORKER | R12 | 1 |
| CLOTHING CENTR MGR | S15 | 1 | OCCUPTNL THERPS | R19 | 2 | SR ACCT OF/SUP | S01 | 1 |
| COM PRG SP I | R01 | 2 | OFF ASST/TYPE | R04 | 2 | SR MEDICAL TRANSCB | S04 | 1 |
| COM PRG SP II | R01 | 1 | OFF TECH (TYPING) | R04 | 30 | SR OCCU THERP | R19 | 1 |
| COM PRG SP IV | S01 | 1 | OFF TECHCN (GEN) | R04 | 1 | SR PERSNL SP | R01 | 1 |
| COOK SP II | R15 | 6 | PAINTER I | R12 | 3 | SR PSY TECH | R18 | 39 |
| COORD NUR SVS | M17 | 1 | PAINTER SUPERVISOR | S12 | 1 | SR PSYCH/HF/SP | R19 | 1 |
| COORD OF VOLUNT SV | S20 | 1 | PATIENT BEN&IN O I | S01 | 1 | SR PSYCH/HF/SUP | S19 | 1 |
| CUSTODN | R15 | 45 | PEACE OF I/DEV CT | R07 | 7 | ST INFO SYS AN/SP | R01 | 2 |
| CUSTODN SUP III | S15 | 1 | PEACE OF II/DEV CT | S07 | 1 | STAFF SER AN (GEN) | R01 | 5 |
| DENTAL ASSISTANT | R20 | 1 | PERSNL SP | R01 | 6 | STAFF SVS MANGER I | S01 | 2 |
| DENTIST | R16 | 1 | PERSNL SUP I | S01 | 0 | STAT ENG | R13 | 9 |
| DIGITL PRNT OP II | R14 | 1 | PERSNL SUP II | S01 | 1 | STDS COMP COORD | S01 | 4 |
| DIR OF DIETETICS | S19 | 1 | PEST CONTROL TECHN | R12 | 1 | STF PSYCHIATRST | R16 | 1 |
| DISPATCHER CLK SPR | S04 | 1 | PHARM SVS MGR | S19 | 1 | STF SVS MGR II/SUP | S01 | 1 |
| DSPATCHER-CLERK | R04 | 5 | PHARMACIST I | R19 | 4 | STOCK CLERK | R04 | 1 |
| ELECTRICIAN I | R12 | 3 | PHARMACY TECH | R20 | 4 | SUP CL LAB TECH | S20 | 0 |
| ENERGY RES SPEC I | R10 | 1 | PHY THERPS I | R19 | 3 | SUP REGISTERED NUR | S17 | 6 |
| EXEC SEC I | C04 | 1 | PHYSICIAN&SURGN | R16 | 9 | SUP SPEC INVEST I | S07 | 1 |
| FAC ENV AUD TECH | R15 | 1 | PLUMBER I | R12 | 3 | SUP SPEC INVEST II | S07 | 0 |
| FIRE FIGHTER | R07 | 1 | PLUMBER II | R12 | 1 | SUP/VOC SVS | S19 | 1 |
| FOOD SERV SUPVR I | S15 | 4 | PODIATRIST | R16 | 1 | SUPERVISING COOK I | S15 | 2 |
| FOOD SERV SUPVR II | S15 | 1 | PROG ASST DEV D PR | S18 | 5 | SUPERVISNG COOK II | S15 | 1 |
| FOOD SVS TECH I | R15 | 61 | PROG DIR DEV D PRG | M18 | 6 | SUPG HOUSEKEEPER I | S15 | 7 |
| | | | PROG TECH II | R04 | 1 | SUPVR OF BLDG TRDS | S12 | 1 |
| | | | | | | SVS A-CUSTODN | R15 | 14 |
| | | | | | | T/ST HOSP/ADULT ED | R03 | 4 |
| | | | | | | T/ST HOSP/S H D D | R03 | 4 |
| | | | | | | T/ST HOSP/SP DEV+C | R03 | 1 |
| | | | | | | TEACHING A | R20 | 13 |
| | | | | | | UNIT SUPERVISOR | S18 | 12 |
| | | | | | | VOC RES SP | R01 | 2 |
| | | | | | | WAREHOUSE MANAGR I | S12 | 1 |
| | | | | | | ⊞ | | 199 |

**Employee County of Residence**.  FDC employees primarily live in one of nine counties near FDC.  Seventy-three percent (73%) reside in Orange County, 14% in Los Angeles County, 6% in Riverside County, 6% in San Bernardino County and 1% in San Diego County.  Less than 1% of employees reside in a county other than the ones identified above.

**Specialized Services Provided by Employees of Fairview Developmental Center**

The Department recognizes the unique and specialized services provided at FDC. There are many professionals at FDC who have decades of experience in their field, specialized to persons with complex medical needs and behavioral supports, as well as maintaining FDC's facilities.  Some of the specialized services unique to FDC that are currently provided include:

- Customized equipment including specialized positioning devices by the rehabilitation engineering department staff;

- Specialized dentistry utilizing sedation by dentists experienced in working with people with developmental disabilities;

- Specialized health clinics that address the medical complexities and the complications that are attributed to physical abnormalities of persons with development disabilities; and

- Acute crisis behavior stabilization in the Southern STAR acute crisis home located at FDC.

A staff expertise survey was completed in December of 2015 to assist in identifying the unique skills, abilities, and specialized training that FDC staff members have acquired over the course of their careers.  Survey results indicate FDC's staff provide the following specialized services, among others:

- Crisis intervention;

- Wound care management;

- Orthotics management;

- Sensory integration;

- Administration of a residential program;

- Complex major medical support;

- Psychiatric intervention;

- Facilitation of person-centered planning with interdisciplinary teams; and

- Behavioral management.

**EMPLOYEE INFORMATION FOR THE PORTERVILLE DEVELOPMENTAL CENTER GENERAL TREATMENT AREA**

**Employee Characteristics**

A summary of the PDC GTA employee characteristics is provided in the table below and selected information is described in the following narrative.

| Porterville GTA Employee Characteristics | | | |
|---|---|---|---|
| **TOTAL - GTA** | | **01/21/16** | |
| | | **# OF STAFF** | **% OF STAFF** |
| | | **464** | **100%** |
| **Gender** | Male | 138 | 26% |
| | Female | 326 | 75% |
| **Ethnicity** | American Indian | 2 | 1% |
| | Asian | 11 | 2% |
| | Black/African American | 9 | 2% |
| | Filipino | 31 | 6% |
| | Hispanic | 223 | 48% |
| | White | 182 | 39% |
| | Pacific Islander | 1 | 1% |
| | Other | 5 | 1% |
| **Age** | Under 43 | 225 | 49% |
| | 43 – 50 | 61 | 13% |
| | 50+ | 178 | 38% |
| **\*Work Status** | **# OF TOTAL STAFF @ PDC GTA** | **464** | |
| | Permanent Full-Time | 444 | 96% |
| | Permanent Part-Time | 0 | 0% |
| | Permanent Intermittent | 0 | 0% |
| | Temporary/Limited-Term | 20 | 4% |
| | Retired Annuitant | 0 | 0% |
| **Classification** | Direct Care Nursing | 221 | 48% |
| | Level-of-Care Professional | 36 | 8% |
| | Non-Level-of-Care/Administrative Support | 207 | 44% |
| **Years of Service** | 10 Years or Less | 190 | 41% |
| | 11 - 20 Years | 180 | 39% |
| | 20 Years or More | 94 | 20% |
| **Residency (list all counties where employees live)** | Tulare | 464 | 100% |

**Time Base and Years of Service.**  As of January 2016, there were 464 employees at the PDC GTA.  Of these employees, 96% are full-time and the remaining 4% are intermittent, temporary, or limited-term employees.

Thirty-nine percent (39%) of the employees have been employed at the facility between 11 and 20 years and 41% have worked at the PDC GTA for ten years or less.  The remaining 20% have worked at PDC for 20 years or more.

**Demographics.**  Thirty-eight percent (38%) of the total workforce at the PDC GTA is 50 years of age or older,13% of employees are between 43 and 50 years of age, and 49% of employees are under 43 years of age.

Employees at the PDC GTA are from diverse ethnic backgrounds.  The number of employees who identify themselves as Hispanic represents 48% of the workforce.  The next most predominant group, representing 39% of the workforce is Caucasian. Following in descending order, 7% of the employees are Filipino, 2% are African-American, 2% are Asian and the remaining less than 1% are American Indian, Pacific Islanders and Other.

**Classifications**.  A wide range of employees and classifications provide services to people residing at the PDC GTA, as reflected in the table on the next page.

## PDC GTA Employee Classifications and BUs

| Classification | BU | # of EE's | | Classification | BU | # of EE's |
|---|---|---|---|---|---|---|
| CLIN SOC WORK | R19 | 2 | | SUPV. HK I | S15 | 2 |
| CLIN SOC WORK | R19 | 1 | | SUPV. HK I | S15 | 2 |
| LICENSED VOC NURSE | R20 | 5 | | CUSTODIANS | R15 | 22 |
| LICENSED VOC NURSE | R20 | 1 | | SERVICE ASST-CUST | R15 | 18 |
| MAINT&SRV OCCP TRN | R15 | 2 | | FOOD SRV TECH I | R15 | 43 |
| MAINT&SRV OCCP TRN | R15 | 4 | | FOOD SRV SUPV. I | S15 | 2 |
| NURSING COORDINATR | R17 | 1 | | TEACHER | R03 | 1 |
| NURSING COORDINATR | S17 | 1 | | TEACHER - SPEECH | R03 | 3 |
| OFF TECH (TYPING) | R01 | 4 | | VOC. INSTR-CULINARY | R03 | 1 |
| OFF TECH (TYPING) | R04 | 8 | | OFFICE TECH | R04 | 2 |
| PROG ASST DEV D PR | S18 | 2 | | STUDENT ASSISTANT | E | 1 |
| PROG DIR DEV D PRG | M18 | 2 | | PSYCHIATRIC TECH ASST | R18 | 13 |
| PROG DIR DEV D PRG | M18 | 1 | | UNIT SUPERVISOR | S18 | 1 |
| PSYCH TECH A | R18 | 6 | | SR. PSYCH TECH | R18 | 3 |
| PSYCH TECH A | R18 | 49 | | PSYCHIATRIC TECH | R18 | 28 |
| PSYCH/HF-CLINCIAL | R19 | 1 | | PROGRAM ASST | S18 | 1 |
| PSYCH/HF-CLINCIAL | R19 | 6 | | TEACHING ASSISTANT | R20 | 1 |
| PSYCH/HF-EDUCATION | R19 | 1 | | | | |
| PSYCHIATRIC TECH | R18 | 24 | | | | |
| PSYCHIATRIC TECH | R18 | 113 | | | | |
| REGISTERED NURSE | R17 | 21 | | | | |
| REGISTERED NURSE | R17 | 1 | | | | |
| REHAB TH ST F/MUSI | R19 | 1 | | | | |
| REHAB TH ST F/REC | R19 | 2 | | | | |
| REHAB TH ST F/REC | R19 | 3 | | | | |
| RESP CR PRACTNER | R20 | 5 | | | | |
| SOCIAL WORK ASSOC | R19 | 2 | | | | |
| SR OCCU THERP | R19 | 1 | | | | |
| SR PSY TECH | R18 | 9 | | | | |
| SR PSY TECH | R18 | 22 | | | | |
| STUDENT ASSISTANT | E | 2 | | | | |
| STUDENT ASSISTANT | E | 8 | | | | |
| UNIT SUPERVISOR | S18 | 2 | | | | |
| UNIT SUPERVISOR | S18 | 6 | | | | |
| *SUPERVISING RN* | S17 | 1 | | | | |
| *SUPERVISING RN* | S17 | | | | | |
| | | | | **Grand Total** | | *464* |

As with FDC, the classifications fall into one of the following three categories:

**Direct Care Nursing:**  The direct care nursing staff at the PDC GTA makes up 48% of the workforce and includes those employees who are assigned to shifts and fulfill required staffing minimums for providing direct care services to the men and women residing at the PDC GTA.  These employees are primarily registered nurses, psychiatric technicians, psychiatric technician assistants, and trainees or students.

**Level-of-Care Professional:**  The level-of-care professionals make up 8% of the total workforce and include physicians, rehabilitation therapists, social workers, teachers, physical and occupational therapists, respiratory therapists, vocational trainers, and others who also provide a direct and specialized service for the consumers at the PDC GTA, but are not in classifications included in the direct care nursing minimum staffing ratios.

**Non-Level-of-Care and Administrative Support:**  The remaining 44% of the workforce includes those who are in non-level-of-care nursing positions but provide other direct services to consumers, and also administrative support.  This category includes dietary employees such as cooks and food service workers, plant operations staff, clerical support, personnel and fiscal services employees, health and safety office staff, quality assurance reviewers, and all facility supervisors and managers.

**Employee County of Residence**.  All PDC GTA employees live in Tulare County.

**Specialized Services Provided by Employees of Porterville Developmental Center**

In addition to key services provided at SDC and FDC, the Department recognizes there are unique and specialized services provided at PDC that benefit both the STP and GTA.  Many professionals at PDC also have decades of experience in their field, specialized to persons with complex medical needs and behavioral supports, as well as to maintaining PDC's facilities.  Some of the specialized services unique to PDC that are currently provided include:

- Customized positioning equipment, alternative mobility devices, safety and behavioral equipment by the Biomedical Engineering department staff;

- Specialized dentistry utilizing sedation by dentists experienced in working with people with developmental disabilities;

- Specialized health clinics that address the medical complexities and the complications that are attributed to physical abnormalities of persons with development disabilities;

- Specialized health and respiratory services provided to individuals who are dependent on mechanical ventilation to assist in breathing and maintaining oxygenation; and

- An intense behavioral treatment program that specializes in social sexual treatment.

Additionally, a staff expertise survey was completed in December 2015 to assist in identifying the unique skills, abilities, and specialized training that the PDC GTA staff members have acquired over the course of their careers.  Survey results indicate the PDC GTA staff provide the following specialized services, among others:

- Physical and nutritional support services;

- Vocational instruction including upholstery skill training;

- Forensic and competency services;

- Life-skills training;

- Information technology expertise;

- Consultation on mental health and behavioral complexities; and

- Art therapy.

**PART 6:**
**FACILITY INFORMATION**


**FACILITY INFORMATION FOR FAIRVIEW DEVELOPMENTAL CENTER**

<u>General Description</u>

FDC is located on 114 acres of state-owned land in Orange County.  The center opened in 1959 and as of January 1, 2016, serves approximately 248 people with developmental disabilities.

FDC is one of four State-operated facilities within DDS and is a multi-disciplinary, service-oriented residential facility licensed by the CDPH.  FDC provides general acute care, skilled nursing care, intermediate care, and acute crises services to individuals with developmental disabilities.

Admissions to FDC require a court order and are limited to the Southern STAR acute crisis center for individuals requiring short-term treatment and stabilization in order to return to their home in the community.

Services provided within the FDC community occur on a continuum and include 24-hour health care supervision, a structured medical, nursing and social/behavioral environment, and a habilitation program designed to enhance their independence and life skills.  Services also include training in daily living, vocational skill development, leisure, academic advancement, communication, mobility, socialization and community integration.  Services are provided both on campus and in community integrated settings.

FDC's philosophy is that all human beings have value and are part of the wealth and richness of our human family.  People do not lose their inherent value because of a disability.  The men and women who live at FDC have strengths and abilities that make them the unique individuals they are.  Each individual living at FDC is provided a safe and nurturing environment where opportunities for growth, realization, self-expression and goal achievement are celebrated.  FDC strives to empower each individual to be as self-reliant as their skills, strengths, perseverance and abilities allow.

<u>History</u>

FDC officially opened on January 5, 1959, under the name of Fairview State Hospital. It is located in Costa Mesa, California, a city in Orange County.  Originally occupying 752 acres, FDC had an initial bed capacity of 2,622 and was intended to serve 4,125 residents.  The actual population peaked in 1967 at 2,700 and much of the original land was transferred in 1979 to the city of Costa Mesa.

FDC's campus is surrounded on three sides by a 36-hole golf course which was formerly part of the FDC campus and sold to the City of Costa Mesa.  Facilities that make up FDC include a work activity center, auditorium, park, recreational campsite and library.

**Leases**

FDC currently has nine active leases as follows:

| 1. | 2,240 sf. | Credit Union of Southern California – Land Lease |
|----|-----------|--------------------------------------------------|
| 2. | 39 acres | Fairview Management Co. – Harbor Village Apartments |
| 3. | 1,786 sf. | Regional Center of Orange County (Supported Living) |
| 4. | 2,826 sf. | Independent Options – Youth Crisis Homes |
| 5. | 1,786 sf. | Kids First Foundation – Crisis Intervention, Care, and Respite |
| 6. | 5 acres | City of Costa Mesa, Youth Practice; School Soccer Fields |
| 7. | 2,826 sf. | Kids First Foundation – Consumer Housing |
| 8. | 1,768 sf. | Employee Residential Housing; Mark Lane House 3 |
| 9. | 1,768 sf. | Employee Residential Housing; Mark Lane House 6 |

Some leases have expiration terms that currently run beyond 2018.  With the exception of the School Soccer Fields lease and the Harbor Village Apartments, the leases have short term notification requirements that allow either party to terminate the lease upon notice to the other.  Each lease will be evaluated for renewal or other use as part of the closure process.  As detailed in the "Mark Lane Homes" section on Page 80, DDS will work with DGS to explore the possibility of accommodating the consumers that reside in leased facilities (numbers 3, 4, 5, and 7, above) beyond the closure of FDC.

**Seismic Safety Deficits**

Buildings at FDC were reviewed during the seismic risk evaluations performed by the DGS under the State Building Seismic Program in 1994.  DGS structured its evaluation to identify the most significant buildings in terms of the population at risk and type of use. DGS assigned risk levels ranging from Level I to Level VII.  A building designated as 'Level I' is expected to have nearly perfect performance during an earthquake. 'Level VII' indicates buildings that are considered unsafe in their current condition (even without an earthquake) and should be vacated immediately.

All major buildings at FDC have been reviewed and have had seismic risk levels assigned.  A total of 53 buildings out of 116 were reviewed.  Risk levels were assigned for 28 buildings totaling 885,666 square feet (94% of square footage at FDC).  The results of the evaluation are as follows:

| Risk Level VII | 0 |
|----------------|---|
| Risk Level VI | 3 |
| Risk Level V | 4 |
| Risk Level IV | 13 |
| Risk Level III | 8 |
| Risk Level II | 0 |
| Risk Level I | 0 |

Twenty-five (25) buildings totaling 52,000 square feet (6% of square footage) have not had a risk level assignment. The evaluation was structured to identify the most significant buildings in terms of population at risk and type of use.  Smaller one-story structures were excluded due to funding limitations.  Where there are repetitive building types, only one unit was reviewed as representative of buildings of that type.

## 2012 Property Assessment Study

The most recent assessment of the FDC property was the DGS Infrastructure Study in 2012 performed by the DGS Real Estate Services Division (RESD).  This assessment includes an Infrastructure Capacity Assessment, which reviews sewers, water, gas, electricity and storm drainage systems.  Some of the recommendations from the infrastructure study include:

- **Mechanical:**  Replace all steam to heating hot water heat exchangers.  Replace all steam to domestic hot water heat exchangers with double wall instantaneous heaters inside Mechanical Rooms. This includes asbestos containing material abatement and re-insulation of all piping to be re-used and appurtenances in all mechanical rooms.  Replace all steel chilled water supply and return piping.

- **Electrical:**  Replace the Automatic Transfer Switch (ATS) for the emergency generators.  Replace the 125 volt DC batteries for Main switchgear operation.  Replace medium voltage main and feeder circuit breakers.  This project is currently underway and expected to be completed in 2016.

## Special Repairs and Other Major Projects

FDC has spent approximately $4.6 million in special repairs over the past five fiscal years, and additional funds have been used over the same period from support funds as well as its facility maintenance budget.  Special repair funds are prioritized to ensure the health and safety of FDC consumers and staff.  These repairs range from plumbing and roof replacement, to replacement of fire alarm systems, to renovation of living areas. Even with impending closure, there is still a need to address immediate issues that could affect the safety or health of those who live and work at the facility during the course of the closure process.  Currently, all projects are focused on sustaining the facility through closure.  Special repair projects and other projects for 2015-16 have been identified for FDC which include these vital needs:

- Emergency Power Electrical Switchgear.

- Boiler Burner Retrofit 1 and 2.

- Replace HVAC Chilled Water Coils and Pans (Reception and Treatment Building).

- Install Heavy Duty Doors, Electric Strikes and Locks (Buildings 36-39).

**Environmental Conditions**

An Environmental Site Assessment, which identifies areas of potential environmental concern such as the presence of hazardous materials and potential contamination sources, has not been completed.

**Community Housing**

**Harbor Village.**  Harbor Village is a 39 acre residential housing complex located on State land adjacent to FDC and is comprised of 564 units.  The complex offers both apartments and detached single-family homes.  The project was developed in the mid-1980s as a cooperative effort between the State and private developers.  The project provides specialized housing to consumers by leveraging State land assets via a long-term lease.  A full array of consumer housing options including ICFs, CCFs, Supported Living, and Independent Living units is provided.  The project enjoys support from DDS, the Regional Center of Orange County, local city officials, and a variety of parent and stakeholder advocacy groups.

Approximately 265 individuals with developmental disabilities reside at the complex in approximately 165 dwelling units (29% of the total units).  The project currently has a waiting list of several years for one-bedroom units.

The project provides several key benefits including, but are not limited to:  Affordable housing specifically designed to meet the needs of consumers in a difficult-to-serve region without cost to the State; long-term, stable housing opportunities for consumers and care providers; flexibility to adapt to changes in individual needs, trends in care provision practices, and revisions in DDS policy regarding service provision structure(s); and an ongoing source of funds to convert housing stock to individual consumer needs, subsidize housing costs, and support project requirements.

Additionally, community supports go beyond the simple subsidy of rent.  DDS managers work closely with consumer tenants, parents and other stakeholders, Regional Center of Orange County staff and managers, and local officials to ensure quality, efficient housing and housing services.  The project also provides a "community watch" program, after-hours security patrols, a complex newsletter, and a DDS-monitored consumer complaint resolution process.

DDS intends to continue to manage the lease through the current term and beyond. Therefore, this lease and the associated land will not be considered surplus upon closure of FDC.  The current Harbor Village lease expires in 2036 at which time the entire complex will revert to full State ownership.

**Shannon's Mountain.**  SB 82 (Chapter 23, Statutes of 2015), was passed in June 2015.  The bill added GC section 14670.36 which authorizes the development of up to an additional 20 acres of property within the grounds of FDC for the purposes of providing affordable housing for individuals served by the RCOC.  GC section 14670.36 requires that a minimum of 20 percent of the units developed be available and affordable to RCOC consumers.  The authorized lease shall be for a period not to exceed 55 years and include a provision for ongoing DDS oversight of the project.  The

development process is expected to be completed sometime after the closure of FDC. The 20 acres of land authorized under GC section 14670.36 will be retained by DDS after closure and developed to benefit individuals with developmental disabilities.

The City of Costa Mesa is processing a General Plan Update that will allow for the development of up to the 300 units on 12 acres within the FDC grounds.  However, final design elements will not be known until several preliminary analyses are completed, and it is not clear how this General Plan Update will affect development of Shannon's Mountain.

**Mark Lane Homes.**  There are ten residential units (six single family homes and two duplexes) within the grounds of FDC that are located on Mark Lane.  Six of the units are currently used to provide consumer housing and crisis services.  One of the consumer homes has tenants that have resided at the unit for more than 15 years.  The consumer housing units are leased to the RCOC, or to service providers that are vendorized through the RCOC.  Two of the units are currently rented to FDC employees through the facility's State Owned Housing Program and the remaining two units are utilized for FDC operations.  Because these units represent a valuable asset as long-term opportunities for consumer housing, DDS will work with DGS and Harbor Village management to explore the possibility of retaining the homes and the associated land, similar to Harbor Village units, beyond the closure of FDC.

## Utilities

Utility services including water, sewer, communications, natural gas, and electricity are provided through local providers and districts.

## FACILITY INFORMATION FOR THE PORTERVILLE DEVELOPMENTAL CENTER GENERAL TREATMENT AREA

## General Description

PDC, in Porterville, California, opened in 1953 and as of January 1, 2016, serves approximately 363 people with developmental and intellectual disabilities, approximately 171 in the GTA and 192 in the STP.

PDC is one of four State-operated facilities within DDS serving people with developmental disabilities.  PDC provides 24-hour residential services for individuals 18 years or older who have serious medical and/or behavioral problems for which appropriate services are not currently available through community resources.  PDC is licensed by the CDPH to provide general acute medical services, skilled nursing services, and intermediate care services.  Individuals are admitted on referral by one of the 21 RCs.

The majority of individuals served at PDC have an intellectual disability and many have severe chronic medical or behavioral problems.  Others require services within the STP. These individuals are in the mild to moderate range of intellectual disability, have come in contact with the legal system, have been determined to be a danger to themselves or

others and/or incompetent to stand trial, and have been determined by the court to meet the criteria requiring treatment in a secure area.

The mission of PDC is to provide personalized support and treatment programs to maximize the potential of the individual to achieve his/her preferred future, be responsive to the ever-changing needs of the people we serve, and build partnerships with our stakeholders.  Individualized supports are provided to advance each person's level of independence.  This is done by the ID Team, which includes the consumer, the family or legal representative, and PDC staff such as physicians, psychologists, nurses, psychiatric technicians, social workers, chaplains, rehabilitation and speech therapists, teachers, dietitians, and pharmacists.  The team develops an IPP using a person-centered planning process.  Services may include health care, education, work training, employment, self-help training, and preparation for independent living, as well as leisure activities, behavior management, and socialization skills development.

## History

PDC is located on about 670 acres in the foothills of the Sierra Nevada Mountains in Porterville, California, an agricultural city in Tulare County.  In 1945, the State purchased 1,245 acres of land for $62,850 for the future Porterville State Hospital.  The site was originally planned for the care and treatment of individuals with epilepsy, but was redesigned as a treatment center for "the mentally retarded."  Construction began in 1950 and on May 12, 1953, then Governor Earl Warren dedicated the Porterville State Hospital.  PDC admitted its first 200 consumers on June 3, 1953.  The total population reached its peak in 1957 with over 2,600 consumers.

In 1985, the facility was renamed Porterville Developmental Center by the Department to better reflect the purpose of the facility to care for individuals with developmental disabilities.  The STP was developed in 1997, upon the closure of Camarillo State Hospital and DC.  At that time, 200 consumers were transferred to the PDC STP.

In addition to home residences and training/work sites, the campus includes an auditorium, two gymnasiums and swimming pool complexes, athletic field, religious center, education complex, two cafes, crafts store, fashion center, police station, fire station, hospital, maintenance shops, and has its own water supply and power plant.  In November 2006, construction began for a 96-bed residential expansion in the STP.  The expansion included six 16-bed living residences, a recreation complex and a new reception building.  Construction was completed in October 2009.

## Leases

PDC currently has three active leases, as follows:

| 1. | 6,888 sf. | Porsh Benefit Inc. which covers two locations; Blue Heron Canteen (1,998 sf.) and Oasis Canteen (4,890 sf.). |
| 2. | 60 sf. | Safe 1 Credit Union |
| 3. | 207 sf. | Business Enterprise Program (BEP) Vending Machine |

The leases have various expiration terms that currently run beyond 2018.  With the exception of the BEP Vending Machine, the leases have short term notification requirements that allow either party to terminate the lease upon notice to the other. Each lease will be evaluated for renewal or other use as part of the closure process.

## Seismic Safety Deficits

Buildings at PDC were reviewed during the seismic risk evaluations performed by DGS under the State Building Seismic Program in 1994.  DGS structured its evaluation to identify the most significant buildings in terms of the population at risk and type of use. DGS assigned Risk Levels ranging from Level I to Level VII.  A building designated as 'Level I' is expected to have nearly perfect performance during an earthquake.  'Level VII' indicates buildings that are considered unsafe in their current condition (even without an earthquake) and should be vacated immediately.

All major buildings at PDC have been reviewed and have had seismic risk levels assigned.  A total of 39 out of 165 buildings were reviewed.  Risk levels were assigned for the 39 buildings that total 771,772 square feet (65% of square footage at PDC).  The results of the evaluation are as follows:

| Risk Level VII | 0 |
|---|---|
| Risk Level VI | 0 |
| Risk Level V | 0 |
| Risk Level IV | 5 |
| Risk Level III | 34 |
| Risk Level II | 0 |
| Risk Level I | 0 |

Sixty-one (61) buildings totaling nearly 218,000 square feet (22% of square footage) have not had a risk level assignment.  The evaluation was structured to identify the most significant buildings in terms of population at risk and type of use.  Smaller one-story structures were excluded due to funding limitations.  Where there are repetitive building types, only one unit was reviewed as representative of buildings of that type.

## 2012 Property Assessment Study

The most recent assessment of the PDC property was the DGS Infrastructure Study in 2012 performed by RESD.  This assessment includes an Infrastructure Capacity Assessment, which reviews sewers, water, gas, electricity and storm drainage systems. Some of the recommendations from the infrastructure study include:

- **Mechanical:**  Replace all steam to heating hot water heat exchangers.  Replace all steam to domestic hot water heat exchangers with double wall or instantaneous heaters including hot water tanks inside Mechanical Rooms. Replace all mechanical piping, valves, equipment and appurtenances as necessary in mechanical rooms for proper operations.  This includes asbestos-containing material abatement and insulation of all piping and appurtenances in mechanical rooms.

- **Electrical:** Replace select electrical feeders. Replace 3 manholes. Replace 15 oil filled cutout switches with vacuum interrupter switches. Remove overhead service to modular buildings. Replace overhead service to pump station/well field.

## Special Repairs and Other Major Projects

PDC has spent approximately $4.26 million in special repairs over the past five fiscal years, and additional funds have been used over the same period from its facility maintenance budget. Special repair funds are prioritized to ensure the health and safety of PDC consumers and staff. These repairs range from plumbing and roof replacement, to replacement of fire alarm systems, to renovation of living areas. Even with impending closure, there is still a need to address immediate issues that could affect the safety or health of those who live and work at the facility during the course of the closure process. Because the PDC STP area will remain open after the PDC GTA closes, there will be active special repairs, deferred maintenance and Capital Outlay projects at PDC necessary to maintain the health and safety of the residents and staff.

## Environmental Conditions

An Environmental Site Assessment, which identifies areas of potential environmental concern such as the presence of hazardous materials and potential contamination sources, has not been completed.

## Centralized Infrastructure and Support Facilities

PDC consists of two separate major treatment programs. As detailed in the opening paragraph of this Section, the first is commonly known as the GTA and the other as the STP. However, the two treatment areas share the majority of the utility infrastructure and support facilities. The majority of these support facilities will have to be retained as part of the ongoing operation of the STP.

Facilities to be retained by DDS in support of ongoing operations include, but are not limited to, the central boiler facility; back-up power plant; plant operations facilities; and school facilities including the gymnasium, recreation fields, and other appurtenances. Additional facilities to be retained will include the centralized laundry, warehouse facilities, and other associated support facilities such as the employee apartments and homes will also be retained for recruitment purposes.

The Administration Building, which houses both administrative support areas as well as medical and clinical functions, will also be retained to support ongoing operations.

## Utilities

Natural gas, electricity, sewer service, and electricity are provided through local providers and districts.

Domestic water is provided to the center though state owned facilities operated by center personnel. The water system is comprised of seven domestic water wells,

various storage tanks, pump stations, and water treatment facilities.  The facilities also include surface conveyance ditches and percolation ponds for aquifer recharge.

Of the approximate 670 acres that comprise the facility grounds, an approximate 345 acre portion contains the facility's well fields and percolation ponds.  This area is vital to the facility's water supply and flood protection.  Additionally, approximately 156 acres of the percolation area located to the south of Highway 190 and east of Blue Heron Parkway comprise the Yaudanchi Ecological Reserve.

## FACILITY INFORMATION FOR BOTH DEVELOPMENTAL CENTERS

Facility information that applies to FDC and PDC is described below.

## Infrastructure and Environmental Issues

**Vanir Study.**  In 1996, DDS began developing strategic plans to help guide decisions involving the future of the DCs.  To assist in developing strategic plan goals, the Department hired Vanir Construction Management, Inc. (Vanir), to conduct a system-wide Master Planning and Condition Assessment project.  Under that effort, PDC, along with the other DCs, underwent thorough land, infrastructure, seismic, and facilities assessments.  The Vanir study report was published in 1998 and included recommendations for corrections, by facility.  The report ended with a recommendation for system-wide renovations at a cost estimate of $986 million at that time.  This cost was less than the $1.469 billion (in 1998) for full system-wide facility replacement but only slightly more than the estimated cost for full code updates and corrections of $967 million, also estimated in 1998.  Costs today would be significantly higher due to inflation since the Master Planning and Condition Assessments were conducted approximately 20 years ago.  The Vanir report concluded that PDC's physical and functional condition, like the other DCs, was significantly inadequate to address the then-current, more modern codes to be structurally viable for the long term.  Site surveys and existing documentation were used to develop a database of obvious deficiencies and minimum corrections needed were identified.

While the report recommended very significant system-wide renovations, along with some programmatic improvements, it also concluded that with the magnitude of the cost investment, it would be prudent to explore other options for service delivery outside the DCs.  Faced with these cost estimates, along with the State's fiscal realities and the national trend away from the provision of services in congregate settings, funding became more readily available for increasing and strengthening the community service system, which has steadily decreased the population of DCs.  As the DC population has decreased, some of the older buildings needing the most expensive corrections have been closed.  In addition, vacant areas have been made available for training and activity space, freeing up some of the congestion on residences and allowing for greater privacy and room for personal possessions.

The Department has used the funds available to fix only the most serious deficiencies that could impact consumer health and safety, or major operations of the facilities, and has avoided large scale renovations or construction of new buildings.

## Fire and Safety and Residential Deficiencies

Both FDC and PDC have a large number of waivers granted in the late 1970s and early 1980s for variances to the 1967 building and life safety codes.  The understanding at the time was that gradually the waivered conditions would be remedied, either with building remodeling or replacement.  Due to the cost of such work, the DCs are still operating under these waivers today, many of which relate to the lack of required windows, exits, and corridors; problems with corridor and door widths for evacuation; problems with heating, ventilation and air conditioning return air ducts; and corridors used as return air plenums.  Any new construction on a DC site would likely necessitate full compliance with current codes.

## Americans with Disabilities Act Compliance

As Title II of the ADA applies to departments and agencies of a state, PDC is also subject to the provisions of Title II.  The nature of the facility operation is that staff members are highly involved in the day-to-day lives and activities of consumers with disabilities, and assisting persons with disabilities is a critical component in the care and treatment of this population.  In 2001, the Department entered into a contract with Carter & Burgess, Inc., in conjunction with National Access Consultants, LLC, to conduct surveys, assess physical barriers, prepare survey reports, and prepare Transition Plans to address the issues of facility accessibility for persons with disabilities, in accordance with requirements of the ADAAG and Title 24 of the CCR.  The survey areas included all portions of the buildings that are used by consumers, visitors, or the general public.  Areas that were primarily utilized by employees, such as central corridor staff restrooms in residence buildings and doors to staff offices, were analyzed.  Similarly, parking facilities, which are primarily utilized by staff and the public, were also examined.  Generally, ADA required maintenance and repairs have been requested and approved based on priority through the special repair process.  Some of the access compliance projects have been addressed and completed, but major work remains.

## Residential and Programmatic Space

There have been efforts over the years to repair, maintain and correct deficiencies in residential and programmatic spaces through special repairs and facility operations funding.  Some of the major functional limitations include the following:

- Congested bedrooms limiting space for care, storage and hence not meeting code requirements for size and privacy; some rooms have less than full-height walls and house up to four people per room.

- Insufficient electrical outlets, lighting, and inadequate voice/data outlets in nurse stations; medical units lack nurse call systems and adequate space for mobility and medical equipment and supplies.

- Bathing areas are too small for staff to easily maneuver and transfer consumers, work around tubs and toilets, use lifts and specialized equipment, and allow for storage of individual grooming and hygiene supplies.

- Space for separate and simultaneous consumer activities is unavailable in living units, therefore requiring the transportation of consumers to activities and training in older vacant buildings that were designed for other purposes and are not optimally configured.

**DISPOSITION OF DEVELOPMENTAL CENTER PROPERTY PROCESS**

Under the surplus property process, the Department reports the property to DGS as excess land.  DGS then determines if there is another state use for the property.  If DGS determines that there is no state need, the property is included in the annual omnibus surplus property bill.  After the Legislature has declared the property surplus through chaptered legislation, DGS takes the lead in determining the future use of the property and arranging for its sale, transfer, or disposition, in accordance with GC sections 11011 and 11011.1 concerning surplus state property.  The final disposition of the property may take several years to complete.

At PDC, because the STP portion of the facility will operate into the future, more facility planning efforts will occur before it can be determined if any land and/or facilities should be determined to be excess to the needs of the State.

Specific to FDC, the City of Costa Mesa is currently developing a General Plan Update that includes concepts for the property at FDC.  The planning process is expected to take several months to complete and will only affect portions of the property that are determined to be excess to the needs of the State.  The most recent version of the General Plan Update includes residential, recreational, and open space uses of the property.

**PART 7:**
**ATTACHMENTS**

1       Statutory Requirements for the Closure of a Developmental Center:
        W&I Code section 4474.1

2       November 30, 2015, Letter Announcing the Department's Intent to Submit
        Closure Plans for FDC and the PDC GTA by April 1, 2016

3       Comments from Stakeholders on the Closures of FDC and the PDC GTA
        (separately bound)

4       List of Stakeholders/Organizations Contacted

5       Calendar of DC Closure Activities

6       August 19, 2015, Memo from Santi J. Rogers, then Director of DDS, to Regional
        Centers Regarding the Statewide CSSP

**Attachment 1**

STATE OF CALIFORNIA
AUTHENTICATED
ELECTRONIC LEGAL MATERIAL

**State of California**
**WELFARE AND INSTITUTIONS CODE**
**DIVISION 4.1.   DEVELOPMENTAL SERVICES**
**PART 2.   ADMINISTRATION OF STATE INSTITUTIONS FOR THE**
      **DEVELOPMENTALLY DISABLED**
CHAPTER 1.   JURISDICTION AND GENERAL GOVERNMENT
**§ 4474**

———————————

4474.1.   (a)  Whenever the State Department of Developmental Services proposes the closure of a state developmental center, the department shall be required to submit a detailed plan to the Legislature not later than April 1 immediately prior to the fiscal year in which the plan is to be implemented, and as a part of the Governor's proposed budget. A plan submitted to the Legislature pursuant to this section, including any modifications made pursuant to subdivision (b), shall not be implemented without the approval of the Legislature.

(b)  A plan submitted on or before April 1 immediately prior to the fiscal year in which the plan is to be implemented may be subsequently modified during the legislative review process.

(c)  Prior to submission of the plan to the Legislature, the department shall solicit input from the State Council on Developmental Disabilities, the Association of Regional Center Agencies, the protection and advocacy agency specified in Section 4901, the local regional center, consumers living in the developmental center, parents, family members, guardians, and conservators of persons living in the developmental centers or their representative organizations, persons with developmental disabilities living in the community, developmental center employees and employee organizations, community care providers, the affected city and county governments, and business and civic organizations, as may be recommended by local state Senate and Assembly representatives.

(d)  Prior to the submission of the plan to the Legislature, the department shall confer with the county in which the developmental center is located, the regional centers served by the developmental center, and other state departments using similar occupational classifications, to develop a program for the placement of staff of the developmental center planned for closure in other developmental centers, as positions become vacant, or in similar positions in programs operated by, or through contract with, the county, regional centers, or other state departments, including, but not limited to, the community state staff program, use of state staff for mobile health and crisis teams in the community, and use of state staff in new state-operated models that may be developed as a component of the closure plan.

(e)  Prior to the submission of the plan to the Legislature, the department shall confer with the county in which the development center is located, and shall consider recommendations for the use of the developmental center property.

(f)  Prior to the submission of the plan to the Legislature, the department shall hold at least one public hearing in the community in which the developmental center is located, with public comment from that hearing summarized in the plan.

(g)  The plan submitted to the Legislature pursuant to this section shall include all of the following:

(1)  A description of the land and buildings at the developmental center.

(2)  A description of existing lease arrangements at the developmental center.

(3)  A description of resident characteristics, including, but not limited to, age, gender, ethnicity, family involvement, years of developmental center residency, developmental disability, and other factors that will determine service and support needs.

(4)  A description of stakeholder input provided pursuant to subdivisions (c), (d), and (e), including a description of local issues, concerns, and recommendations regarding the proposed closure, and alternative uses of the developmental center property.

(5)  The impact on residents and their families.

(6)  A description of the unique and specialized services provided by the developmental center, including, but not limited to, crisis facilities, health and dental clinics, and adaptive technology services.

(7)  A description of the assessment process and community placement decision process that will ensure necessary services and supports are in place prior to a resident transitioning into the community.

(8)  Anticipated alternative placements for residents.

(9)  A description of how the department will transition the client rights advocacy contract provided at the developmental center pursuant to Section 4433 to the community.

(10)  A description of how the well-being of the residents will be monitored during and following their transition into the community.

(11)  The impact on regional center services.

(12)  Where services will be obtained that, upon closure of the developmental center, will no longer be provided by that facility.

(13)  A description of the potential job opportunities for developmental center employees, activities the department will undertake to support employees through the closure process, and other efforts made to mitigate the effect of the closure on employees.

(14)  The fiscal impact of the closure.

(15)  The timeframe in which closure will be accomplished.

(Amended by Stats. 2015, Ch. 23, Sec. 5.  (SB 82)  Effective June 24, 2015.)

**Attachment 2**

STATE OF CALIFORNIA--HEALTH AND HUMAN SERVICES AGENCY                    EDMUND G. BROWN JR., Governor

# DEPARTMENT OF DEVELOPMENTAL SERVICES

1600 NINTH STREET, Room 240, MS 2-13
SACRAMENTO, CA 95814
TDD 654-2054 (For the Hearing Impaired)
(916) 654-1897



November 30, 2015

Dear Residents, Family Members, Representatives, Employees, Regional Centers and Other Interested Parties:

Our system of State-operated developmental centers is at a critical juncture in history. Beginning with the 2012 moratorium on admissions to developmental centers, and now faced with decertification and the loss of federal funding at the remaining developmental centers, California is undertaking the next step in the state's important endeavor to transform how services are delivered to individuals with significant service needs. Our focus today is to achieve the promises and vision of the Lanterman Developmental Disabilities Services Act, and empower the residents of the remaining developmental centers to make choices and receive the services and supports they need to lead more independent and productive lives in the least restrictive environment appropriate for their needs. The process will require careful planning, development of specialized community services and well-coordinated service delivery and oversight.

In the 2015 May Revision to the Governor's Budget, the Department of Developmental Services (Department) proposed to initiate closure planning for the three remaining developmental centers. Based on decertification actions at Sonoma Developmental Center (SDC) and the need to negotiate a settlement with the federal government to continue federal funding for a limited amount of time, the first priority was to prepare and submit the "Plan for the Closure of Sonoma Developmental Center" to the Legislature. The closure plan for SDC was submitted on October 1, 2015. Consistent with the final settlement agreement with the Centers for Medicare and Medicaid Services (CMS), the goal is to close SDC by the end of 2018. Materials related to the closure of SDC are available on the Department's website at http://www.dds.ca.gov/SonomaNews.

Decertification actions are also pending at Fairview Developmental Center (FDC) and the non-secure treatment portion of Porterville Developmental Center (PDC), referred to as the General Treatment Area (GTA). Settlement discussions with CMS are currently underway, and will likely follow a process similar to the one for SDC.

This letter announces the Department's intent to submit a closure plan for FDC and the PDC GTA to the Legislature by April 1, 2016. As anticipated by Welfare and Institutions Code section 4474.1, stakeholder input is critical to the development of the closure plan. The Department is initiating a closure planning process that reaches out to all interested

## "Building Partnerships, Supporting Choices"

November 30, 2015
Page two

stakeholders using various methods and forums, including meetings, opportunities to submit comments, and public hearings to receive testimony.  The Department will conduct independent stakeholder processes for each facility so that local interests are properly represented and clearly understood.  Significant activity to communicate with stakeholders will occur in early 2016.

I encourage you to refer regularly to the Department's website at http://www.dds.ca.gov/DevCtrs/DCClosures.cfm for the latest information for FDC and PDC.  It will be updated soon to identify email addresses for transmitting your input to the Department throughout the planning process.

The Department is very aware that closure of a developmental center will directly affect the lives of the residents, their families and representatives, the employees of the developmental center, the local community and numerous others.  Your involvement and feedback are essential to the development of the closure plan, and will guide Department policies and priorities going forward.  By working closely with you during the closure planning process and as closure progresses, we hope to achieve the best possible futures for the people living and working at the developmental centers.

Sincerely,

SANTI J. ROGERS
Director

# Attachment 3

## Written Input and Comments Received

Written input received by the Department to inform the April 1, 2016, Plan for the Closure of Fairview Developmental Center and the Porterville Developmental Center General Treatment Area is provided as a separately bound compilation of stakeholder comments and input.

The attachment includes emails received, written comments submitted at the public hearings, and comments or suggestions submitted online via the "Comment Submission" feature on the DDS website.

An electronic copy of Attachment 3 and the April 1, 2016, Plan for the Closure of Fairview Developmental Center and the Porterville Developmental Center General Treatment Area is available online via http://www.dds.ca.gov/DevCtrs/.

**Attachment 4**

**Attachment 4: STAKEHOLDERS/ORGANIZATIONS CONTACTED**
**December 2015 – March 2016**

Immediately following the announcement of the Department's intent to submit a closure plan for FDC and the PDC GTA, the Department began a process of informing and seeking input from all interested and involved stakeholders. This process took place in the form of face to face meetings, open forums, phone contacts, a scheduled public hearing and via email to obtain as much input as possible in the development of the plan. Below is a listing of individuals, agencies and organizations contacted by Department representatives during development of this closure plan.

Consumer Organizations and Individuals including:
- PDC Resident Council
- FDC Resident Council
- Consumers residing throughout California
- People First of California, Inc.
- DDS Consumer Advisory Committee

Parent Organizations and Individuals including:
- Fairview Family and Friends (FFF)
- PDC Families
- CASH/PCR

Employees and Employee Organizations including:
- FDC Employees
- PDC GTA Employees
- California Association of Psychiatric Technicians (CAPT)
- American Federation of State, County, and Municipal Employees (AFSCME)
- Service Employees International Union (SEIU)
- Union of American Physicians and Dentists (UAPD)
- California Statewide Law Enforcement Association (CSLEA)
- Association of California State Supervisor (ACSS)
- International Union of Operating Engineers (IUOE)
- Professional Engineers of California Government (PECG)

Local and State Government including:
- Senator Jean Fuller
- Senator John Moorlach
- Senator Andy Vidak
- Senator Janet Nguyen
- Assembly Member Matthew Harper
- Assembly Member Shannon Grove
- Legislative Policy and Budget Committee Staff
- Orange County Supervisor Lisa Bartlett, Chair
- Orange County Supervisor Michelle Steel
- City of Costa Mesa Council Member Gary Armstrong

**Page 96**

- City of Costa Mesa, Assistant Development Services Director, Claire Flynn
- Tulare County Supervisor Mike Ennis, Chair
- Tulare County Supervisor Allen Ishida
- Porterville Mayor Milt Stowe
- Porterville City Manager John D. Lollis

Provider and Advocacy Organizations:
- Disability Rights California (DRC)
- State Council on Developmental Disabilities (SCDD)
- Olmstead Advisory Committee
- California Disability Community Action Network (CDCAN)
- The ARC of California
- California Supported Living Network
- California Disability Services Association

Regional Center Organizations including:
- Association of Regional Center Agencies (ARCA)
- Eastern Los Angeles Regional Center (ELARC)
- Harbor Regional Center (HRC)
- North Los Angeles County Regional Center (NLACRC)
- Regional Center of Orange County (RCOC)
- South Central Los Angeles Regional Center (SCLARC)
- San Diego Regional Center (SDRC)
- San Gabriel/Pomona Regional Center (SGPRC)
- Central Valley Regional Center (CVRC)
- Kern Regional Center (KRC)
- Tri-Counties Regional Center (TCRC)
- Valley Mountain Regional Center (VMRC)

State Departments including:
- Department of State Hospitals
- Department of Social Services
- Department of Motor Vehicles
- Department of Veterans Affairs
- Department of Health Care Services
- Department of Public Health
- Department of Corrections and Rehabilitation
- Employment Development Department
- CalHR
- Department of General Services
- Department of Finance

# Attachment 5

| 2015 | January 2016 | February 2016 | March 2016 | April 2016 | May 2016 |
|---|---|---|---|---|---|
| **MAY 14, 2015**<br>DC Closures Proposed | **Governor's Budget Released by Jan. 10** | **Saturday, February 6**<br>Public Hearing @ FDC 10:00 a.m. to 5:00 p.m. | **TUESDAY, MARCH 1**<br>**Public Comment Due** | **FRIDAY, APRIL 1**<br>**Closure Plan Due** | **By MAY 14**<br>**May Revision Budget** |
| **OCTOBER 1, 2015**<br>SDC Closure Plan Submitted | **Friday, January 8**<br>Opportunity Fair @ SDC 10:30 – 1:00 pm in Gym | **Monday, February 8**<br>DDS Mtg. with SCDD | **Friday, March 4**<br>SDC QMAG Mtg. @NBRC | **Thursday, April 7**<br>Senate Budget Sub #3 on Health & Human Svcs | |
| **NOVEMBER 30, 2015**<br>Intent to Develop PDC GTA & FDC Closure Plan by 4/1/16 announced | **Saturday, January 9**<br>PHA Meeting @SDC 10:00 a.m. Wagner Bldg. | **Tuesday, February 9**<br>RTAG Mtg. @ SDC | **Tuesday, March 8**<br>SDC RTAG Mtg. - 2 pm<br>DDS @ SCDD Mtg. - 1pm | **Tuesday, April 12**<br>SDC QMAG Mtg. - 10am<br>SDC RTAG Mtg. - 2pm | |
| **December 11**<br>Employee Town Hall @ Fairview | **Sunday, January 10**<br>FFF Meeting @ Fairview 10:00 a.m. Gymnasium | **Wednesday, Feb. 10**<br>State CAC call to discuss closure plan input | **Thursday, March 10**<br>DDS Mtg. with CalHR | **Friday, April 15**<br>Quarterly Reporting Due to CMS | |
| **December 19**<br>Senator McGuire Town Hall @ SDC in the Gym | **Wednesday, January 13**<br>Employee Town Hall @ Porterville | **Friday, February 12**<br>Official opening of SDC Career Center | **Saturday, March 12**<br>PHA Legislative Mtg. 10:00 a.m. Wagner Bldg. | *2nd PDC Family Mtg. with DDS & RCs – Date TBD* | |
| | **Friday, January 15**<br>Quarterly Reporting Due to CMS | **Tuesday, February 16**<br>NBRC Family Mtg @ SDC<br>DDS Mtg. with DRC<br>Touring DSS (CCL) at SDC | **Wednesday, March 16**<br>Assembly Budget Sub #1 Hearing | | |
| | **Tuesday, January 19**<br>Sonoma RTAG Meeting | **Wednesday, Feb. 17**<br>RCOC Consumer Mtg. | **Thursday, March 17**<br>Touring DSS (CCL) at FDC<br>FDC Employee Mtg.<br>FDC Consumer Mtg. | | |
| | **Monday, January 25**<br>SDC RC Directors Mtg. Sacramento | **Tuesday, February 23**<br>Senate Hearing on DC Closures 1:30 pm | | | |
| | **Tuesday, January 26**<br>NBRC/PHA Family Mtg @ SDC | **Wednesday, Feb. 24**<br>FDC Consumers-10:15 am<br>FDC Employees-2 pm<br>FDC County & City-6 pm | **Monday, March 21**<br>PDC/DDS/RC Mtg. @PDC | | |
| | **Wednesday, January 27**<br>DDS Mtg. with Unions Sacramento | **Thursday, February 25**<br>PDC Employees - 2 pm | | | |
| | **Saturday, January 30**<br>Public Hearing at PDC 10:00 a.m. to 5:00 p.m. | **Friday, February 26**<br>PDC Co. & City - 10 am | **Wednesday, March 30**<br>SDC Clinic Tour for Sonoma Co. FQHC Reps | | **Monday, May 30**<br>*Memorial Day* |
| | **By the End of Jan. 2016**<br>"Soft Opening" SDC Career Cntr | **Saturday, February 27**<br>PDC Consumers-9:30 am<br>PDC Families-12:30 pm | **Thursday, March 31**<br>Cesar Chavez Day | | |

*Items shaded in light blue are DDS/DC events; lavender are CHHS events; light orange are Legislative events and light yellow are parent/family events.

# Attachment 6

**State of California**                                    **Department of Developmental Services**

# Memorandum

**Date:**      August 19, 2015

**To:**        REGIONAL CENTER EXECUTIVE DIRECTORS

**From:**      Office of the Director
               1600 9th Street, Room 240, MS 2-13
               Sacramento, CA  95814
               (916) 654-1897

**Subject:**   Community State Staff Program

In a recent June 4, 2015, letter, I discussed the closure of the remaining Developmental Centers (DC) and addressed the components that will be necessary to focus our efforts in achieving a successful closure plan for Sonoma Developmental Center (SDC).  Since it is critical that we work together to look for ways to support the men and women as they transition from the DCs into community-based services, I encourage you to seek information about the Community State Staff (CSS) Program and consider using it as a tool to promote natural transitions.  More information on the CSS Program can be found on the Department of Developmental Services (DDS) website at: http://www.dds.ca.gov/DevCtrs/DCInitiatives_Community.cfm.

The use of the CSS Program has extended the relationships of former DC consumers with their families to promote the continuity of care during and after the transition into the community.  The CSS Program also continues our partnership with consumers as they move to new settings.

The CSS Program coordinators listed below will be contacting your regional center soon and we hope you and your staff will take the opportunity to review the benefits of the CSS Program.  We look forward to working with each of you as we expand the CSS Program statewide.

If you have questions or need further information, please contact Northern Regional CSS Coordinator, Maggi Haller, at (916) 654-2420 or Maggi.Haller@dds.ca.gov or Southern Regional CSS Coordinator, Sandy Middleton, at (714) 668-7603 or Sandra.Middleton@fdc.dds.ca.gov.

SANTI J. ROGERS
Director

cc: Dwayne LaFon, DDS

### "Building Partnerships, Supporting Choices"

# PART 8:  GLOSSARY OF ACRONYMS

| Acronym | Definition |
|---|---|
| AB | Assembly Bill |
| ACRC | Alta California Regional Center |
| ACSS | Association of California State Supervisors |
| ADA | Americans with Disabilities Act |
| ADAAG | Americans with Disability Act Accessibility Guidelines |
| AFSCME | American Federation of State, County, and Municipal Employees |
| ARCA | Association of Regional Center Agencies |
| ARFPSHN | Adult Residential Facility for Persons with Special Health Care Needs |
| ATS | Automatic Transfer Switch |
| BEP | Business Enterprise Program |
| BU | Bargaining Unit |
| CAC | Consumer Advisory Committee |
| CalHR | California Department of Human Resources |
| CalPERS | California Public Employees' Retirement System |
| Canyon Springs CF | Canyon Springs Community Facility |
| CAPT | California Association of Psychiatric Technicians |
| CCF | Community Care Facility |
| CCH | Community Crisis Home |
| CCR | California Code of Regulations |
| CDCR | California Department of Corrections and Rehabilitation |
| CDER | Client Development Evaluation Report |
| CDPH | California Department of Public Health |
| CDSS | California Department of Social Services |
| CF | Community Facility |
| CHHS | California Health and Human Services Agency |
| CMF | Client Master File |
| CMS | Centers for Medicare and Medicaid Services |
| CPP | Community Placement Plan |
| CRA | Clients' Rights Advocate |

| Acronym | Definition |
|---|---|
| CSLEA | California Statewide Law Enforcement Association |
| CSSP | Community State Staff Program |
| CVRC | Central Valley Regional Center |
| DC | Developmental Center |
| DC Task Force | Health and Human Services Agency Task Force on the Future of Developmental Centers |
| DDS Task Force | Department of Developmental Services Task Force |
| DE | Delayed Egress |
| DE/SP | Delayed Egress/Secured Perimeter |
| Department or DDS | Department of Developmental Services |
| DGS | Department of General Services |
| DHCS | Department of Health Care Services |
| DOF | Department of Finance |
| DOR | Department of Rehabilitation |
| DRC | Disability Rights California |
| DROA | Department Restriction of Appointments |
| DSH | Department of State Hospitals |
| EBSH | Enhanced Behavioral Supports Home |
| EDD | Employment Development Department |
| ELARC | East Los Angeles Regional Center |
| FDC | Fairview Developmental Center |
| FDC/PDC GTA Closure Plan | Plan for the Closure of Fairview Developmental Center and the Porterville Developmental Center General Treatment Area |
| FDLRC | Frank D. Lanterman Regional Center |
| FFF | Fairview Family and Friends |
| FNRC | Far Northern Regional Center |
| GACH | General Acute Care Hospital |
| GC | Government Code |
| GF | General Fund |
| GGRC | Golden Gate Regional Center |
| GTA | General Treatment Area |

**Page 102**

| Acronym | Definition |
|---|---|
| Health Plans | Local Managed Care Health Plans |
| HRC | Harbor Regional Center |
| ICF | Intermediate Care Facility |
| ICF/DD-CN | Intermediate Care Facility/Developmentally Disabled-Continuous Nursing |
| ICF/DD-H | Intermediate Care Facility/Developmentally Disabled-Habilitative |
| ICF/DD-N | Intermediate Care Facility/Developmentally Disabled-Nursing |
| ID Team | Interdisciplinary Team |
| IHCP | Individual Health Care Plan |
| IHTP | Individualized Health Transition Plan |
| IPP | Individual Program Plan |
| IRC | Inland Regional Center |
| IUOE | International Union of Operating Engineers |
| KRC | Kern Regional Center |
| Lanterman Act | Lanterman Developmental Disabilities Services Act |
| Lanterman DC | Lanterman Developmental Center |
| NBRC | North Bay Regional Center |
| NCI | National Core Indicators |
| NF | Nursing Facility |
| NLACRC | North Los Angeles County Regional Center |
| OCRA | Office of Clients' Rights Advocacy |
| PDC | Porterville Developmental Center |
| PDC GTA | Porterville Developmental Center General Treatment Area |
| PDC STP | Porterville Developmental Center Secure Treatment Program |
| PECG | Professional Engineers of California Government |
| Plan | Plan for the Closure of Fairview Developmental Center and the Porterville Developmental Center General Treatment Area |
| POS | Purchase of Services |
| PRP | Porterville Regional Project |
| QMAG | Quality Management Advisory Group |
| QMS | Quality Management System |

| Acronym | Definition |
|---|---|
| RC | Regional Center |
| RCEB | Regional Center of the East Bay |
| RCOC | Regional Center of Orange County |
| Regional Project | Regional Resource Development Project |
| RESD | Real Estate Services Division |
| RFP | Request for Proposals |
| RTAG | Resident Transition Advisory Group |
| SARC | San Andreas Regional Center |
| SB | Senate Bill |
| SCCRCD | Southern California Conference of Regional Center Directors |
| SCDD | State Council on Developmental Disabilities |
| SCLARC | South Central Los Angeles Regional Center |
| SDC | Sonoma Developmental Center |
| SDRC | San Diego Regional Center |
| SEIU | Service Employees International Union |
| SG/PRC | San Gabriel/Pomona Regional Center |
| SLS | Supported Living Services |
| SROA | State Restriction of Appointments |
| SSAG | Staff Support Advisory Group |
| STAR | Stabilization, Training, Assistance and Reintegration |
| STP | Secure Treatment Program |
| TCRC | Tri-Counties Regional Center |
| TRM | Transition Review Meeting |
| UAPD | Union of American Physicians and Dentists |
| Vanir | Vanir Construction Management, Inc. |
| VAS | Volunteer Advocacy Services |
| VMRC | Valley Mountain Regional Center |
| W&I Code | Welfare and Institutions Code |
| WIOA | Workforce Innovation and Opportunity Act |
| WRC | Westside Regional Center |

**Subject:**                    RE: City of Costa Mesa et a. v. United States of America, et al.

**From:** Van Riper, Marianne <Marianne.VanRiper@coco.ocgov.com>
**Sent:** Tuesday, February 25, 2020 4:13 PM
**To:** daniel.beck@usdoj.gov; jonathan.eisenberg@doj.ca.gov
**Cc:** Jennifer L. Keller <jkeller@kelleranderle.com>; Nahal Kazemi <nkazemi@kelleranderle.com>; Page, Leon <Leon.Page@coco.ocgov.com>; Knapp, Laura <Laura.Knapp@coco.ocgov.com>; Shamel, Massoud <Massoud.Shamel@coco.ocgov.com>
**Subject:** RE: City of Costa Mesa et a. v. United States of America, et al.

Good Afternoon,

In addition to the questions posed in Dr. Quick's declaration, the County has the following additional questions which we would like the State and Federal government to address:

1)    Do you have a written operational plan that you will share with us?
2)    It is our understanding that Fairview Developmental Center will be receiving travelers who have tested positive for COVID-19.  Given that they have tested positive, is there considered to be no risk for these travelers to be exposed to each other?  Or will efforts be made to prevent contact between infected travelers? If so, what provisions are in place at Fairview Developmental Center to prevent contact between infected individuals?
3)    Addition to question j:  Who will conduct this cleaning and disinfection? Can CDPH/CDC share those plans with the Health Care Agency?
4)    How will potentially contaminated materials (such as PPE) be disposed of? A
5)    Addition to question p: How will staff who become symptomatic be cared for?  Will they be provided any medical assessment at Fairview, or transferred to local healthcare facilities?

Thank you,

Marianne Van Riper
Senior Assistant County Counsel
Office of the Orange County Counsel
(714) 834-6020 (direct work phone)
(714) 834-2359 (fax)
marianne.vanriper@coco.ocgov.com

*The information contained in this electronic mail transmission is confidential and intended to be sent only to the stated recipient of the transmission.  It may therefore be protected from unauthorized use or dissemination by the attorney-client and/or attorney work-product privileges.  If you are not the intended recipient or the intended recipient's agent, you are hereby notified that any review, use, dissemination, distribution or copying of this communication is strictly prohibited.  You are also asked to notify us immediately by telephone and to delete this transmission with any attachments and destroy all copies in any form.  Thank you in advance for your cooperation .*

**From:** Van Riper, Marianne
**Sent:** Tuesday, February 25, 2020 9:44 AM
**To:** 'daniel.beck@usdoj.gov' <daniel.beck@usdoj.gov>; 'jonathan.eisenberg@doj.ca.gov' <jonathan.eisenberg@doj.ca.gov>
**Cc:** 'jkeller@kelleranddderle.com' <jkeller@kelleranddderle.com>; 'Nahal Kazemi' <nkazemi@kelleranddderle.com>; Page, Leon <Leon.Page@coco.ocgov.com>; Knapp, Laura <Laura.Knapp@coco.ocgov.com>
**Subject:** City of Costa Mesa et a. v. United States of America, et al.

Good Morning Mr. Beck and Mr. Eisenberg,

I am a Senior Assistant County Counsel with the County of Orange.  I was in attendance during yesterday's hearing on the City of Costa Mesa's application for a TRO.  During the hearing, it was mentioned that the Fairview Developmental Center was "certified" sometime yesterday.  I am trying to get an understanding as to under what guidelines/authority such certification is granted.  Also, if you could send me the a copy of the actual certification and any documentation (applications, declarations, etc.) supporting the certification, I would greatly appreciate it.  I am hoping you will promptly volunteer this information/documentation to better assist the parties in compliance with the Court's Order that we opening discuss the outstanding issues in this matter.

I thank you in advance for your anticipated professional courtesy in this regard.


Marianne Van Riper
Senior Assistant County Counsel
Office of the Orange County Counsel
(714) 834-6020 (direct work phone)
(714) 834-2359 (fax)
marianne.vanriper@coco.ocgov.com


*The information contained in this electronic mail transmission is confidential and intended to be sent only to the stated recipient of the transmission.  It may therefore be protected from unauthorized use or dissemination by the attorney-client and/or attorney work-product privileges.  If you are not the intended recipient or the intended recipient's agent, you are hereby notified that any review, use, dissemination, distribution or copying of this communication is strictly prohibited.  You are also asked to notify us immediately by telephone and to delete this transmission with any attachments and destroy all copies in any form.  Thank you in advance for your cooperation .*