JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF COSTA MESA and KATRINA FOLEY, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA; THE DEPARTMENT OF HEALTH AND HUMAN SERVICES; THE UNITED STATES DEPARTMENT OF DEFENSE; THE UNITED STATES AIR FORCE; THE CENTERS FOR DISEASE CONTROL AND PREVENTION; THE STATE OF CALIFORNIA; FAIRVIEW DEVELOPMENTAL CENTER (FAIRVIEW); THE CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES, and THE CALIFORNIA DEPARTMENT OF GENERAL SERVICES, <br><br> Defendants. | CASE NO. 8:20-cv-00368-JLS-JDE <br><br><br> **ORDER (1) DISSOLVING TEMPORARY RESTRAINING ORDER (Doc. 9), (2) DENYING AS MOOT PLAINTIFFS' APPLICATION AND (3) DISMISSING ACTION** |

Before the Court is Plaintiffs City of Costa Mesa and Katrina Foley's Ex Parte Application for Temporary Restraining Order and Order to Show Cause re Issuance of Preliminary Injunction (the "Ex Parte Application"). (App., Doc. 4.)[1] The Federal Defendants and California Defendants each opposed.[2] (Fed. Opp'n, Doc. 13; CA Opp'n, Doc. 14.) Plaintiffs replied. (Reply, Doc. 19.) After considering the parties' briefs and all relevant papers, and having held a hearing on the matter, the Court DISSOLVES the temporary restraining order (Doc. 9), DENIES AS MOOT Plaintiffs' Application, and DISMISSES this action.

## I. BACKGROUND[3]

### A. Repatriation of United States Citizens and Need for Isolation Facilities

On February 17, 2020, the federal government repatriated United States citizens who were previously passengers aboard the Diamond Princess cruise ship, which was docked in Yokohama, Japan. (Ghaly Decl. ¶ 6, Doc. 14-1.) These passengers "had significant exposure to other individuals who tested positive for COVID-19." (*Id.* ¶ 7; *see also* Yeskey Decl. ¶ 9, Doc. 13-2.) Some repatriated passengers were flown to Travis Air Force Base ("Travis") in Fairfield, Solano County, California, while others were delivered to Lackland Air Force Base in Austin, Texas. (Ghaly Decl. ¶ 8.) As of February 22, 2020, 156 evacuees remained at Travis Air Force Base. (Yeskey Decl. ¶ 12.) Of those, sixty-seven were California residents. (*Id.*)

On February 18, 2020, USHHS notified its California counterpart, the California Health and Human Services Agency ("CHHS"), that the Department of Defense "would

---

[1] Plaintiffs filed an amended version of their Application (Doc. 4) after submitting their initial filing (Doc. 1).

[2] The Federal Defendants named in this action are the United States, the Department of Health and Human Services ("USHHS"), the United States Department of Defense, the United States Air Force, and the Centers for Disease Control and Prevention ("CDC"). The named California Defendants are the State of California, Fairview Developmental Center, the California Governor's Office of Emergency Services, and the California Department of General Services.

[3] The Court uses "COVID-19" to refer to the novel coronavirus first detected in Wuhan City, Hubei Province, China earlier this year.

2

not allow repatriated individuals who have tested positive or are symptomatic for COVID-19 to remain on military installations[.]" (Ghaly Decl. ¶ 9.) Those passengers would need to be housed elsewhere, in a location where they could be "isolated from others for approximately a month or until they have two negative tests [] one day apart" from each other. (*Id.*) USHHS also stated that individuals quarantined at Travis who test positive for COVID-19 but did not require hospitalization would be relocated to the Federal Emergency Management Agency Center for Domestic Preparedness in Anniston, Alabama, for their isolation period. (*Id.* ¶ 10.)

"[C]oncerned about the health risks of forcing [] California residents to relocate from California to Alabama for the duration of their isolation" given the ordeal that they had already endured aboard the Diamond Princess, and because many of the individuals are "over age 65 and have multiple chronic health conditions," CHHS began evaluating state-owned facilities within California where COVID-19 patients could be housed and observed during their isolation period. (*Id.* ¶¶ 10–11.)

### B. Selection of Fairview Developmental Center as Potential Isolation Site

On February 20, 2020, CHHS communicated to USHHS that California would offer the Fairview Developmental Center ("FDC") in Costa Mesa, California as an isolation facility for California residents who tested positive for COVID-19 but did not need hospital care, thereby obviating the need for them to travel "all the way to Alabama." (*Id.* ¶ 13; Mijic-Greene Email, Ex. A to Ghaly Decl., Doc. 14-1.) CHHS stated that "allowing CDC to have Californians who test positive for COVID-19 complete their isolation at Fairview would be the best means to safeguard public health in California." (Ghaly Decl. ¶ 18.)

On the evening of February 20, 2020, City of Costa Mesa Emergency Services Manager Jason Dempsey was contacted by Jim Acosta of the California Governor's Office of Emergency Services, who notified Dempsey that "buildings were being cleaned up by Sunday, February 23, 2020 because they might be placing 30 to 50 persons who are infected with [COVID-19] at FDC." (Dempsey Decl., Doc. 4-4 ¶ 2; Acosta-Dempsey

3

Email, Ex. to Dempsey Decl., Doc. 4-5.) Dempsey describes FDC as "dilapidated" and "not intended to house individuals infected with a highly contagious and deadly disease." (Dempsey Decl. ¶ 3.) Local officials claim they were not included in the site-evaluation process, provided any notice of FDC's impending use before February 20, 2020, or informed of the steps taken to ensure the public's safety during the facility's operation as an isolation site. (*See id.* ¶ 7.)

### C.     Initiation of Suit and Issuance of Temporary Restraining Order ("TRO")

On the evening of Friday, February 21, 2020, Plaintiffs initiated the instant lawsuit by filing their Ex Parte Application. They asserted therein that Defendants imminently planned to move 30 to 50 COVID-19 positive patients to FDC "without a proper assessment of the Fairview facility and without informing local government and public health officials of what [would] be done to protect" the local community. (App. at 2–4.) Plaintiffs argued that the condition of the facility as well as the lack of information or planning details shared with local officials meant that use of FDC as an isolation site posed an "imminent danger to [both] the [surrounding] community and to the individuals" that Defendants intended to isolate there. (*See id.*)

Based on the exigent circumstances presented in Plaintiffs' Ex Parte Application, the Court issued a narrowly tailored TRO late in evening of Friday, February 21, 2020. (TRO, Doc. 9) The Court did so only to maintain the status quo—*i.e.*, to ensure that an expedited hearing could be held on the matter on Monday, February 24, 2020 before any individuals would be relocated to FDC.

### D.     February 24, 2020 Hearing and Extension of TRO

On Monday, February 24, 2020, the Court held the scheduled hearing and heard arguments from both sides on whether the TRO should remain in place. Given the rapid pace at which this litigation had proceeded, one of the Court's principal goals at the hearing was to clearly establish the facts on which the dispute rested and to which the Court needed to apply the law. That goal proved difficult to achieve, as Defendants'

account of the situation changed and evolved over the course of the hearing[4] and they were unable to provide answers to certain fundamental questions about their plan with respect to FDC.

Based on the state of uncertainty at the hearing, the Court ordered the parties to hold a meeting with all relevant stakeholders, including Orange County officials, by the end of the week, to allow them to continue the discussions necessary to reach clarity or resolution of their impasse.  The Court also ordered the parties to submit a status report by Friday, February 28, 2020, at 5:00 p.m., apprising the Court of the results of their meeting.

The parties timely complied.  Shortly before 5:00 p.m. on Friday, February 28, 2020, Federal Defendants filed a "Notice of Mootness," informing the Court that they "have decided not to move forward with the challenged proposal" and asking the Court to "dissolve the temporary restraining order and dismiss th[e] action" as a result.  (Notice of Mootness at 2, Doc. 44.)  Minutes later, the parties filed their Joint Status Report, in which State Defendants echoed Federal Defendants' position, arguing (somewhat cryptically) that, "[b]ecause the situation has evolved, and because State public health officials have found new ways to confront that evolving situation, this case is now moot."[5]  (Joint Status Report at 18, Doc. 45.)

## II.   LEGAL STANDARD

"A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the parties lack a

---

[4] For instance, counsel for Federal Defendants represented during the hearing that the federal government was considering placing non-California residents at FDC, only to be contradicted by counsel for the State about twenty minutes later, after which counsel for Federal Defendants conceded that non-California residents would *not* be placed at FDC.  As another example, Defendants revealed for the first time at the hearing that the decision to transfer individuals to FDC had only been finalized on the morning of the hearing.

[5] The California Defendants claim that the TRO "deprived public health officials of a secure quarantine facility at a time when such a facility was badly needed, and has occupied key hospital resources in other counties at a time when those resources were needed for other patients." (Joint Status Report at 17–18.)  However, the Court notes that even when given the opportunity at the

5

1 legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91
2 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982) (per curiam)).  Under the
3 mootness doctrine a case becomes nonjusticiable "when it is impossible for a court to grant
4 any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 136
5 S. Ct. 663, 669 (2016) (quoting *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S.
6 298, 306 (2012)).  "[A] party must maintain a live controversy through all stages of the
7 litigation process." *Doe v. Madison Sch. Dist*. No. 321, 177 F.3d 789, 797 (9th Cir. 1999)
8 (citing *Di Giorgio v. Lee (In re Di Giorgio)*, 134 F.3d 971, 974 (9th Cir. 1998)).
9 Accordingly, in deciding whether subsequent acts have rendered a request for injunctive
10 relief moot, "the question is not whether the precise relief sought at the time the
11 application for an injunction was filed is still available.  The question is whether there can
12 be any effective relief." *Oregon Nat. Res. Council v. U.S. Bureau of Land Mgmt.*, 470
13 F.3d 818, 820 (9th Cir. 2006) (quoting *Nw. Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241,
14 1244–45 (9th Cir. 1988)).  "If an action or a claim loses its character as a live controversy,
15 then the action or claim becomes 'moot,' and we lack jurisdiction to resolve the underlying
16 dispute." *Doe*, 177 F.3d at 797–98.

## III. **DISCUSSION**[6]

19      In this case, each of Plaintiffs' asserted claims is moot.  This action was initiated by
20 an application for injunctive relief focused squarely on the potential transfer to Costa Mesa
21 of COVID-19-positive patients evacuated from the Diamond Princess cruise ship and
22 federally quarantined at Travis Air Force Base.  (*See* App. at 2, 7; Yeskey Decl. ¶¶ 12–24.)

---

hearing, California Defendants failed to provide facts showing that the FDC was a "secure quarantine facility" or that hospital facilities in other counties were being unduly burdened.

[6] The Court has received several applications requesting permission to submit amicus briefs. (Docs. 17, 21, 30, 33, 36, 41.)  "Whether to allow Amici to file a brief is solely within the Court's discretion, and generally courts have 'exercised great liberality.'" *Woodfin Suite Hotels, LLC v. City of Emeryville*, No. C 06-1254 SBA, 2007 WL 81911, at *3 (N.D. Cal. Jan. 9, 2007) (citations omitted).  In light of the public interest in the subject matter of the litigation, and the absence of any objection by Defendants, the Court grants the requests.

The Federal Defendants have affirmatively stated that the challenged transfer of evacuees is no longer being considered as "[t]he federal government has no plans to use the Fairview Developmental Center, or any other facility in Costa Mesa, to house individuals who have tested positive for COVID-19, and it has made other arrangements for the individuals previously proposed to be housed at Fairview."  (Notice of Mootness at 2; Yeskey Decl. ISO Notice of Mootness ¶ 3, Doc. 44-1.)  The California Defendants concur, stating that "[b]ecause the situation has evolved, and because State public health officials have found new ways to confront that evolving situation, this case is now moot."[7]  (Joint Status Update at 18.)  This significant development has rendered it impossible for this Court to provide "any effectual relief" to Plaintiffs, and has eliminated any "live" aspect of this controversy; thus the Court is deprived of jurisdiction to resolve the underlying dispute.

Specifically, this case was predicated on and concerned only a particular contemplated transfer of a group of individuals who were previously under federal quarantine at Travis Air Force Base.  In part because of "the imminent end of the quarantine period for those passengers, as well as the unexpectedly small number of passengers who have tested positive for COVID-19," (Joint Status Update at 17), that planned transfer to FDC is now unnecessary and has been explicitly abandoned.  (Notice of Mootness at 3.)  Accordingly, because Plaintiffs cannot reasonably expect to again be subjected to this asserted wrongdoing, and the challenged conduct cannot resume upon the issuance of this order, the mootness doctrine applies.  *See Alaska Ctr. For Env't v. U.S. Forest Serv.*, 189 F.3d 851, 854–55 (9th Cir. 1999) (explaining "capable of repetition, yet evading review" exception to the mootness doctrine); *Knox v. Serv. Employees Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012) (explaining voluntary cessation exception to the

---

[7] In the Parties Joint Status Update, the California Defendants note that "[t]he federal government has determined (as it informed the State today, Feruary 28, 2020) that it now does not need to use the Fairview Developmental Center site to maintain a federal quarantine of passengers from the Diamond Princess cruise ship."  (Joint Status Update at 17.)

7

1  mootness doctrine).  Instead, Plaintiffs assert the Court should allow this case to continue
2  because what Plaintiffs have really challenged is not the transfer of individuals from Travis
3  Air Force Base to FDC, but "a flawed, unreasonable decision-making process that wrongly
4  excluded county and local professionals and government leaders."  (Plaintiffs' Response to
5  Notice of Mootness at 1, Doc. 46.)  While that may be Plaintiffs' broad goal, it does not
6  reflect the narrow focus of this litigation, namely, the now-moot endeavor to prevent the
7  identified transfer.

## IV.  CONCLUSION

For the foregoing reasons, the Court DISSOLVES the temporary restraining order and DENIES AS MOOT Plaintiffs' Ex Parte Application.  Because Plaintiffs have not filed a complaint, this case's scope is confined to the injunctive relief sought in Plaintiffs' Ex Parte Application.  Having dissolved the temporary restraining order and found that Plaintiffs' claims for injunctive relief are all moot, the Court also DISMISSES the action.

DATED: February 28, 2020

_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE